# 15-3135(L)

## 15-3151(XAP), 22-1060(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

❖❖

EVA WALDMAN, REVITAL BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA, MINOR, BY HIS NEXT FRIEND AND GUARDIAN VARDA GUETTA, VARDA GUETTA, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFF OZ JOSEPH GUETTA, NORMAN GRITZ, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DAVID GRITZ, MARK I. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAMIE A. SOKOLOW, RENA M. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAIME A. SOKOLOW, JAMIE A. SOKOLOW, MINOR, BY HER NEXT FRIENDS AND GUARDIAN

*(Caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANTS

KENT A. YALOWITZ
AVISHAI D. DON
ARNOLD & PORTER KAYE
  SCHOLER LLP
250 West 55th Street
New York, New York 10019
(212) 836-8000

ALLON KEDEM
DIRK C. PHILLIPS
STEPHEN K. WIRTH
ARNOLD & PORTER KAYE
  SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000

*Attorneys for Plaintiffs-Appellants*

MARK I. SOKOLOW AND RENA M. SOKOLOW, LAUREN M. SOKOLOW, ELANA R. SOKOLOW, SHAYNA EILEEN GOULD, RONALD ALLAN GOULD, ELISE JANET GOULD, JESSICA RINE, SHMUEL WALDMAN, HENNA NOVACK WALDMAN, MORRIS WALDMAN, ALAN J. BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, YEHONATHON BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, BINYAMIN BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, DANIEL BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, YEHUDA BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, RABBI LEONARD MANDELKORN, KATHERINE BAKER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN, RICHARD BLUTSTEIN, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, LARRY CARTER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DIANE ("DINA") CARTER, SHAUN COFFEL, DIANNE COULTER MILLER, ROBERT L COULTER, JR., ROBERT L. COULTER, SR., INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JANIS RUTH COULTER, CHANA BRACHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ELIEZER SIMCHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ESTHER ZAHAVA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, KAREN GOLDBERG, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STUART SCOTT GOLDBERG/ NATURAL GUARDIAN OF PLAINTIFFS CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG,TZVI YEHOSHUA GOLDBERG, SHOSHANA MALKA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, TZVI YEHOSHUA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YAAKOV MOSHE GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YITZHAK SHALOM GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, NEVENKA GRITZ, SOLE HEIR OF NORMAN GRITZ, DECEASED,

*Plaintiffs-Appellants,*

UNITED STATES OF AMERICA,

*Intervenor-Appellant,*

—against—

PALESTINE LIBERATION ORGANIZATION, PALESTINIAN AUTHORITY, AKA PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY and or PALESTINIAN COUNCIL and or PALESTINIAN NATIONAL AUTHORITY,

*Defendants-Appellees,*

YASSER ARAFAT, MARWIN BIN KHATIB BARGHOUTI, AHMED TALEB MUSTAPHA BARGHOUTI, AKA AL-FARANSI, NASSER MAHMOUD AHMED AWEIS, MAJID AL-MASRI, AKA ABU MOJAHED, MAHMOUD AL-TITI, MOHAMMED ABDEL RAHMAN SALAM MASALAH, AKA ABU SATKHAH, FARAS SADAK MOHAMMED GHANEM, AKA HITAWI, MOHAMMED SAMI IBRAHIM ABDULLAH, ESATATE OF SAID RAMADAN, DECEASED, ABDEL KARIM RATAB YUNIS AWEIS, NASSER JAMAL MOUSA SHAWISH, TOUFIK TIRAWI, HUSSEIN AL-SHAYKH, SANA'A MUHAMMED SHEHADEH, KAIRA SAID ALI SADI, ESTATE OF MOHAMMED HASHAIKA, DECEASED, MUNZAR MAHMOUD KHALIL NOOR, ESTATE OF WAFA IDRIS, DECEASED, ESTATE OF MAZAN FARITACH, DECEASED, ESTATE OF MUHANAD ABU HALAWA, DECEASED, JOHN DOES, 1-99, HASSAN ABDEL RAHMAN,

*Defendants.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................... iii

INTRODUCTION .................................................................................1

JURISDICTION ....................................................................................5

ISSUES ..................................................................................................5

STATEMENT OF THE CASE ..............................................................5

SUMMARY OF ARGUMENT............................................................14

ARGUMENT .......................................................................................19

I. The Court Should Apply The PSJVTA In This Case ................................19

    A. This Court Has The Power To Salvage Jurisdiction .........................19

    B. The Court Should Exercise Its Power To Reinstate The District Court's Judgment ..................................................................22

        1. The Interest In Finality Favors Plaintiffs ..................................22

        2. The Interests Of Justice Favor Plaintiffs....................................25

    C. Reinstating the District Court's Judgment Would Demonstrate Fidelity To The Supreme Court's Mandate ...............33

II. Exercising Personal Jurisdiction under the PSJVTA Would Not Deprive Defendants Of Due Process.........................................................37

    A. The PSJVTA Meets Relevant Due Process Standards.....................38

        1. The PSJVTA Gave Defendants Fair Warning, Such That Their Conduct Was Knowing and Voluntary ..............................41

        2. The PSJVTA Is Reasonable In The Context Of Our Federal System.................................................................................43

        3. *Brown v. Lockheed Martin* Supports The PSJVTA's Constitutionality ..........................................................................46

    B. The District Court's Analysis Was Incorrect ....................................51

        1. *Hammond Packing*........................................................................51

        2. "Meaningful" Intentionality .........................................................53

i

3. "Obsolete" Supreme Court Cases ...............................................57

C. The *Fuld* Decision Is Unpersuasive ..................................59

CONCLUSION.............................................................................64

# TABLE OF AUTHORITIES

**Cases**                                                                 Page(s)

*ACLU v. Dep't of Def.*,
   543 F.3d 59 (2d Cir. 2008) ................................................................26

*Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*,
   817 F.3d 755 (Fed. Cir. 2016) ..........................................................39

*Agostini v. Felton*,
   521 U.S. 203 (1997)............................................................................59

*Andrus v. Charlestone Stone Prods.*,
   436 U.S. 604 (1978)............................................................................21

*Arizona v. United States*,
   567 U.S. 387 (2012)............................................................................45

*Armour Handcrafts, Inc. v. Miami Decorating & Design Ctr.*,
   99 A.D.2d 521 (2d Dept. 1984) ........................................................50

*Axel Johnson Inc. v. Arthur Andersen & Co.*,
   6 F.3d 78 (2d Cir. 1993) ....................................................................29

*B.K. Instrument, Inc. v. United States*,
   715 F.2d 713 (2d Cir. 1983) ..............................................................31

*Baltimore & Carolina Line v. Redman*,
   295 U.S. 654 (1935)............................................................................63

*Baltimore & Ohio R.R. Co. v. Harris*,
   79 U.S. (12 Wall.) 65 (1870)..............................................................58

*Banco Nacional de Cuba v. Farr*,
   383 F.2d 166 (2d Cir. 1967) ..............................................................35

*Bank of Columbia v. Okely*,
   17 U.S. (4 Wheat.) 235 (1819) ..........................................................63

*Bell v. Thompson*,
   545 U.S. 794 (2005)....................................................................29, 34

*Birchfield v. North Dakota,*
    579 U.S. 438 (2016).............................................................63

*Blodgett v. Holden,*
    275 U.S. 142 (1927)...............................................................3

*Bristol-Myers Squibb v. Super. Ct. of Cal.,*
    137 S. Ct. 1773 (2017) ...............................................45, 46

*Brown v. Lockheed Martin Corp.,*
    814 F.3d 619 (2d Cir. 2016) ...........................40, 46, 47, 48

*Brownlee v. Hospira, Inc.,*
    869 F.3d 509 (7th Cir. 2017).............................................35

*Bryant v. Ford Motor Co.,*
    886 F.2d 1526 (9th Cir. 1989)....................................19, 26

*Burnham v. Superior Court,*
    495 U.S. 604 (1990).............................................................57

*Calderon v. Thompson,*
    523 U.S. 538 (1998).............................................................19

*Carnival Cruise Lines, Inc. v. Shute,*
    499 U.S. 585 (1991).....................................................55, 56

*CGB Occupational Therapy, Inc.* v. *RHA Health Servs. Inc.,*
    357 F.3d 375 (3d Cir. 2004) ..............................................24

*Chicago Life Ins. Co. v. Cherry,*
    244 U.S. 25 (1917)...............................................................53

*City of New York v. Mickalis Pawn Shop, LLC,*
    645 F.3d 114 (2d Cir. 2011) ......................................42, 53

*College Sav. Bank v. Florida Prepaid Postsecondary Educ.*
    *Expense Bd.,*
    527 U.S. 666 (1999).............................................60, 61, 62, 63

*Colorado v. Connelly,*
    479 U.S. 157 (1986).............................................................41

iv

*In re Coudert Brothers LLP,*
809 F.3d 94 (2d Cir. 2015) ...................................................36

*Daou v. BLC Bank, S.A.L.,*
42 F.4th 120 (2d Cir. 2022)...................................................49

*Davis v. United States,*
643 Fed. App'x 19 (2d Cir. 2016) ....................................27

*Disabled Am. Veterans v. U.S. Dep't of Veterans Affairs,*
962 F.2d 136 (2d Cir. 1992) .............................................60

*Ditto v. McCurdy,*
510 F.3d 1070 (9th Cir. 2007).........................................35

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.,*
141 S. Ct. 1017 (2021) ...........................................*passim*

*Fuld v. Palestine Liberation Org.,*
578 F. Supp. 3d 577 (S.D.N.Y. 2022)....................*passim*

*Gamble v. United States,*
139 S. Ct. 1960 (2019) .......................................................44

*Gilmore v. Palestinian Interim Self-Governing Auth.,*
675 F. Supp. 2d 104 (D.D.C. 2009), *aff'd,*
843 F.3d 958 (D.C. Cir. 2016)...........................................30

*Gish v. Newsom,*
141 S. Ct. 1290 (2021) ......................................................35

*Gondeck v. Pan Am. World Airways, Inc.,*
382 U.S. 25 (1965)......................................................22, 28

*Gutierez v. Saenz,*
141 S. Ct. 1260 (2021) ......................................................35

*Hammond Packing Co. v. Arkansas,*
212 U.S. 322 (1909).....................................................51, 52

*Hampton v. Wong,*
426 U.S. 88 (1976)............................................................44

*Hawkins v. i-TV Digitalis Tavkozlesi zrt.*,
  935 F.3d 211 (4th Cir. 2019)........................................................39

*Hazel-Atlas Glass Co. v. Hartford Empire Co.*,
  322 U.S. 238 (1944)........................................................28

*Hazout v. Ting*,
  134 A.3d 274 (Del. 2016) ........................................................50

*Healy v. Beer Inst., Inc.*,
  491 U.S. 324 (1989)........................................................45

*Hess v. Pawloski*,
  274 U.S. 352 (1927)........................................................54

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010)........................................................44

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinée*,
  456 U.S. 694 (1982)........................................................*passim*

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945)........................................14, 38, 51, 58

*J. McIntyre v. Nicastro*,
  564 U.S. 873 (2011)........................................................44

*Jesner v. Arab Bank, PLC*,
  138 S. Ct. 1386 (2018) ........................................30, 31, 46

*Kerman v. City of New York*,
  374 F.3d 93 (2d Cir. 2004) ........................................................33

*Kiobel v. Royal Dutch Petroleum Co.*,
  133 S. Ct. 1659 (2013) ........................................................32, 46

*Klinghoffer v. Achille Lauro*,
  795 F. Supp. 112 (S.D.N.Y. 1992)........................................................25

*Lawrence v. Chater*,
  516 U.S. 163 (1996)........................................................37

*Linde v. Arab Bank, PLC,*
706 F.3d 92 (2d Cir. 2013) ...............................................................30

*Lingle v. Chevron U.S.A. Inc.,*
544 U.S. 528 (2005)..........................................................................40

*McGeshick v. Choucair,*
72 F.3d 62 (7th Cir. 1995)......................................................22, 23, 24

*Meacham v. Knolls Atomic Power Lab.,*
358 F. App'x 233 (2d Cir. 2009) .......................................................36

*Miller v. Angliker,*
848 F.2d 1312 (2d Cir. 1988) ...........................................................42

*Missouri v. McNeely,*
569 U.S. 141 (2013)..........................................................................63

*Morris v. Slappy,*
461 U.S. 1 (1983)........................................................................24, 30

