**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

**MOTION INFORMATION STATEMENT**

Docket Number(s): 15-3135(L), 15-3151(XAP), 22-1060(CON) _____ Caption [use short title] _____

Motion for: Amici Curiae

_____

_____

Set forth below precise, complete statement of relief sought:

Leave to File Amicus Brief Pursuant to FRAP 29

_____

_____

_____

_____

_____

_____

EVA WALDMAN, et al.,

                 Plaintiffs-Appellants,

v.

PALESTINE LIBERATION ORGANIZATION, et al.,

                 Defendants-Appellees.

MOVING PARTY: Amici Curiae _____   OPPOSING PARTY: Palestine Liberation Organization, et al.

☐ Plaintiff          ☐ Defendant

☐ Appellant/Petitioner    ☐ Appellee/Respondent

MOVING ATTORNEY: Joshua E. Abraham _____   OPPOSING ATTORNEY: Gassan A. Baloul

[name of attorney, with firm, address, phone number and e-mail]

Abraham Esq. PLLC _____   Squire Patton Boggs (US) LLP

477 Madison Ave., Suite 1230, New York, NY 10022   30 Rockefeller Plaza, New York, NY 10012

josh@abrahamesq.com, (646) 245-6710 _____   gassan.baloul@squirepb.com (212) 872-9800

Court- Judge/ Agency appealed from: _____

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes   ☐ No (explain):_____
_____

Opposing counsel's position on motion:
☐ Unopposed  ☑ Opposed  ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes   ☐ No   ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has this request for relief been made below?   ☐ Yes ☐ No
Has this relief been previously sought in this court?  ☐ Yes ☐ No
Requested return date and explanation of emergency: _____
_____
_____
_____
_____

Is oral argument on motion requested?   ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   ☐ Yes ☑ No If yes, enter date:_____

**Signature of Moving Attorney:**

/s/ Joshua E. Abraham _____ Date: 11-04-2022 _____ Service by: ☑ CM/ECF   ☐ Other [Attach proof of service]

Form T-1080 (rev.12-13)

# 15-3135(L)

15-3151(XAP)
22-1060(CON)

IN THE
United States Court of Appeals
for the Second Circuit

―――――――――――――――

EVA WALDMAN, et al.,

*Plaintiffs-Appellants,*

UNITED STATES OF AMERICA,

*Intervenor-Appellant,*

v.

PALESTINE LIBERATION ORGANIZATION; PALESTINIAN AUTHORITY, a/k/a
PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY and/or PALESTINIAN
COUNCIL and/or PALESTINIAN NATIONAL AUTHORITY,

*Defendants-Appellees.*

YASSER ARAFAT, et al.

*Defendants.*

―――――――――――――――

*On Appeal from the United States District Court
for the Southern District of New York*

## MOTION OF PHILIP C. BOBBITT, MICHAEL C. DORF, AND H. JEFFERSON POWELL FOR LEAVE TO PARTICIPATE AS *AMICI CURIAE* SUPPORTING PLAINTIFFS- APPELLANTS

Professors Philip C. Bobbitt, Michael C. Dorf, and H. Jefferson Powell respectfully move for leave to participate in this appeal as *amici curiae* supporting appellants. Plaintiffs-Appellants and the Government have consented to the participation of the *amici*, but Defendants-Appellees have declined to consent.

This appeal arises from a suit under the civil liability provisions of the Anti-Terrorism Act (ATA), 18 U.S.C. § 2333(a), for injuries to United States nationals resulting from acts of international terrorism. The ATA is expressly extraterritorial in scope. 18 U.S.C. § 2331(1). Congress conferred exclusive jurisdiction on United States district courts to adjudicate ATA claims, 18 U.S.C. §§ 2333(a) & 2338, and authorized nationwide service of process "in any district where the defendant resides, is found, or has an agent," 18 U.S.C. § 2334(a).

In 2019, Congress facilitated personal jurisdiction over the Palestine Liberation Organization (PLO) and the Palestinian Authority (PA) in civil ATA cases by enacting the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), Pub. L. No. 116-94, div. J, tit. IX, § 903 (codified at 18 U.S.C. § 2334(e)). The PSJVTA specifies conduct—paying terrorists who killed or injured Americans, or engaging in activities within the United States—deemed to signify consent to personal jurisdiction in such cases.

The principal issue on appeal is whether the PSJVTA satisfies the Due Process Clause of the Fifth Amendment. This is a question of constitutional law. Your

2

proposed *amici* are distinguished professors of constitutional law, and they seek to lend their expertise to the Court in considering this important topic.

*Amici* respectfully submit, as more fully set forth in their brief, that the PSJVTA satisfies the Due Process Clause of the Fifth Amendment. *First*, we offer an argument based on history: the First Congress whose actions we associate with the generation of framers and ratifiers of the Constitution dealt with the terrorists of their era in a way that recognized the federal power to provide a jurisdictional basis for deterring piracy, the terrorism of that Age.

*Second*, we offer a prudential argument for judicial restraint where matters of national security are concerned and where the Congress and the Executive are in explicit statutory harmony.

*Third*, we provide a textual argument stressing plain differences in the language of the Fifth and Fourteenth Amendments, and criticize the use of Fourteenth Amendment cases to restrain the federal government without a showing that there was good reason to defy the text.

*Fourth*, we provide a structural argument, inferring rules for distinguishing between the restraints on federal and state action by looking at the different responsibilities of the governments and the relationship between state and federal authority.

*Fifth*, we offer a doctrinal analysis of the district court's opinion that highlights the most important element of any court's holding—it's implication for future cases—and urges the Court not to make doctrine into an artifact of the past.

*Finally,* we conclude with an ethical argument. The district court is appropriately sensitive to any attempt to bend the rules when government officials are going after terrorists. Those are the times when we must be most vigilant because they are the occasions when we are most tempted to cut corners in our passion to protect our people. But shouldn't we also be wary of treating the context of global terror as if it were simply a variation on ordinary crime? We know that democracies cannot coexist with terror. We question whether it is consistent with our constitutional traditions to disempower the national government when it must cope with a foreign threat to its citizens.

