UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 15-3135 _____    _____ Caption [use short title] _____

Motion for: Leave to File Brief as Amici Curiae in Support

of Plaintiffs-Appellants

_____

_____

Set forth below precise, complete statement of relief sought:

Leave to file amicus brief of amici curiae Strength to

Strength, Canadian Coalition against Terror, Omagh          **Sokolow v. Palestine Liberation Organization**

Support and Self Help Group, Manchester Survivors Choir,

V-Europe, Sarz Sanctuary, Iraq Al-Amal Association,

onePULSE Foundation, in support of Plaintiffs-Appellants

_____

MOVING PARTY: Amici Curiae _____    OPPOSING PARTY: Palestine Liberation Organization,Palestinian Authority

☐ Plaintiff          ☐ Defendant

☐ Appellant/Petitioner     ☐ Appellee/Respondent

MOVING ATTORNEY: Dina Gielchinsky _____    OPPOSING ATTORNEY: Mitchell R. Berger

[name of attorney, with firm, address, phone number and e-mail]

Dina Gielchinsky, Osen LLC                Mitchell R. Berger, Squire Patton Boggs (US) LLP

190 Moore Street, Hackensack, NJ 07666        2550 M Street NW, Washington, DC 20037

(201) 265-6400, dgielchinsky@osenlaw.com        (202)457-5601, mitchell.berger@squirepb.com

Court- Judge/ Agency appealed from: Southern District of New York,  Honorable George B. Daniels

**Please check appropriate boxes:**                **FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has movant notified opposing counsel (required by Local Rule 27.1):      Has this request for relief been made below?    ☐ Yes ☐ No
☑ Yes ☐ No (explain): _____      Has this relief been previously sought in this court?  ☐ Yes ☐ No
_____      Requested return date and explanation of emergency: _____

Opposing counsel's position on motion:                _____
☐ Unopposed ☑ Opposed ☐ Don't Know            _____
Does opposing counsel intend to file a response:            _____
☑ Yes ☐ No ☐ Don't Know                    _____

Is oral argument on motion requested?  ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  ☐ Yes ☑ No If yes, enter date: _____

Signature of Moving Attorney:

/s/ Dina Gielchinsky _____ Date: 11/4/2022 _____ Service by: ☑ CM/ECF ☐ Other [Attach proof of service]

Form T-1080 (rev.12-13)

# No. 15-3135 (L)

## No. 15-3151(XAP), No. 22-1060(CON)

---

### IN THE UNITED STATES COURT OF APPEALS

### FOR THE SECOND CIRCUIT

---

| | | |
|---|---|---|
| **Mark I. Sokolow, et al.,** | ) | **Appeal from the United** |
| | ) | **States District Court for the** |
| **Plaintiffs-Appellants,** | ) | **Southern District of New York** |
| | ) | |
| **v.** | ) | **No. 04-cv-397 (GBD)** |
| | ) | |
| **Palestine Liberation Organization, et al.,** | ) | **Hon. George B. Daniels** |
| | ) | |
| **Defendants-Appellees.** | ) | |

---

### MOTION FOR LEAVE TO FILE AMICUS BRIEF

---

Pursuant to Federal Rules of Appellate Procedure 27 and 29, and this Court's corresponding local rules, movants Strength to Strength, Canadian Coalition against Terror, Omagh Support and Self Help Group, Manchester Survivors Choir, V-Europe, Sarz Sanctuary, Iraq Al-Amal Association, and onePULSE Foundation respectfully move for leave to file the attached amicus brief in support of the Plaintiffs-Appellants.

As more fully detailed in their proposed brief, *amici curiae* are organizations from around the world established to provide various forms of support to victims of terrorism. *Amici* believe, based upon their experience with the long-lasting psychological effects of terrorist attacks, that subjecting terror victims to a retrial in this case, after having already testified as to their attacks and aftermath, would be detrimental to their psychological well-being. *Amici* therefore respectfully submit their proposed brief to urge this Court to exercise its discretion not to require a new trial.

*Amici* obtained consent to file this brief from Plaintiffs-Appellants and Intervenor-Appellant the United States, but Defendants-Appellees, the Palestine Liberation Organization and Palestinian Authority, have refused to consent, and have advised *amici* that they will file an opposition to this motion. *Amici* therefore respectfully seek leave of court, pursuant to Fed. R. App. P. 29(a)(2), to file the attached brief. No party's counsel authored this brief in whole or in part or contributed money to the submission of this brief. Counsel for *amici* represent certain of the Plaintiff-Appellants in other pending matters, but do not have any financial stake in the outcome of this action.

## I.     MOVANTS' INTERESTS ARE IMPLICATED BY THIS APPEAL.

*Amici* have a particular interest in their position that the Court should recall its mandate and instruct the district court to reinstate its original judgment, rather than requiring the parties to relitigate their dispute.

As explained in *amici*'s proposed brief, when victims of serious trauma – such as terrorist attacks – testify in open court about their traumatic events, it can cause "retraumatization," *i.e.*, the feeling that the traumatizing event is happening again. The kind of retraumatization created by courtroom testimony can lead to additional barriers in a victim's recovery. *Amici* therefore wish to impress upon the Court that while they encourage victims of terrorism to advocate for themselves and other victims, those efforts come with a significant emotional cost. To the extent a retrial in this or any other case involving terror victim testimony is discretionary, courts should not unnecessarily compel terror victims to undergo the trauma of testifying in court.

