# No. 15-3135(L)

**15-3135(XAP), 22-1060 (CON)**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

EVA WALDMAN, REVITAL BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA, MINOR, BY HIS NEXT FRIEND AND GUARDIAN VARDA GUETTA, VARDA GUETTA, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFF OZ JOSEPH GUETTA, NORMAN GRITZ, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DAVID GRITZ, MARK I. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAMIE A. SOKOLOW, RENA M. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAIME A.

*(Caption continued on inside cover)*

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE SOUTHERN DISTRICT OF NEW YORK (No. 04-CV-397 (GBD))*

**BRIEF OF AMICI CURIAE SENATORS AND REPRESENTATIVES CHARLES E. GRASSLEY, JERROLD NADLER, RICHARD BLUMENTHAL, JAMES LANKFORD, SHELDON WHITEHOUSE, KATHLEEN RICE, BRADLEY E. SCHNEIDER, AND GRACE MENG SUPPORTING APPELLANTS AND URGING REVERSAL**

J. Carl Cecere
CECERE PC
6035 McCommas Blvd.
Dallas, TX 75206
(469) 600-9455
ccecere@cecerepc.com

SOKOLOW, JAMIE A. SOKOLOW, MINOR, BY HER NEXT FRIENDS AND GUARDIAN MARK I. SOKOLOW AND RENA M. SOKOLOW, LAUREN M. SOKOLOW, ELANA R. SOKOLOW, SHAYNA EILEEN GOULD, RONALD ALLAN GOULD, ELISE JANET GOULD, JESSICA RINE, SHMUEL WALDMAN, HENNA NOVACK WALDMAN, MORRIS WALDMAN, ALAN J. BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, YEHONATHON BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, BINYAMIN BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, DANIEL BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, YEHUDA BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, RABBI LEONARD MANDELKORN, KATHERINE BAKER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN, RICHARD BLUTSTEIN, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, LARRY CARTER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DIANE ("DINA") CARTER, SHAUN COFFEL, DIANNE COULTER MILLER, ROBERT L COULTER, JR., ROBERT L. COULTER, SR., INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JANIS RUTH COULTER, CHANA BRACHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ELIEZER SIMCHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ESTHER ZAHAVA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, KAREN GOLDBERG, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STUART SCOTT GOLDBERG/ NATURAL GUARDIAN OF PLAINTIFFS CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG, TZVI YEHOSHUA GOLDBERG, SHOSHANA MALKA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, TZVI YEHOSHUA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YAAKOV MOSHE GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YITZHAK SHALOM GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, NEVENKA GRITZ, SOLE HEIR OF NORMAN GRITZ, DECEASED,

*Plaintiffs-Appellants,*

UNITED STATES OF AMERICA,

*Intervenor Appellant,*

—against—

PALESTINE LIBERATION ORGANIZATION, PALESTINIAN AUTHORITY, AKA PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY AND/OR PALESTINIAN COUNCIL AND/OR PALESTINIAN NATIONAL AUTHORITY,

*Defendants-Appellees,*

YASSER ARAFAT, MARWIN BIN KHATIB BARGHOUTI, AHMED TALEB MUSTAPHA BARGHOUTI, AKA AL-FARANSI, NASSER MAHMOUD AHMED AWEIS, MAJID AL- MASRI, AKA ABU MOJAHED, MAHMOUD AL-TITI, MOHAMMED ABDEL RAHMAN SALAM MASALAH, AKA ABU SATKHAH, FARAS SADAK MOHAMMED GHANEM, AKA HITAWI, MOHAMMED SAMI IBRAHIM ABDULLAH, ESATATE OF SAID RAMADAN, DECEASED, ABDEL KARIM RATAB YUNIS AWEIS, NASSER JAMAL MOUSA SHAWISH, TOUFIK TIRAWI, HUSSEIN AL-SHAYKH, SANA'A MUHAMMED SHEHADEH, KAIRA SAID ALI SADI, ESTATE OF MOHAMMED HASHAIKA, DECEASED, MUNZAR MAHMOUD KHALIL NOOR, ESTATE OF WAFA IDRIS, DECEASED, ESTATE OF MAZAN FARITACH, DECEASED, ESTATE OF MUHANAD ABU HALAWA, DECEASED, JOHN DOES, 1-99, HASSAN ABDEL RAHMAN,

*Defendants.*

# TABLE OF CONTENTS

Index of authorities ............................................................ iii

Statement of interest.............................................................1

Introduction and  summary of argument..................................2

Argument...............................................................................4

I.    The decision below nullifies heartland applications of the ATA, a critical component of Congress's comprehensive antiterrorism scheme.................................................................................4

    A.    Congress enacted the ATA to overcome jurisdictional obstacles to holding terrorists accountable in U.S. courts.............5

    B.    Congress amended the ATA in response to new jurisdictional obstacles that hindered its operation......................14

    C.    The PSJVTA includes provisions reflecting the importance of this case.................................................................18

    D.    The district court overturned the PSJVTA, notwithstanding Congress's express determination that holding the PLO and PA accountable in U.S. civil cases serves vital U.S. national security interests.................................................................20

II.    The district court's decision misconstrues Due Process requirements and inserts the judiciary into matters the Constitution vests in the Political Branches. ...........................................22

    A.    The district court's decision erroneously disregards the considered judgment of Congress and the President on a matter of national security and foreign affairs.............................24

    B.    The judiciary should respect  the Political Branches' determinations.................................................................31

Conclusion................................................................................32

Certificate of compliance ........................................................................34

Certificate of service............................................................................35

# INDEX OF AUTHORITIES

**Cases:**

*Biton v. Palestinian Auth,,*
    310 F. Supp. 2d 172 (D.D.C. 2004) ................................................................14

*Daimler AG v. Bauman,*
    134 S. Ct. 746 (2014)................................................................14, 15, 31

*Dolan v. City of Tigard,*
    512 U.S. 374 (1994)................................................................26

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,*
    141 S. Ct. 1017 (2021)................................................................27

*Fuld v. Palestine Liberation Org.,*
    578 F. Supp. 3d 577 (S.D.N.Y. 2022), *app. pending*, No. 22-76 ....................31

*Gamble v. United States,*
    139 S. Ct. 1960 (2019)................................................................29

*Gilmore v. Palestinian Interim Self-Government Auth.,*
    422 F. Supp. 2d 96 (D.D.C. 2006) ................................................................14

*Goldberg v. Kelly,*
    397 U.S. 358 (1970)................................................................25

*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004)................................................................25

*International Shoe Co. v. Washington,*
    326 U.S. 310 (1945)................................................................26

*Jesner v. Arab Bank PLC,*
    138 S. Ct. 1386 (2018)................................................................28, 32

*Kingsley v. Hendrickson,*
    576 U.S. 389 (2015)................................................................25

*Kiobel v. Royal Dutch Petrol. Co.,*
    133 S. Ct. 1659 (2013)................................................................32

*Klieman v. Palestinian Auth.*,
   467 F. Supp. 2d 107 (D.D.C. 2006) ............................................................14, 17

*Klinghoffer v. S.N.C. Achille Lauro*,
   795 F. Supp. 112 (S.D.N.Y. 1992) ...................................................14

*Knox v. Palestine Liberation Org.*,
   248 F.R.D. 420 (S.D.N.Y. 2008) .....................................................14