*Mullaney v. Anderson,*
342 U.S. 415 (1952).....................................................................14, 20

*National Equipment Rental, Ltd. v. Szukhent,*
375 U.S. 311 (1964)...................................................................*passim*

*Newman-Green, Inc. v. Alfonzo-Larrain,*
490 U.S. 826 (1989)...............................................................2, 14, 20

*Oppel v. Empire Mut. Ins. Co.,*
92 F.R.D. 494 (S.D.N.Y. 1981).........................................................54

*Oregon v. Elstad,*
470 U.S. 298 (1985)..........................................................................41

*PennEast Pipeline Co., LLC v. New Jersey,*
141 S. Ct. 2244 (2021) .....................................................................61

*Pennsylvania Fire Ins. Co. of Philadelphia v. Gold Issue*
*Mining & Milling Co.,*
243 U.S. 93 (1917)............................................................................58

*Plaut v. Spendthrift Farm,*
514 U.S. 211 (1995)................................................................34

*Principality of Monaco v. Mississippi,*
292 U.S. 313 (1934)................................................................46

*Reno v. Flores,*
507 U.S. 292 (1993)................................................................59

*Republic of Austria v. Altmann,*
541 U.S. 677 (2004)................................................................25

*Richmond Newspapers, Inc. v. Virginia,*
448 U.S. 555 (1980)................................................................30

*Roell v. Withrow,*
538 U.S. 580 (2003)................................................................63

*Rogers v. Tennessee,*
532 U.S. 451 (2001)................................................................40

*Sargent v. Columbia Forest Prods., Inc.,*
75 F.3d 86 (2d Cir. 1996) ...........................................19, 26, 27, 28

*Schneckloth v. Bustamonte,*
412 U.S. 218 (1973)................................................................62

*In re Sealed Case,*
932 F.3d 915 (D.C. Cir. 2019).......................................................50

*Shatsky v. Palestine Liberation Org.,*
955 F.3d 1016 (D.C. Cir. 2020).....................................20, 41, 43, 56

*Sokolow v. Palestine Liberation Org.,*
138 S. Ct. 1438 (2018) ............................................................8

*Sosa v. Alvarez-Machain,*
542 U.S. 692 (2004)................................................................31

*South Dakota v. Neville,*
459 U.S. 553 (1983)................................................................63

*St. Clair v. Cox,*
  106 U.S. 350 (1882)................................................................58

*Tal v. Miller,*
  No. 97 Civ. 2275 (JGK), 1999 WL 38254 (S.D.N.Y. Jan. 27, 1999)..............28

*Taylor v. United States,*
  822 F.3d 84 (2d Cir. 2016) ........................................................28

*In re Terrorist Attacks on Sept. 11, 2001,*
  298 F. Supp. 3d 631 (S.D.N.Y. 2018)................................................21

*Thai-Lao Lignite (Thailand) Co. v. Lao People's Democratic
  Republic,*
  864 F.3d 172 (2d Cir. 2017) ......................................................28

*The Bremen v. Zapata Off-Shore Co.,*
  407 U.S. 1 (1972)...................................................................43

*In re Tribune Co. Fraudulent Conveyance Litigation,*
  946 F.3d 66 (2d Cir. 2019) ........................................................28

*Ungar v. Palestinian Auth.,*
  153 F. Supp. 2d 76 (D.R.I. 2001) ................................................25

*United Republic Ins. Co. v. Chase Manhattan Bank,*
  315 F.3d 168 (2d Cir. 2003) ...........................................2, 15, 20, 24

*United States v. Alabama,*
  362 U.S. 602 (1960)............................................................14, 21

*United States v. Genao-Sánchez,*
  525 F.3d 67 (1st Cir. 2008) .......................................................35

*United States v. Lentz,*
  383 F.3d 191 (4th Cir. 2004)......................................................35

*United States v. Lopez,*
  514 U.S. 549 (1995)................................................................61

*United States v. Morrison,*
  529 U.S. 598 (2000)................................................................38

ix

*United States v. Pink*,
  315 U.S. 203 (1942)......................................................................45

*United States v. Reyes*,
  49 F.3d 63 (2d Cir. 1995) ...........................................................33

*United States v. Wasylyshyn*,
  979 F.3d 165 (2d Cir. 2020) .......................................................38

*Universal Reins. Co. v. St. Paul Fire & Marine Ins. Co.*,
  312 F.3d 82 (2d Cir. 2002) ....................................................2, 24

*Waite v. All Acquisition Corp.*,
  901 F.3d 1307 (11th Cir. 2018)..................................................39

*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016) .................................................*passim*

*Waldman v. Palestine Liberation Org.*,
  925 F.3d 570 (2d Cir. 2019) .................................................*passim*

*Washington v. Glucksberg*,
  521 U.S. 702 (1997)......................................................................60

*Washington v. Superior Ct. of Wash.*,
  289 U.S. 361 (1933)......................................................................57

*Wellness Int'l Network v. Sharif*,
  575 U.S. 665 (2015)................................................................41, 63

*Wingate v. Gives*,
  725 F. App'x 32 (2d Cir. 2018) ..................................................27

**Federal Statutes**

15 U.S.C.
  § 3903(e) .......................................................................................50
  § 7216(d)(2) ..................................................................................50

18 U.S.C.
  § 2333.............................................................................................31
  § 2334(e) ........................................................................................8

21 U.S.C.
    § 360mm(d) ...........................................................................50
    § 968 ......................................................................................50

31 U.S.C. § 5318(k)(3) ...........................................................48

42 U.S.C. § 5411(e) ...............................................................50

46 U.S.C. § 40902(d) ............................................................50

47 U.S.C.
    § 325(e)(2) .............................................................................50
    § 413 ......................................................................................50

49 U.S.C.
    § 1324(a) ...............................................................................50
    § 13303(a) .............................................................................50
    § 30164(a) .............................................................................50
    § 46103(a) .............................................................................50

Anti-Terrorism Clarification Act,
    Pub. L. 115-253, § 4 (Oct. 3, 2018) ............................8, 9, 21

Promoting Security and Justice for Victims of Terrorism Act,
    Pub. L. 116-94, div. J, title IX, § 903 (Dec. 20, 2019) ..........*passim*
        § 903 ..................................................................................1, 10
        § 903(b) ..................................................................................3
        § 903(b)(4) ........................................................................10, 31
        § 903(b)(5) ........................................................................10, 31
        § 903(c) .................................................................................10
        § 903(d) ..................................................................................3
        § 903(d)(1)(A) ...................................................................10, 31
        § 903(d)(2) ...............................................................3, 10, 15, 21

Pub. L. 99-399, § 1202 (Aug. 27, 1986) ...............................24

Pub. L. 102-572, title X, § 1003(a)(4) (Oct. 29, 1992) ..........25

**State Statutes**

Del. Code, tit. 10,
  § 3114(a) ...............................................................................50
  § 3114(b) ...............................................................................50

N.Y. Bus. Corp. L. § 907(e)(2)(E) ...............................................50

**Rules**

Federal Rule of Appellate Procedure 36(a) ...........................................33

Federal Rule of Civil Procedure 12(h)(1) ............................................53

**Legislative Materials**

163 Cong. Rec. H9650 (Dec. 5, 2017) ...................................................45

164 Cong. Rec.
  H6617 (July 23, 2018) ..................................................................8
  S2926 (May 24, 2018) ...................................................................8
  S5103 (July 19, 2018) ..................................................................8

165 Cong. Rec. S7182 (Dec. 19, 2019) .......................................3, 15, 21

*The Constitution of the United States: Analysis and
  Interpretation*, S. Doc. No. 112-9 (2012 & Supp. 2020) ...................39, 61

H.R. Rep. No. 115-858 (2018) ................................................................8

**International Conventions**

International Convention for the Suppression of the Financing of
  Terrorism, 39 I.L.M. 268, https://bit.ly/ICSFT_Parties .............................32

International Convention for the Suppression of Terrorist
  Bombings, 2149 U.N.T.S. 256, https://bit.ly/ICSTB_Parties ......................32

**Books, Treatises & Articles**

Bryan A. Garner, *A Dictionary of Modern Legal Usage* (3d ed. 2011) ..........33

16 James Wm. Moore et al., *Moore's Fed. Prac.—Civil* (2020) ......................39

Jon O. Newman, *Decretal Language: Last Words of an Appellate Opinion*, 70 Brook. L. Rev. 727 (2005)............................................................35

Wendy Collins Perdue, *Aliens, the Internet, and "Purposeful Availment,"* 98 Nw. U. L. Rev. 455 (2004)......................................................46

Restatement (Second) of Conflict of Laws (1971)..............................................49

2 Ronald D. Rotunda & John E. Nowak, *Treatise on Const. L.* (5th ed. 2012 & Supp. 2022) ............................................................60

4 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* (4th ed.) ............................................................39

## INTRODUCTION

After a lengthy and fair trial, the jury in this case found that Plaintiffs and their loved ones were killed or injured in terror attacks carried out by Defendants' employees and agents acting within the scope of their official duties. This Court vacated the district court's judgment for lack of personal jurisdiction, holding that neither general nor specific personal jurisdiction is available in this case.

Since then, Congress has twice acted to provide for personal jurisdiction by consent, a traditional alternative to general jurisdiction and specific jurisdiction. After Congress passed the first of these statutes, this Court held that the statute did not apply and declined to recall its mandate. Congress then amended the law by enacting the Promoting Security and Justice for Victims of Terrorism Act (PSJVTA), Pub. L. 116-94, div. J, title IX, § 903 (Dec. 20, 2019), and the Supreme Court vacated this Court's judgment and remanded for further consideration of the case in light of the amended statute. This Court remanded to the district court, which correctly found that Defendants had met the PSJVTA's statutory terms by paying families of suicide terrorists who had killed and injured U.S. citizens after the statute's enactment, but incorrectly held that applying the statute would deprive Defendants of due process. The

case now returns to this Court. (Another case pending in this Court presents the same constitutional issue, with briefing scheduled to be complete on November 10, 2022, *Fuld v. Palestine Liberation Organization*, No. 22-76.)

This Court should recall the mandate, apply the PSJVTA in this case, and remand to the district court with instructions to reinstate its original judgment based on the jury's verdict. After final judgment, appellate courts are under an "imperative to salvage jurisdiction where possible." *Universal Reins. Co. v. St. Paul Fire & Marine Ins. Co.*, 312 F.3d 82, 89 (2d Cir. 2002). "Once a district court has proceeded to final judgment, considerations of finality, efficiency, and economy become overwhelming, and federal courts must salvage jurisdiction where possible." *United Republic Ins. Co. v. Chase Manhattan Bank*, 315 F.3d 168, 170 (2d Cir. 2003) (cleaned up).

Here, the imperative to salvage jurisdiction is especially strong, because Plaintiffs filed a backup complaint in the district court before the limitations period expired. In the absence of relief from this Court, the parties and the district court will simply restart the case from square one. Doing so would "impose unnecessary and wasteful burdens on the parties, judges, and other litigants waiting for judicial attention." *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 836 (1989).

In its prior decision, this Court stated that Congress did not "provide explicitly or implicitly that closed cases can be reopened." *Waldman v. Palestine Liberation Org.*, 925 F.3d 570, 575 (2d Cir. 2019) (*Waldman II*). Congress has now done so explicitly. The PSJVTA applies to any case "pending on or after" the day before this Court issued its decision that it lacked personal jurisdiction. PSJVTA § 903(d)(2). The law's co-sponsors explained that they intended to "empower" the Judiciary "to restore jurisdiction in cases previously dismissed for lack of jurisdiction." 165 Cong. Rec. S7182-83 (Dec. 19, 2019). The PSJVTA also expresses the sense of Congress that terror victims whose cases were dismissed for lack of personal jurisdiction should *not* be subjected to "unnecessary or protracted litigation" and states that the legislative purpose was "to provide relief for victims of terrorism." PSJVTA § 903(b), (d). In short, Defendants have now engaged in the specified conduct that signifies consent to personal jurisdiction, and Congress has empowered this Court to recall its mandate and has offered every indication that it should do so.

The district court's reasons for holding the statute unconstitutional fall far short of the clear showing of invalidity required to strike down an Act of Congress, "the gravest and most delicate duty that [the Judiciary] is called on to perform." *Blodgett v. Holden*, 275 U.S. 142, 147-48 (1927).