Dated: November 4, 2022

Respectfully submitted,

By: /s/ *Joshua E. Abraham*
Joshua E. Abraham
ABRAHAM ESQ. PLLC
477 Madison Avenue, Suite 1230
New York, NY 10022
(646) 245-6710
josh@abrahamesq.com

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing brief with the Clerk of the United States Court of Appeals for the Second Circuit via the CM/ECF system this 4[h] day of November, 2022, to be served on all counsel of record via ECF.


<u>/s/ Joshua E. Abraham</u>
Joshua E. Abraham

# 15-3135(L)

**15-3151(XAP)**
**22-1060(CON)**

IN THE
United States Court of Appeals
for the Second Circuit

_____

EVA WALDMAN, et al.,

*Plaintiffs-Appellants*,

UNITED STATES OF AMERICA,

*Intervenor-Appellant*,

v.

PALESTINE LIBERATION ORGANIZATION; PALESTINIAN AUTHORITY, a/k/a
PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY and/or PALESTINIAN
COUNCIL and/or PALESTINIAN NATIONAL AUTHORITY,

*Defendants-Appellees*.

YASSER ARAFAT, et al.

*Defendants*.

_____

*On Appeal from the United States District Court
for the Southern District of New York*

**BRIEF OF AMICI CURIAE CONSTITUTIONAL LAW SCHOLARS
PHILIP C. BOBBITT, MICHAEL C. DORF, AND H. JEFFERSON
POWELL IN SUPPORT OF PLAINTIFFS-APPELLANTS**

Joshua E. Abraham
ABRAHAM ESQ. PLLC
477 Madison Avenue, Suite 1230
New York, NY 10022
(646) 245-6710
josh@abrahamesq.com

*Counsel for Amici Curiae*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................II

INTEREST OF AMICI CURIAE............................................................... 1

INTRODUCTION ................................................................................... 2

ARGUMENT........................................................................................ 4

I. ................................................................................................ 4

II. ................................................................................................ 6

III. ............................................................................................... 10

IV. ............................................................................................... 14

V. ................................................................................................ 18

VI. ............................................................................................... 19

CONCLUSION...................................................................................... 25

CERTIFICATE OF COMPLIANCE...................................................... 28

CERTIFICATE OF SERVICE .............................................................. 29

# <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

### <u>Cases</u>

*Banco Nacional de Cuba v. Sabbatino*,
   376 U.S. 398 (1964) ............................................................ 17

*Bank Markazi v. Peterson*,
   578 U.S. 212 (2016) ............................................................ 11

*Burnet v. Brooks*,
   288 U.S. 378 (1933) ............................................................ 19

*Charles T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*,
   651 F.2d 800 (1st Cir. 1981) .............................................. 13

*Chew v. Dietrich*,
   143 F.3d 24 (2d Cir. 1998) .................................................. 21

*Coleman v. American Export Isbrandtsen Lines, Inc.*,
   405 F.2d 250 (2d Cir. 1968) ............................................... 22

*Cook v. Tait*,
   265 U.S. 47 (1924) ............................................................. 19

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ........................................................... 13

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*,
   582 F.3d 393 (2d Cir. 2009) ............................................... 21

*G. M. Leasing Corp. v. United States*,
   429 U.S. 338 (1977) ............................................................. 9

*Hamdan v. Rumsfeld*,
   548 U.S. 557 (2006) ........................................................... 17

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004) ........................................................... 20

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) ............................................................. 19

*In re Terrorist Attacks on Sept. 11, 2001*,
   538 F.3d 71 (2d Cir. 2008) .................................................. 21

*Kiobel v. Royal Dutch Petroleum Co.*,
   569 U.S. 108 (2013) ............................................................. 8

ii

*Lynch v. Donnelly*,
    465 U.S. 668 (1984) ................................................................... 9

*Marsh v. Chambers*,
    463 U.S. 783 (1983) ................................................................... 7

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ................................................................. 20

*Mississippi Pub. Corp. v. Murphree*,
    326 U.S. 438 (1946) ................................................................. 23

*Picquet v. Swan*,
    19 F. Cas. 609 (C.C.D. Mass. 1828) ...................................... 15

*Pierce v. Globemaster Baltimore, Inc.*,
    49 F.R.D. 63 (D. Md. 1969) ................................................... 22

*Principality of Monaco v. State of Mississippi*,
    292 U.S. 313 (1934) ................................................................. 16

*Quinones v. Pennsylvania General Ins. Co.*,
    804 F.2d 1167 (10th Cir. 1986) .............................................. 22

*Robertson v. Railroad Labor Board*,
    268 U.S. 619 (1925) ................................................................. 23

*Samantar v. Yousuf*,
    560 U.S. 305 (2010) ................................................................. 21

*Slaughter-House Cases*,
    83 U.S. (16 Wall.) 36 (1873) ................................................. 19

*Sokolow v. Palestine Liberation Org.*,
    No. 4-397 (Mar. 10, 2022) ........................................................ 4

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ........................................................... 8, 10

*Texas Trading & Mill. Corp. v. Fed. Republic of Nigeria*,
    647 F.2d 300 (2d Cir. 1981) ................................................... 21

*Toland v. Sprague*,
    12 Pet. 300 (1838) ................................................................... 23

*United States v. Bennett*,
    232 U.S. 299 (1914) ................................................................. 19

*United States v. Pink*,
    315 U.S. 203 (1942) ................................................................. 13

iii

*United States v. Smith,*
   18 U.S. 153 (1820) ........................................................................ 8

*United States v. Union Pacific R. Co.,*
   98 U.S. 569 (1878) ....................................................................... 23

*United States v. Vilar,*
   729 F.3d 62 (2d Cir. 2013) .......................................................... 15

*United States v. Yousef,*
   327 F.3d 56 (2d Cir. 2003) .................................................... 10, 16

*Waldman v. Palestine Liberation Org.,*
   835 F.3d 317 (2d Cir. 2016) ...................................... 15, 18, 20, 21

*Wisconsin v. Pelican Ins. Co.,*
   127 U.S. 265 (1888) ...................................................................... 7

*World-Wide Volkswagen Corp. v. Woodson,*
   444 U.S. 286 (1980) ..................................................................... 15