## II.    THE COURT WILL BENEFIT FROM *AMICI*'S PROPOSED BRIEF.

*Amici*'s brief does not duplicate Plaintiffs-Appellants' brief. Rather, *amici*'s brief provides the Court with a unique and important perspective.

Many of the *amici* organizations were founded in the wake of specific terrorist attacks, including the 1998 car bombing in Omagh, Northern Ireland, which killed 29 people and injured over 200 more; the 2016 mass shooting at an Orlando night

3

club, killing 49 people and injuring 53 more; the 2017 suicide bombing during a concert at Manchester Arena which killed 22 concertgoers and injured 116 more; and 9/11, which killed almost 3,000 people. Some *amici* were founded by survivors of terrorist attacks; others by family members of the slain. They are largely supported and advised by volunteers, many of whom comprise mental health professionals, counterterrorism experts, and terror victims.

*Amici* therefore have deep experience with the trauma suffered by victims of terrorist attacks, and have firsthand knowledge – sometimes even personal knowledge – of the deleterious effects that testifying in open court about an attack and its aftermath can have. The approaches *amici* typically recommend victims take to protect themselves and their recovery and healing processes when talking about their attacks, including controlling the content and pace of their own narratives, are generally not well served in a courtroom setting, and thus exposures to that setting should be limited where possible. *Amici*'s brief therefore provides an important perspective on the psychological risks posed to Plaintiffs-Appellants in requiring them to re-testify.

Wherefore, *amici* respectfully ask the Court for leave to file the proposed brief attached here as Exhibit A as *amici curiae* in support of Plaintiffs-Appellants.

4

Dated: November 4, 2022

Respectfully submitted,

/s/  Dina Gielchinsky

Dina Gielchinsky
OSEN LLC
190 Moore Street, Suite 272
Hackensack, NJ 07601
(201) 265-6400
dgielchinsky@osenlaw.com

*Counsel for Amici Curiae*

# EXHIBIT A

# 15-3135(L)

## 15-3151(XAP), 22-1060(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆◆◆

EVA WALDMAN, REVITAL BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA, MINOR, BY HIS NEXT FRIEND AND GUARDIAN VARDA GUETTA, VARDA GUETTA, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFF OZ JOSEPH GUETTA, NORMAN GRITZ, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DAVID GRITZ, MARK I. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAMIE A. SOKOLOW, RENA M. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAIME A. SOKOLOW, JAMIE A. SOKOLOW, MINOR, BY HER NEXT FRIENDS AND GUARDIAN

*(Caption continued on inside cover)*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**BRIEF OF ORGANIZATIONS PROVIDING SUPPORT
TO VICTIMS OF TERROR AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFFS-APPELLANTS**

---

DINA GIELCHINSKY
OSEN LLC
190 Moore Street, Suite 272
Hackensack, New Jersey 07601
(201) 265-6400

*Attorneys for Amicus Curiae*

MARK I. SOKOLOW AND RENA M. SOKOLOW, LAUREN M. SOKOLOW, ELANA R. SOKOLOW, SHAYNA EILEEN GOULD, RONALD ALLAN GOULD, ELISE JANET GOULD, JESSICA RINE, SHMUEL WALDMAN, HENNA NOVACK WALDMAN, MORRIS WALDMAN, ALAN J. BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, YEHONATHON BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, BINYAMIN BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, DANIEL BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, YEHUDA BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, RABBI LEONARD MANDELKORN, KATHERINE BAKER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN, RICHARD BLUTSTEIN, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, LARRY CARTER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DIANE ("DINA") CARTER, SHAUN COFFEL, DIANNE COULTER MILLER, ROBERT L COULTER, JR., ROBERT L. COULTER, SR., INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JANIS RUTH COULTER, CHANA BRACHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ELIEZER SIMCHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ESTHER ZAHAVA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, KAREN GOLDBERG, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STUART SCOTT GOLDBERG/ NATURAL GUARDIAN OF PLAINTIFFS CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG,TZVI YEHOSHUA GOLDBERG, SHOSHANA MALKA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, TZVI YEHOSHUA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YAAKOV MOSHE GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YITZHAK SHALOM GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, NEVENKA GRITZ, SOLE HEIR OF NORMAN GRITZ, DECEASED,

*Plaintiffs-Appellants,*

UNITED STATES OF AMERICA,

*Intervenor-Appellant,*

—against—

PALESTINE LIBERATION ORGANIZATION, PALESTINIAN AUTHORITY, AKA PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY and or PALESTINIAN COUNCIL and or PALESTINIAN NATIONAL AUTHORITY,