*Knox v. Palestine Liberation Org.*, No. 03 Civ. 446 (VM) (THK),
   2009 WL 1591404 (S.D.N.Y. Mar. 26, 2009), *adopted*, 628 F. Supp. 2d 507
   (S.D.N.Y. 2009) ...................................................................14

*Matthews v. Eldridge*,
   424 U.S. 319 (1976) .............................................................25

*Nollan v. Calif. Coastal Com'n*,
   483 U.S. 825 (1987) .............................................................26

*Palestine Information Off. v. Shultz*,
   853 F.2d 932 (D.C. Cir. 1988) ..................................................30

*Rosales-Mireles v. United States*,
   138 S. Ct. 1897 (2018) .........................................................25

*Selective Serv. Sys. v. Minnesota Pub. Int. Rsch. Grp.*,
   468 U.S. 841 (1984) .............................................................26

*Sokolow v. Palestine Liberation Org.*,
   No. 04-cv-397 (S.D.N.Y. Mar. 30, 2011) ..........................................14

*Ungar v. Palestinian Auth.*,
   153 F. Supp. 2d 76 (D.R.I. 2001) ...............................................14

*Ungar v. Palestinian Auth.*,
   715 F. Supp. 2d 253 (D.R.I. 2010) ..............................................14

*United States v. Carlton*,
   512 U.S. 26 (1994) .............................................................26

*Walden v. Fiore*,
   134 S. Ct. 1115 (2014) ......................................................14, 15

iv

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980).....................27

**Statutes:**

18 U.S.C. ch. 111A...............................................................................12

18 U.S.C. § 32 ...............................................................................6, 13

18 U.S.C. § 37 ...........................................................................12, 13

18 U.S.C. § 112 ...................................................................................7

18 U.S.C. § 175 ...................................................................................7

18 U.S.C. § 229 .................................................................................13

18 U.S.C. § 351 ...................................................................................7

18 U.S.C. § 831 ........................................................................7, 12, 13

21 U.S.C. § 960a .................................................................................13

18 U.S.C. § 1116 ..................................................................................7

18 U.S.C. § 1119 ................................................................................12

18 U.S.C. § 1201 ..................................................................................7

18 U.S.C. § 1203 ..................................................................................6

18 U.S.C. § 2280 ................................................................................12

18 U.S.C. § 2280a ..............................................................................12

18 U.S.C. § 2281 ................................................................................12

18 U.S.C. § 2281a ..............................................................................12

18 U.S.C. § 2331(1)(C) .......................................................................10

18 U.S.C. § 2332 ..................................................................................7

18 U.S.C. § 2332b ..............................................................................13

18 U.S.C. § 2332c ..................................................................................13

18 U.S.C. § 2332f ..................................................................................13

18 U.S.C. § 2332i ..................................................................................12

18 U.S.C. § 2334(e)(1)(B) .....................................................................17

18 U.S.C. § 2339C .................................................................................13

18 U.S.C. § 2401 ...................................................................................12

22 U.S.C. § 5202 ...................................................................................16

49 U.S.C. § 1472(n) .................................................................................6

49 U.S.C. § 46502(b) .............................................................................13

Act for the Prevention and Punishment of Crimes Against Internationally
    Protected Persons, Pub. L. 94-467, 90 Stat. 1997 (Oct. 8, 1976) ....................7

Act for the Prevention and Punishment of the Crime of Hostage-Taking,
    Pub. L. 98-473, tit. II, ch. XX, Part A, 98 Stat. 2186 (Oct. 12, 1984) .............6

Aircraft Sabotage Act, Pub. L. 98-473, tit. II, ch. XX, Part B,
    98 Stat. 2187 (Oct. 12, 1984) .........................................................................6

Antihijacking Act of 1974, Pub. L. 93-366, 88 Stat. 409
    (Aug. 5, 1974) ...................................................................................................6

Anti-Terrorism Act of 1992, Pub. L. 102–572, tit. X, § 1003,
    106 Stat. 4522-4524  (Oct. 29, 1992) (codified as amended at
    18 U.S.C. §§ 2331 *et seq*.)........................................................1, 2, 3, 4, 28

Anti-Terrorism Clarification Act of 2018, Pub. L. No. 115-253,
    132 Stat. 3183-3185 (2018))..........................................................................16

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132 (Apr.
    4, 1996),
    § 303...............................................................................................................12

    § 502...............................................................................................................13

vi

§ 521 ...........................................................................................13

§ 702 ...........................................................................................13

§ 721 ...........................................................................................13

Pub. L. 97-285, 96 Stat. 1219 (Oct. 6, 1982) ..........................................7

Biological Weapons Anti-Terrorism Act of 1989, Pub. L. 101-298, 104 Stat. 201 (May 22, 1990).........................................................................7

Federal Death Penalty Act of 1994, Pub. L. 103-322, tit. VI, § 60009 ..................................................................................12

§ 60019 .......................................................................................12

§ 60021 .......................................................................................12

Providing Justice for Victims of Terrorism Act of 2019 (PSJVTA), Pub. L. No. 116-94, div. J, tit. IX. . ........................................................ passim

§ 903. ..........................................................................................17

§ 903(b)(5) ..................................................................................18

§ 903(d)(1)(A) ............................................................................19

§ 903(d)(2). ................................................................................19

Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. 105-277, div. I, title II, § 201, 112 Stat. 2681-866 (Oct. 21, 1998) ...........................................................................13

Omnibus Diplomatic Security and Antiterrorism Act of 1986, Pub. L. 99-399, § 1202, 100 Stat. 896 (Aug. 27, 1986).....................................7

Suppression of the Financing of Terrorism Convention Implementation Act of 2002, Pub. L. 107-197, § 202, 116 Stat. 724 (June 25, 2002) ...............13

Terrorist Bombings Convention Implementation Act of 2002, Pub. L. 107-197, § 101, 116 Stat. 721 (June 25, 2002).....................................13

vii

USA FREEDOM Act of 2015, Pub. L. 114-23, §§ 801-805, 129 Stat. 300-309 (June 2, 2015)............................................................................12

§ 81.......................................................................................................12

§ 82.......................................................................................................12

USA PATRIOT Act, Pub. L. 107-56, 115 Stat. 237 (Oct. 26, 2001).................12

§ 36.......................................................................................................12

§ 122......................................................................................................13

War Crimes Act of 1996, Pub. L. 104-192, 110 Stat. 2104................................12

**Treaties and Conventions:**

Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, S. Treaty Doc. 92-32 (ratified Oct. 3, 1972) .........................6

Convention for the Suppression of Unlawful Acts against the Safety of Maritime Navigation, S. Treaty Doc. 101-1 (ratified Nov. 22, 1989) .............7

Convention for the Suppression of Unlawful Seizure of Aircraft, S. Treaty
Doc. 92-1 (ratified Sept. 8, 1971) ........................................................6

Convention on the Physical Protection of Nuclear Material Implementation Act of 1982, Pub. L. 97-351, 96 Stat. 1663 (Oct. 18, 1982) ......................................................................................7

Convention on the Physical Protection of Nuclear Material, S. Treaty Doc. 96-43 (ratified July 30, 1981) ......................................................7

Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents, S. Treaty Doc. 93-36 (ratified Oct. 28, 1975) .....................................................7

Convention on the Prohibition of the Development, Production, and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction, S. Treaty Doc. 92-29 (ratified Dec. 16, 1974).............6

International Convention against the Taking of Hostages, S. Treaty
Doc. 96-49 (ratified July 30, 1981) ..................................................6