The exercise of jurisdiction under the PSJVTA meets the relevant due process principles for jurisdiction by consent, which require the statute to provide potential defendants fair warning of the conduct that will subject them to jurisdiction and to reasonably advance legitimate government interests within our federal system. This Court's holding that the minimum-contacts requirement was not met, *Waldman v. Palestine Liberation Org.*, 835 F.3d 317 (2d Cir. 2016) (*Waldman I*), is not germane here, because minimum contacts are not required for consent.

The district court did not address the fair notice and reasonableness standards, even though both the Government and Plaintiffs explained them. The district court did not adopt Defendants' theory, either. It advanced its own rationale, which misreads Supreme Court precedent and rests on a rudimentary error of logic. On a motion for reconsideration, the district court then offered a different rationale, asserting that the conduct Congress chose to signify consent was not "meaningful" enough to reflect a defendant's "intention" to submit to jurisdiction. (Defendants never made that argument either.) The district court's reasoning on this point closely tracks *dissents* in Supreme Court cases that were *rejected* by majority decisions that remain good law.

Because the PSJVTA meets due process requirements, and Defendants' conduct manifests consent to jurisdiction under it, the Court should apply the statute in this case.

## JURISDICTION

The district court's subject-matter jurisdiction rested on 18 U.S.C. § 2338. Appellate jurisdiction rests on 28 U.S.C. § 1291.

## ISSUES

I.     In view of the Supreme Court's remand to consider this case in light of the PSJVTA, whether this Court should recall its mandate and instruct the district court to reinstate its original judgment, rather than requiring the parties to relitigate their dispute in a separate pending action.

II.     Whether exercising personal jurisdiction under 18 U.S.C. § 2334(e) would deprive Defendants of due process of law.

## STATEMENT OF THE CASE

**1.** This case arises out of terror attacks that Defendants' officers and employees carried out in Israel between 2001 and 2004 in which American citizens were maimed and murdered. Mark Sokolow and his family were on vacation in a store buying a pair of shoes for their 12-year-old daughter, when a Palestinian Authority (PA) intelligence agent detonated a 22-pound bomb,

5

killing herself and two other people; the shrapnel wounded more than 100, including the Sokolows. Alan Bauer and his seven-year-old son were walking down a crowded street when a suicide bomber directed by a PA security officer blew himself up, sending shrapnel into the father's arm and the boy's head, causing permanent brain damage. Scott Goldberg died commuting to work on a municipal bus, killed by a PA police officer wearing a suicide belt prepared by fellow officers. Goldberg left a widow and seven children; Defendants gave the suicide bomber a state funeral. Four Plaintiffs were eating lunch at a university cafeteria when a massive bomb took their lives. Their parents learned about the attack at home in the United States—some by recognizing the bodies or personal effects of their children on the television news.

Plaintiffs invoked the Anti-Terrorism Act (ATA), 18 U.S.C. § 2333, in the United States District Court for the Southern District of New York. Discovery revealed extensive evidence that Defendants orchestrated the attacks as part of a bloody string of suicide terror attacks in furtherance of their political goals. Official PA "political guidance" urged "open, bloody and fierce" action by PA security forces "letting the United States of America know" that violence will "threaten U.S. interests." JA-4491. On official PA television, leaders implored viewers to "kill those Jews and those Americans who are like them."

JA-1715. Full-time PA "security" officers planned or participated in each of the attacks, and the Palestinian Liberation Organization (PLO) and PA continue to reward the surviving officers with generous salaries and promotions—even as they sit in prison for their crimes—and provide "martyr" payments to the families of the suicide terrorists in honor of their attacks. *See* JA-4375, 4385, 9435-36.

In 2015, the district court presided over a seven-week jury trial. After hearing testimony from 44 witnesses, the jury found that officers of the PA acting within the scope of their employment planned and perpetrated the terror attacks and that the PLO and PA knowingly provided material support and resources to two U.S.-designated foreign terrorist organizations for the attacks. JA-8261-68. The district court entered a final judgment on the jury verdict. Dist. Ct. ECF No. 980.

**2.** This Court reversed. *Waldman I*, 835 F.3d 317 (2016). It held that United States courts could not exercise general personal jurisdiction over the PLO or the PA because those entities were not "at home" in the United States, *id.* at 332-35; and that their liability-creating conduct was not sufficiently connected to the United States to support specific jurisdiction, *id.* at 335-44. This Court entered its judgment vacating the district court's judgment and

remanding with instructions to dismiss the case for want of jurisdiction on August 31, 2016. ECF No. 211. The mandate issued on November 28, 2016. ECF No. 248. The Supreme Court denied review on April 2, 2018. 138 S. Ct. 1438.

**3.** The Anti-Terrorism Clarification Act (ATCA) was introduced in Congress a few weeks later, on May 24, 2018, 164 Cong. Rec. S2926. Bipartisan sponsors explained that the legislation was a response to "recent Federal court decisions" that "severely undermined the ability of American victims to bring terrorists to justice." 164 Cong. Rec. S5103 (July 19, 2018) (Sen. Grassley); *see* 164 Cong. Rec. H6617-18 (July 23, 2018) (Rep. Nadler). The House Judiciary Committee Report accompanying the bill explained that its "purpose" was "to better ensure that victims of international terrorism can obtain justice in United States courts." H.R. Rep. No. 115-858, at 2-3 (2018). Apparently aware of the bill, Defendants contacted members and staff more than 125 times while it was pending.[1]

In October 2018, Congress enacted the ATCA. Pub. L. 115-253, § 4 (adding 18 U.S.C. § 2334(e)). Section 2334(e) provided that a defendant would be deemed to consent to personal jurisdiction under the ATA, either by: (1)

---

[1] Squire Patton Boggs (US) LLP, FARA Supp. Statement (Dec. 31, 2018), Att. D, https://efile.fara.gov/docs/2165-Supplemental-Statement-20190131-30.pdf.

accepting United States foreign assistance; or (2) maintaining facilities within the jurisdiction of the United States while benefiting from a waiver or suspension of 22 U.S.C. § 5202, which forbids the PLO and its successors and agents from maintaining such facilities.

**4.** Five days after the ATCA became law—and only six months after the Supreme Court denied review—Plaintiffs filed a motion in this Court to recall its mandate in light of the new statute. ECF No. 255. This Court denied the motion, holding that the ATCA failed to restore jurisdiction. The Court explained that Defendants and the United States Government had altered their conduct so that § 2334(e) did not reach Defendants, *Waldman II*, 925 F.3d at 574-75; and it added that the "Court's interest in finality also weighs against recalling the mandate," *id.* at 575. Plaintiffs filed a protective complaint before the limitations period ran, and the Court stated that Plaintiffs remained free to prosecute that case if "there are any developments in the activities of the PA or the PLO that may subject them to personal jurisdiction under the ATCA." *Id.* at 576 n.2.

**5.** Plaintiffs again petitioned for Supreme Court review. While the petition was pending, Congress enacted the PSJVTA, amending § 2334(e) to expand the reach of the U.S. activities prong and to add a new prong providing

9

that the PLO and PA would be deemed to consent to personal jurisdiction in ATA cases if (after a transition period) they paid the designees of individuals who were convicted of or killed while committing terror attacks that injured U.S. nationals and did so "by reason of" the terrorist's death or imprisonment. PSJVTA § 903(c). The PSJVTA includes a "sense of Congress" that:

> (A) covered claims [*i.e.*, claims of U.S. nationals that were "dismissed for lack of personal jurisdiction"] should be resolved in a manner that provides just compensation to the victims;
>
> (B) covered claims should be resolved and settled in favor of the victim to the fullest extent possible and without subjecting victims to unnecessary or protracted litigation[.]

*Id.* § 903(b)(4), (5). The PSJVTA further includes a rule of construction that the statute "should be liberally construed to carry out the purposes of Congress to provide relief for victims of terrorism," *id.* § 903(d)(1)(A), and a provision stating that the statute applies "to any case pending on or after August 30, 2016" (*i.e.*, the day before this Court issued *Waldman I*), *id.* § 903(d)(2).

The Supreme Court granted Plaintiffs' petition, vacated this Court's judgment, and remanded for further consideration in light of the PSJVTA. 140 S. Ct. 2714. This Court then remanded to the district court to determine the applicability of the PSJVTA to this case and "any issues regarding its application to this case including its constitutionality." ECF No. 366. The remand

10

order stated that the motion to recall the mandate would be held "in abeyance" in the meantime. *Id.*

**6.** On remand, Plaintiffs proved that, after the PSJVTA's trigger date, Defendants made monthly payments to designees of 175 terrorists who had killed or injured U.S. nationals and did so by reason of those terrorists' deaths or imprisonment. *See* Dist. Ct. ECF Nos. 1015-1, 1016–1018 (Nov. 12, 2020). Plaintiffs also proved that Defendants maintained an office, notarized official documents, and engaged in public relations activities while in the United States. *See* Dist. Ct. ECF Nos. 1038, 1039, 1059. Plaintiffs, supported by the Government as intervenor, showed that the PSJVTA satisfies established due process principles by providing Defendants with fair warning of the kind of conduct that would be deemed to furnish consent to personal jurisdiction in civil ATA cases and by reasonably advancing legitimate government interests in foreign affairs and national security. Dist. Ct. ECF Nos. 1015, 1043. Defendants did not contest Plaintiffs' factual showing that they had performed actions triggering the statute. They focused instead on legal issues, principally their contention that the due process clause forbids the exercise of consent-based jurisdiction unless Defendants "receive a reciprocal benefit in exchange." SPA-8.

**7.** The district court found that Plaintiffs "presented sufficient evidence to support the determination that Defendants have made payments after April 18, 2020 to the families of individuals killed while committing acts of terrorism, and that those payments were made because the individual engaged in terrorism, and that the terrorism harmed U.S. nationals." SPA-6. The court did not reach the question whether Defendants also met the U.S.-activities prong. SPA-8 n.3.

However, the court held the statute unconstitutional under the Due Process Clause. It did not address the fair-warning and reasonableness analysis set out by Plaintiffs and the Government. It did not adopt Defendants' theory, either. It also eschewed the analysis presented by another judge of the district court, *Fuld v. Palestine Liberation Org.*, 578 F. Supp. 3d 577 (S.D.N.Y. 2022), *appeal pending*, Nos. 22-76, 22-496 (2d Cir.). Instead, it came up with a rationale of its own. The court acknowledged that a defendant "may consent to a court's jurisdiction expressly or by implication." SPA-9. It stated that "where a defendant violates court orders requiring them to produce evidence material to the issue of personal jurisdiction, courts have taken that conduct as a legal submission to support a presumption … of the want of merit in the asserted defense." SPA-9-10 (quoting *Hammond Packing Co. v. Arkansas*, 212 U.S.

322, 351 (1909)). The court then stated that Defendants did not violate any dis-covery orders, so "the conduct plaintiffs point to, making shahid payments,[2] does not support a *Hammond Packing* presumption." SPA-11. From this (and without more), the court concluded that basing jurisdiction on the PSJVTA would "violate the due process clause." *Id.*

**8.** Plaintiffs moved for reconsideration, asking the district court to make factual findings regarding the U.S.-activities prong and to consider that prong's constitutionality. Dist. Ct. ECF Nos. 1057, 1059.

The district court denied the motion. It observed that "[d]efendants do not dispute [that] they have engaged in" U.S. activities including the "provi-sion of consular services," "interviews with prominent media and social media activity," and "maintenance of an office in New York." SPA-15. Although De-fendants argued that these activities fell "within the PSJVTA's exclusions for official U.N. or U.N.-ancillary activities," the court did not resolve that statu-tory issue. *Id.* Instead, it held that these facts did not alter its bottom-line con-clusion: "The activities at issue here—primarily the notarization of documents and a handful of interactions with the media—are insufficient to support any

---

[2] *Shahid* means "martyr" in Arabic. It is the word Defendants use to identify a suicide terrorist.

meaningful consent to jurisdiction by Defendants," because "these types of conduct do not infer any intention on the part of Defendants to legally submit to suit in the United States." SPA-16. The court also rejected Plaintiffs' reliance on Supreme Court cases holding that a sovereign with the right to exclude an entity may condition its entry upon the foreign entity's consent to personal jurisdiction, saying that this argument "relies heavily on pre-*International Shoe* case law from the nineteenth century that is now obsolete." SPA-17.

## SUMMARY OF ARGUMENT

**I.** This Court should recall its mandate, salvage jurisdiction, and reinstate the district court's judgment based on the jury verdict.