*Zadvydas v. Davis,*
   533 U.S. 678 (2001) ..................................................................... 20

## Statutory Authorities

18 U.S.C. § 2333(a) ......................................................................... 3

18 U.S.C. § 2334(e)(1) .................................................................... 14

18 U.S.C. § 2334(e)(1)(A) ............................................................... 14

28 U.S.C. § 2361 ............................................................................. 23

## Rules and Regulations

31 C.F.R. § 589.201 ........................................................................ 13

31 C.F.R. § 589.337 ........................................................................ 13

Fed. R. App. 29(a)(4)(E) .................................................................. 1

Fed. R. Civ. P. 4(k)(1)(A) ............................................................... 22

Fed. R. Civ. P. 4(k)(1)(B) ............................................................... 22

Fed. R. Civ. P. 4(k)(1)(C) ........................................................ 23, 24

## Constitutional Provisions

U.S. Const.art. I, § 8, cl. 9 ........................................... 17

U.S. Const.art. I, § 8, cl. 10 ......................................... 17

U.S. Const.art. I, § 8, cl. 18 ......................................... 17

U.S. Const. ams. v, xiv ............................................... 15

## Legislative Materials

163 Cong. Rec. H9650 (daily ed. December 5, 2017) ............................ 14

## Additional Authorities

Act of Sept. 24, 1789, ch. 20, § 9, 1 Stat. 76-77 ........................... 8

*Br. of Sen. Grassley, Rep. Nadler, et al., at 19* ......................... 14

John F. Manning, *Foreword: The Means of Constitutional Power*,
128 Harv. L. Rev. 1 (2014) ........................................... 17

Juan Zarate, *Treasury's War: The Unleashing of a New Era of
Financial Warfare* (2013) ........................................... 12

Philip Bobbitt, *Terror and Consent: The Wars for the
Twenty-first Century* (Knopf, 2008) ............................... 6, 7

Philip Bobbitt, *The Shield of Achilles: War, Peace and
the Course of History* (Knopf, 2002) ............................. 11

Promoting Security and Justice for Victims of Terrorism Act of 2019,
Pub. L. No. 116-94, tit. IX, § 903, 133 Stat. 3082 ................ 4

Stephen E. Sachs, The Unlimited Jurisdiction of the Federal Courts,
106 Va. L. Rev. 1703 (2020) ....................................... 16

*Trump Administration Brokers Accords to Normalize Relations
Between Israel and Six Countries*, 115 Am. J. Int'l L. 116 (2021) ........ 13

## <u>INTEREST OF AMICI CURIAE</u>[1]

Philip C. Bobbitt is a constitutional law scholar with a special concern for the constitutional law governing national security.  He is Herbert Wechsler Professor of Federal Jurisprudence and Director of the Center for National Security at Columbia Law School.  He is also Distinguished Senior Lecturer at the University of Texas School of Law.  He has published widely on the subjects of constitutional interpretation and international security.  He has also served as Associate Counsel to the President and, in that role, participated in negotiations to release the U.S. hostages taken in Tehran in 1980, and later served as the Counselor in the Office of the Legal Adviser at the Department of State.

Michael C. Dorf is the Robert S. Stevens Professor of Law at Cornell Law School.  A scholar of U.S. constitutional law, he has also taught and written in the subjects of federal courts and civil procedure and has advised organizations involved in constitutional litigation.  He is the co-author (with Laurence H. Tribe) of *On Reading the Constitution* and the coauthor (with Trevor Morrison) of *The Oxford Introductions to U.S. Law: Constitutional Law.*

---

[1]   Pursuant to Fed. R. App. 29(a)(4)(E), *amici* represent that this brief was written in part by counsel for *amici*, and not by counsel for any party.  The Jewish Institute for National Security of America awarded an honorarium to Professor Bobbitt for his work in preparing this brief.

H. Jefferson Powell is Professor of Law at Duke Law School. He has served as the deputy assistant attorney general in the Office of Legal Counsel and as the principal deputy solicitor general at the U.S. Department of Justice. He is widely noted as a constitutional historian specializing in the powers of the executive branch and the role of the Constitution in legislative and judicial decision-making.

Amici have an interest in this case and in offering their perspective on how the statute at issue furthers U.S. foreign policy interests and falls within Congress's enumerated powers.

## INTRODUCTION

Between 2001 and 2004, the lives of dozens of American citizens were irreparably changed by heinous terrorist acts committed by agents of the Palestinian Authority ("PA"). Mark Sokolow and his family, who were vacationing in Jerusalem, were grievously injured when a PA intelligence agent detonated a bomb hidden in a backpack. Shrapnel from another suicide bomber pierced Alan Bauer's arm and his young son's brain. Scott Goldberg died on his way to work when his bus was incinerated by a suicide bomber, leaving a wife and seven children. In each of these incidents – and in many others – the PA and the Palestine Liberation Organization ("PLO") rewarded participants in these attacks with continued salaries and promotions, or provided payments to the families of the suicide bombers in honor of their murderous acts.

2

Petitioners – victims of these attacks, or their heirs and representatives – sued the PLO and PA under the Anti-Terrorism Act of 1992 ("ATA"), 18 U.S.C. § 2333(a). That statute gives U.S. citizens and their families a right to bring a civil action against organizational sponsors of terrorism. Numerous cases have been brought against the PLO and the PA under the ATA and for many years the PLO and PA settled such cases or paid the judgments entered in them.

U.S. policy makers supported enactment of the ATA in order to further this country's efforts at combatting and deterring terrorism. It was envisioned by the Congress and the Executive that by eliminating sources of terrorist funding and holding the sponsors of terrorism accountable for their actions, acts of terror worldwide against Americans could be made more costly to their sponsors. Imposing civil liability is an important means to accomplish these objectives because it disrupts the financing of terrorism and jeopardizes the ability of terror organizations to promise to support these atrocities.

Recent court decisions then held, however, that the PLO and PA were beyond the jurisdictional reach of the U.S. courts, even if they harmed U.S. citizens. Congress responded to these decisions with legislation providing that if a defendant to an ATA action maintained a presence within the United States, it would be deemed to have consented to jurisdiction rendering it potentially liable under the ATA. This jurisdictional statute was the Anti-Terrorism Clarification Act of 2018.