*Defendants-Appellees,*

YASSER ARAFAT, MARWIN BIN KHATIB BARGHOUTI, AHMED TALEB MUSTAPHA BARGHOUTI, AKA AL-FARANSI, NASSER MAHMOUD AHMED AWEIS, MAJID AL-MASRI, AKA ABU MOJAHED, MAHMOUD AL-TITI, MOHAMMED ABDEL RAHMAN SALAM MASALAH, AKA ABU SATKHAH, FARAS SADAK MOHAMMED GHANEM, AKA HITAWI, MOHAMMED SAMI IBRAHIM ABDULLAH, ESATATE OF SAID RAMADAN, DECEASED, ABDEL KARIM RATAB YUNIS AWEIS, NASSER JAMAL MOUSA SHAWISH, TOUFIK TIRAWI, HUSSEIN AL-SHAYKH, SANA'A MUHAMMED SHEHADEH, KAIRA SAID ALI SADI, ESTATE OF MOHAMMED HASHAIKA, DECEASED, MUNZAR MAHMOUD KHALIL NOOR, ESTATE OF WAFA IDRIS, DECEASED, ESTATE OF MAZAN FARITACH, DECEASED, ESTATE OF MUHANAD ABU HALAWA, DECEASED, JOHN DOES, 1-99, HASSAN ABDEL RAHMAN,

*Defendants.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure:

Strength to Strength certifies that it is a non-profit organization, that it does not have a parent corporation, and that no publicly held corporation owns more than ten percent of its stock.

Canadian Coalition against Terror certifies that it is a non-profit organization, that it does not have a parent corporation, and that no publicly held corporation owns more than ten percent of its stock.

Omagh Support and Self Help Group certifies that it is a registered charity, that it does not have a parent corporation, and that no publicly held corporation owns more than ten percent of its stock.

The Manchester Survivors Choir certifies that it is registered as an association, that it does not have a parent corporation, and that no publicly held corporation owns more than ten percent of its stock.

V-Europe certifies that it is a non-profit organization, that it does not have a parent corporation, and that no publicly held corporation owns more than ten percent of its stock.

Sarz Sanctuary Party Ltd. certifies that it is a registered company. Sarz Spirit Foundation Ltd. certifies that it is a registered charity. Neither has a parent

corporation, and no publicly held corporation owns more than ten percent of their stock.

Iraqi Al-Amal Association certifies that it is a registered NGO, that it does not have a parent corporation, and that no publicly held corporation owns more than ten percent of its stock.

onePULSE Foundation certificates that it is a non-profit organization, that it does not have a parent corporation, and that no publicly held corporation owns more than ten percent of its stock.

# TABLE OF CONTENTS

INTEREST OF THE *AMICI CURIAE* ..................................................................1

SUMMARY OF ARGUMENT ..........................................................................3

ARGUMENT ..................................................................................................3

    I.   Courts Consider the Interests of Victims in Deciding Whether to Order a Retrial ........................................................................................................3

   II.   Terror Victims Can Suffer From Long-Term and Severe Emotional Trauma .......................................................................................................5

  III.  The *Sokolow* Plaintiffs Suffered From Severe Emotional Trauma ..............6

  IV.  Forcing Victims to Testify About the Incidents That Led to Their Trauma Can Lead to Retraumatization ..................................................................11

CONCLUSION ............................................................................................15

i

# TABLE OF AUTHORITIES

## Cases

*Advance Business Systems & Supply Co. v. SCM Corp.*,
   287 F. Supp. 143 (D. Md. 1968) ............................................................5

*Calderon v. Thompson*,
   523 U.S. 538 (1998) ........................................................................3

*Edwards v. Vannoy*,
   141 S. Ct. 1547 (2021) ....................................................................3

*Gilmore v. Palestinian Interim Self Governing Auth.*,
   675 F. Supp. 2d 104 (D.D.C. 2009) ..............................................4, 5

*Gilmore v. Palestinian Interim Self Governing Auth.*,
   843 F.3d 958 (D.C. Cir. 2016) ........................................................4

*Karcher v. Islamic Republic of Iran*,
   396 F. Supp. 3d 12 (D.D.C. 2019) ..................................................5

*McGeshick v. Choucair*,
   72 F.3d 62 (7th Cir. 1995) ..............................................................3

*Morris v. Slappy*,
   461 U.S. 1 (1983) ............................................................................4

*United States v. Hasting*,
   461 U.S. 499 (1983) ........................................................................4

## Other Authorities

Jill Littrell, *Is the Reexperience of Painful Emotion Therapeutic?*,
   18 Clinical Psych. Rev., no. 1 (1988)............................................14

Judith Lewis Herman, *Justice From the Victim's Perspective*,
   11 Violence Against Women 571 (2005)........................................13

Karen Brounéus, *Truth-Telling as Talking Cure? Insecurity and Retraumatization in the Rwandan Gacaca Courts*,
39 Sec. Dialogue, no. 1, Feb. 2008.............................................................. 13, 15

Katherine Swanson, *Providing Trauma-Informed Legal Services*,
42 L.A. Law. 15 (2019) ........................................................................12

María Paz García-Vera et al., *Ten Things Every Psychologist Should Know About Treating Psychological Disorders in Victims of Terrorism*,
33 Psicothema 177 (2021) .................................................................5, 6

Matthew G. Whalley & Chris R. Brewin, *Mental Health Following Terrorist Attacks*,
190 Brit. J. of Psych. 94 (2007)............................................................6

Negar Katirai, *Retraumatized in Court*,
62 Ariz. L. Rev. 81 (2020) ................................................................13