**Legislative Materials:**

S. Rep. 102-342 (1992) ...........................................................10

S. Rep. No. 102-342 (1992). ....................................................9

H.R. Rep. No. 115-848 (2018) .................................................18

*Antiterrorism Act of 1990: Hearing Before the Subcommittee on
Courts and Administrative Practice of the Senate Committee on
the Judiciary,* 101st Cong., 2d Sess. at 2-3 (July 25, 1990) .................8, 9, 10

*Antiterrorism Act of 1990: Hearing on S. 2465 Before the Sen.
Subcomm. on Courts & Admin. Practice*, 101st Cong. (1990) .....................21

*The Antiterrorism Act of 1991: Hearing Before the Subcomm. on
Intellectual Property & Judicial Admin. of the H. Comm. on the
Judiciary*, 102d Cong. (1992) ..............................................4

*Antiterrorism Act of 1991, Hearing before the Subcommittee on
Intellectual Property and Judicial Administration of the
Committee on the Judiciary*, United States House of
Representatives, 102d Cong., Second Session (Sept. 18, 1992)..........8, 10, 11

136 Cong. Rec. 7594 (Apr. 19, 1990)......................................11

137 Cong. Rec. 9883 (May 2, 1991)........................................11

137 Cong. Rec. S1771-01 (1991)..........................................5, 9

136 Cong. Rec. S4592 (1990) .............................................5

136 Cong. Rec. S4594 (1990) .............................................5

137 Cong. Rec. S4511 (1991) .............................................11

137 Cong. Rec. S4511-04 (1991)..........................................5, 10

137 Cong. Rec. S7182 (Dec. 19, 2019) ...................................20

137 Cong. Rec. S7183 (2019) ...................................................18

136 Cong. Rec. S14279 (1990) .................................................10

136 Cong. Rec. S14283 (1990) ...............................................6, 8

136 Cong. Rec. S14284 (1990) .................................................10

138 Cong. Rec. S17252-04 (1992) ..............................................8

138 Cong. Rec. S17252-14 (1992) ..............................................9

163 Cong. Rec. H9650 (daily ed. December 5, 2017) .......................30

163 Cong. Rec. H9652 (daily ed. December 5, 2017) .......................30

165 Cong. Rec. S7182 (Dec. 19, 2019) ...............................18, 29

**Other Authorities:**

The 9/11 Commission Report, *Final Report of the National
Commission on Terrorist Attacks Upon the United States* (2004)............21

John C. Coffee Jr., *Rescuing the Private Attorney General:
Why the Model of the Lawyer as Bounty Hunter is Not Working*,
42 Md. L. Rev. 215 (1983)..................................................22

Cong. Rsch. Serv., *Constitution of the United States: Analysis and
Interpretation*, Amdt. 5.4.1, (constitution.congress.gov/
browse/essay/amdt5-4-1/ALDE_00000874/)....................................24

Jimmy Gurulé, *Unfunding Terror: the Legal Response to the
Financing of Global Terrorism* (2008) (*Unfunding Terror*)...............22

Robert A. Katzman, *Madison Lecture: Statutes*,
87 N.Y.U. L. Rev. 63 (2012) ..............................................31

Juan C. Zarate, *Treasury's War: The Unleashing of a New Era of
Financial Warfare* (2013)..................................................21

## STATEMENT OF INTEREST[1]

Amici are a bipartisan group of members of the U.S. Senate and the House of Representatives with deep experience guiding national antiterrorism policy. They have served on congressional committees with jurisdiction over issues related to foreign relations, the judiciary, homeland security, and armed services. They also share a commitment to the private right of action provided in the Anti-Terrorism Act of 1992 (ATA). Amici include those who were involved in enacting the ATA and monitoring its implementation over the past 25 years, as well as the Anti-Terrorism Clarification Act of 2018 (ATCA), and the Promoting Security and Justice for Victims of Terrorism Act of 2019 (PSJVTA), a pair of legislative efforts to strengthen the ATA in response to jurisdictional obstacles faced by terror victims and their families.

The decision under review holds the PSJVTA unconstitutional in many of its most important applications, thereby undermining the ATA's private right of action and inhibiting Congress's power to provide meaningful relief and a federal forum for American citizens harmed by overseas terrorism.

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than amici or their counsel made a monetary contribution intended to fund the brief's preparation or submission.

1

Amici submit this brief to urge this Court to reverse that erroneous and troubling decision.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

For decades, starving terror networks of funding has been a focus of Congress's national-security efforts, one that has been singularly effective in bringing terror sponsors to justice, reducing terrorists' destructive capabilities, and saving American lives. Private civil actions have proven an integral component of that strategy. Such suits provide a measure of justice to terror victims and their families and impose uniquely effective financial pressures on the sponsors, directors, and perpetrators of terror.

Congress's enactment of the ATA unlocked private civil lawsuits' terror-fighting potential, removing many of the jurisdictional barriers that once made it difficult to reach terror sponsors like the PLO and PA. And after new jurisdictional barriers emerged that prevented American plaintiffs from haling the PLO and PA into U.S. courts, Congress responded with new legislation, most recently with the Promoting Security and Justice for Victims of Terrorism Act of 2019 (PSJVTA), Pub. L. No. 116-94, div. J, tit. IX, § 903, which removed those barriers and restored the ATA's full effectiveness against the PLO and PA, by declaring their post-enactment presence in the

2

United States, and their post-enactment payments to terrorists convicted of or killed while harming Americans, to constitute consent to ATA suits in U.S. courts. But the district court in this case held the PSJVTA unconstitutional through a novel and erroneous interpretation of the Due Process clause that renders government interests irrelevant.

That erroneous decision effectively renders the ATA ineffective against terrorists and terror sponsors acting abroad—which is to say, in the very type of cases for which the ATA was designed to furnish a remedy, perpetrated by the very organization Congress had in mind when it passed the ATA in 1992. It will leave the Political Branches with sharply limited options to staunch the continued, admitted, and unapologetic support of terrorism by the PLO and PA, even as those organizations continue to operate freely on U.S. soil and to reward and honor terrorists who murdered and maimed Americans.

This case therefore raises constitutional and policy questions of the highest order. If the decision's legal underpinnings are allowed to stand, the decision will effect constitutional damage, not merely by extinguishing a class of cases that Congress has repeatedly acted to preserve, but perpetuating an interpretation of the Due Process Clause that disregards congressional judgments about vital interests of the United and unnecessarily cabins

3

congressional authority to extend the judicial power of the United States to conduct occurring abroad.

This Court should reverse that decision, remove the barriers preventing the PSJVTA's operation, and confirm Congress's authority to combat terror occurring outside the borders of the United States where the Political Branches have determined that federal interests require the exercise of such authority.

## ARGUMENT

## I.    The decision below nullifies heartland applications of the ATA, a critical component of Congress's comprehensive antiterrorism scheme.

Congress enacted the ATA, Pub. L. 102–572, tit. X, § 1003, 106 Stat. 4522-4524 (Oct. 29, 1992) (codified as amended at 18 U.S.C. §§ 2331 *et seq.*), in order to "remove the jurisdictional hurdles in the courts confronting victims [of international terrorism]"—and to ensure that the Defendants in this case (and others like them) can be held accountable for harms they have inflicted on innocent Americans abroad. *The Antiterrorism Act of 1991: Hearing Before the Subcomm. on Intellectual Property & Judicial Admin. of the H. Comm. on the Judiciary*, 102d Cong. 10 (1992) (*1992 Hearing*) (letter from Sen.