**A.** This Court can order the district court's judgment reinstated. The power of an appellate court to salvage jurisdiction on appeal—even if the district court lacked jurisdiction at the time of entry of its judgment—is well established. *Newman-Green, Inc.*, 490 U.S. at 838; *United States v. Alabama*, 362 U.S. 602, 604 (1960); *Mullaney v. Anderson*, 342 U.S. 415, 417 (1952). Indeed, an appellate court is under a duty to "salvage jurisdiction where possible." *United Republic*, 315 F.3d at 170 (quotation marks omitted).

14

In its 2019 decision and order, this Court observed that Congress did not "provide explicitly or implicitly that closed cases can be reopened." *Waldman II*, 925 F.3d at 575. Congress then amended the statute to apply "to any case pending on or after August 30, 2016" (*i.e.*, the day before this Court issued *Waldman I*). PSJVTA § 903(d)(2). The amendment's lead sponsors explained that Congress included this provision to "mak[e] clear Congress's intent that courts have the power to restore jurisdiction in cases previously dismissed for lack of jurisdiction after years of litigation" and "to enable victims to pursue justice without being subjected to repetitive, unnecessary, or protracted litigation." 165 Cong. Rec. S7182 (Dec. 19, 2019).

**B.** Often, the need for finality outweighs the interests in doing justice that would be achieved by reopening a closed case to apply new law. This case is different. By applying the PSJVTA in this case, the Court will put a complete end to the parties' dispute. In contrast, declining to do so would require the parties to relitigate the very same claims from scratch in the protective case filed before the limitations period ran. Nothing would be achieved by subjecting the parties to a second trial. A 'do-over' would harm the institutional interest in finality and would cause severe prejudice to the thirty terror

15

victims who testified in support of their claims, subjecting them to a pointless reliving of trauma.

**C.** Applying the PSJVTA in this case would reflect fidelity to the Supreme Court's mandate. In the Supreme Court, Defendants argued that to grant the petition for certiorari would be to "overturn the court of appeals' discretionary decision not to recall an old mandate," thereby "trampling on the court of appeals' discretionary decision on finality." Br. in Opp. 1-2, *Sokolow v. Palestine Liberation Org.*, No. 19-764 (March 13, 2020) (Defendants' Br. in Opp.). In response, Plaintiffs specifically asked the Supreme Court for the very relief Defendants opposed: "if [Defendants] are correct that the Second Circuit treated finality as an independent ground not to recall its mandate," Plaintiffs wrote, "then the court [of appeals] abused its discretion" and the Supreme Court should vacate "the *judgment*, not merely the order denying the motion to recall the mandate." Reply Br. at 9, *Sokolow v. Palestine Liberation Org.*, No. 19-764 (Apr. 7, 2020) (emphasis in original). That is what the Supreme Court did, stating that "the judgment" is vacated. The use of that word in the Supreme Court's decretal paragraph is meaningful here. Because this Court's *judgment* has been vacated, the case has been reinstated in this Court, which now must decide the case under existing law—including the PSJVTA.

**II.** The PSJVTA fully complies with the two criteria required by due process cases for the valid exercise of personal jurisdiction and other government action: it gives Defendants fair warning of what conduct will subject them to personal jurisdiction, and it reasonably advances legitimate government interests in the context of our federal system of government. *See Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1023-25 (2021).

**A.** The PSJVTA gives fair warning because it describes, in advance and with precision, the specific conduct that will cause a defendant to be deemed to have consented to personal jurisdiction in civil cases under the ATA if those actions are taken after specified post-enactment dates. Defendants undertook that conduct fully aware of the statute's terms and without coercion. The PSJVTA reasonably advances the federal government's foreign policy and national security interests because it disrupts and deters terrorism, protects Americans abroad, compensates victims of terrorism, and incentivizes Defendants to halt the abhorrent practice of making payments to convicted murderers and to the families of suicide terrorists.

**B.** The district court's reasons for striking down the PSJVTA under the Due Process Clause are incorrect. The district court never addressed the standards described above. Instead, it focused on a single type of constructive

17

consent and said that the PSJVTA is unconstitutional because it does not match that exemplar. Its thin reasoning thus rested on a rudimentary error of logic: the fallacy of denying the antecedent. On rehearing, the court added a new reason for its holding—that the statute's specified bases for inferring an intent to submit to jurisdiction are not sufficiently "meaningful"—but that reasoning cannot be squared with the Supreme Court's decisions, which have held that consent to jurisdiction existed in circumstances far more attenuated than those at issue here.

**C.** The district court correctly disregarded the bulk of the analysis in *Fuld v. Palestine Liberation Organization*, 578 F. Supp. 3d 577 (S.D.N.Y. 2022), *appeal pending*, No. 22-76 (2d Cir.). That decision mistakenly concluded that the rights at stake under the PSJVTA are "fundamental rights," and it erroneously stated that striking down the statute was "all but compelled" by *dicta* in a Supreme Court case involving sovereign immunity. Contrary to the *Fuld* district court, the Supreme Court has repeatedly upheld constructive consent in the context of constitutional rights, has embraced the concept of "implied consent to the personal jurisdiction of the court," *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinée*, 456 U.S. 694, 703-04 (1982), and has rejected the argument that "there is something unique about the

18

requirement of personal jurisdiction, which prevents it from being established or waived like other rights," *id.* at 706.

## ARGUMENT

## I. THE COURT SHOULD APPLY THE PSJVTA IN THIS CASE

An appellate court has inherent power to recall its own mandate and an obligation to salvage jurisdiction where possible. Here, the factors governing the exercise of that power uniformly militate in favor of applying the PSJVTA in this case, thus concluding the litigation between these parties. Doing so would reflect fidelity to the Supreme Court's mandate.

### A. This Court Has The Power To Salvage Jurisdiction

The courts of appeals "have an inherent power to recall their mandates." *Calderon v. Thompson*, 523 U.S. 538, 549 (1998). "One circumstance that may justify recall of a mandate is a supervening change in governing law that calls into serious question the correctness of the court's judgment." *Sargent v. Columbia Forest Prods., Inc.*, 75 F.3d 86, 90 (2d Cir. 1996) (alterations and quotation marks omitted). A new federal statute is the kind of law-change that supports such relief. *See Bryant v. Ford Motor Co.*, 886 F.2d 1526, 1530 (9th Cir. 1989) (it would be "patently unfair" to deprive a litigant of the benefit of legislation if "Congress act[s] specifically to overrule our … decision").

The power of an appellate court to salvage jurisdiction on appeal—even if the district court lacked jurisdiction at the time of entry of its judgment—is well established. In *Mullaney*, 342 U.S. at 417, the Supreme Court exercised discretion to add parties in order to cure the plaintiff's lack of standing, explaining: "To dismiss the present petition and require the new plaintiffs to start over in the District Court would entail needless waste and runs counter to effective judicial administration." *Id.* In *Newman-Green, Inc.*, 490 U.S. at 838, the Supreme Court salvaged jurisdiction by dismissing a non-diverse party that had been in the case at the time of judgment in the district court. The Court explained it was exercising a "deeply rooted understanding of appellate power," *id.* at 836, and focused on the practicality that "requiring dismissal after years of litigation would impose unnecessary and wasteful burdens on the parties, judges, and other litigants waiting for judicial attention," where the plaintiff could "simply refile in the District Court," *id.* at 836-37. And in *United Republic*, 315 F.3d at 170-71, this Court discovered that it lacked subject-matter jurisdiction, recalled its mandate, and remanded to the district court to determine whether jurisdiction could be salvaged.

A defendant may consent to personal jurisdiction "at any stage of a proceeding, including … on appeal." *Shatsky v. Palestine Liberation Org.*, 955

F.3d 1016, 1029 (D.C. Cir. 2020). And when Congress makes an intervening change in controlling law, a court's jurisdiction may appear for the first time on appeal. *Andrus v. Charlestone Stone Prods.*, 436 U.S. 604, 608 n.6 (1978); *United States v. Alabama*, 362 U.S. at 604; *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 661 (S.D.N.Y. 2018) ("once the judgments were reopened, courts must apply the law that exists at the time, including newly enacted legislation given retroactive effect").

In its 2019 decision and order, this Court observed that the ATCA did not "provide explicitly or implicitly that closed cases can be reopened." *Waldman II*, 925 F.3d at 575. Congress addressed that concern by stating explicitly that the statute applies "to any case pending on or after August 30, 2016" (*i.e.*, the day before this Court issued *Waldman I*). PSJVTA § 903(d)(2). Senator Lankford, co-lead sponsor of the bill, explained that this subparagraph was included to "mak[e] clear Congress's intent that courts have the power to restore jurisdiction in cases previously dismissed for lack of jurisdiction after years of litigation" and "to enable victims to pursue justice without being subjected to repetitive, unnecessary, or protracted litigation, which would just reopen the pain that many Americans have already suffered through." 165 Cong. Rec. S7182 (Dec. 19, 2019); *accord id.* S7183 (Senator Grassley) ("The bill also

21

sends a clear signal that Congress intends to empower courts to restore jurisdiction in cases previously dismissed.").

## B. The Court Should Exercise Its Power To Reinstate The District Court's Judgment

Previously, this Court indicated that it would hold Plaintiffs' original motion to recall the mandate in abeyance. ECF No. 366. The Court should now recall the mandate and remand to the district court with instructions to reinstate its judgment based on the jury verdict, thus concluding the litigation between the parties.

In exercising discretion to recall its mandate, a court must weigh "the interest in finality" and "the interests of justice." *Gondeck v. Pan Am. World Airways, Inc.*, 382 U.S. 25, 26-27 (1965). Although such interests often conflict, that is not the case here. *Both* interests counsel in favor of recalling the mandate.

### 1. The Interest In Finality Favors Plaintiffs

The judicial policy favoring finality serves two goals: "party reliance in the finality of judgments and the need to conserve judicial resources for other litigation as yet unresolved." *McGeshick v. Choucair*, 72 F.3d 62, 63 (7th Cir. 1995) (citing *Am. Iron & Steel Inst. v. EPA*, 560 F.2d 589, 592 (3d Cir. 1977)).

22

These goals would *both* be served by reinstating the district court's judgment on the merits in this extraordinary case.

*First:* The "need to conserve judicial resources for other litigation," *id.*, strongly favors reinstating the district court's judgment on the merits, because the alternative is a complete "do-over." The District Court conducted many years of litigation, culminating in a jury trial and a final judgment on the merits. The court decided numerous substantive motions. *See, e.g.*, Dist. Ct. ECF Nos. 58 (subject-matter jurisdiction), 251 (judgment on the pleadings), 646 (summary judgment). It decided *Daubert* motions, *in limine* motions, issues related to the jury, proposed bifurcation, and all manner of other pre-trial proceedings. *See* JA-3092-8260. It selected a twelve-member jury from a panel of hundreds of citizens. *See* Dist. Ct. ECF No. 747 at 6. It presided over a seven-week trial at which 44 witnesses testified. It decided extensive post-trial motions. JA-215-33, 8355-952, 9458-584. The 37-volume Joint Appendix exceeds 10,000 pages. The parties had the benefit of a full assessment of the disputed evidence by an impartial judge and twelve-member jury, each of whom devoted hundreds of hours to the case.

As this Court has explained, "[o]nce the district court has proceeded to final judgment, 'considerations of finality, efficiency, and economy become

overwhelming,' and federal courts are directed to salvage jurisdiction where possible." *Universal Reins.*, 312 F.3d at 89 (quoting *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 75 (1996)); *see United Republic*, 315 F.3d at 170 (same). The "spectacle of repeated trials to establish the truth about a single criminal episode inevitably places burdens on the system in terms of witnesses, records, and fading memories, to say nothing of misusing judicial resources." *Morris v. Slappy*, 461 U.S. 1, 15 (1983). Courts "strive to cure jurisdictional defects, rather than dismiss for want of jurisdiction, in cases that have already proceeded to trial and judgment." *CGB Occupational Therapy, Inc.* v. *RHA Health Servs. Inc.*, 357 F.3d 375, 381 n.6 (3d Cir. 2004). For this reason, this Court deems its duty to salvage jurisdiction where possible an "imperative." *Universal Reins.*, 312 F.3d at 90.[3]

**Second:** Defendants do not have any "reliance [interest] in the finality of judgment[]" in this case, *McGeshick*, 72 F.3d at 63, because of the pendency of the backup case. In addition, their primary conduct—orchestration of terror attacks—occurred many years after it was criminalized under U.S. law, Pub. L. 99-399, § 1202 (Aug. 27, 1986), and many years after Congress created a

---

[3] Before trial, the district court dismissed all non-federal claims and one plaintiff's federal claim on the merits. In the interest of finality, Plaintiffs are not pursuing further adjudication of those claims in this appeal.

private right of action for U.S. citizens, Pub. L. 102-572, title X, § 1003(a)(4) (Oct. 29, 1992). No legal framework permitted Defendants "to shape their conduct in reliance on the promise of future immunity from suit in United States courts." *Republic of Austria v. Altmann*, 541 U.S. 677, 696 (2004). To the contrary, at the time of their unlawful conduct, they had already been held subject to general jurisdiction repeatedly. *Ungar v. Palestinian Auth.*, 153 F. Supp. 2d 76, 88 (D.R.I. 2001); *Klinghoffer v. Achille Lauro*, 795 F. Supp. 112, 114 (S.D.N.Y. 1992). Defendants obtained an eleventh-hour jurisdictional reprieve only because the Supreme Court "significantly narrowed the general personal jurisdiction test in *Daimler*." *Waldman I*, 835 F.3d at 326. In the PSJVTA, Congress *vindicated* the parties' expectations circa 2002–2004 by providing a U.S. forum for U.S. terror victims, if the Defendants elected to engage in conduct specified in the PSJVTA—which they did.