3

When this language was deemed ambiguous, Congress responded with the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), Pub. L. No. 116-94, div. J, tit. IX, § 903, 133 Stat. 3082, specifically naming the PLO and the PA as subject to the jurisdiction of the courts when applying the ATA. When the PLO or the PA engages in activities in the United States or continues their "pay-for-slay" programs with regard to terrorists who harmed U.S. nationals, such actions are to be deemed consent to personal jurisdiction in civil cases under the ATA.

The PLO and PA claimed that that statute, the PSJVTA, was unconstitutional. The district court, per Daniels, J., agreed, striking down the 2019 legislation and neutering the ATA with respect to the PLO and PA. *Sokolow v. Palestine Liberation Org.*, 04 Civ. 397 (GBD), 2022 WL 719261 (S.D.N.Y. Mar. 10, 2022). Not surprisingly, many US officials now fear that these groups will be emboldened to continue their incitement of terror with impunity and that the US will have been deprived of an increasingly important tool in the global struggle against organized acts of terror. Explaining why this is so, and its constitutional significance for this case, is one element of this *amicus* brief.

## **ARGUMENT**

### **I.**

We begin with a vignette.

In 1980, during the Iranian Hostage Crisis, Lloyd Cutler, the Counsel to the President, held a clandestine meeting at the Century Association with a representative of Bank Markazi, the Iranian Central Bank; [Cutler was accompanied by a young associate counsel to the president.] [They] met in a darkened room, the only persons there, for about three hours. Cutler explained that the $7 billion in frozen Iranian assets held in the US was not coming back to Teheran. [His] Iranian counterpart took this calmly. What he knew, and what the Administration only came to realize, was that the Ayatollah Khomeini did not see the unlawful detention of American hostages as mainly a bilateral, international affair. Rather he was using the Crisis that the detention had provoked as a means to isolate his domestic adversaries, flushing out those who had supported the Revolution but who were insufficiently radical to desire a permanent adversarial relationship with the US. $7 billion was a price he was willing to pay to accomplish this goal.

Cutler explained that Iran's exposure, however, went far beyond the frozen assets. The families of the hostages were suing Iran in numerous American jurisdictions and could reasonably expect enormous damages. The suits could go on for years, and the total amount of

potential Iranian losses was astronomical. Judgments won in American courts could be levied throughout Europe and elsewhere. This scenario got the attention of [his] Iranian counterpart.

There was a possible way out, Cutler explained. The Congress might be persuaded to cap Iran's exposure if, and only if, the hostages were promptly returned without injuries. It was this maneuver that ultimately ended the crisis and brought our hostages home.[2]

## II.

For much of the twentieth century the analytical assumption reigned that, though the technology and causes might change, terrorism had remained the same throughout modern history (giving rise to the quip that, "one man's terrorist is another man's freedom fighter"). *Terror and Consent: The Wars for the Twenty-first Century*[3] argued, however, that terrorism had gone through a number of distinct phases since the birth of the modern state in the 16th century. Ironically, these phases tracked the periods of the evolution of the distinct constitutional orders of the very states that terrorists attacked. For example, the sectarian mercenaries who sacked Antwerp in the Spanish Fury menaced a constitutional order, the princely state, that

---

[2]  Adapted from an unpublished memoir by Philip Bobbitt. No classified or otherwise confidential information has been disclosed.

[3]  Philip Bobbitt, *Terror and Consent: The Wars for the Twenty-first Century* (Knopf, 2008).

was itself intensely sectarian and depended upon mercenary forces, *see id.* at 28-29; the pirates of the Caribbean attacked the shipping routes of kingly states and declared themselves sovereigns in mimicry of the dynastic, absolute monarchs of that constitutional order, *see id.* at 30-31; the terrorists of the littoral states of the southern Mediterranean exploited as well as copied the mercantile culture of the colonial, territorial states of the 18th century whose trade they menaced, *see id.* at 35-36; and so on up to the present day of global, networked terror groups that reflect the globalized contexts and market-driven policies of twenty-first century states, *see id.* at 44-45. This historical background is relevant to the present appeal, as will be seen, for conventional, constitutional reasons.

To begin with, the founding era of the United States and its leaders' treatment of the Barbary Pirates as terror groups set the constitutional stage because they help us take the intentions of the original framers and ratifiers forward to the present day. It is well-established that historical evidence of the practices and actions of the First Congress, "many of whose members had taken part in framing [the Constitution], is contemporaneous and weighty evidence of its true meaning." *Marsh v. Chambers*, 463 U.S. 783, 790 (1983) (quoting *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888)). *See also* n.5, *infra*.

In fact, the constitutional and international law of piracy was well established in the 18th century and the early 19th century. Indeed, the US Supreme Court has

observed that "in the 18th century, nations reached consensus not only on the substantive principle that acts of piracy were universally wrong but also on the jurisdictional principle that any nation that found a pirate could prosecute him." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 762 (2004) (Breyer, J., concurring) (citing *United States v. Smith*, 18 U.S. 153, 161 (1820)).[4]

The First Congress enacted the Judiciary Act of 1789, granting district courts jurisdiction over exterritorial civil claims relating to piracy. *See* Act of Sept. 24, 1789, ch. 20, § 11, 1 Stat. 76-77. "Congress intended [this statute] to furnish jurisdiction for a relatively modest set of actions," including, among other things, "individual actions arising out of … piracy." *Sosa*, 542 U.S. at 720. The Judiciary Act also granted the district courts exclusive "cognizance of all crimes and offences … committed … upon the high seas." Act of Sept. 24, 1789 § 9. Because the First Congress also proposed the Fifth Amendment whose Due Process Clause is at issue in this case, they clearly did not believe that there was a constitutional violation in the grant of exterritorial jurisdiction they provided in the First Judiciary Act for the prosecution of pirates.[5] Therefore, the Due Process Clause of the Fifth Amendment

---

[4] *See also, e.g.*, *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 121 (2013) ("Pirates were fair game wherever found, by any nation ….").