Olga Trujillo & Patricia Moen, *Enhancing Access to Justice Through a Trauma-Informed Approach*, Nat'l Resource Ctr. for Reaching Victims (July 2019), https://reachingvictims.org/wp-content/uploads/2020/01/Trauma-Informed-Courts-Tipsheet-Trujillo-final.pdf........................................................12

Sarah Kroll, *Opposing Viewpoints: The Sixth Amendment and Child Witnesses*,
35 Child. Legal Rts. J. 257 (2015) ....................................................12

Trudy de Ridder, *The Trauma of Testifying* 3-4, 6 Track Two, nos. 3 & 4, Dec. 1997,
https://journals.co.za/doi/pdf/10.10520/EJC111681 ..........................14

## INTEREST OF THE *AMICI CURIAE*[1]

*Amici curiae* are organizations from around the world established to provide various forms of support to victims of terrorism. Some organize retreats and social gatherings during which participants engage in guided dialogue about their experiences with terrorism; others support terror victims in their efforts to advocate for counterterrorism legislation. Strength to Strength, for example, launched a Young Ambassadors Program for young adults between the ages of 15-20 who lost a family member in a terrorist attack or who were injured themselves. The participants, who come from countries worldwide, spend a week in New York City advocating for terror victims before political and community leaders.

Many of these *amici* organizations were founded in the wake of specific terrorist attacks, including the 1998 car bombing in Omagh, Northern Ireland, which killed 29 people and injured over 200 more; the 2016 mass shooting at an Orlando night club, killing 49 people and injuring 53 more; the 2017 suicide bombing during a concert at Manchester Arena which killed 22 concertgoers and injured 116 more; and 9/11, which killed almost 3,000 people. Some *amici* were founded by survivors

---

[1] Plaintiffs-Appellants and Intervenor-Appellant the United Sates consent to the filing of this brief; Defendants-Appellees do not consent. No party's counsel authored this brief in whole or in part or contributed money to the submission of this brief. Counsel for *amici curiae* represent certain of the Plaintiff-Appellants in other pending matters, but do not have any financial stake in the outcome of this action.

of terrorist attacks; others by family members of the slain. They are largely supported and advised by volunteers, many of whom comprise mental health professionals, counterterrorism experts, and terror victims.

*Amici*'s interest in this case is significant. The organizations encourage victims of terror to advocate for themselves and others in order to accomplish important public policy and personal recovery goals, including seeking justice, counterterrorism activism, reclamation of the individual's control and purpose, and limiting the self-isolation of terrorism victims. One element of seeking justice for terror victims involves participating in lawsuits against state sponsors of terrorism, terrorist organizations and those who aid and abet them. Often such lawsuits require victims of terrorism to testify in court. While encouraging victims of terrorism to speak out and advocate for themselves and others, *amici* also take care to encourage terror victims to take measures to protect themselves emotionally from retraumatization that can occur when victims recall, recount, and essentially relive their terror attacks. These approaches, which include limiting consumption of information regarding their attacks, and controlling the content and pace of their own narrative of the attack and its aftermath, are of limited application in a courtroom setting. *Amici* therefore wish to impress upon the Court that while they encourage victims of terrorism to advocate for themselves and other victims, those efforts come with a significant emotional cost. To the extent a retrial in this or any other case

involving terror victim testimony is discretionary, courts should not unnecessarily compel terror victims to undergo the trauma of testifying in court.

## SUMMARY OF ARGUMENT

*Amici* believe, based upon their (in many cases, personal) experience with the long-lasting psychological effects of terrorism, that subjecting terror victims to a retrial in this case, after having already testified as to their attacks and aftermath, would be highly detrimental to their psychological well-being. *Amici* therefore respectfully submit this brief to urge this Court to exercise its discretion and not require a new trial.

## ARGUMENT

### I.   Courts Consider the Interests of Victims in Deciding Whether to Order a Retrial

Courts of appeals have discretion to recall their mandates, *Calderon v. Thompson*, 523 U.S. 538, 549 (1998), weighing, among other things, "party reliance in the finality of judgments," *McGeshick v. Choucair*, 72 F.3d 62, 63 (7th Cir. 1995).

Victims have a strong reliance interest in the finality of judgments. As the Supreme Court emphasized recently, "conducting retrials years later inflicts substantial pain on crime victims who must testify again and endure new trials." *Edwards v. Vannoy*, 141 S. Ct. 1547, 1554–55 (2021). For precisely this reason, the Supreme Court has long held that "courts may not ignore the concerns of victims" when deciding whether to require a retrial, even in the criminal context. *Morris v.*

*Slappy*, 461 U.S. 1, 14 (1983). For example, in *Morris*, the Supreme Court criticized the Ninth Circuit for awarding a retrial in a rape and robbery case without "tak[ing] into account the interest of the victim of these crimes," noting that a retrial would require the victim to testify again "about a humiliating and degrading experience." *Id.* Similarly, in *United States v. Hasting*, 461 U.S. 499 (1983), the Supreme Court held that the Seventh Circuit erred in reversing the convictions of four men who allegedly raped three women, noting (among other things) that the Seventh Circuit "did not consider the trauma the victims of these particularly heinous crimes would experience in a new trial, forcing them to relive harrowing experiences now long past." *Id.* at 507.