Grassley); 137 Cong. Rec. S4511-04 (1991) (statement of Sen. Grassley) (same); 137 Cong. Rec. S1771-01 (1991) (statement of Sen. Grassley) (same).

Yet the decision under review has imposed *new* jurisdictional barriers that undermine the ATA, even after Congress amended the law to remove such barriers, effectively placing the PLO and PA beyond the reach of Congress and American courts, notwithstanding the PLO and PA's continued enjoyment of the benefits of operating in the United States and their continuing payments to terrorists for murdering and maiming U.S. citizens. That result is not required by the Due Process Clause and should not be left standing.

### A. Congress enacted the ATA to overcome jurisdictional obstacles to holding terrorists accountable in U.S. courts.

Congress's impetus for enacting the ATA dates back to the 1970s and 1980s, when the Nation was stunned by a series of brazen terror attacks against Americans abroad. 136 Cong. Rec. S4592, S4594 (1990) (statement of Sen. Heflin). These included the PLO's kidnapping and murder of U.S. Ambassador Cleo Noel in Sudan in 1973; Hezbollah's suicide truck-bomb attack that killed 220 U.S. Marines in Beirut in 1983; Hezbollah terrorists' murder of U.S. Navy Diver Robert Stethem during the hijacking of TWA

Flight 847 in 1985; and the bombing of Pan Am flight 103, which ended the lives of more than 250 people above Lockerbie, Scotland in 1988.

These horrendous attacks of the 1970s and 80s brought attention to a significant "gap" in the Nation's legal strategy for combatting oversees terrorism, 136 Cong. Rec. at S14283 (1990) (statement of Sen. Grassley). Up to that time, Congress had focused on enacting *criminal* anti-terrorism laws—many of which explicitly reached actors and conduct beyond our borders. In addition, Congress and the Executive Branch negotiated, ratified, and implemented a series of international anti-terrorism conventions prohibiting hijacking,[2] aircraft sabotage,[3] hostage-taking,[4] use of biological[5] and nuclear

---

[2] Convention for the Suppression of Unlawful Seizure of Aircraft, S. Treaty Doc. 92-1 (ratified Sept. 8, 1971); Antihijacking Act of 1974, Pub. L. 93-366, 88 Stat. 409 (Aug. 5, 1974) (adding 49 U.S.C. § 1472(n)).

[3] Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, S. Treaty Doc. 92-32 (ratified Oct. 3, 1972); Aircraft Sabotage Act, Pub. L. 98-473, tit. II, ch. XX, Part B, 98 Stat. 2187 (Oct. 12, 1984) (amending 18 U.S.C. § 32).

[4] International Convention against the Taking of Hostages, S. Treaty Doc. 96-49 (ratified July 30, 1981); Act for the Prevention and Punishment of the Crime of Hostage-Taking, Pub. L. 98-473, tit. II, ch. XX, Part A, 98 Stat. 2186 (Oct. 12, 1984) (adding 18 U.S.C. § 1203).

[5] Convention on the Prohibition of the Development, Production, and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction, S. Treaty Doc. 92-29 (ratified Dec. 16, 1974); Biological Weapons
(Continued . . .)

6

weapons,[6] assassination, kidnapping and assault of diplomats,[7] and piracy on the high seas.[8] Congress also enacted expressly extraterritorial criminal laws to punish international terrorists for harms inflicted on Americans abroad, including laws prohibiting assassination, kidnapping, and assault against senior government officials (1982),[9] and terror attacks against United States nationals (1986).[10]

But while Congress had long combatted terrorism through criminal laws that allowed foreign terrorists to be tried in U.S. courts, it was not until the

Anti-Terrorism Act of 1989, Pub. L. 101-298, 104 Stat. 201 (May 22, 1990) (adding 18 U.S.C. § 175).

[6] Convention on the Physical Protection of Nuclear Material, S. Treaty Doc. 96-43 (ratified July 30, 1981); Convention on the Physical Protection of Nuclear Material Implementation Act of 1982, Pub. L. 97-351, 96 Stat. 1663 (Oct. 18, 1982) (adding 18 U.S.C. § 831).

[7] Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents, S. Treaty Doc. 93-36 (ratified Oct. 28, 1975); Act for the Prevention and Punishment of Crimes Against Internationally Protected Persons, Pub. L. 94-467, 90 Stat. 1997 (Oct. 8, 1976) (amending 18 U.S.C. §§ 112, 1116, 1201).

[8] Convention for the Suppression of Unlawful Acts against the Safety of Maritime Navigation, S. Treaty Doc. 101-1 (ratified Nov. 22, 1989).

[9] Pub. L. 97-285, 96 Stat. 1219 (Oct. 6, 1982) (amending 18 U.S.C. § 351).

[10] Omnibus Diplomatic Security and Antiterrorism Act of 1986, Pub. L. 99-399, § 1202, 100 Stat. 896 (Aug. 27, 1986) (currently codified as amended at 18 U.S.C. § 2332).

enactment of the ATA that Congress utilized the terrorism-fighting potential of civil lawsuits. With the ATA, Congress recognized that civil lawsuits could provide a means of "fill[ing] the gap" in federal national security legal strategy by providing the "civil counterpart" to the nation's extraterritorial criminal statutes, *id.* (statement of Sen. Grassley); *see also 1992 Hearing* at 11. Congress recognized that allowing such private civil actions for terror attacks would not only provide compensation to the victims of terror but could provide "an important instrument in the fight against terrorism" itself *id.* at 10 (letter from Sen. Grassley), by striking at "the resource that keeps [international terrorists] in business—their money." 138 Cong. Rec. S17252-04 (1992) (statement of Sen. Grassley). The ATA reaffirmed America's "commitment to the rule of law," under which "the people of the United States" could "bring terrorists to justice the American way, by using the framework of our legal system to seek justice against those who follow no framework or defy all notions of morality and justice." *Antiterrorism Act of 1990: Hearing Before the Subcommittee on Courts and Administrative Practice of the Senate Committee on the Judiciary,* 101st Cong., 2d Sess. at 2-3 (July 25, 1990) ("*1990 Hearing*").

The attacks of the 1970s and 80s also illustrated why the ATA was necessary to facilitate these civil suits, revealing terrorism to be "a wrong that, by its nature, falls outside the usual jurisdictional categories of wrongs that national legal systems have traditionally addressed." S. Rep. No. 102-342, at 22. One case more than any other illustrated the limitations of these traditional remedies: the PLO's 1985 murder of wheelchair-bound Leon Klinghoffer, an American passenger aboard the Italian vessel *Achille Lauro*. *1990 Hearing* 56. The incident prompted public outcry and a congressional inquiry into the PLO and its finances, *id.* at 109-117, but also revealed the difficulty in holding organizational terrorism perpetrators accountable, given the welter of technical challenges that the PLO raised when sued by the Klinghoffer family. The ATA's legislative record is replete with references to the legal challenges of the *Klinghoffer* case—and shows how Congress drew inspiration from that case in how to solve them.[11] "Only by virtue of the fact that the attack violated

---

[11] See 137 Cong. Rec. S1771-01 (1991) (statement of Sen. Grassley) ("The PLO must be held accountable for its crimes and the Klinghoffers are making sure that, at least in some way, the PLO will be brought to justice."); 138 Cong. Rec. S17252-14 (1992) (statement of Sen. Grassley) ("[T]he first and best remedy is to bring these terrorists to justice in our courts of law. But often, the terrorists elude justice, as in the Achille Lauro case, where Leon Klinghoffer, an elderly American was callously murdered by PLO terrorists."); By enacting Section 2333, Congress intended to "put terrorist[s] on notice[] [t]o keep their hands
(Continued . . .)

certain Admiralty laws and that the [PLO] had assets and carried on activities in New York, was the court able to establish jurisdiction over the case." *Id.* at 5. But Congress was concerned that "[a] similar attack occurring on an airplane or in some other [foreign] locale might not have been subject to civil action in the U.S.," and therefore passed the ATA to "codify" the *Klinghoffer* ruling and "make[] the rights of American victims definitive," 137 Cong. Rec. S4511-04 (1991) (statement of Sen. Grassley), whenever they seek redress for terrorism-related injuries from attacks occurring overseas.