### 2. *The Interests Of Justice Favor Plaintiffs*

This Court considers four factors when determining whether to recall its mandate in light of supervening law: (1) whether the new law is "inconsistent" with the Court's judgment; (2) whether the movant previously "made the argument" that it is now asking the Court to adopt; (3) whether there was an impermissible "lapse of time" before moving to recall the mandate; and

(4) whether the equities "strongly favor" relief. *Sargent*, 75 F.3d at 90. All four factors support reinstating the district court's merits judgment in this case.

*First:* The new federal statute establishes personal jurisdiction, superseding this Court's earlier decision. A new federal statute is a reason to recall the mandate. Thus, in *ACLU v. Department of Defense*, 543 F.3d 59 (2d Cir. 2008), this Court recalled its mandate in light of newly introduced legislation. Order, No. 06-3140 (June 10, 2009).[4] The Court had held that photographs depicting mistreatment of detainees in Iraq and Afghanistan must be released under the Freedom of Information Act. *ACLU*, 543 F.3d at 63. After the mandate issued, the Court recalled it in view of pending legislation introduced to supersede this Court's decision and an anticipated petition for certiorari. *See* Govt.'s Mot. to Recall Mandate at 6, filed May 28, 2009, in *ACLU*, No. 06-3140, *available at* goo.gl/5mRPDb. As the Ninth Circuit put it in *Bryant*, 886 F.2d at 1530, "an abrupt change in the law shortly after the panel's opinion justifies a recall of the mandate," as it would be "patently unfair" to deprive a litigant of the benefit of legislation if "Congress act[s] specifically to overrule our … decision."

---

[4] Available on PACER as ECF No. 356 in *ACLU v. Dep't of Def.*, No. 04 Civ. 4151 (AKH) (S.D.N.Y. filed June 15, 2009).

Here, as in *ACLU*, Congress acted specifically in response to this Court's decision to change the legal regime in decisive respects. In *Waldman II*, this Court held that § 2334(e) did not reach Defendants' conduct, which they modified after Congress enacted the statute. 925 F.3d at 574-75. Congress then amended § 2334(e) to specify different post-enactment conduct that would trigger the statute, and Defendants elected to engage in that conduct. Thus, the statute indisputably applies. Although the district court held the statute unconstitutional, its reasoning is indefensible, as discussed *infra* at pp. 59-63.

**Second:** Plaintiffs previously "made the argument" that they now ask the Court to adopt. *Sargent*, 75 F.3d at 90. They argued in the original appeal that Defendants were subject to personal jurisdiction and even invoked the consent doctrine. Appellees' Br. 40-44 [ECF No. 96].

**Third:** Plaintiffs' motion to recall the mandate was timely. Plaintiffs made their motion five days after Congress changed the governing law; six months after the Supreme Court denied review; and 23 months after this Court's mandate issued. ECF Nos. 248, 255. That is well within the period in which courts of appeals routinely recall the mandate. *E.g.*, *Wingate v. Gives*, 725 F. App'x 32, 35 (2d Cir. 2018) (five years); *Davis v. United States*, 643 Fed.

27

App'x 19, 21-22 (2d Cir. 2016) (four years); *Gondeck*, 382 U.S. at 28 (three years); *see Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 251 (1944) (holding that Third Circuit should have recalled its mandate *nine years* after it was issued).

Thus, in *Taylor v. United States*, 822 F.3d 84 (2d Cir. 2016), this Court recalled its mandate in response to a request made 23 months after the Court had issued its mandate.[5] A similar time-frame (21 months) occurred in *In re Tribune Co. Fraudulent Conveyance Litigation*, 946 F.3d 66, 72 n.3 (2d Cir. 2019).[6] And in *Thai-Lao Lignite (Thailand) Co. v. Lao People's Democratic Republic*, this Court affirmed the reopening of a case on a Rule 60(b) motion made 19 months after final judgment, explaining: "Had *ten* years elapsed … the judicial interests in finality of judgments *might* well outweigh" other factors. 864 F.3d 172, 189 (2d Cir. 2017) (emphasis added). Although the *Thai-Lai Lignite* court was addressing a Rule 60(b) motion and not a motion to recall the mandate, the two are "analogous." *Sargent*, 75 F.3d at 90; *see Tal v. Miller*,

---

[5] *See* 822 F.3d at 87 (mandate issued on November 14, 2013); Pet. Br. (Oct. 5, 2015) and Order (Feb. 21, 2017) in No. 15-827 (2d Cir.), ECF Nos. 75, 155.

[6] *See* Mandate (Aug. 1, 2016), Motion to Recall Mandate (Apr. 10, 2018), and Order (May 15, 2018) in No. 13-3992 (2d Cir.), ECF Nos. 374, 376, 386.

No. 97 Civ. 2275 (JGK), 1999 WL 38254, at *2 (S.D.N.Y. Jan. 27, 1999) (same, applying *Sargent* factors to a Rule 60(b) motion).

Moreover, this case remained pending in the Supreme Court until only six months before the motion to recall the mandate. It is the "decision by [the Supreme] Court denying discretionary review [that] usually signals the end of litigation." *Bell v. Thompson*, 545 U.S. 794, 806 (2005); *see Axel Johnson Inc. v. Arthur Andersen & Co.*, 6 F.3d 78, 84 (2d Cir. 1993) ("a case remains 'pending,' and open to legislative alteration, so long as an appeal is pending or the time for filing an appeal has yet to lapse," which does not end until "a petition for certiorari has been finally denied") (cleaned up).

***Fourth:*** The equities strongly favor recalling the mandate in this case. The relevant equitable considerations are fairness to plaintiffs; the public interest; the views of Congress; and the protection of fundamental international-law norms.

With regard to fairness, thirty terror victims testified at trial. JA-6343-7053. Most struggle with life-long psychological trauma as a result of the terror attacks. JA-5743-6002. A terror victim forced to undergo "the wrenching process of testifying again" suffers "serious prejudice," due to the "enormous emotional cost to Plaintiffs should they be forced 'to undergo the excruciating

29

process of testifying about their loss all over again.'" *Gilmore v. Palestinian Interim Self-Governing Auth.*, 675 F. Supp. 2d 104, 111 (D.D.C. 2009), *aff'd*, 843 F.3d 958 (D.C. Cir. 2016); *accord Morris*, 461 U.S. at 14-15 (forcing the victim of a traumatic crime to go through "the ordeal of reliving such an experience [by a retrial]…is not to be ignored by the courts"). Some plaintiffs have died since the trial and others would be unable to travel to New York from their homes, further prejudicing them: "the availability of a trial transcript is no substitute for a public presence at the trial itself. As any experienced appellate judge can attest, the 'cold' record is a very imperfect reproduction of events that transpire in the courtroom." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 597 n.22 (1980) (Brennan, J., concurring).

The public interest also factors into the equities. "Congress conceived of the ATA, at least in part, as a mechanism for protecting the public's interests through private enforcement." *Linde v. Arab Bank, PLC*, 706 F.3d 92, 112 (2d Cir. 2013). "Congress may act to bring provisions of international law into federal law…. [T]he decision to impose sanctions in disputes…over international norms… belongs to those answerable to the people and assigned by the Constitution to defend this nation. If they wish our help, they are free to enlist

it…." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1416-19 (2018) (Gorsuch, J. concurring).

The non-binding views of Congress also merit respectful consideration. The courts "welcome any congressional guidance in exercising jurisdiction" having the "potential to affect foreign relations." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 731 (2004). Congress's views in this area merit "special respect" because they involve "a balance that it is the prerogative of the political branches to make." *Jesner*, 138 S. Ct. at 1408; *see B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 722-23 (2d Cir. 1983) (Friendly, J.) (holding that a disappointed bidder on a government contract had standing in part because rejecting standing "would show some lack of respect to Congress" based on views expressed in committee reports). Here, the PSJVTA expressed the "sense of Congress" that claims by a "national of the United States" "dismissed for lack of personal jurisdiction" "should be resolved in a manner that provides just compensation to the victims" "without subjecting victims to unnecessary or protracted litigation," PSJVTA § 903(b)(4), (5) (18 U.S.C. § 2333 note). Congress also provided that the legislative "purpose[]" was "to provide relief for victims of terrorism." *Id.* § 903(d)(1)(A). These statutory provisions support the Court's exercise of its discretion to recall the mandate.

Finally, the protection of "fundamental international norms is an important jurisdiction-related interest." *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1674 (2013) (Breyer, J., concurring) (citing Pierre N. Leval, *The Long Arm of International Law: Giving Victims of Human Rights Abuses Their Day in Court*, Foreign Affairs (2013)). Surely the terror campaign orchestrated by these Defendants violated these norms. At trial, Defendants' own expert, a renowned human rights lawyer, characterized the terror attacks at issue here as "crimes against humanity, absolutely." JA-7530. Atrocities like those at issue in this case are universally condemned by nearly every nation on earth. *See* International Convention for the Suppression of the Financing of Terrorism, 39 I.L.M. 268 (joined by 189 nations, *see* https://bit.ly/ICSFT_Parties); International Convention for the Suppression of Terrorist Bombings, 2149 U.N.T.S. 256 (joined by 170 nations, *see* https://bit.ly/ICSTB_Parties). Yet Defendants did not merely tolerate these attacks; they incited them through official channels, organized them though senior officers, and ratified them with systematic pay and promotions to hundreds of convicted perpetrators.

### C. Reinstating the District Court's Judgment Would Demonstrate Fidelity To The Supreme Court's Mandate

This Court's decision on the motion to recall the mandate should also reflect fidelity to the Supreme Court's mandate. When a case has been decided by an appellate court and remanded, "the court to which it is remanded must proceed in accordance with the mandate and such law of the case as was established by the appellate court." *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004). The Supreme Court's decretal paragraph reads:

> The judgment of the above court in this cause is vacated with costs, and the case is remanded to the United States Court of Appeals for the Second Circuit for further consideration in light of the Promoting Security and Justice for Victims of Terrorism Act of 2019.

ECF No. 341 (filed in this Court May 29, 2020) (citation omitted).

The Supreme Court used the word "judgment." In the appellate context, the word judgment has a technical legal meaning: it is "the document that states the dispositive action taken by the court of appeals." *United States v. Reyes*, 49 F.3d 63, 65 (2d Cir. 1995); *see* Fed. R. App. P. 36(a); Bryan A. Garner, *A Dictionary of Modern Legal Usage* 497 (3d ed. 2011) ("the final decree of an appellate court that acts upon a lower-court judgment"). In this context, an "*order* is distinguished from [a] *judgment*"—with *order* meaning the

"determination of the court upon some subsidiary or collateral matter arising in an action, not disposing of the merits." *Id.* at 640 (quotation marks omitted). Although "a court speaks through its judgments and orders," *Bell v. Thompson*, 545 U.S. at 805 (cleaned up), it is the Court's *judgment* that "conclusively resolves the case," *Plaut v. Spendthrift Farm*, 514 U.S. 211, 219 (1995).