[5] The First Congress's practical construction of Bill of Rights provisions is of "special significance in light of the" fact that "the First Congress 'was a Congress whose constitutional decisions have always been regarded … as of the greatest

could scarcely be construed to bar Congress from granting extraterritorial jurisdiction to *civil suits* where the constraints of due process are so much less, when these suits are aimed at terrorist acts abroad.

The Supreme Court has invited Congress to update from the 18th century the causes of action that fall under extraterritorial jurisdiction, writing that "we would welcome any congressional guidance in exercising jurisdiction with such obvious potential to affect foreign relations." *Sosa*, 542 U.S. at 731. Congress has responded with measures like the PSJVTA, repeatedly asserting that the extraterritorial jurisdiction that extended to piracy in the 18th century now applies to cases arising from certain acts of terror. This guidance reaffirms the Congress's consistent view that terrorism, like piracy, has morphed and become more global and potentially more deadly, posing a threat to the United States. By extension, litigation concerning its victims does not give rise to a violation of due process; indeed, the continuity of asserting extraterritorial jurisdiction over acts of terror is striking.

This claim need not be made more broadly than is justified by the historical record. While piracy to the Founding generation was terrorism—the terrorism of the 18th century constitutional order—it does not follow that all terrorism today is

---

weight in the interpretation of that fundamental instrument.'" *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984). The First Congress also "proposed the adoption of the Bill of Rights," *G. M. Leasing Corp. v. United States*, 429 U.S. 338, 354 (1977), and so its interpretation of the Bill of Rights carries special weight.

piracy. Thus, this Court has written that "terrorism—unlike piracy, war crimes, and crimes against humanity—does not provide a basis for universal jurisdiction." *United States v. Yousef*, 327 F.3d 56, 107–08 (2d Cir. 2003). *Yousef*, however, was a criminal, not a civil case, and the plaintiffs in *Sokolow* assert jurisdiction on statutory grounds, not on the basis of universal jurisdiction. This Court recognized this distinction in *Yousef* when it wrote that, "Yousef's claim that principles of customary international law constrain Congress's power to enact laws that proscribe extraterritorial conduct is simply wrong." *Id*. at 108. To create a due process limitation on Congress's ability to make that power effective in the courts is to reintroduce through a back door the claim this Court rejected in *Yousef*.[6]

## III.

Courts have consistently expressed caution when addressing issues that implicate the foreign policy prerogatives of the Legislative and Executives branches. For example, in *Sosa*, the Supreme Court declined to give judicial recognition to the claim that a cause of action fell under extraterritorial jurisdiction, reasoning in part that "the potential implications for the foreign relations of the United States of

---

[6] "[I]rrespective of whether customary international law provides a basis for jurisdiction over Yousef … United States law provides *a separate and complete basis* for jurisdiction … and, contrary to Yousef's assertions, United States law is not subordinate to customary international law or necessarily subordinate to treaty-based international law and, in fact, may conflict with both." *United States* v. *Yousef* at 91 (emphasis added).

recognizing such causes should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." 542 U.S. at 727.  Similarly, courts should be circumspect with respect to doing the inverse: denying Congress's ability to extend extraterritorial jurisdiction, because doing so would impinge on the discretion of the Legislative Branch to manage foreign affairs.  *See also, e.g.*, *Bank Markazi v. Peterson*, 578 U.S. 212, 234 (2016) (holding that a statute removing execution immunity over assets to satisfy a terrorism-related judgment would not be deemed unconstitutional because, in part, "foreign affairs" is "a domain in which the controlling role of the political branches is both necessary and proper").  This is particularly true in this case given the crippling effect such judicial interference would have on the United States' ability to adapt to the terror tactics of the 21st century.

*The Shield of Achilles: War, Peace and the Course of History*,[7] argued that changes in the constitutional order of states brought about changes in strategy and warfare, and vice versa.  It observed that our present constitutional order—the industrial nation state that has been the dominant constitutional order in the United States since the re-founding of the US after the Civil War—was mutating away from a State that relied on co-opting the market to a State that used the market to

---

[7] Philip Bobbitt, *The Shield of Achilles: War, Peace and the Course of History* (Knopf, 2002).

accomplish its political goals. All over the world, in fact, state-owned enterprises were giving way to sovereign wealth funds, conscription was being replaced by all-volunteer armies, industries were being deregulated, privatization was assisting and in some areas supplanting government operations, and local options for hitherto national constitutional rules were proliferating. This change in the constitutional order, according to this analysis, would bring about changes in strategy.

With respect to warfare, global networked terror groups were now increasingly able to exploit innovations in information technology to recruit, raise funds, train units and deploy them. These developments, it was argued, operate synergistically; states will increasingly want to use the resources of private litigation, banking, and monetary facilities (including SWIFT mechanisms), as well as informal economic sanctions in competition with other states.[8]

The United States has long used the threat of civil litigation as a bargaining chip in resolving international crises. Pursuant to its authority to resolve "claims against foreign states and the disposition of foreign-state property in the United States, *Bank Markazi*, 578 U.S. at 235, the United States often "has agreed to renounce or extinguish claims of United States nationals against foreign

---

[8]  *See, e.g.*, Juan Zarate, *Treasury's War: The Unleashing of a New Era of Financial Warfare* 89 (2013) (describing several instances in which banks have voluntarily shut down accounts with potential ties to terrorist financing and nuclear proliferation to avoid "reputational risks" and "potential liability").

governments," *Dames & Moore v. Regan*, 453 U.S. 654, 679 (1981); *see also, e.g.*, *Charles T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*, 651 F.2d 800, 811 (1st Cir. 1981) (collecting historical examples). Often, the Executive Branch has agreed to such settlements in return for a "lump-sum payment or the establishment of arbitration procedures," as well as other concessions. *Dames & Moore*, 453 U.S. at 679; *see also, e.g.*, *Trump Administration Brokers Accords to Normalize Relations Between Israel and Six Countries*, 115 Am. J. Int'l L. 116, 117-18 (2021) (noting that Sudan agreed to recognize Israel and pay $355 million to settle terrorism claims against it in exchange for being removed from the state sponsors of terrorism list). Resolution of claims has even been used to extract concessions from a government seeking recognition from the United States. *See, e.g.*, *United States v. Pink*, 315 U.S. 203, 216 (1942) (recognition of the Soviet Union). U.S. sanctions for internationally wrongful acts now, as a matter of course, pause enforcement of civil litigation by private parties to give the United States this leverage in international negotiations. *See, e.g.*, 31 C.F.R. §§ 589.201, 589.337 (prohibiting, in connection with the Russian invasion of Ukraine, the transfer of Russian property, including "the issuance … of … any judgment, decree, attachment, injunction, execution, or other judicial or administrative process or order" against blocked Russian property).