This principle applies with full force to civil trials involving terror victims. As Judge Gladys Kessler has explained, a terror victim forced to undergo "the wrenching process of testifying again" suffers "serious prejudice," due to the "enormous emotional cost" of "be[ing] forced to undergo the excruciating process of testifying about" his or her "loss all over again." *Gilmore v. Palestinian Interim Self Governing Auth.*, 675 F. Supp. 2d 104, 111 (D.D.C. 2009) (internal quotation marks omitted), *aff'd*, 843 F.3d 958 (D.C. Cir. 2016). Similarly, following a three-day bench trial that included testimony by various terror victims, Judge Colleen Kollar-Kotelly instructed the appointed special master to "avoid causing further hardship by taking additional testimony from" the plaintiffs "who already testified

4

about their injuries or, with respect to [the widow of one of the slain terror victims], her husband's death." *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 65 (D.D.C. 2019).

Lest the suggestion be made that a court can avoid this issue simply by allowing the victim's prior testimony to be read into the record, courts themselves acknowledge that "[f]indings of fact must be made 'while the testimony is fresh in the judge's mind,'" and a "cold written record . . . will [not] have the same meaning and impact to a fact-finder when read years later." *Gilmore*, 675 F. Supp. 2d at 111 (quoting *Advance Business Systems & Supply Co. v. SCM Corp.*, 287 F. Supp. 143, 163 (D. Md. 1968)).

## II. Terror Victims Can Suffer From Long-Term and Severe Emotional Trauma

It is well-established in the psychological literature that "[a] significant percentage of [terror] victims, whether adults, adolescents, or children, will develop psychological disorders." María Paz García-Vera et al., *Ten Things Every Psychologist Should Know About Treating Psychological Disorders in Victims of Terrorism*, 33 Psicothema 177, 178 (2021). Post-traumatic stress disorder ("PTSD") "appears to be the most common disorder attributable to" a terror attack, and other sequelae—that is, pathological conditions resulting from a traumatic event—can include "depression," "traumatic grief, panic, phobias, generalized anxiety disorder and substance misuse." Matthew G. Whalley & Chris R. Brewin, *Mental Health*

5

*Following Terrorist Attacks*, 190 Brit. J. of Psych. 94, 95 (2007). These psychological effects of terror can be "clinically significant and [can] cause[] significant impairment" in a victim's social, work, and family life. María Paz García-Vera et al., *supra*, at 178. Both direct victims of the attack and relatives of the victims can suffer from these sequalae. *See id.* at 180.

## III.    The *Sokolow* Plaintiffs Suffered From Severe Emotional Trauma

The *Sokolow* Plaintiffs experienced numerous sequalae in the aftermath of their attacks, including chronic PTSD, *see, e.g.*, J.A.-5748 (Shmuel Waldman); J.A.-5768 (Shayna Gould), chronic partial PTSD, *see, e.g.*, J.A.-5788 (Mark Sokolow); J.A.-5800 (Lauren Sokolow Mandelstam), pathological bereavement, *see, e.g.*, J.A.-5852 (Rebecca Blutstein); J.A.-5903 (Diane Miller), and chronic dysthemia (persistent depressive disorder), *see, e.g.*, J.A.-5909 (Larry Carter); J.A.-5931 (Chana Goldberg). Many broke down while testifying during the trial and were offered a break. *See, e.g.*, J.A.-6399 (Jamie Sokolow); J.A.-6482 (Revital Bauer); J.A.-6631 (Jessica Gould Rine); J.A.-6702 (Karen Goldberg); J.A.-6796 (Shoshana Goldberg); J.A.-6591 (Shmuel Waldman). The testimony of four Plaintiffs who continue to suffer trauma years after their respective attacks is highlighted below:

*Shmuel Waldman*: Plaintiff Shmuel Waldman was boarding a public bus when a PA police officer began walking down the street shooting at civilians with an M-16 rifle. J.A.-6585-87. A woman standing next to Mr. Waldman was shot and killed.

J.A.-5747. Mr. Waldman jumped onto the bus while the terrorist continued spraying bullets indiscriminately. J.A.-6587. Two bullets pierced Mr. Waldman's leg, shattering his tibia and leaving him with a large gash. J.A.-6587. He lost half of his blood and was rushed to the hospital. J.A.-6587. Mr. Waldman testified:

> I didn't die that day, but my life changed. Everything changed. Hospitals, therapies, surgeries, casts, nurses, needles and shots and more shots and morphine and more morphine and more morphine, pain. So much pain.

J.A.-6588.

Mr. Waldman eventually suffered a mental breakdown and checked himself into an inpatient facility. J.A.-6595. He described his life in the aftermath of the attack as follows:

> You start living a life where your brain and your body and soul just tear you in different directions. . . . You try to do the things [that are] right. But your mind just shuts you down. You cannot control it. You try, but your mind just takes you to places, to bad places, to horrible places. You become so detached you start living alone in the world, and when you live alone in the world suicide thoughts start coming in.

J.A.-6589. Mr. Waldman also experienced chronic PTSD. J.A.-5748. As Dr. Rael Strous explained to the jury, PTSD is a "debilitating syndrome" that "is expressed by re-experiencing." J.A.-5748-49. PTSD victims like Mr. Waldman "have intrusive thoughts, which means suddenly they could be teaching or working and suddenly they have thoughts of the event and what they went through." J.A.-5749. When that happens, Dr. Strous explained, "they experience intense emotional pain, as well as

[a] physiological response," including sudden spike in blood pressure, headaches, hyperventilation, and palpitations. J.A.-5749.