The ATA therefore allows U.S. nationals to bring actions for injuries from acts of "international terrorism" that "occur primarily outside the territorial jurisdiction of the United States." *See* 18 U.S.C. § 2331(1)(C). And the ATA, extended the "jurisdictional structure that undergirds the reach of American criminal law to the civil remedies it defines." S. Rep. 102-342, at 45 (1992). Congress specifically enacted the ATA as a counterpart to 18 U.S.C. § 2331 [now 2332], the "so-called 'long-arm statute,' which provides extraterritorial criminal jurisdiction for acts of international terrorism against

---

off Americans" like Leon Klinghoffer. 136 Cong. Rec. S14279, S14284 (1990) (statement of Sen. Grassley); see also *1992 Hearing* at 4.

U.S. Nationals," allowing them to be tried, convicted, and sentenced in U.S. district courts. H.R. Rep. No. 102-1040, at 5 (1992).[12]

Congress was attentive to the sensitivities raised by this sort of extraterritorial legislation. Congress considered testimony about the ATA's due process implications, *1990 Hearing* 79, 121-131, and as a result, tailored the statute to provide a cause of action only where vital U.S. interests are at stake. Congress was confident that Due Process posed no impediment to reaching acts of terrorism committed abroad by the PLO, because the *Klinghoffer* case itself had shown "that the U.S. courts have jurisdiction over the PLO." 137 Cong. Rec. S4511 (1991) (statement of Sen. Grassley).

---

[12] Antiterrorism Act of 1991, *Hearing before the Subcommittee on Intellectual Property and Judicial Administration of the Committee on the Judiciary*, United States House of Representatives, 102d Cong., Second Session at 1 (Sept. 18, 1992) ("House Hearing") (Subcommittee Chairman Hughes: the "new civil legal cause of action for international terrorism by providing for extraterritorial jurisdiction over terrorist acts against U.S. nationals…parallels criminal legislation which we enacted in 1986"); *id.* at 11 (Ranking Member Moorhead: legislation "will provide civil sanctions as a counterpart to the criminal statute"); 136 Cong. Rec. 7594 (Apr. 19, 1990) (Statement of Sen. Heflin) ("While Congress has enacted various laws aimed at extending American criminal jurisdiction for acts of international terrorism against our citizens, there are currently no laws expressly providing Federal civil remedies against these outrageous acts."); 137 Cong. Rec. 9883 (May 2, 1991) (Statement of Rep. Feighan).

That jurisdictional understanding held even after the creation of the PA in 1993, and persisted for decades. During that time, Congress continued combatting international terrorism by enacting extraterritorial criminal laws prohibiting foreign murders of U.S. nationals,[13] maritime piracy against U.S. nationals,[14] violence at international airports against U.S. nationals,[15] use of weapons of mass destruction against U.S. nationals,[16] war crimes against U.S. nationals,[17] the provision of material support and resources to foreign terrorist organizations designated as threats to U.S. interests or U.S. nationals,[18] use of

---

[13] Federal Death Penalty Act of 1994 (FDPA), Pub. L. 103-322, tit. VI, § 60009 (adding 18 U.S.C. § 1119).

[14] FDPA § 60019 (adding 18 U.S.C. § 2280); USA PATRIOT Act, Pub. L. 107-56, § 306, 115 Stat. 237 (Oct. 26, 2001) (adding 18 U.S.C. ch. 111A); see USA FREEDOM Act of 2015, Pub. L. 114-23, §§ 801-805, 129 Stat. 300-309 (June 2, 2015) (adding 18 U.S.C. §§ 2280a and 2281a and amending 18 U.S.C. §§ 2280 and 2281).

[15] FDPA § 60021 (adding 18 U.S.C. § 37).

[16] *Id.* § 60021 (adding 18 U.S.C. § 37).

[17] War Crimes Act of 1996, Pub. L. 104-192, 110 Stat. 2104 (adding 18 U.S.C. § 2401).

[18] Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132 (Apr. 4, 1996), § 303 (adding 18 U.S.C. § 2339B); see USA FREEDOM Act, §§ 81-82 (adding 18 U.S.C. § 2332i and amending 18 U.S.C. § 831).

nuclear weapons[19] and chemical weapons against U.S. nationals,[20] transnational terrorism against U.S. nationals,[21] aircraft hijacking against U.S. nationals,[22] narcoterrorism harming U.S. nationals,[23] terrorist bombings against U.S. nationals,[24] and the financing of terrorism harming U.S. nationals.[25]

During that same period, private parties successfully sued the PLO and PA in numerous civil cases under the ATA. In each case, district courts held that the PLO and PA were subject to personal jurisdiction in the United

---

[19] AEDPA § 502 (amending 18 U.S.C. § 831).

[20] *Id.* § 521 (adding 18 U.S.C. § 2332c); Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. 105-277, div. I, title II, § 201, 112 Stat. 2681-866 (Oct. 21, 1998) (adding 18 U.S.C. § 229)

[21] AEDPA § 702 (adding 18 U.S.C. § 2332b).

[22] AEDPA § 721 (amending 18 U.S.C. §§ 32, 37, and 49 U.S.C. § 46502(b)).

[23] USA PATRIOT Act § 122 (adding 21 U.S.C. § 960a).

[24] Terrorist Bombings Convention Implementation Act of 2002, Pub. L. 107-197, § 101, 116 Stat. 721 (June 25, 2002) (adding 18 U.S.C. § 2332f).

[25] Suppression of the Financing of Terrorism Convention Implementation Act of 2002, Pub. L. 107-197, § 202, 116 Stat. 724 (June 25, 2002) (adding 18 U.S.C. § 2339C).

States.[26] And both the PLO and PA were forced to pay substantial sums to U.S. victims of international terror attacks.[27]

## B. Congress amended the ATA in response to new jurisdictional obstacles that hindered its operation.

Things changed, however, after the Supreme Court's decisions in *Daimler AG* v. *Bauman*, 134 S. Ct. 746 (2014), and *Walden* v. *Fiore*, 134 S. Ct. 1115 (2014). After *Daimler* and *Walden* were decided, the PLO and PA began advancing the argument that U.S. courts no longer had jurisdiction over either of them, and that meritorious suits brought against them by Americans who had been injured or killed abroad had to be dismissed. *See Waldman v.*

---

[26] *See Sokolow v. Palestine Liberation Org.*, No. 04-cv-397, 2011 WL 1345086, at *3 n.7 (S.D.N.Y. Mar. 30, 2011) (collecting cases); *Klinghoffer v. S.N.C. Achille Lauro*, 795 F. Supp. 112, 114 (S.D.N.Y. 1992); *Ungar v. Palestinian Auth.*, 153 F. Supp. 2d 76, 88 (D.R.I. 2001); *Biton v. Palestinian Auth,*, 310 F. Supp. 2d 172, 179 (D.D.C. 2004); *Knox v. Palestine Liberation Org.*, 248 F.R.D. 420, 427 (S.D.N.Y. 2008); *Klieman v. Palestinian Auth.*, 467 F. Supp. 2d 107, 113 (D.D.C. 2006). The rule was so well established that the PLO and PA stopped contesting jurisdiction in some cases. *Gilmore v. Palestinian Interim Self-Government Auth.*, 422 F. Supp. 2d 96, 102 n.4 (D.D.C. 2006) ("Defendants did not move to dismiss the PLO and the PA from this action for lack of personal jurisdiction.").