Here, this Court issued only one *judgment*. ECF No. 211. Then, it issued an *order* denying the motion to recall the mandate, which left the Court's judgment in place. ECF No. 326. The Supreme Court vacated this Court's "*judgment*," not its *order*. ECF No. 341 (emphasis added).[7]

The Supreme Court's vacatur of this Court's *judgment* rather than its *order* is meaningful. A reviewing court's mandate "should be read so that to

_____

[7] This Court's initial post-remand orders correctly recited that the Supreme Court had vacated the *judgment* and that the Supreme Court's judgment itself reinstated the case. On June 8, 2020, this Court entered an order stating that the Supreme Court had "vacated the judgment of this Court." ECF No. 349. On September 8, 2020, the Court entered an order stating: "By the Supreme Court's Judgment filed on May 29, 2020, the above referenced case is reinstated restoring jurisdiction to this Court. The mandate in this case is hereby recalled and the case is reinstated." ECF No. 362. However, a third order refers to the Supreme Court's text with some imprecision, stating "the Supreme Court of the United States granted a petition for certiorari and vacated this Court's ORDER, dated June 3, 2019," and the motion to recall the mandate "will be held in ABEYANCE." ECF No. 366. As shown above, that decretal language is not quite right. The Supreme Court vacated this Court's *judgment*, not its *order*, *see* ECF No. 349, and this Court has already recalled its own mandate, *see* ECF No. 362.

the maximum extent practicable every word and phrase has meaning." *United States v. Genao-Sánchez*, 525 F.3d 67, 70 (1st Cir. 2008). As Judge Newman has explained, "decretal language should be careful to refer correctly to the nature of the district court ruling, *i.e.*, whether it is a 'judgment' or an 'order.'" Jon O. Newman, *Decretal Language: Last Words of an Appellate Opinion*, 70 Brook. L. Rev. 727, 733 (2005). In other cases the Supreme Court has vacated "*orders*" of courts under review. *E.g.*, *Gutierez v. Saenz*, 141 S. Ct. 1260 (2021); *Gish v. Newsom*, 141 S. Ct. 1290 (2021).

When a judgment has been set aside by a higher court, the parties are in the "position they occupied before entry of the [vacated] judgment"—namely, "the case remains open," and "the court must apply the law as it stands," including intervening legal developments. *Ditto v. McCurdy*, 510 F.3d 1070, 1077 & n.4 (9th Cir. 2007); *see Brownlee v. Hospira, Inc.*, 869 F.3d 509, 510 (7th Cir. 2017) ("the case remains open in the district court" following vacatur); *United States v. Lentz*, 383 F.3d 191, 223 (4th Cir. 2004) (Michael, J., concurring) ("reversal of the judgment of acquittal means that the case … remains open"). Thus, following remand from the Supreme Court, the case "must be decided according to the law as it exists at the time." *Banco Nacional*

35

*de Cuba v. Farr*, 383 F.2d 166, 173 (2d Cir. 1967). By that rule, the PSJVTA applies in *this* case.

A reviewing court's mandate also cabins the ability of the court on remand to revisit issues decided expressly or implicitly by the reviewing court. *See In re Coudert Brothers LLP*, 809 F.3d 94, 100-01 (2d Cir. 2015) ("If we thought an alternative, dispositive holding would altogether preclude application of Connecticut's choice-of-law rules, we would have affirmed; there would have been no need for a remand.") (cleaned up); *Meacham v. Knolls Atomic Power Lab.*, 358 F. App'x 233, 235-36 (2d Cir. 2009) (mandate rule barred argument that party had "squarely presented" to Supreme Court, which implicitly rejected it).

In the Supreme Court, the parties actually litigated whether to apply the PSJVTA in this case or in Plaintiffs' later-filed backup case, and Defendants lost. Defendants urged the Court to deny Plaintiffs' certiorari petition by arguing that this Court's 2019 order rested on independent "finality grounds … unaffected by the subsequent passage of the PSJVTA." Defendants' Br. in Opp. at 2, 12-16. Defendants were within their rights to raise this issue: on GVR orders, the Supreme Court weighs "the equities of the case," because if "the delay and further cost entailed in a remand are not justified by the

36

potential benefits of further consideration by the lower court, a GVR order is inappropriate." *Lawrence v. Chater*, 516 U.S. 163, 167-68 (1996). Defendants argued that a grant of the petition would "overturn the court of appeals' discretionary decision not to recall an old mandate," thereby "trampling on the court of appeals' discretionary decision on finality." Defendants' Br. in Opp. at 1-2.

In response, Plaintiffs specifically asked the Supreme Court for that very relief: "if [Defendants] are correct that the Second Circuit treated finality as an independent ground not to recall its mandate," Plaintiffs wrote, "then the court abused its discretion" and the Supreme Court should vacate "the *judgment*, not merely the order denying the motion to recall the mandate." Reply Br. at 9, *Sokolow v. Palestine Liberation Org.*, No. 19-764 (Apr. 7, 2020) (emphasis in original). That is precisely what the Supreme Court did, granting the petition and vacating "the judgment."

## II. EXERCISING PERSONAL JURISDICTION UNDER THE PSJVTA WOULD NOT DEPRIVE DEFENDANTS OF DUE PROCESS

The district court's constitutional analysis cannot be sustained.[8] "Due respect for the decisions of a coordinate branch of Government demands that

---

[8] Earlier in this case, this Court held that Defendants enjoy due process rights,

we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000). This Court conducts that inquiry *de novo. United States v. Wasylyshyn*, 979 F.3d 165, 172 (2d Cir. 2020).

We demonstrate below: (a) the PSJVTA meets relevant due process standards; (b) the district court's analysis was incorrect; and (c) the district-court decision in *Fuld* is unpersuasive.

### A.    The PSJVTA Satisfies Relevant Due Process Standards

At a prior stage of this case, this Court held that Defendants' conduct did not give rise to specific (*i.e.*, case-linked) personal jurisdiction because there were insufficient contacts with the United States. "Pursuant to the due process clauses of the Fifth and Fourteenth Amendments, there are two parts to the due process test for [specific] personal jurisdiction as established by *International Shoe*, 326 U.S. 310 (1945), and its progeny: the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Waldman I*, 835 F.3d at 331. Under Circuit precedent, "the minimum contacts and fairness analysis is the same

---

that the Fifth and Fourteenth Amendment minimum-contacts standards are the same, and that the exercise of specific jurisdiction was unconstitutional. *Waldman I*, 835 F.3d. at 329-31, 335-44. We proceed under those holdings, reserving our appellate rights.

under the Fifth Amendment and the Fourteenth Amendment in civil cases." *Id.* at 330.

The minimum-contacts inquiry is irrelevant to the evaluation of consent-based jurisdiction, which is the separate basis for jurisdiction set forth under the PSJVTA. "Consent is a traditional basis of jurisdiction that may be upheld even in the absence of minimum contacts between the defendant and the forum state." 16 James Wm. Moore et al., *Moore's Fed. Prac.—Civil* § 108.53 (2020) (citation omitted); *see* 4 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1067.3 (4th ed.) (similar); *The Constitution of the United States of America: Analysis and Interpretation*, S. Doc. No. 112-9, at 1999 (2012 & Supp. 2017) ("Consent has always been sufficient to create [personal] jurisdiction, even in the absence of any other connection between the litigation and the forum."); *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 228 (4th Cir. 2019) ("unless the party consents to jurisdiction, there must be … minimum contacts") (citation omitted); *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1312 (11th Cir. 2018) ("Even where neither the forum state's long-arm statute nor the due process minimum contacts analysis is satisfied, a court may exercise personal jurisdiction over a party if the party consents."); *Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*, 817 F.3d 755, 769 (Fed. Cir. 2016)

(O'Malley, J., concurring) ("consent to jurisdiction is an alternative to the minimum contacts analysis"). As this Court has explained, "a defendant may consent to personal jurisdiction without regard to what a due process analysis of its [minimum] contacts would yield." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 641 (2d Cir. 2016). Such consent need not be express; rather, it may be inferred through a "variety of legal arrangements." *Bauxites*, 456 U.S. at 703-04.

Contrary to the district court's rhetoric, Plaintiffs are not asserting that Congress can "simply declare anything it wants to be consent." SPA-16. The relevant core standards of due process must still be met. Due process safeguards "fundamental fairness (through notice and fair warning) and the prevention of the arbitrary and vindictive use of the laws." *Rogers v. Tennessee*, 532 U.S. 451, 459 (2001); *see Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 542 (2005) ("a regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause"). The district court never engaged with the requisite due process standards of fair warning and reasonableness, which are satisfied here.

1.    *The PSJVTA Gave Defendants Fair Warning, Such That Their Conduct Was Knowing and Voluntary*

Due process requires that Defendants receive "fair warning" that "a particular activity may subject [them] to the jurisdiction of a foreign sovereign." *Ford Motor Co.*, 141 S. Ct. at 1024-25 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). The PSJVTA easily meets the fair warning requirement. The statute described, with precision and in advance, exactly what actions would cause Defendants to be deemed to have consented to personal jurisdiction in civil cases under the ATA. Defendants received notice of the PSJVTA before it took effect. *See Shatsky*, 955 F.3d at 1038.

The Supreme Court has said that consent to the jurisdiction of a court must be "knowing and voluntary," *Wellness Int'l Network v. Sharif*, 575 U.S. 665, 685 (2015), and that the defendant's actions "may amount to a legal submission to the jurisdiction of the court, whether voluntary or not," *Bauxites*, 456 U.S. 704-05. What is required under this standard is that the actions by which the defendant submits to jurisdiction be uncoerced and fairly informed.

A person's actions are "'voluntary' within the meaning of the Due Process Clause" if they are the product of "'a free and unconstrained will.'" *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (quoting *Haynes v. Washington*, 373 U.S. 503, 514 (1963)). By contrast, conduct is "involuntary" under the Due

Process Clause only if it arises from "coercive activity of the State." *Colorado v. Connelly*, 479 U.S. 157, 165 (1986). Defendants make no claim of coercion, which is "the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh … options rationally." *See Miller v. Angliker*, 848 F.2d 1312, 1320 (2d Cir. 1988).

"Voluntary" submission to jurisdiction does not mean, however, that the defendant *subjectively intends* to submit to jurisdiction. In *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114 (2d Cir. 2011), the defendant lost a motion to dismiss for lack of personal jurisdiction in the district court and then dismissed its counsel. The district court "warned" defendant that the withdrawal of counsel would result in a default, then permitted counsel to withdraw and granted final injunctive relief on default without further considering personal jurisdiction. *Id.* at 121-22. This Court affirmed. Although the defendant had asserted in connection with the withdrawal of counsel that it "would continue to assert its defense of lack of personal jurisdiction and did not intend to waive that defense," *id.* at 122, thus making clear that the defendant had no subjective desire to submit to the court's jurisdiction, the default nonetheless amounted to a "legal submission to the jurisdiction of the court," *id.* at 134 (quoting *Bauxites*).

42

Thus, the Due Process Clause does not give Defendants a right to avoid personal jurisdiction by announcing that they do not intend to submit to the personal jurisdiction of the court, while at the same time engaging in conduct that they have been warned will reflect a legal submission to jurisdiction. Their conduct was certainly not coerced; and it came after Defendants had not merely received fair warning, but had even represented to the D.C. Circuit that they "might never make covered payments" (*i.e.*, post-enactment payments triggering the PSJVTA). *Shatsky*, 955 F.3d at 1038.

### 2. The PSJVTA Is Reasonable In The Context Of Our Federal System

The exercise of personal jurisdiction must also be "reasonable, in the context of our federal system of government." *Ford Motor Co.*, 141 S. Ct. at 1024 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316-17 (1945)). Consent to jurisdiction should be enforced unless the defendant can "clearly show that enforcement would be unreasonable and unjust." *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972).

In the state-court context, the exercise of jurisdiction is reasonable by forum States that have "significant interests at stake," such as "'providing [their] residents with a convenient forum for redressing injuries inflicted by

43

out-of-state actors,' as well as enforcing their own safety regulations," *Ford Motor Co.*, 141 S. Ct. at 1030 (quoting *Burger King*, 471 U.S. at 473).

In evaluating the reasonableness of federal personal jurisdiction, the Court looks to interests of the federal government. "[P]ersonal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign, analysis." *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (plurality opinion). Even where the Fifth and Fourteenth Amendments "require the same type of analysis," "there may be overriding national interests" supporting federal legislation that "would be unacceptable for an individual State." *Hampton v. Wong*, 426 U.S. 88, 100 (1976). "Because the United States is a distinct sovereign, a defendant may in principle be subject to the jurisdiction of the courts of the United States but not of any particular State." *J. McIntyre*, 564 U.S. at 884.