Given the United States' lengthy history of economic deterrence, holdings like the one in the District Court in *Sokolow* could inadvertently deprive the U.S. of one

of its strongest tactical options. The lead sponsors of the ATA recognized this when they wrote in a Supreme Court *amicus* brief that "[c]ivil litigation under the ATA plays an essential role in reinforcing . . . governmental antiterrorism efforts." Br. of Sen. Grassley, Rep. Nadler, et al., at 19, *Sokolow v. Palestine Liberation Org.*, No. 19-764 (Jan. 15, 2020) (citation and quotation marks omitted).

One of the jurisdictional bases established by the PSJVTA was designed to undermine a key means by which modern terrorist groups exploit markets to accomplish their political goals—payments made to terrorists who kill or injure U.S. nationals. 18 U.S.C. § 2334(e)(1)(A).[9] These payments "clearly incentivize terrorist attacks, and they further threaten prospects for peace, pushing the chance for a Palestinian state further and further out of reach." 163 Cong. Rec. H9650 (daily ed. December 5, 2017) (Rep. Engel). Absent the clearest constitutional command, courts should not impede the development of innovative, non-violent tools for fighting the kind of innovative terror that mimics the constitutional order it is attacking.

## IV.

In an earlier phase of the case, this Court applied circuit precedent asserting that the Fifth Amendment and Fourteenth Amendment are "basically the same" for

---

[9] "A defendant shall be deemed to have consented to personal jurisdiction in such civil action if … the defendant … makes any payment, directly or indirectly" to a terrorist who kills or injures a U.S. national. 18 U.S.C. § 2334(e)(1).

purposes of jurisdictional analysis. *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 330 (2d Cir. 2016). The actual language of the Fifth and Fourteenth Amendments' Due Process Clauses, however, is importantly not quite the same. While the Fifth Amendment provides that, "No person shall...be deprived of life, liberty, or property, without due process of law," the Fourteenth states that, "[N]or shall any *state* deprive any person of life, liberty or property without due process of law." U.S. Const. ams. v, xiv (emphasis supplied).

This textual difference reflects a structural distinction of great significance: the Fourteenth Amendment's provision is limited to state power—plenary, subordinate to the federal power, and territorial—while the Fifth Amendment imposes a limitation on federal power—enumerated, supreme with respect to the states, and both national and international.[10] In other words, the Fourteenth Amendment's Due Process Clause acts "as an instrument of interstate federalism" limiting the territorial reach of state power. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294 (1980). By contrast, "[i]t is beyond doubt that, as a general proposition, Congress has the authority to 'enforce its laws beyond the territorial boundaries of the United States.'" *United States v. Vilar*, 729 F.3d 62, 72

---

[10] *See Picquet v. Swan*, 19 F. Cas. 609, 611 (C.C.D. Mass. 1828) (Story, J.) (States are "bounded in the exercise of [their judicial] power by the limits of [state] territory.") (distinguishing the state and federal governments).

(2d Cir. 2013) (quoting *Yousef*, 327 F.3d at 86). Unlike a state attempt to intrude its authority into other states, expanding U.S. jurisdiction abroad poses no threats to the federal structure because foreign states, unrecognized governments, and foreign terrorist groups "lie[] outside the structure of the Union." *Principality of Monaco v. State of Mississippi*, 292 U.S. 313, 330 (1934).

Accordingly, it would be a category mistake to impose on Congress's power those restraints that derive from the nature of state power, yet that is precisely what occurs when the territorial limitations of the states' personal jurisdiction are grafted onto federal power. Professor Sachs has noted that while the Fourteenth Amendment "enabled direct federal-question review of [state] jurisdictional rulings," the same does not apply to the federal government since the federal law is supreme with regard to state law. Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 Va. L. Rev. 1703, 1709 (2020). "A federal long-arm provision, if within Congress's enumerated powers, *establishes* territorial jurisdiction to the satisfaction of the courts…. The federal government can look past a state's assertion of jurisdiction, but not the other way round." *Id*.

Broad assertions of federal, but not state, jurisdiction can be justified under a number of enumerated powers when these are given effect by the implied powers implicit in the Necessary and Proper Clause. Congress has the power "to make all Laws which shall be necessary and proper for carrying into Execution the foregoing

16

Powers, *and all other Powers vested by this Constitution in the Government of the United States* ….” U.S. Const. art. I, § 8, cl. 18 (emphasis added).  “That additional text is significant because it gives Congress express authority over the implementation of the coordinate branches’ powers.”  John F. Manning, *Foreword: The Means of Constitutional Power*, 128 Harv. L. Rev. 1, 46 (2014).  Congress has the power to “constitute Tribunals inferior to the supreme Court,” U.S. Const. art. I, § 8, cl. 9, and define and punish … Offences against the Law of Nations,” *id.* art. I, § 8, cl. 10, and the judiciary has power over all “Cases, in Law and Equity, arising under [federal law].”  *Id.* art. III, § 2, cl. 1.  Congress thus has the means to effect that power by allowing injured citizens to sue terrorists in U.S. courts.  *See* Sachs, *supra*, at 1729-30; *see also, e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 655 (2006) (Kennedy, J., concurring in part) (“Congress, not the Court, is the branch in the better position to undertake the ‘sensitive task of establishing a principle [of international law] not inconsistent with the national interest or with international justice.’” (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964))).