*Shayna Gould*: Plaintiff Shayna Gould was injured in the same terror attack as Mr. Waldman. J.A.-6675-77. She was waiting at a bus stop when the terrorist shot her in the chest, missing her heart by inches. J.A.-6692. By the time she reached the hospital, she was dead on arrival, but her life was saved by a doctor who performed direct cardiac massage. J.A.-5767. The doctors needed to remove some of her ribs and one of her lungs. J.A.-5767.

Ms. Gould too has PTSD and adjustment disorder with depression. J.A.-5768. Dr. Strous explained that she "has developed this perception that just life is not a safe place. . . . [S]he [can] never relax. She is constantly on [a] flame of anxiety." J.A.-5768; J.A.-5774. She too testified that she continues to have "a lot of anxiety" on a daily basis, and that she is "constantly fearful that lightning is going to strike again. . . . I cannot walk around in my life and not feel scared that terror is right around the corner from my family, from my husband, from me." J.A.-6687; J.A.-6691. For her, "terror is a thing that's never really over. . . . I'm terrified that it knows my name." J.A.-6691. Her father recalled one incident at home in Chicago after the attack:

> [T]here was a UPS truck . . . that had one of the big metal lifts, and somehow he knocked it over, and the handle hit the concrete with a real sharp sound. Shayna collapsed, collapsed on the sidewalk, wasn't— beyond tears. I couldn't even pick her up.

J.A.-6647-48.

*Lauren Sokolow Mandelstam*: Plaintiff Lauren Sokolow Mandelstam was 16 years old when a terrorist walked up behind her, her sister, and her parents and detonated an explosive device, killing one person and wounding more than a hundred. J.A.-5414; J.A.-6386-87. As Ms. Mandelstam testified:

> [T]here was a loud boom and the first thing I remember, there was a lot of smoke. . . . I remember looking down at myself and I saw blood and my ankles were killing. I was in a lot of pain. Then I had no idea where my family was. I was looking around. I didn't see them. I was petrified. I had no idea where they were. I kept telling people, I have my mother, my father, my sister, where are they? Finally the ambulance came and put me on the stretcher and I kept yelling, where is my family, my family.

J.A.-6387-88. Her injuries consisted of "second degree burns to her face and her ankle, multiple shrapnel injuries throughout her body, injury from bolts to her right calf, and [a] perforated left eardrum." J.A.-5799. She testified that she thinks about the attack on a "[d]aily" basis, explaining that she "ha[s] scars all over [her] body that" serve as a "constant reminder." J.A.-6393.

Dr. Strous diagnosed her with Chronic Partial PTSD, J.A.-5800, noting that "[t]o this day" she reports having "painful and overwhelming" nightmares about the incident, as well as "flashbacks to the event." J.A.-5800. As Dr. Strous explained, "[f]lashbacks can be very disturbing because the person feels they are in [the] situation again. . . . You flash back to the event and you feel that [you are] about to die again, and that's very disabling, that's a very painful thing." J.A.-5800.

*Karen Goldberg*: Karen Goldberg lost her husband, Stuart Scott ("Yechezkel") Goldberg, when a suicide bomber blew himself up on a bus in Jerusalem on January 29, 2004. J.A.-5914. Ms. Goldberg had been married to her husband for 17 years and had seven children with him. J.A.-5913. Dr. Strous testified about Ms. Goldberg's extraordinary family life:

> They did everything together as a family. They would sing a lot together. They would clean the house together. They would spend a lot of time day to day as a family, as a group. . . . [T]hey were known very well as singers and often people would come and listen to them outside or come inside and hear them singing because they had a very unique practice of singing a lot together. That would describe them very well.

J.A.-5919.

On the morning of her husband's death, after hearing that a terrorist attack had occurred, Ms. Goldberg tried and failed to contact her husband by phone; social workers then came to her house and asked her to go to the medical examiner's office. J.A.-6731-34. She could not bring herself to identify her husband at the forensic center, and so two of her friends identified her husband for her. J.A.-5921. She then went home and told her children that their father had been murdered. J.A.-6737. As Ms. Goldberg's daughter testified, "[t]ill today," Yechezkel's sweater "sit[s] on his chair in his office in the house because nobody wants to touch it; he left it that way in the morning." J.A.-6750-51.

After her husband was murdered, Ms. Goldberg testified, "everything changed. Nothing stayed the same, absolutely nothing." J.A.-6707. She likened her

10

experience to being "thrown to the bottom of a pit, a dark, deep pit, without anything on the walls to hold on to [to] climb up, and . . . just stay[ing] there." J.A.-6708. She explained:

> I have suffered from overwhelming pain and devastation. My life changed completely. I became very emotionally fragile. I have many feelings of hopelessness and instability. I am constantly battling crises. I have trouble sleeping. Since the terrorist attack, I sleep about three hours a night. And there are times throughout the year where I get depressed. Sometimes I don't want to get out of bed. Sometimes I just don't want to live. Life seems too difficult.