[27] *See, e.g., Ungar v. Palestinian Auth.*, 715 F. Supp. 2d 253, 269 (D.R.I. 2010) ($116 million judgment paid on installment basis); *Knox v. Palestine Liberation Org.*, No. 03 Civ. 446 (VM) (THK), 2009 WL 1591404, at *12 (S.D.N.Y. Mar. 26, 2009) ($5 million per month payments), *adopted*, 628 F. Supp. 2d 507 (S.D.N.Y. 2009).

*Palestine Liberation Org.*, 835 F.3d 317, 322 (2d Cir. 2016); *see also Livnat v. Palestinian Auth.*, 851 F.3d 45, 142 (D.C. Cir. 2017).

This Court agreed in an earlier stage of this case. Although both *Daimler* and *Walden* concerned Fourteenth Amendment Due Process standards applicable only against the states, this Court held that these precedents should also govern Fifth Amendment Due Process standards applicable in federal district court. *Waldman v. Palestine Liberation Org.*, 835 F.3d at 337, *vacated sub nom. Sokolow v. Palestine Liberation Org.*, 140 S. Ct. 2714 (2020); *see also Livnat v. Palestinian Auth.*, 851 F.3d 45, 57-59 (D.C. Cir. 2017). And the Court applied the personal jurisdiction standards from *Walden* and *Daimler* on terms that essentially precluded the ATA from being applied to conduct occurring abroad by any foreign-terror-sponsoring organization like the PLO or PA. The Court decided that the ATA could not be constitutionally applied to Defendants, because neither of them could be considered "at home," in *Daimler*'s parlance, in this country. 835 F.3d at 331-35. The Court also concluded that the PLO's and PA's terror-sponsoring activities lacked the "'substantial connection'" to the United States that *Walden* demands, because their "'suit-related conduct'" occurred abroad, and "the plaintiff-victims[' status as] United States citizens" was insufficient to

15

establish the requisite connection. *Id.* at 335 (quoting *Walden*, 134 S. Ct. at 1121). These rulings effectively precluded the PLO, the PA, or any similar foreign sponsor of terrorism acting abroad from being hailed into U.S. courts under general or specific personal jurisdiction Due Process standards.[28]

In response, Congress quickly and decisively passed the ATCA (Pub. L. No. 115-253, 132 Stat. 3183-3185 (2018)) using a long-recognized and firmly established basis for obtaining personal jurisdiction—jurisdiction by *consent*. Congress enacted the ATCA without objection. The statute provided that any person who benefited from a waiver of 22 U.S.C. § 5202 (a statute excluding the PLO and its agents from the United States) or accepted specified forms of U.S. foreign assistance (which both the PLO and PA had received) would be deemed to have consented to personal jurisdiction in U.S. civil actions brought under the ATA. Pub. L. 115-253, § 4(a) (formerly codified at 18 U.S.C. §

---

[28] Some of the present Amici, as well as the House of Representatives acting on a bipartisan basis, urged the Supreme Court to review the decision in *Waldman*, expressing the view that Fourteenth Amendment personal jurisdiction standards had no application to suits arising under federal law where Congress provided for federal jurisdiction in federal courts. *See* Br. for the U.S. House of Reps. as Amicus Curiae, *Sokolow* v. *PLO*, No. 16-1071 (Apr. 2017) (H.R. Br.); Br. of U.S. Senator Charles E. Grassley *et al.* as Amici Curiae, *Sokolow* v. *PLO*, No. 16-1071 (Apr. 2017). The Supreme Court declined review. 138 S. Ct. 1438 (2018).

2334(e)(1)(A)). After the ATCA became law, the PLO and PA stopped accepting any of the foreign assistance that qualified under the Act. In addition, this Court and the D.C. Circuit held that the PLO and PA were not benefiting from a waiver of the relevant statute, and thus the ATCA's "factual predicates" had not been established against them. *Klieman v. Palestinian Auth.*, 923 F.3d 1114, 1128-31 (D.C. Cir. 2019), *vacated*, 140 S. Ct. 2713 (2020); *Waldman*, 925 F.3d at 574.

Congress again responded with the Promoting Security and Justice for Victims of Terrorism Act of 2019 (PSJVTA). Pub. L. No. 116-94, div. J, tit. IX, § 903. The PSJVTA expanded the bases for jurisdiction established by the ATCA. And it specifically identified the PA and PLO by name, 18 U.S.C. § 2334(e)(5), expressly providing that those organizations' post-enactment activities in the United States would be deemed to be consent to jurisdiction in civil ATA cases, with narrow exceptions for participation in official U.N. business and other specified activities. 18 U.S.C. § 2334(e)(1)(B). The PSJVTA also contained a new jurisdictional provision, under which the PLO and PA would be deemed to consent to personal jurisdiction in civil ATA cases if they made post-enactment payments to terrorists who had been imprisoned for

17

injuring or killing American citizens or made such payments to the families of terrorists who had been killed doing so. 18 U.S.C. § 2334(e)(1)(A).

Congress based the PSJVTA on the same consent-based theory that undergirded the ATCA: that imposing such conditions on "the PLO and the PA," was eminently reasonable as "Congress has repeatedly tied their continued receipt of privileges," including this country's tolerance of their "continued presence in the United States" "to their commitment to renounce terrorism." *See* H.R. Rep. No. 115-848, at 7 (2018). Congress gave the PLO and PA a choice: abide by conditions on matters of intense interest to the United States, or provide grounds to "reopen[] the courthouse doors to American victims and their families," 137 Cong. Rec. S7183 (2019) (statement of Sen. Grassley), who had seen their cases "dismissed for lack of jurisdiction after years of litigation," *id.* at S7182 (statement of Sen. Lankford).

## C. The PSJVTA includes provisions reflecting the importance of this case.

Several provisions of the PSJVTA reflect Congress' view of the importance of this case. To begin, the statute specifically includes a "sense of Congress" about claims of U.S. nationals that were "dismissed for lack of personal jurisdiction," which it defines as "covered claims." PSJVTA § 903(b)(5):

It is the sense of Congress that—

> (A) covered claims should be resolved in a manner that provides just compensation to the victims;

> "(B) covered claims should be resolved and settled in favor of the victim to the fullest extent possible and without subjecting victims to unnecessary or protracted litigation; * * *

*Id.* § 903(b)(4).

The statute also included a "rule of construction" provision that the statute "should be liberally construed to carry out the purposes of Congress to provide relief for victims of terrorism," *id.* § 903(d)(1)(A), and an applicability provision that the statute would apply "to any case pending on or after August 30, 2016" (*i.e.*, the day before this Court issued *Waldman I*), *id.* § 903(d)(2).