Here, the PSJVTA indisputably advances legitimate interests of the federal government. It disrupts terrorism, which is "an urgent objective of the highest order." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 4 (2010). The statute advances the protection of U.S. citizens abroad, which is also a national interest. *See Gamble v. United States*, 139 S. Ct. 1960, 1967 (2019). The statute promotes the federal interest in ensuring "fair compensation for American victims of terrorism from those responsible for their losses." U.S. Statement of

Interest ¶ 12, Dist. Ct. ECF No. 953-1 at 4. And the statute furthers U.S. foreign policy objectives in the Middle East because, as the then-Ranking Member (and later Chair) of the House Foreign Affairs Committee explained, Defendants' terror-reward policies "threaten prospects for peace, pushing the chance for a Palestinian state further and further out of reach." 163 Cong. Rec. H9650 (Dec. 5, 2017) (Rep. Engel).

In the state-court context, the exercise of personal jurisdiction is *not* reasonable if "States with 'little legitimate interest' in a suit … encroach on States more affected by the controversy." *Ford Motor Co.*, 141 S. Ct. at 1025 (quoting *Bristol-Myers Squibb v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017)). "The sovereignty of each State implies a limitation on the sovereignty of all its sister States," and "this federalism interest may be decisive." *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980)) (cleaned up). The Commerce Clause similarly limits each State's substantive extraterritorial regulatory powers. *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).

Here, by contrast, the exercise of federal-court jurisdiction under the PSJVTA does not infringe on the interests of any sovereign within our constitutional framework. Rather, the PSJVTA concerns interests distinct to the

national sovereign—foreign affairs and national security. "Power over external affairs is not shared by the States," but instead "is vested in the national government exclusively." *United States v. Pink*, 315 U.S. 203, 233 (1942); *see Arizona v. United States*, 567 U.S. 387, 395 (2012). It would be error to treat potential infringement on the interests of foreign sovereigns as analogous to the horizontal federalism restraints animating *Bristol-Myers Squibb*. "States are situated within the United States quite differently than is the United States within the international community." Wendy Collins Perdue, *Aliens, the Internet, and "Purposeful Availment,"* 98 Nw. U. L. Rev. 455, 461 (2004). Federalism limitations on the individual States inhere in the "constitutional plan," but a "foreign State lies outside the structure of the Union." *Principality of Monaco v. Mississippi*, 292 U.S. 313, 330 (1934). "The political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns," *Jesner*, 138 S. Ct. at 1403, and it is up to "Congress" to "indicate" whether it "intends federal law to apply to conduct occurring abroad," *Kiobel*, 133 S. Ct. at 1665.

### 3. *Brown v. Lockheed Martin Supports The PSJVTA's Constitutionality*

This Court's reasoning in *Brown v. Lockheed Martin* supports the PSJVTA's constitutionality. In *Brown*, the Court interpreted Connecticut's

registration-to-do-business statute as not imposing implied consent to general jurisdiction, explaining that it was construing the statute narrowly to avoid a difficult constitutional question under the Due Process Clause of the Fourteenth Amendment. 814 F.3d at 641. The relevant due process concerns were the exact ones described above—fair warning and reasonableness in the context of our federal system.

With regard to fair warning, *Brown* observed that the Connecticut statute contained no "express language alerting the potential registrant that by complying with the statute and appointing an agent it would be agreeing to submit to the general jurisdiction of the state courts." *Id.* at 636. The Court thus expressed reluctance to permit "a slender inference of consent pulled from routine bureaucratic measures that were largely designed for another purpose entirely." *Id.* at 639.

With regard to reasonableness, *Brown* expressed concern about construing the statute to permit "the exercise of *general* jurisdiction over a corporation" under a registration statute, even if "the corporation had done *no business at all*." *Id.* at 640 (emphasis in original). Such an "exorbitant exercise of all-purpose jurisdiction" would reach "circumstances where the state's

47

interests seem limited," such as where the case involved "matters unrelated to its citizens or to affairs within its borders." *Id.* at 627, 637, 640 (cleaned up).

At the same time, *Brown* acknowledged "that a carefully drawn state statute that expressly required consent to general jurisdiction as a condition on a foreign corporation's doing business in the state, at least in cases brought by state residents, might well be constitutional." *Id.* at 641. Here, the PSJVTA is carefully drawn and far narrower than the general-jurisdiction statute at issue in *Brown*: The conditions that trigger consent to jurisdiction are explicit; the law serves legitimate federal governmental interests; it concerns a limited class of anti-terrorism cases within the heartland of federal concern; it applies to a limited class of plaintiffs who are citizens of the forum; and it does not infringe on State interests.

The *Brown* Court also explained that an expansive reading of the Connecticut statute would have the practical effect in all 50 States of "creating precisely the result that the [Supreme] Court so roundly rejected in *Daimler*," in which the Supreme Court had overturned longstanding doctrine allowing general jurisdiction over foreign corporations on the basis of their doing business in the State. *Brown*, 814 F.3d at 640. The *Brown* Court used strong language to describe this risk: If merely registering to do business in a State were

48

sufficient to submit to the general jurisdiction of its courts, "every corporation would be subject to general jurisdiction in every state in which it registered, and *Daimler's* ruling would be robbed of meaning by a back-door thief." *Id.* But this language is not a basis to extend the result in *Brown* to forbid far-more-narrowly drawn consent statutes like the PSJVTA. Doing so would risk invalidating reasonable legislative and regulatory judgments that such statutes serve legitimate governmental interests in contexts that *Daimler* plainly did not reach.

For example, Congress has provided that, in the context of federal investigations enforcing U.S. banking laws, a foreign bank with a correspondent account in a U.S. financial institution *must* appoint a U.S. resident as its agent to accept service of process for production of *any* records of the foreign bank anywhere in the world. 31 U.S.C. § 5318(k)(3). Appointment of such an agent has traditionally been construed as a consent to personal jurisdiction. *See National Equipment Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1964); Restatement (Second) of Conflict of Laws § 44 (1971). This statute thus overrides cases holding that a foreign bank's mere maintenance of a correspondent account with a U.S. financial institution is insufficient to meet the minimum-contacts test. *See Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 130 (2d Cir. 2022).

49

Many statutes require foreign companies to appoint agents for service of process where Congress has determined that submission to jurisdiction serves federal interests. *See, e.g.*, 15 U.S.C. § 3903(e), 7216(d)(2), 21 U.S.C. §§ 360mm(d), 968; 42 U.S.C. § 5411(e); 46 U.S.C. § 40902(d); 47 U.S.C. §§ 325(e)(2), 413; 49 U.S.C. §§ 1324(a), 13303(a), 30164(a), 46103(a). Extending *Brown* to this case would jeopardize those statutes as well.

Extending *Brown* to this case would also jeopardize the practice of the Federal Reserve Board of Governors, which does not allow foreign banks to open U.S. offices unless they consent to the jurisdiction of the United States courts in investigations involving U.S. banking laws. *See In re Sealed Case*, 932 F.3d 915, 923 (D.C. Cir. 2019); Bd. of Governors of the Fed. Res. Sys., Form FR K-2.

Narrowly drawn state statutes would also be at risk. For example, a Delaware statute provides that acting as a director or officer of a Delaware corporation "shall be a signification of the consent" to personal jurisdiction in cases involving corporate governance. Del. Code, tit. 10, § 3114(a), (b); *see Hazout v. Ting*, 134 A.3d 274, 289 (Del. 2016). And a New York statute requires foreign successors to domestic corporations merged out of existence to consent to suit in New York "for the enforcement of any liability of obligation" of

50

the domestic predecessor. N.Y. Bus. Corp. L. § 907(e)(2)(E); *see Armour Handcrafts, Inc. v. Miami Decorating & Design Ctr.*, 99 A.D.2d 521, 521-22 (2d Dept. 1984).

## B. The District Court's Analysis Was Incorrect

The district court did not evaluate the PSJVTA under the relevant due process standards; indeed, the court did not even consider whether exercising jurisdiction under the statute would be reasonable or would provide Defendants with fair warning. Instead, it concluded: (1) the statute is unconstitutional because the so-called *Hammond Packing* presumption does not apply; (2) Defendants' relevant conduct did not indicate their intention to submit to jurisdiction; and (3) Plaintiffs' U.S.-presence argument "relies heavily on pre-*International Shoe* case law from the nineteenth century that is now obsolete." SPA-17. This reasoning is incorrect.

### 1. Hammond Packing

The district court articulated its principal basis for striking down the statute as follows. "[A] defendant constructively consents to a court's personal jurisdiction where defendants refuses to comply with discovery orders regarding personal jurisdiction" under the "*Hammond Packing* presumption." SPA-9. In *Hamond Packing Co. v. Arkansas*, 212 U.S. 322 (1909), the Supreme

51

Court held that due process permitted a state court to render a default judgment against a defendant who failed to comply with a pretrial discovery order, because "the preservation of due process [i]s secured by the presumption that the [litigant's] refusal to produce evidence material to the administration of due process was but an admission of the want of merit in the asserted defense." *Id.* at 351. The district court concluded that *Hammond Packing*'s "presumption" does not apply to this case, however, because the conduct specified in the PSJVTA "is wholly unrelated to any court order in this litigation." SPA-10. "Accordingly," the court reasoned, "Defendants actions in violation of the statute is insufficiently related to the litigation to enable the court to exercise constitutionally valid personal jurisdiction over Defendants on the basis of constructive or implied consent." *Id.*

This reasoning reflects a logical error called the fallacy of the inverse, or denying the antecedent—such as "dogs can run fast; a racehorse is not a dog; therefore, a racehorse cannot run fast." Just as horses are one of the many kinds of animals that can run fast, the refusal to obey jurisdictional discovery orders while contesting jurisdiction is one of "a variety of legal arrangements [that] have been taken to represent express or implied consent to the personal jurisdiction of the court." *Bauxites*, 456 U.S. at 703. Implied consent can

satisfy due process standards in many circumstances not involving the *Hammond Packing* presumption. "'What acts of the defendant shall be deemed a submission to a court's power is a matter upon which States may differ.'" *Id.* at 704 (quoting *Chicago Life Ins. Co. v. Cherry*, 244 U.S. 25, 29-30 (1917)) (cleaned up). Such acts have included appointing an agent to accept service, *see Szukhent*, 375 U.S. at 316, expressly consenting to personal jurisdiction in a contract, *see Bauxites*, 456 U.S. at 704, implicitly consenting to personal jurisdiction by agreeing to arbitrate in the forum, *id.*, "the voluntary use of certain state procedures," *id.*, such as filing cross-claims, *id.*, "filing a plea in abatement," *Chicago Life Ins.*, 244 U.S. at 30, failing to assert a personal-jurisdiction defense when required by court rules, *Bauxites*, 456 U.S. at 704 (discussing Fed. R. Civ. P. 12(h)(1)), and defaulting after having appeared, *Mickalis Pawn Shop*, 645 F.3d at 133-34. The Supreme Court has never purported to catalogue an exhaustive list.

### 2.  *"Meaningful" Intentionality*

In denying the motion for reconsideration, the district court added a second rationale to support its conclusion. It said "[t]he activities at issue here—primarily the notarization of documents and a handful of interactions with the media—are insufficient to support any meaningful consent to jurisdiction by

Defendants," because "these types of conduct do not infer any intention on the part of Defendants to legally submit to suit in the United States." SPA-16.

This assertion is incorrect. As discussed above, the due process clause requires no assessment whether a defendant *subjectively* intended to consent to personal jurisdiction. As Judge Weinfeld put it, "there is no due process problem in applying Rule 12(h)(1) and deeming defendant to have waived his defense of lack of personal jurisdiction by failing to raise it in a timely fashion." *Oppel v. Empire Mut. Ins. Co.*, 92 F.R.D. 494, 497 n.11 (S.D.N.Y. 1981).

Moreover, Defendants themselves concede that conduct alone—such as "driving on public roads" or "engaging in [] regulated activity"—can constitute "signification of [an] agreement to consent to jurisdiction."[9] These volitional acts, like the jurisdiction-triggering conduct under the PSJVTA, involve no subjective intent to submit to court jurisdiction. Indeed, the Supreme Court has repeatedly inferred consent to the exercise of jurisdiction from circumstances far less indicative of a knowing and intelligent decision than the circumstances that Defendants faced in this case. For example, in *Hess v. Pawloski*, the Court upheld an implied-consent statute declaring "that the use of

---

[9] Defendants' Supp. Br. at 7-8, *Fuld v. PLO,* No. 20 Civ. 3374 (JMF), ECF No. 42 (S.D.N.Y. June 7, 2021). The district court took judicial notice of this brief at Defendants' request. Dist. Ct. ECF Nos. 1031, 1034.

the highway by [a] nonresident is the equivalent of the appointment of the registrar as agent on whom process may be served" and thus "consent to be bound by the process of its courts." 274 U.S. 352 355-57 (1927).