If Congress has the power to “forbid terrorist attacks on our citizens abroad, under its power to ‘define and punish… Offenses against the Law of Nations,’” then it has the means to effect that power by allowing injured citizens to sue in U.S. courts.  Sachs, *supra*, at 1730 (quoting U.S. Const. art. I, § 8, cl. 10).

## V.

Circuit precedent seems to assume that cases construing the term "due process of law" in the Fourteenth Amendment can be mechanically applied to the Fifth Amendment's due process precedents regarding the federal government – and doubtless this is often the case. *See Waldman*, 835 F.3d at 330.

But when is it not the case? When does the federal government stand in a unique position, one that the states do not share? Both state and federal authorities are engaged with preventing and prosecuting terrorist acts. What is the difference in their responsibilities?

When is the Due Process Clause of the Fourteenth Amendment applied to the state to prevent activity that would not forbidden by the Fifth amendment—or any portion of the Bill of Rights—to the federal government?

The answer lies in Congress's exercise of its powers to address the unique security and diplomatic responsibilities of the federal government and, with respect to terrorism, to support the U.S. government's struggle against global terror networks.

The Supreme Court has held that the Fourteenth Amendment barriers prohibiting states from "transcending the limits of their authority… [and] affords no ground for constructing an imaginary constitutional barrier around the exterior confines of the United States for the purpose of shutting that government off from

the exertion of powers which inherently belong to it by virtue of its sovereignty." *United States v. Bennett*, 232 U.S. 299, 306 (1914); *accord Burnet v. Brooks*, 288 U.S. 378, 403-405 (1933); *Cook v. Tait*, 265 U.S. 47, 55-56 (1924). One inherent power, "recognized immemorially as a responsibility of government, has to do with the protection of the just rights of a country's own nationals when those nationals are in another country." *Hines v. Davidowitz*, 312 U.S. 52, 64 (1941). With the passage of PSJVTA, Congress was exercising its power to protect its citizens in a manner appropriate to the changing constitutional order. This Court has described the right of an American citizen "to demand the care and protection of the Federal Government over his life, liberty, and property when … within the jurisdiction of a foreign government" as a "privilege of a citizen of the United States." *Slaughter-House Cases*, 83 U.S. 36, 79 (1873). Without the ability to grant exterritorial jurisdiction for private suits relating to acts of terror, Congress will be hamstrung by the courts in its obligation to protect citizens, as terror groups use the market to purchase attacks against Americans.

## VI.

The briefs filed by the Plaintiffs-Appellants and by the Government carefully and powerfully discuss the caselaw that is relevant to the District Court's opinion. There is little to be gained from a repetition of their analyses in a succinct *amicus* brief that aims mainly to illuminate the strategic consequences of the District Court's

holding in the context of the unique security and diplomatic responsibilities of the federal government and, with respect to terrorism, the U.S. government's struggle against global terror networks and the contribution that civil process can make to prevail in that struggle.

But there is one point to be made: this brief's discussion of the broad constitutional concerns implicated in this case demonstrates that Second Circuit precedents, and *Waldman* in particular, do *not* in fact govern the constitutional issue at hand. *Waldman* assumed that precedents construing the term, "due process of law" in the Fourteenth Amendment can be unreflectively applied to the federal government under the Fifth Amendment. But "due process is flexible," *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (citation omitted); "do[es] not extend to aliens outside the territorial boundaries," *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); and must reflect "governmental interests," *Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004) (plurality opinion). The federal government has unique security and diplomatic interests and responsibilities, especially with regards to global terrorist networks, none of which were discussed in *Waldman*. The issue addressed in *Waldman* was limited to whether "minimal contacts and fairness analysis is the same under the Fifth and Fourteenth Amendment." 835 F.3d at 331. But the basis for personal jurisdiction under the PSJVTA is consent, rather than minimum contacts or specific

20

jurisdiction or general jurisdiction. *Waldman* is not controlling precedent for a question it did not decide.

Furthermore, the *Waldman* Court believed itself to be governed by an earlier Second Circuit decision in which the appeals court had applied Fourteenth Amendment principles to the Fifth Amendment in civil cases arising from acts of terrorism, but once again predicated on minimal contacts or general jurisdiction reasoning. 835 F.3d at 330 (citing *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 93 (2d Cir. 2008), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010)).[11]

*In re Terrorist Attacks on Sept. 11, 2001* involved a lawsuit brought by victims of the September 11, 2001 terrorist attacks. 538 F.3d 71. Plaintiffs in that case specifically brought tort claims against several entities including four Saudi princes ("the Four Princes"). *Id.* at 75. The Court held that the princes' contacts with the United States were "far too attenuated to establish personal jurisdiction in American Courts," and that there was no evidence that their conduct expressly directed

---

[11] *Waldman* also cited footnotes in *Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998), and *Texas Trading & Mill. Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 315 n.37 (2d Cir. 1981), *overruled by Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393 (2d Cir. 2009), which stated, with minimal analysis, that "the due process analysis is basically the same under both the Fifth and Fourteenth Amendments." *Chew* 143 F.3d at 28 n.4. Neither opinion analyzed the Constitution's text or structure or provided significant analysis in support of this (footnoted) conclusion.

"intentional tortious acts at residents of the United States." *Id.* at 95. Thus, the court found that personal jurisdiction did not attach either under minimum contacts rules or under concepts of general jurisdiction. *Id.*

Again, the basis for personal jurisdiction in *Sokolow* is consent rather than minimum contacts or general jurisdiction.

Moreover, the Due Process Clause of the Fourteenth Amendment limits the territorial jurisdiction of state but not federal courts. As a policy matter, Congress and the Supreme Court, acting through the federal rulemaking process, have generally confined the territorial jurisdiction of federal district courts to the limits the Fourteenth Amendment makes applicable *ex proprio vigore* to state courts. *See* Fed. R. Civ. P. 4(k)(1)(A). However, the rule makes two express exceptions to federal incorporation of state limits. One such exception allows for so-called bulge jurisdiction: where a party who could not, consistent with the Fourteenth Amendment, be subject to jurisdiction in state court, that party may nonetheless be served across state lines if the service occurs within 100 miles of a federal judicial district. Fed. R. Civ. P. 4(k)(1)(B). The Second Circuit and other federal courts have uniformly upheld bulge jurisdiction.[12]

---

[12] *See*, *e.g.*, *Coleman v. American Export Isbrandtsen Lines, Inc.*, 405 F.2d 250, 252 (2d Cir. 1968); *Pierce v. Globemaster Baltimore, Inc.*, 49 F.R.D. 63, 67 (D. Md. 1969); *Quinones v. Pennsylvania General Ins. Co.*, 804 F.2d 1167, 1176 (10th Cir. 1986).