J.A.-6717. Dr. Strous diagnosed Ms. Goldberg with pathological bereavement and adjustment disorder with depressed mood. J.A.-5921. As Dr. Strous explained, Ms. Goldberg's "whole world suddenly fell apart" when she lost her husband: "[s]ince they had such an excellent marriage and he was such a wonderful person, the loss for her was absolutely devastating and incalculable." J.A.-5921-22. In Dr. Strous's words:

> Her life was destroyed. Her children's life, the way she described it, was destroyed. And both of them became a cascade, like a circular thing. She was destroyed, her children were destroyed, and the fact that her children were destroyed even destroyed her even more.

J.A.-5922.

## IV. Forcing Victims to Testify About the Incidents That Led to Their Trauma Can Lead to Retraumatization

When victims of serious trauma testify in open court about a traumatic event it can cause "retraumatization"—i.e., the "feeling[] that the traumatizing event" "is happening . . . again." Sarah Kroll, *Opposing Viewpoints: The Sixth Amendment and*

11

*Child Witnesses*, 35 Child. Legal Rts. J. 257, 257 (2015). In other words, courtroom testimony "can bring up the feelings and sensations associated with" the "traumatic event[], which can cause a *literal reexperiencing* of the incident." Olga Trujillo & Patricia Moen, *Enhancing Access to Justice Through a Trauma-Informed Approach*, Nat'l Resource Ctr. for Reaching Victims, ¶ 1 (July 2019), *available at* https://reachingvictims.org/wp-content/uploads/2020/01/Trauma-Informed-Courts-Tipsheet-Trujillo-final.pdf (emphasis added). "This kind of re-experiencing may cause feelings of panic, anger, disorientation, physical pain, grief, or numbing and shutting down." *Id.* Indeed, even the obviously necessary step of discussing a traumatic incident with the victim's attorney can be harmful for a victim—and, for precisely this reason, one practitioner recommends that "[t]o avoid retraumatization, attorneys should strive only to interview the client *once* about sensitive events." Katherine Swanson, *Providing Trauma-Informed Legal Services*, 42 L.A. Law. 15, 15 (2019) (emphasis added).

As Harvard University Medical School professor and psychiatrist Judith Lewis Herman has noted, "if one set out intentionally to design a system for provoking symptoms of traumatic stress, it might look very much like a court of law." Judith Lewis Herman, *Justice From the Victim's Perspective*, 11 Violence Against Women 571, 574 (2005). To illustrate,

> [t]he wishes and needs of victims are often diametrically opposed to the requirements of legal proceedings. Victims need social

acknowledgement and support; the court requires them to endure a public challenge to their credibility. Victims need to establish a sense of power and control over their lives; the court requires them to submit to a complex set of rules and bureaucratic procedures that they may not understand and over which they have no control. . . . *Victims often need to control or limit their exposure to specific reminders of the trauma; the court requires them to relive the experience*.

*Id.* (emphasis added).

The kind of retraumatization created by courtroom testimony can lead to "extra barriers in [a victim's] recovery." Negar Katirai, *Retraumatized in Court*, 62 Ariz. L. Rev. 81, 90–91 (2020). Although discussing a traumatic incident in a clinical setting can often be therapeutic for a victim, "our legal system requires survivors to go through the trauma of reliving their experience without the safeguards that mental health professionals recommend." *Id.* at 107. Short-term re-exposure to trauma in a courtroom setting, that is, "risks further psychological ill-health" and "risks *enhancing* trauma reactions instead of decreasing them." Karen Brounéus, *Truth-Telling as Talking Cure? Insecurity and Retraumatization in the Rwandan Gacaca Courts*, 39 Sec. Dialogue, no. 1, Feb. 2008, at 55, 62 (emphasis added). Multiple studies have suggested that re-exposure to traumatic events in such an "unsystematic" and "uncontrolled" manner can cause serious harm. Jill Littrell, *Is the Reexperience of Painful Emotion Therapeutic?*, 18 Clinical Psych. Rev., no. 1, at 71, 85–86 (1988).

13

Witnesses' experiences from testifying in the South Africa Truth and Reconciliation Commission ("TRC") and the Rwandan *gacaca* (tribunals established to address the Rwandan genocide) bear out this phenomenon. One study, for example, noted that "a worrying number of" victims who testified at the South Africa TRC discovered that "in the weeks following their" testimonies, "there [was] a return and intensification of symptoms associated with the original" incidents, in addition to "the onset of *new* symptoms . . . caused by retelling the[ir] stor[ies]." Trudy de Ridder, *The Trauma of Testifying* 3-4, 6 Track Two, nos. 3 & 4, Dec. 1997, *available at* https://journals.co.za/doi/pdf/10.10520/EJC111681 (emphasis added); *accord, e.g.*, Brounéus, *supra*, at 62 ("[I]t is known that some witnesses in the South African TRC were retraumatized when giving testimony of their trauma . . . ."). A different study involving women who testified at the Rwandan *gacaca* had similar findings:

> [f]or all of the women interviewed, giving testimony involved intense psychological suffering. Five could not continue their testimonies due to traumatism[], or severe psychological ill-health. *Several re-experienced their traumas of the genocide so strongly that they felt as though it was happening again. They saw the machetes, heard the noises, smelled the smells.*

Brounéus, *supra*, at 71 (emphasis added). It takes little imagination to grasp how such an experience can be deeply counter-productive for a trauma victim's recovery.