Senator Lankford, co-lead sponsor of the bill, explained these provisions shortly before the vote:

> By applying the bill to any case pending on or after August 30, 2016, we are making clear Congress's intent that courts have the power to restore jurisdiction in cases previously dismissed for lack of jurisdiction after years of litigation. It is to be liberally construed to carry out the purposes of Congress to provide relief for victims of terrorism, and it specifies Congress's intent to enable victims to pursue justice without being subjected to repetitive, unnecessary, or protracted litigation, which would just reopen the pain that many Americans have already suffered through.

137 Cong. Rec. S7182 (Dec. 19, 2019). Senator Grassley, also a lead co-sponsor echoed those remarks: "The bill also sends a clear signal that Congress intends to empower courts to restore jurisdiction in cases previously dismissed." *Id.* S7183 (Dec. 19, 2019). Thus, the legislation was expressly intended to ensure that the Judicial Branch is empowered to reopen claims like the ones in this and similar cases then pending before the Supreme Court.

### D. The district court overturned the PSJVTA, notwithstanding Congress's express determination that holding the PLO and PA accountable in U.S. civil cases serves vital U.S. national security interests.

The district court in this case shut the courthouse doors once again. After holding that the PSJVTA applies to this case, SPA-4, the district court held that PSJVTA's deemed-consent provisions is unconstitutional. *Id.* at 8-11. It therefore determined that Congress has no proper role in defining conduct that can be jurisdictionally relevant to support personal jurisdiction by consent. *Id.* at 11 n.6. If left standing, this ruling would invalidate Congress's express determination to revive the ATA and would likely prohibit Congress from passing any future deemed-consent legislation that would pass constitutional muster.

Leaving the decision in place would thus hamstring a key component of the United States' antiterrorism strategy. Congress has long understood that

20

terror enterprises "rest[] on a foundation of money." See *Antiterrorism Act of 1990: Hearing on S. 2465 Before the Sen. Subcomm. on Courts & Admin. Practice*, 101st Cong. 84 (1990) (testimony of Joseph A. Morris, former General Counsel, U.S. Information Agency). Congress has therefore employed a robust and comprehensive scheme—composed of administrative sanctions, civil and criminal penalties—that aims to deny malefactors of every dollar they might use to fund terrorism. And these government efforts to combat terror financing have been demonstrably effective. *See* The 9/11 Commission Report, *Final Report of the National Commission on Terrorist Attacks Upon the United States* 382–383 (2004). For instance, documents found in Osama Bin Laden's compound revealed that efforts to restrict terrorist funding had frustrated al Qaeda's efforts to raise and transfer money around the world. Juan C. Zarate, *Treasury's War: The Unleashing of a New Era of Financial Warfare* ix (2013).

Congress has determined that government enforcement alone is not enough to stanch the flow of terror funds. Civil litigation under the ATA plays an irreplaceable role in reinforcing these governmental antiterrorism efforts, providing "an invaluable supplement to the criminal justice process and administrative blocking orders," Jimmy Gurulé, *Unfunding Terror: the Legal*

*Response to the Financing of Global Terrorism* 325 (2008) (*Unfunding Terror*). Private civil litigation also provides advantages that make it a more effective terror-fighting tool than criminal enforcement efforts, including a less stringent burden of proof, an absence of constitutional restrictions on investigation, and broader discovery rights than those accorded governmental agents. *Id.* Private civil lawsuits also provide "an important failsafe function" against the winds of political change, "by ensuring that legal norms are not wholly dependent on the current attitudes of public enforcers." John C. Coffee Jr., *Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter is Not Working*, 42 Md. L. Rev. 215, 227 (1983).

Accordingly, by undercutting the operation of the ATA, the district court not only denied relief to American victims of international terrorism, it blunted a vital tool in our Nation's war on terror, frustrating an Act of Congress that concerns one of the gravest threats facing our nation. For these reasons, the district court's decision is of serious concern to amici.

## II. The district court's decision misconstrues Due Process requirements and inserts the judiciary into matters the Constitution vests in the Political Branches.

It is not just the district court's result—striking down as unconstitutional a federal statute aimed at national security—that raises great

22

concerns for Congress. The decision's legal underpinnings themselves threaten to undermine Congress's legitimate authority to legislate consistent with the Due Process Clause and to meet future threats facing the Nation. In the course of rejecting the constitutionality of the PSJVTA, the district court expressly disregarded the interests of the United States in matters of foreign affairs and national security and the judgment of Congress that civil lawsuits serve vital national interests in combatting terrorism, rejecting the Government's argument that the PSJVTA warrants deference because it is "an enactment by Congress and the President in the field of foreign affairs." SPA-11-12 n.6. The district court therefore concluded that the government's legitimate interests, as expressed by Congress and the President of the United States, are simply irrelevant to the application of the Due Process Clause in the context of personal jurisdiction. That is incorrect.

Amici commend the views of the Department of Justice in in this case as consistent with their own views: a federal statute meets the Due Process Clause if it reasonably advances a legitimate federal interest and gives the defendant fair warning of the consequences of conduct specified in the statute.

But amici wish to highlight that even if the Court were to adopt some other due-process standard, adopting one that simply disregards federal interests would be outside the judicial mainstream.

### A. The district court's decision erroneously disregards the considered judgment of Congress and the President on a matter of national security and foreign affairs.

Any Due Process standard that is untethered from the Political Branches' legitimate objectives would be well outside the traditional standards for reviewing federal statutes. Historically, due process has had a procedural and a substantive component. *See* Cong. Rsch. Serv., *Constitution of the United States: Analysis and Interpretation*, Amdt. 5.4.1, (constitution.congress.gov/browse/essay/amdt5-4-1/ALDE_00000874/). The procedural component in this context requires fair warning, and the substantive component requires "non-arbitrary action." *Id.*

The jurisprudence on both of these Due Process components has traditionally involved a balance that is "determined by weighing the private interest that will be affected by the official action against the Government's asserted interest, including the function involved and the burdens the Government would face in providing greater process." *Hamdi v. Rumsfeld*,

542 U.S. 507, 529 (2004) (quoting *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The Supreme Court has thus directed courts to take government interests into account in a wide variety of Due Process contexts. For instance, whether the Government may deprive a person of governmental assistance benefits without a hearing depends upon "whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication." *Goldberg v. Kelly*, 397 U.S. 358, 362-63 (1970).

The test for determining whether a government agent has engaged in misconduct that "shock[s] the conscience" in violation of the Due Process Clause "is satisfied where the conduct was intended to injure in some way unjustifiable by any government interest, or in some circumstances if it resulted from deliberate indifference." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1906 (2018) (internal quotation marks omitted).

In determining whether prison officials have employed excessive force against a prisoner in violation of Due Process, a court must account for "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (internal quotation marks omitted).

25

Under the "unconstitutional conditions" doctrine, which prohibits governments from arbitrarily forcing persons to give up constitutional rights in exchange for discretionary benefits, courts must examine "the 'essential nexus' that exists between the 'legitimate state interest' and the [] condition extracted by the [government]." *Dolan v. City of Tigard*, 512 U.S. 374, 386 (1994) (quoting *Nollan v. Calif. Coastal Com'n*, 483 U.S. 825, 837 (1987)).