In *Szukhent*, the Court upheld a consent-to-jurisdiction clause in a farm-equipment lease. 375 U.S. at 313-14. The contract, prepared by the company's lawyers, appointed a person connected with the company as the defendants' agent to accept service of process. *Id.* at 318-19 (Black, J., dissenting). The Court rejected the dissent's argument that the clause was "too weak an imitation of a genuine agreement to be treated as a waiver of so important a constitutional safeguard as is the right to be sued at home." *Id.* at 332 (Black, J., dissenting). The dissent asserted, to no avail, that: "It strains credulity to suggest that these Michigan farmers ever read this contractual provision" or that they "would have known or even suspected that [it] amounted to an agreement …to let the company sue them in New York should any controversy arise." *Id.* at 332-33 (Black, J., dissenting).

Similarly, *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991), involved a forum-selection clause in a contract that a cruise-line customer was "deemed to have had knowledge of." *Id.* at 590. The Court upheld the clause under standards of "fundamental fairness." *Id.* at 595. It was undisputed that

"only the most meticulous passenger [was] likely to [have] become aware of the forum-selection provision" at all, and most likely only after "they ha[d] actually purchased their tickets." *Id.* at 597 (Stevens, J., dissenting). Yet the Court rejected the dissent's assertion that this provision should be "deemed as wanting in the element of voluntary assent." *Id.* at 598 (Stevens, J., dissenting).

In short, in cases overlooked by the district court, individuals (many quite unsophisticated) were deemed to have consented to personal jurisdiction by engaging in conduct that does not expressly signify subjective consent—in some cases, over dissents pointing out that the defendants did not appear even to be conscious that the conduct at issue (driving on a public road, leasing farm equipment, booking a cruise) would be deemed to be consent to personal jurisdiction. These cases rejected arguments that inferred consent was "too weak an imitation of a genuine agreement," *Szukhent*, 375 U.S. at 332 (Black, J., dissenting), and should be "deemed as wanting in the element of voluntary assent," *Shute*, 499 U.S. at 598 (Stevens, J., dissenting).

The district court did not grapple with these cases (likely because Defendants did not raise this issue, so it was not briefed). But finding consent to be sufficiently "meaningful" here follows *a fortiori* from them. Defendants,

represented by sophisticated counsel, were well aware of the statute's terms before it took effect. *See Shatsky*, 955 F.3d at 1038. If driving on a public road or serving as a corporate officer can validly signify consent to personal jurisdiction, how can the same not be said of engaging in conduct expressly set out in a statute actually known to sophisticated parties advised by elite counsel?

### 3. *"Obsolete" Supreme Court Cases*

In asking the district court to address Defendants' U.S. activities, Plaintiffs relied on the reasoning of the plurality and concurrence in *Burnham v. Superior Court*, 495 U.S. 604 (1990). While the holding of *Burnham* addressed a different factual scenario (tag jurisdiction on an individual), Plaintiffs explained that the *reasoning* provides useful guidance on the issue at hand. The plurality held that, regardless of minimum contacts, "tag" jurisdiction was constitutional because it is "[a]mong the most firmly established principles of personal jurisdiction," and "its validation is its [historical] pedigree." *Id.* at 621 (Scalia, J.). The concurrence held that fairness is relevant, concluding that the exercise of personal jurisdiction is fair where a defendant in the physical territory of a sovereign, even briefly, and receives "significant benefits," such as guarantees of "health and safety," freedom to travel, and "the fruits of the State's economy." *Id.* at 637-38 (Brennan, J., concurring).

57

Plaintiffs argued that both modes of reasoning supported jurisdiction here. Plaintiffs pointed out that numerous Supreme Court cases, dating back to the nineteenth century, uphold personal jurisdiction over artificial entities on the basis of deemed consent based on those entities' activities within the territory of a sovereign, *Washington v. Superior Ct. of Wash.*, 289 U.S. 361, 364-65 (1933); *Pennsylvania Fire Ins. Co. of Philadelphia v. Gold Issue Mining & Milling Co.*, 243 U.S. 93, 95 (1917); *St. Clair v. Cox*, 106 U.S. 350, 356 (1882); *Baltimore & Ohio R.R. Co. v. Harris*, 79 U.S. (12 Wall.) 65, 81 (1870), and also that Defendants received benefits from their U.S. activities exceeding those that Justice Brennan found compelling in *Burnham*.

The district court rejected this argument on the ground that it "relies heavily on pre-*International Shoe* case law from the nineteenth century that is now obsolete" and that "receipt of benefits is not a component of the consent analysis." SPA-17-18. Whether these directly applicable cases are or are not obsolete is a question that the Supreme Court has recently granted certiorari to consider. *Mallory v. Norfolk Southern Ry. Co.*, 142 S. Ct. 2646 (2022). The Supreme Court may uphold the old cases; or overrule them; or do something else. But the Court's grant of review indicates the Supreme Court has not overruled this line of cases. In these circumstances, it was not the district

court's place to disregard Supreme Court precedent as "obsolete." SPA-17. As the Supreme Court has repeatedly reaffirmed: "if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)).

### C. The *Fuld* Decision Is Unpersuasive

Shortly before the district court issued its decision, another judge in the same district also held the PSJVTA unconstitutional. *Fuld v. Palestine Liberation Org.*, 578 F. Supp. 3d 577 (S.D.N.Y. 2022) (Furman, J.), *appeal pending*, No. 22-76 (2d Cir.). Briefing on the Government's and plaintiffs' appeal in that case to this Court is scheduled to close November 10, 2022. The district court here was correct not to adopt the district-court analysis in the *Fuld* case, which contained several errors.

The *Fuld* district court went astray by mischaracterizing the jurisdictional issue as involving a "fundamental constitutional right." *Id.* at 580, 588, 591. Defendants never made this argument, and for good reason. A fundamental-rights analysis must begin with a "careful description of the asserted

right." *Reno v. Flores*, 507 U.S. 292, 302 (1993). One leading treatise has cata-logued "fundamental rights" as: (1) freedom of association; (2) the right to vote; (3) interstate travel; (4) fair procedures in the criminal process; (5) fair procedures (*i.e.*, notice and an opportunity to be heard) in claims against gov-ernmental deprivations of life, liberty, or property; and (6) privacy in matters relating to an individual's personal life. 2 Ronald D. Rotunda & John E. Nowak, *Treatise on Const. L.* § 15.7 (5th ed. 2012 & Supp. 2022). Courts are reluctant to add to this list—a modest approach "tends to rein in the subjective elements that are necessarily present in due-process judicial review." *Wash-ington v. Glucksberg*, 521 U.S. 702, 722 (1997); *Disabled Am. Veterans v. U.S. Dep't of Veterans Affairs*, 962 F.2d 136, 141-42 (2d Cir. 1992). Our research has disclosed no case ever classifying personal jurisdiction as a "fundamental right."

The *Fuld* district court also relied heavily on *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666 (1999), a case that forbids constructive waivers of state sovereign immunity. 578 F. Supp. 3d at 587-88. The holding of *College Savings* was that Congress did not have authority "to exact constructive waivers of sovereign immunity through the exercise of Article I powers." 527 U.S. at 683. Emphasizing the

special context of state sovereign immunity, the Court underscored that its "test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." *Id.* at 675 (quotation marks omitted).

Personal jurisdiction differs critically from state sovereign immunity. The requirement of personal jurisdiction is a matter of "individual liberty" that can "be waived" through "express or implied consent." *Bauxites*, 456 U.S. at 702-03. As discussed above, it does not implicate "fundamental rights." Sovereign immunity, by contrast, is "a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution." *PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2258 (2021) (quotation marks omitted). It "goes to the very heart of the federal system," *Constitution of the United States: Analysis and Interpretation*, S. Doc. No. 112-9, at 1791 (2012 & Supp. 2020); reflects "the unique contribution of the Framers to political science and political theory," *United States v. Lopez*, 514 U.S. 549, 575 (1995) (Kennedy, J., concurring); and constitutes an "essential … part of our constitutional structure" with a "vital … role in securing freedom," *id.* at 578. Thus, the holding of *College Savings*—that the constitutional plan's structural limits on Congress vis-à-vis the States forbid constructive waivers of state sovereign immunity—does not control and provides no guidance here. Indeed, the *Fuld*

district court acknowledged that "there are differences between the two contexts." 578 F. Supp. 3d at 588.

Yet the district court in *Fuld* stated that *College Savings* "all but compels" striking down the PSJVTA, relying especially on *dicta* that constructive consent is "'simply unheard of in the context of other constitutionally protected privileges.'" *Id.* (quoting *College Savings*, 527 U.S. at 684). This *dicta* was incorrect, and the *Fuld* district court should not have relied on it. It is true that waivers or consents implicating *fundamental* constitutional rights must be evaluated with heightened rigor, because a "strict standard of waiver" protects "those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial." *Schneckloth v. Bustamonte*, 412 U.S. 218, 237 (1973). But there is a well-established difference between constructive consent involving fundamental constitutional rights and other constitutional rights, as the Supreme Court held in *Schneckloth*. In that case, the Court declined to apply heightened scrutiny to a suspect's implied consent to a warrantless search notwithstanding his Fourth Amendment rights. *Id.* Contrary to the *Fuld* district court's rhetoric, permitting constructive consent has not resulted in "staggering implications beyond the realm of personal jurisdiction." 578 F. Supp. 3d at 591. Indeed, the Supreme Court has repeatedly upheld

62

constructive consent in contexts highlighted as troublesome by the *Fuld* district court, 578 F. Supp. 3d at 591-92, such as warrantless searches,[10] non-jury trials,[11] and non-Article III adjudications.[12] In language directly applicable here, the Supreme Court has embraced the concept of "implied consent to the personal jurisdiction of the court," *Bauxites*, 456 U.S. at 703-04, and specifically rejected the argument that "there is something unique about the requirement of personal jurisdiction, which prevents it from being established or waived like other rights," *id.* at 706. The *Fuld* district court was wrong to elevate the *dicta* in *College Savings* over the reasoning in *Bauxites*.

---

[10] "[A]ll 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense." *Missouri v. McNeely*, 569 U.S. 141, 161 (2013). The Supreme Court evaluates these consent statutes for reasonableness in challenges under the Fourth and Fifth Amendments. *Birchfield v. North Dakota*, 579 U.S. 438, 477 (2016); *South Dakota v. Neville*, 459 U.S. 553, 559-60 (1983).

[11] *See Bank of Columbia v. Okely*, 17 U.S. (4 Wheat.) 235, 235-36, 243 (1819) (rejecting defendant's claim that statutory authorization of summary execution for nonpayment of specified notes violated his Seventh Amendment rights, because he had "voluntarily relinquished his claims to the ordinary administration of justice" by issuing a note governed by the statute); *accord Baltimore & Carolina Line v. Redman*, 295 U.S. 654, 657 (1935) ("in the absence of express or implied consent to the contrary, issues of law are to be resolved by the court and issues of fact are to be determined by the jury").

[12] *Wellness Int'l Network*, 575 U.S. at 674-78; *Roell v. Withrow*, 538 U.S. 580, 590 (2003).

## CONCLUSION

The Court should RECALL its mandate, AFFIRM the district court's judgment entered on October 1, 2015, and REMAND to the district court with instructions to reinstate its judgment on the merits.

Respectfully submitted,

October 28, 2022
New York, New York

ARNOLD & PORTER KAYE SCHOLER LLP

By: _____

Kent A. Yalowitz
Avishai D. Don
250 West 55th Street
New York, NY 10019-9710
212-836-8000
kent.yalowitz@arnoldporter.com

– and –

Allon Kedem
Dirk C. Phillips
Stephen K. Wirth
601 Massachusetts Ave., NW
Washington, DC 20001-3743

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the foregoing document contains 13,812 words and complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Century font.

Dated: October 28, 2022          */s/ Stephen K. Wirth*
                                           Stephen K. Wirth

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2022, I caused the foregoing document to be electronically filed using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: October 28, 2022         */s/ Stephen K. Wirth*
                                               Stephen K. Wirth