And rightly so. After all, "Congress could provide for service of process anywhere in the United States." *Mississippi Pub. Corp. v. Murphree*, 326 U.S. 438, 442 (1946) (citing *Toland v. Sprague*, 12 Pet. 300, 328 (1838); *United States v. Union Pacific R. Co*., 98 U.S. 569, 604 (1878); *Robertson v. Railroad Labor Board*, 268 U.S. 619, 622 (1925)). Put differently, whereas the Fourteenth Amendment's Due Process Clause acts "as an instrument of interstate federalism," *World-Wide Volkswagen Corp.*, 444 U.S. at 294, the Fifth Amendment's Due Process Clause sets only those limits on territorial jurisdiction that are proper to the United States as a whole.

The second express exception to Rule 4(k)'s general incorporation of state limits on territorial jurisdiction recognizes the primary role of Congress in establishing the geographic bounds of federal judicial power. It permits broader reach "when authorized by a federal statute." Fed. R. Civ. P. 4(k)(1)(C). One such statute, 28 U.S.C. § 2361, authorizes nationwide service of process in federal interpleader actions. But Congress could authorize territorial jurisdiction over any party anywhere in the world, so long as the exercise of such jurisdiction satisfies the Fifth Amendment's Due Process Clause—which, to reiterate, does not simply incorporate those restrictions that are particular to the role of the States in our federal system.

23

The PSJVTA falls squarely within Rule 4(k)(1)(C)'s ambit as a statute authorizing territorial jurisdiction that extends beyond the limits the Fourteenth Amendment imposes on state courts.  Where, as in the PSJVTA, Congress expressly disavowed its general policy of incorporating state limits on territorial jurisdiction, the powers and interests of the United States as a sovereign on the world stage render the analysis of personal jurisdiction of federal courts under the Fifth Amendment quite different from the analysis that applies to state courts under the Fourteenth Amendment—regardless of the basis for such jurisdiction. An act that occurs overseas may not manifest purposeful availment of the benefits and protections of any particular state but nonetheless constitute such purposeful availment with respect to the United States as a whole.  Likewise, an act that manifests no consent to jurisdiction in any single state may properly be deemed consent to jurisdiction in the United States—especially where that act is reasonably related to international terrorism, as the federal government has a unique responsibility for combating such acts.

Accordingly, Judge Daniels erred in treating cases defining consent to state court jurisdiction as equally applicable to the question of what Congress may properly deem consent to federal court jurisdiction.

24

## **CONCLUSION**

An *amicus* brief that begins its argument with a scene from a memoir might seem to have strayed from the usual forms of constitutional discourse long recognized by our jurisprudence. So let us review the key points in the forms courts and advocates are accustomed to using.

Section I is a frankly prudential argument. Although it uses an historical example, the point being made is simply that in an historic instance, the possibility of civil suits broke a diplomatic deadlock and spared American lives.

Section II offers a familiar historical argument: that the First Congress whose actions we associate with the generation of framers and ratifiers of the Constitution dealt with the terrorists of their era in a way that recognized the federal power to provide a jurisdictional basis for deterring piracy, the terrorism of that Age.

Section III returns to a familiar prudential argument for judicial restraint where matters of national security are concerned and where the Congress and the Executive are in explicit statutory harmony.

Section IV gives a textual argument that stressed the plain differences in the language of the Fifth and Fourteenth Amendments and criticized the use of Fourteenth Amendment cases to restrain the federal government without a showing that there was a good reason to defy the text.

25

Section V lays out a straightforward structural argument that inferred rules for distinguishing between the restraints on federal and state action by looking at the different responsibilities of the governments and the relationship between state and federal authority.

Section VI provides a doctrinal analysis of the District Court's opinion that implicitly criticized the court's use of precedent as having avoided the most important element of a court's holding—its implication for future cases. There is Second Circuit language that would support the District Court's conclusions. But doctrinal argument is at its weakest when it can do no more than recite the language of a prior opinion: it amounts to the assumption that a court can never refine an earlier holding without repudiating it. This, without more, renders doctrine an artifact of the past when in fact every judicial holding is necessarily about the future.

With these standard forms in mind, we would like to conclude with an ethical argument. The District Court is appropriately sensitive to any attempt to bend the rules when government officials are going after terrorists. Those are the times when we must be most vigilant because they are the occasions when we are most tempted to cut corners in our passion to protect our people.

But shouldn't we also be wary of treating the context of global terror as if it were simply a variation on ordinary crime? We know that democracies cannot coexist with terror. But the reverse is also true. That is why states of terror like the

fascist and communist states with whom the U.S. and her allies struggled for most of the 20th century fear democracies and are loath to permit democratic reforms in their own societies.

Is it really consistent with our constitutional traditions to disempower the national government when it must cope with a foreign threat to its citizens on the grounds that we would not be or at least should not be so alarmed by the local, petty criminal? The long struggle just past—and the long one that is coming—counsel otherwise.

Dated: November 4, 2022

Respectfully submitted,

By: /s/ *Joshua E. Abraham*
Joshua E. Abraham
ABRAHAM ESQ. PLLC
477 Madison Avenue, Suite 1230
New York, NY 10022
(646) 245-6710
josh@abrahamesq.com

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that,

1.      This brief complies with the type-volume limitation of Second Circuit Local Rule 29.1(c) because it contains 6025 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman.

/s/ *Joshua E. Abraham*
Joshua E. Abraham

## **CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing brief with the Clerk of the United States Court of Appeals for the Second Circuit via the CM/ECF system this 4th day of November 2022, to be served on all counsel of record via ECF.

/s/ <em>Joshua E. Abraham</em><br>Joshua E. Abraham