14

**CONCLUSION**

Requiring the *Sokolow* Plaintiffs to testify in a new trial could cause retraumatization and have a deleterious effect on their well-being. Accordingly, the Second Circuit should exercise its discretion to recall its mandate instead of requiring a new trial.


Dated: November 4, 2022         Respectfully submitted,

                        /s/  Dina Gielchinsky
                         Dina Gielchinsky
                        OSEN LLC
                        190 Moore Street, Suite 272
                        Hackensack, NJ 07601
                        (201) 265-6400
                        dgielchinsky@osenlaw.com

                        *Counsel for Amici Curiae*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Appellate Procedure 29(a)(4) and 32(g)(1), I hereby certify that the foregoing document complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) and Local Rule 29.1(c). According to the word-count feature of Microsoft Word, the word-processing system used to prepare the document, the document contains 3,510 words, excluding the items that may be excluded under Federal Rule of Appellate Procedure 32(f).

I further certify that the foregoing brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman font, a proportionally spaced typeface.

Dated: November 4, 2022

/s/ Dina Gielchinsky

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 4, 2022, I electronically filed the foregoing document with the United States Court of Appeals for the Second Circuit by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

I further certify that, consistent with Local Rule 31.1, six hard copies of the foregoing document will be filed with the Court forthwith.

Dated: November 4, 2022         /s/ Dina Gielchinsky

# ADDENDUM – LIST OF *AMICI CURIAE*

**1) Strength to Strength**

Strength to Strength was founded by a survivor of a 2003 suicide bombing in Israel, and is registered as a non-profit organization in New York. Many of its volunteer staff were also personally affected by terror attacks, and work to facilitate peer-to-peer support for victims of terrorism around the world. The organization holds regular meetings and retreats designed to allow victims and their families to connect with other victims of terrorism in a safe, empowering and healing environment. Programs including speakers, documentaries, family outings, and self-defense classes.

**2) Canadian Coalition against Terror ("C-CAT")**

C-CAT was founded by Canadian terror victims in 2004, and is registered as a non-profit organization in Canada. It is a non-partisan research and policy group committed to seeking innovative legal and public policy strategies in the fight against terrorism and extremism. C-CAT is comprised of terror victims, analysts, lawyers, and others dedicated to building bridges between the private and public sectors in this effort.

**3) Omagh Support and Self Help Group ("OSSHG")**

OSSHG is a registered charity in Northern Ireland. Its leadership largely comprises victims of the 1998 Omagh terrorist car bombing. The organization works

to alleviate poverty, sickness, and disability among terror victims, and recommends policy and legislation regarding victims' issues to the British and Irish governments. It has produced booklets, training aids, and educational seminars on victims' issues, and seeks to develop an anti-radical school package in order to deter vulnerable youth from engaging in terrorist organizations and activities.

**4) Manchester Survivors Choir**

The Manchester Survivors Choir is made up of survivors of the 2017 terror attack at Britain's Manchester Arena. The association was started after parents of the young victims in attendance at the concert were added to an online forum set up in partnership with the police and other support agencies. On that forum, parents shared stories about how their children were reluctant to engage in singing as they had done before the attack. Someone suggested that they start their own choir. The choir now gives regular performances at events held by the British Association of Social Workers, which is the UK's professional membership organization for social work.

**5) V-Europe**

V-Europe was created following the terror attacks of March 22, 2016, in Brussels. The non-profit organization represents approximately 300 members who are victims of terrorism, and provides direct assistance to victims by supplying them

with information, organizing internal meetings for peer support and informational purposes, organizing social activities, and preparing commemorations.

### 6) Sarz Sanctuary Party Ltd. & Sarz Spirit Foundation Ltd.

Founded in Australia by parents of a 21-year old woman murdered in the 2017 London Bridge and Borough Markets terror attack, Sarz Sanctuary Pty Ltd. offers its members access to practitioners providing support through various therapies and modalities. The organization also offers its members education on grief and healing through courses, workshops, webinars, e-books, articles, podcasts, and live events. Sarz Spirit Foundation Ltd., its affiliated charity registered in Australia and the UK, facilitates conversation, and provides educational resources and support, across communities which have experienced trauma.

### 7) Iraqi Al-Amal Association

The Iraqi Al-Amal Association is a registered NGO in Iraq and Kurdistan. Established in 1992 after the Second Gulf War, its mission is to rehabilitate Iraqi citizens, raise social consciousness, and contribute to building a civil state of democracy in Iraq. The organization collaborates with the UN Assistance Mission for Iraq in holding programs discussing how to charter the road to peaceful coexistence in Iraq.

**8) onePULSE Foundation**

The onePULSE Foundation is a non-profit organization incorporated by the owner of Pulse nightclub in Florida, established after the 2016 terror attack there. The organization erected and supports a museum and memorial, and funds 49 annually awarded college scholarships named in honor of each victim and designed for their specific vocations, hobbies or life aspirations. The organization also holds quarterly gatherings with social justice thought leaders from around the world engaging audiences in impactful and immersive conversations on acceptance and inclusion designed to inspire social change.