Traditional rational-basis review under Due Process requires courts to determine whether a law is "rationally related to a legitimate government interest." *Selective Serv. Sys. v. Minnesota Pub. Int. Rsch. Grp.*, 468 U.S. 841, 859 n.17 (1984). Similarly, the Court has directed courts to test statutes' retroactivity for compliance with the Due Process Clause by evaluating whether retroactive application is "rationally related to a legitimate legislative purpose." *United States v. Carlton*, 512 U.S. 26, 35 (1994).

Consistent with these principles, governmental interests are relevant in determining whether *States* may exercise personal jurisdiction over foreign corporations under the standards of *International Shoe Co. v. Washington*, 326 U.S. 310 (1945). *International Shoe* requires contacts that "make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there." 326 U.S. at

26

317. "Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, *including the forum State's interest in adjudicating the dispute*; the plaintiff's interest in obtaining convenient and effective relief, at least when that interest is not adequately protected by the plaintiff's power to choose the forum; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; *and the shared interest of the several States in furthering fundamental substantive social policies*." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980) (citations omitted; emphasis added). To that end, the Supreme Court "has considered alongside defendants' interests those of the States in relation to each other." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021). In *Ford*, the Supreme Court found that principles of "interstate federalism" supported jurisdiction because the forum states had "significant interests at stake—providing their residents with a convenient forum for redressing injuries inflicted by out-of-state actors, as well as enforcing their own safety regulations." *Id.* at 1030.

As State interests must be taken into account in determining whether state courts can maintain jurisdiction over run-of-the mill state-law disputes,

courts should be at least equally attentive to the federal government's interests when matters of core national concern are at stake, particularly in lawsuits concerning policies vital to national security. Indeed, in the context presented by this case, Congress's judgment should be afforded "special respect" because it involves "delicate judgments, involving a balance that it is the prerogative of the political branches to make, especially in the field of foreign affairs, " and therefore implicates "important separation-of-powers concerns." *Jesner v. Arab Bank PLC*, 138 S. Ct. 1386, 1408 (2018) (plurality opinion); *see also id.* at 1412 (Gorsuch, J., concurring) ("[T]he job of creating new causes of action and navigating foreign policy disputes belongs to the political branches."). Such deference is especially appropriate where "Congress has been conscious of its own responsibility to consider how its actions may implicate constitutional concerns." *Holder v. Humanitarian Law Project*, 561 U.S. at 35-36; *Rostker*, 453 U.S. at 64 ("The customary deference accorded the judgments of Congress is certainly appropriate when, as here, Congress specifically considered the question of the constitutionality" of its national security measures."). And Congress has demonstrated that attentiveness both in crafting the ATA, and in the tailored, measured, and attentive ways it has amended the Act over time to respond to changes in the

28

legal landscape in which the ATA operates, even as it has registered disagreement with those changes.

The district court should have considered the interests and policy judgments at the heart of the PSJVTA. There can, after all, be no debate that the federal interests and policy judgments concern "an urgent objective of the highest order"—combatting terrorism. *Holder*, 561 U.S. at 5. The PSJVTA vitally serves this interest by "cutting terrorists' financial lifelines." 165 Cong. Rec. S7182 (Dec. 19, 2019) (Sen. Grassley). And it also advances the national interest in ensuring fair compensation for American victims of terrorism from those responsible for their losses.

The Act also furthers more general policy objectives as well. It fulfills the Government's responsibility to protect U.S. citizens wherever they travel in the world from danger, as Congress may reasonably determine that "special protection for U.S. nationals serves key national interests." *Gamble v. United States*, 139 S. Ct. 1960, 1967 (2019). Indeed, the PSJVTA's "pay-for-slay" provision advances the foreign-policy objective of facilitating a durable peace in the Mideast region—because the payments that the PLO and PA make to terrorists "clearly incentivize terrorist attacks, and they further threaten prospects for peace, pushing the chance for a Palestinian state further and

further out of reach." 163 Cong. Rec. H9650 (daily ed. December 5, 2017) (Rep. Engel); *see id.* at H9649 (Rep. Royce) (The goal of "peaceful coexistence between the Palestinians and Israelis" is "undermined every day that the PA makes payments for acts of terrorism"); *id.* at H9650 (Rep. Deutch) ("[I]t is impossible for the Palestinian Authority to demonstrate that commitment to peace while paying terrorists for attacks on innocent civilians"); *id.* at H9652 (Rep. Smith) ("[T]he PA cannot be a partner for peace until it stops subsidizing terrorism").

These are paramount policy goals, unquestionably reasonable for Congress to pursue through the PSJVTA. And the policy choices Congress has made in pursuing those goals are reasonable as well. The United States has no obligation to allow the PLO or PA to operate at all in this country. *See Palestine Information Off. v. Shultz*, 853 F.2d 932, 938-39 (D.C. Cir. 1988). It is eminently reasonable for Congress to set conditions for their presence here. And it is absolutely appropriate for Congress to determine that a refusal by the PLO and PA to terminate policies that encourage future acts of terrorism will make them amenable to suit in U.S. courts to answer for the past acts of terrorism carried out by their agents and employees. Holding that the Due

Process Clause renders such interests irrelevant breaks with precedent in ways that seriously concern amici.

## B. The judiciary should respect the Political Branches' determinations.

As the former Chief Judge of this Court has said, "[A]t bottom, the task for the judge is to determine what Congress—in particular the bill's sponsors and others who worked to secure its approval by a majority of the members— was trying to do in passing the law." Robert A. Katzman, *Madison Lecture: Statutes*, 87 N.Y.U. L. Rev. 637, 663 (2012). With the PSJVTA, that task is an easy one. Congress used unambiguous text to achieve foreign policy objectives—and to empower the Judiciary to do justice for a particular class of victims including the plaintiffs in this very case.

The district court's decision relied on another district court decision striking down the PSJVTA in part because, in the opinion of that court, upholding the statute "would pay insufficient 'heed to the risks of international comity.'" *Fuld v. Palestine Liberation Org.*, 578 F. Supp. 3d 577, 595 (S.D.N.Y. 2022), *app. pending*, No. 22-76 (quoting *Daimler*, 571 U.S. at 141). This was improper.

Whether federal laws with extraterritorial application pay sufficient heed to international comity is a decision that rests with Congress and the

President. "The political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns." *Jesner*, 138 S. Ct. at 1403. It is up to "Congress" to "indicate" whether it "intends federal law to apply to conduct occurring abroad." *Kiobel v. Royal Dutch Petrol. Co.*, 133 S. Ct. 1659, 1665 (2013).

Where Congress has made its intention clear that a federal law should apply abroad, that judgment is not to be subject to second-guessing by the courts on grounds of international comity, because Congress and the President are those branches entrusted to decide whether to place certain values above avoiding international friction. The district court's decision to hobble that authority by invoking its own views of "international comity" was another error that this Court should correct.

## CONCLUSION

This Court should reverse the judgment of the district court.

32

Respectfully submitted,

*/s/ J. Carl Cecere*

J. Carl Cecere
CECERE PC
6035 McCommas Blvd.
Dallas, Texas 75206
(469) 600-9455
ccecere@cecerepc.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 29(d) of the Federal Rules of Appellate Procedure because this brief contains 6,861 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure and Circuit Rule 32(a)(2).

This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because the brief has been prepared using Microsoft Word 2013 in 14-point Century Expanded BT font, which is a proportionately spaced typeface.

*/s/ J. Carl Cecere*

**J. Carl Cecere**

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

/s/ *J. Carl Cecere*

**J. Carl Cecere**