# 15-3135(L)

**15-3151(XAP), 22-1060(CON)**

## United States Court of Appeals
## for the Second Circuit

EVA WALDMAN, REVITAL BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF
PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND
YEHUDA BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA,
MINOR, BY HIS NEXT FRIEND AND GUARDIAN VARDA GUETTA, VARDA GUETTA,
INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFF OZ JOSEPH GUETTA,
NORMAN GRITZ, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF DAVID GRITZ, MARK I. SOKOLOW, INDIVIDUALLY AND AS A NATURAL
GUARDIAN OF PLAINTIFF JAMIE A. SOKOLOW, RENA M. SOKOLOW, INDIVIDUALLY
AND AS A NATURAL GUARDIAN OF PLAINTIFF JAIME A. SOKOLOW, JAMIE A.
SOKOLOW, MINOR, BY HER NEXT FRIENDS AND GUARDIAN

*(Caption continued on Inside Cover)*

Appeal from the United States District Court
for the Southern District of New York

## AMICUS BRIEF OF ABRAHAM D. SOFAER AND LOUIS J. FREEH
## IN SUPPORT OF APPELLANTS AND REVERSAL

Tejinder Singh
SPARACINO PLLC
1920 L Street NW
Suite 835
Washington, DC 20036
(202) 629-3520
tejinder@sparacinopllc.com

MARK I. SOKOLOW AND RENA M. SOKOLOW, LAUREN M. SOKOLOW, ELANA R. SOKOLOW, SHAYNA EILEEN GOULD, RONALD ALLAN GOULD, ELISE JANET GOULD, JESSICA RINE, SHMUEL WALDMAN, HENNA NOVACK WALDMAN, MORRIS WALDMAN, ALAN J. BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, YEHONATHON BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, BINYAMIN BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, DANIEL BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, YEHUDA BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, RABBI LEONARD MANDELKORN, KATHERINE BAKER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN, RICHARD BLUTSTEIN, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, LARRY CARTER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DIANE ("DINA") CARTER, SHAUN COFFEL, DIANNE COULTER MILLER, ROBERT L COULTER, JR., ROBERT L. COULTER, SR., INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JANIS RUTH COULTER, CHANA BRACHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ELIEZER SIMCHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ESTHER ZAHAVA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, KAREN GOLDBERG, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STUART SCOTT GOLDBERG/ NATURAL GUARDIAN OF PLAINTIFFS CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG,TZVI YEHOSHUA GOLDBERG, SHOSHANA MALKA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, TZVI YEHOSHUA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YAAKOV MOSHE GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YITZHAK SHALOM GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, NEVENKA GRITZ, SOLE HEIR OF NORMAN GRITZ, DECEASED,

*Plaintiffs-Appellants*,

UNITED STATES OF AMERICA,

*Intervenor-Appellant*,

—against—

PALESTINE LIBERATION ORGANIZATION, PALESTINIAN AUTHORITY, AKA PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY and or PALESTINIAN COUNCIL and or PALESTINIAN NATIONAL AUTHORITY,

*Defendants-Appellees*,

YASSER ARAFAT, MARWIN BIN KHATIB BARGHOUTI, AHMED TALEB MUSTAPHA BARGHOUTI, AKA AL-FARANSI, NASSER MAHMOUD AHMED AWEIS, MAJID AL- MASRI, AKA ABU MOJAHED, MAHMOUD AL-TITI, MOHAMMED ABDEL RAHMAN SALAM MASALAH, AKA ABU SATKHAH, FARAS SADAK MOHAMMED GHANEM, AKA HITAWI, MOHAMMED SAMI IBRAHIM ABDULLAH, ESATATE OF SAID RAMADAN, DECEASED, ABDEL KARIM RATAB YUNIS AWEIS, NASSER JAMAL MOUSA SHAWISH, TOUFIK TIRAWI, HUSSEIN AL-SHAYKH, SANA'A MUHAMMED SHEHADEH, KAIRA SAID ALI SADI, ESTATE OF MOHAMMED HASHAIKA, DECEASED, MUNZAR MAHMOUD KHALIL NOOR, ESTATE OF WAFA IDRIS, DECEASED, ESTATE OF MAZAN FARITACH, DECEASED, ESTATE OF MUHANAD ABU HALAWA, DECEASED, JOHN DOES, 1-99, HASSAN ABDEL RAHMAN,

*Defendants*.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ii

INTEREST OF THE AMICI .........................................................................1

SUMMARY OF ARGUMENT .....................................................................2

ARGUMENT ................................................................................................5

   I.    The Constitution Vests Power in the United States to
          Subject Foreign Persons to U.S. Law ...................................5

   II.   Congress Has Repeatedly Exercised its Broad Powers
          to Enact Legislation with Extraterritorial Effect to
          Prevent, Punish, and Redress Terrorism .............................17

   III.  The Promoting Security and Justice for Victims of
          Terrorism Act Does Not Violate the Due Process
          Clause of the Fifth Amendment .........................................25

CONCLUSION ..........................................................................................30

i

# TABLE OF AUTHORITIES

## CASES

*Alden v. Maine,*
　527 U.S. 706 (1999) .............................................................. 11

*Almog v. Arab Bank, PLC,*
　471 F. Supp. 2d 257 (E.D.N.Y. 2007) ................................. 17

*Am. Banana Co. v. United Fruit Co.,*
　213 U.S. 347 (1909) ................................................................ 6

*Brown v. United States,*
　12 U.S. 110 (1814) .................................................................. 7

*Burger King Corp. v. Rudzewicz,*
　471 U.S. 462 (1985) .............................................................. 26

*Cnty. of Sacramento v. Lewis,*
　523 U.S. 833 (1998) .............................................................. 25

*Cohens v. Virginia,*
　19 U.S. (6 Wheat.) 264 (1821) ............................................. 13

*E.E.O.C. v. Arabian Am. Oil Co.,*
　499 U.S. 244 (1991) ................................................................ 6

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,*
　141 S. Ct. 1017 (2021) .......................................................... 26

*Franchise Tax Bd. of Cal. v. Hyatt,*
　139 S. Ct. 1485 (2019) ............................................................ 7

*Goldberg v. UBS AG,*
　660 F. Supp. 2d 410 (E.D.N.Y. 2009) ................................. 23

*Hartford Fire Ins. Co. v. California,*
　509 U.S. 764 (1993) ................................................................ 6

ii

*Jesner v. Arab Bank, PLC*,
    138 S. Ct. 1386 (2018) ........................................................18

*Kendall v. United States ex rel. Stokes*,
    37 U.S. (1 Pet.) 524 (1838) ..............................................13

*Osborn v. Bank of United States*,
    22 U.S. (9 Wheat.) 738 (1824) ..........................................13

*Palestine Information Office v. Shultz*,
    853 F.2d 932 (D.C. Cir. 1988) ..........................................28

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ............................................................7

*Talbot v. Jansen*,
    3 U.S. (3 Dall.) 133 (1795) ..............................................14

*The Marianna Flora*,
    24 U.S. (11 Wheat.) 1 (1825) ...........................................14

*U.S. Steel Corp. v. Multistate Tax Comm'n*,
    434 U.S. 452 (1987) ............................................................7

*United States v. Ahmed*,
    94 F. Supp. 3d 394 (E.D.N.Y. 2015) ...............................17

*United States v. Arjona*,
    120 U.S. 479 (1887) ............................................................7

*United States v. Bowman*,
    260 U.S. 94 (1922) ..............................................................6

*United States v. Flores*,
    289 U.S. 137 (1933) ..........................................................15

*United States v. Palmer*,
    16 U.S. (3 Wheat.) 610 (1818) .........................................14

*United States v. Smith,*
    18 U.S. 153 (1820)...................................................................14

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003) ..............................................16, 17

*Waldman v. Palestine Liberation Org.,*
    835 F.3d 317 (2d Cir. 2016) ...................................25, 29, 30

*Waring v. Clarke,*
    46 U.S. (5 How.) 441 (1847) ..............................................13

*Wolff v. McDonnell,*
    418 U.S. 539 (1974).............................................................25

## STATUTES

7 U.S.C. § 5 ............................................................................16

18 U.S.C. § 2334(a) .............................................................23

18 U.S.C. § 2334(d) .............................................................23

18 U.S.C. § 2334(e) .............................................................26

18 U.S.C. § 2338 ...................................................................23

22 U.S.C. § 2778(a)(1)..........................................................16

22 U.S.C. § 5201 ...................................................................28

22 U.S.C. § 5202 ...................................................................28

50 U.S.C. §§ 1701-1708 ......................................................17

50 U.S.C. § 1702 ...................................................................19

50 U.S.C. § 1702(a)(1)(A).....................................................19

50 U.S.C. § 1702(a)(1)(B).....................................................19

Act of Apr. 30, 1790, ch. 9, §§ 8-13,
 1 Stat. 113-15 .......................................................................... 11

Act of Sept. 24, 1789, ch. 20, § 9,
 1 Stat. 76-77 ............................................................................ 11

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA),
 Pub. L. No. 104-132, 110 Stat. 1214 ..................................... 24

  § 301(a)(1) ............................................................................. 24

  § 301(a)(2) ............................................................................. 24

  § 301(a)(4) ............................................................................. 24

Justice Against Sponsors of Terrorism Act,
 Pub. L. No. 114-222, 130 Stat. 852 (2016) .......................... 17

  § 2(a)(1) ................................................................................. 17

  § 2(a)(6) .......................................................................... 24, 30

  § 2(b)...................................................................................... 25

Promoting Security and Justice for Victims of Terrorism Act of 2019,
 Pub. L. No. 116-94, div. J, tit. IX, 133 Stat. 3082 ...................... passim

S. 2465, 101st Cong. (1990) .................................................... 22

Taylor Force Act,
 Pub. L. No. 115-141, tit. X, § 1002(1), 132 Stat. 348, 1143 (2018) ..... 27

Torture Victim Protection Act of 1991,
 Pub. L. No. 102-256, 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350
 note......................................................................................... 16

## REGULATIONS AND EXECUTIVE ORDERS

15 C.F.R. § 734.3(a)(2).............................................................. 20

15 C.F.R. § 736.2(b)(2).............................................................. 20

15 C.F.R. § 746.7(e) ...................................................................20

31 C.F.R. § 515.201(a) ...............................................................20

31 C.F.R. § 560.204 ....................................................................20

31 C.F.R. § 560.205(a) ...............................................................20

31 C.F.R. Part 594 ......................................................................18

31 C.F.R. Part 595 ......................................................................18

31 C.F.R. Part 596 ......................................................................18

31 C.F.R. Part 597 ......................................................................18

Exec. Order 13,886,
    84 Fed. Reg. 48,041 (Sept. 9, 2019) ...................................18

Exec. Order No. 13,099,
    63 Fed. Reg. 45,167 (Aug. 20, 1998) ..................................18

Exec. Order No. 13,224,
    66 Fed. Reg. 49,079 (Sept. 23, 2001) .................................18

Exec. Order No. 13,372,
    70 Fed. Reg. 8499 (Feb. 16, 2005) ......................................18

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8, cl. 1 ..........................................................8

U.S. Const. art. I, § 8, cl. 10 ........................................................8

U.S. Const. art. I, § 8, cl. 11 ........................................................8

U.S. Const. art. I, § 8, cl. 18 ........................................................8

U.S. Const. art. I, § 8, cl. 3 ..........................................................8

U.S. Const. art. I, § 8, cl. 4 ..........................................................8

U.S. Const. art. III, § 2, cl. 1 .................................................... 11

## OTHER AUTHORITIES

1 *Annals of Cong.* 843 (Aug. 29, 1789) .................................... 12

Ian Bartrum, *James Wilson and the Moral Foundations of Popular Soveignty*,
64 Buffalo L. Rev. 225 (2016) .............................................. 9

William Blackstone, *Commentaries on the Laws of England* (1770) ..... 13

*Debates in the Several State Conventions on the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia in 1787* (Jonathan Elliot, ed., J.B. Lippincott Co. 1891) .................................................................... 10

William S. Dodge, *A Modest Approach to the Customary International Law of Jurisdiction*,
32 Eur. J. Int'l L. 1471 (2021) ............................................ 15

*Export Administration Act: Hearing Before the Subcomm. on Int'l Econ. Pol'y of the S. Comm. on Foreign Rels.*, 98th Cong. 44 (1983) ........... 19

Max Farrand, *The Framing of the Constitution of the United States* (1913) ........................................................................ 9

Alexander Hamilton, *The Federalist* No. 80 (1788) .............................. 10

Alexander Hamilton, Opin. of the Secretary of the Treasury (Sept. 15, 1790), https://founders.archives.gov/documents/Jefferson/01-17-02-0016-001 ....................................................................... 7

Daniel J. Hickman, *Terrorism as a Violation of the "Law of Nations:" Finally Overcoming the Definitional Problem*,
29 Wis. Int'l L.J. 447 (2011) ............................................ 17

H.R. Rep. No. 102-1040 (1992) ..................................................... 22, 23

International Convention for the Suppression of Terrorist Bombings,
Jan. 12, 1998,
S. Treaty Doc. No. 106-6, 2149 U.N.T.S. 256.4 ................................... 18

International Convention for the Suppression of the Financing of
Terrorism, Dec. 9, 1999,
 S. Treaty Doc. No. 106-49, 39 I.L.M. 268 ........................................... 18

*Legal Authorities Available to the President to Respond to a Severe
Energy Supply Interruption or Other Substantial Reduction in
Available Petroleum Prods.*,
6 U.S. Op. O.L.C. 644 (1982) ............................................................. 20

Letter from Benjamin Franklin to Charles-Guillaume-Frédéric Dumas
(Dec. 9, 1775),
https://founders.archives.gov/documents/Franklin/01-22-02-0172 ...... 7

Office of Foreign Assets Control, U.S. Department of Treasury, *Terrorist
Assets Report* (2020) .............................................................................. 21

Press Release, CFTC, *CFTC Orders Glencore to Pay $1.186 Billion for
Manipulation and Corruption* (May 24, 2022),
https://www.cftc.gov/PressRoom/PressReleases/8534-22 ................... 21

Press Release, U.S. Dep't of Commerce, *BIS Takes Enforcement Action
Against Russian Cargo Airline Operating in Violation of U.S. Export
Controls* (Apr. 21, 2022),
https://www.commerce.gov/news/press-releases/2022/04/bis-takes-
enforcement-action-against-russian-cargo-airline-operating ............. 22

Press Release, U.S. Dep't of Treasury, *Settlement Agreement between
the U.S. Department of the Treasury's Office of Foreign Assets Control
and Sojitz (Hong Kong) Limited* (Jan. 11, 2022),
 https://home.treasury.gov/policy-issues/financial-sanctions/recent-
actions/20220111_33 ........................................................................... 21

Edmund Randolph, Report from the Attorney General on the Judiciary System of the United States, Communicated to the House of Representatives on Dec. 31, 1790,
reprinted in I *Am. State Papers, Misc.* (Walter Lowrie & Walter S. Franklin, eds., 1834)............................................................12

*Records of the Federal Convention of* (Max Farrand, ed., Yale Univ. Press 1911)......................................................................9, 10

Restatement (Fourth) of the Foreign Relations Law of the United States (Am. L. Inst. May 2022 Update)....................................15, 16

S. Rep. No. 102-342 (1992) ..............................................................22, 23

Emmerich de Vattel, *Law of Nations* (Joseph Chitty ed., T. & J. W. Johnson & Co. 1872) ...........................................................7

## INTEREST OF THE AMICI[1]

Amici Abraham D. Sofaer and Louis J. Freeh are former federal officials with legal and policy expertise in the fields of foreign affairs and separation of powers. Both were United States District Judges in the Southern District of New York, and both also served in the Executive Branch—Mr. Sofaer as the Legal Adviser of the Department of State, and Mr. Freeh as the Director of the Federal Bureau of Investigation.

Amici have an interest in preserving the federal government's ability to protect American nationals abroad, as well as an interest in ensuring that Americans harmed by terrorist attacks have access to U.S. courts, as intended by Congress. Accordingly, amici urge this Court to hold that the Promoting Security and Justice for Victims of Terrorism Act of 2019 (PSJVTA), Pub. L. No. 116-94, div. J, tit. IX, 133 Stat. 3082, is constitutional. Amici are filing this brief pursuant to a concurrently filed motion. Amici filed a similar brief in *Fuld v. Palestine Liberation Organization*, No. 22-76.

---

[1] No party's counsel authored this brief in whole or in part, and no person other than the amici and their counsel contributed money intended to fund preparing or submitting this brief.

## SUMMARY OF ARGUMENT

The Constitution vests broad powers in the United States government to enact laws with extraterritorial effect, and to enforce those laws by subjecting foreign persons and entities to jurisdiction in U.S. courts to answer for violations. Indeed, Founding-era sources, as well as settled rules of international law, show that the judicial power is coextensive with the legislative power—such that if Congress has the power to enact a substantive extraterritorial prohibition, Congress also has the power to require defendants to answer claims for violating that prohibition in U.S. court.

The Anti-Terrorism Act (ATA) is a paradigmatic example of Congress exercising its power to enact legislation with extraterritorial effect—and of simultaneously creating federal jurisdiction over civil actions to enforce that law. Originally enacted in response to a terrorist attack carried out by the PLO itself, the ATA provides a civil remedy to Americans injured by terrorist attacks—wherever those attacks occur. The ATA is of a piece with an array of extraterritorial statutes that protect our nationals and our national security. These statutes authorize a broad range of responses to foreign threats to U.S. nationals, including

the use of force, harsh economic sanctions, and criminal liability. Compared to these other tools, civil liability under the ATA represents a mild and measured response to those who are complicit with terrorism against Americans.

Congress enacted the PSJVTA to supplement the ATA's enforcement mechanism. In enacting the statute, Congress spoke unusually clearly, determining that specific conduct by the PLO and PA would constitute consent to personal jurisdiction in civil ATA actions. The PSJVTA thus provides unambiguous notice to these defendants that if they make pay-for-slay payments to people who injure or kill American nationals (or to their families), or if they engage in certain activities in the United States, they must also defend civil ATA actions in U.S. courts—where they will have all the substantive and procedural protections an American litigant would have. Like the ATA itself, the PSJVTA is a measured response to these defendants' notorious record of supporting terrorism.

The district court held that Congress has no power to enact such a law, superimposing on the PSJVTA's consent mechanism an additional requirement that the defendant must satisfy the criteria for either

3

specific or general jurisdiction—and further holding that the PLO and the PA are not subject to jurisdiction under those criteria. In effect, the district court's decision takes the civil-liability option off the table vis-à-vis these defendants.

That was error. To the extent the Fifth Amendment imposes requirements on consent jurisdiction over a foreign entity, it requires—at most—that the statute provide fair notice to the defendant of the conduct that constitutes consent to jurisdiction, and that the basis for implying consent not be arbitrary or irrational.

The PSJVTA satisfies both requirements. With respect to notice, the statute expressly informs the PLO and the PA that continued pay-for-slay payments or continued U.S. presence and activities outside enumerated exceptions will be treated as consent by the PLO and PA to civil jurisdiction in ATA actions.

With respect to the basis for consent, it was reasonable for Congress to treat both of these activities as establishing consent jurisdiction. Congress undoubtedly has the power to legislate to curb pay-for-slay payments, which incentivize killing and harming Americans abroad. Congress also has plenary authority to control which foreign entities may

4

carry on activities within the United States. Indeed, in the grand scheme of legislative responses, providing that the PLO and the PA may be haled into U.S. court to defend a civil ATA action is arguably the least drastic, and certainly the most specifically calibrated response to conduct that in every other context is deemed sufficient to establish jurisdiction over offending individuals or entities. It is surely also a response that the Constitution permits. This Court should reverse the district court's determination that the PSJVTA's assertion of jurisdiction is unconstitutional.

## ARGUMENT

### I. The Constitution Vests Power in the United States to Subject Foreign Persons to U.S. Law

The United States unquestionably has the power to subject foreign persons to federal law. This includes Congress's power to provide for jurisdiction over foreign persons in U.S. courts to answer for extraterritorial violations of U.S. law. The scope of this power is coextensive with Congress's power to enact the underlying substantive law in the first instance—and the scope of that power is broad because Congress is charged with protecting our national interests and the safety of our nationals from harm abroad.

As the Supreme Court has explained: "Congress has the authority to enforce its laws beyond the territorial boundaries of the United States." *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). Indeed, the Court "has repeatedly upheld [Congress's] power to make laws applicable to persons or activities beyond our territorial boundaries where United States interests are affected." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 813-14 (1993) (Scalia, J., dissenting); *see, e.g.*, *United States v. Bowman*, 260 U.S. 94, 98-99 (1922) (allowing prosecution of a conspiracy to defraud the United States that was carried out on the high seas and in Brazil); *Am. Banana Co. v. United Fruit Co.*, 213 U.S. 347, 355-56 (1909) ("[C]ivilized countries . . . will punish anyone, subject or not, who shall do certain things . . . . In cases immediately affecting national interests they may go further still and may make, and, if they get the chance, execute, similar threats as to acts done within another recognized jurisdiction.").

6

This legal principle has deep roots, dating back to the Founding. Emmerich de Vattel, author of the leading Founding-era treatise on the law of nations,[2] wrote:

> Whoever uses a citizen ill, indirectly offends the state, which is bound to protect this citizen; and the sovereign of the latter should avenge his wrongs, punish the aggressor, and, if possible, oblige him to make full reparation; since otherwise the citizen would not obtain the great end of the civil association, which is, safety.

2 Emmerich de Vattel, *Law of Nations* § 71 (Joseph Chitty ed., T. & J. W. Johnson & Co. 1872); *see also* 1 *Law of Nations* § 17 ("If a nation is obliged to preserve itself, it is no less obliged carefully to preserve all its members.").

---

[2] Vattel was "[t]he international jurist most widely cited in the first 50 years after the Revolution," and in 1775 Benjamin Franklin reported that the book "has been continually in the hands of the members of our Congress now sitting." *U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 461 n.12 (1987); *see* Letter from Benjamin Franklin to Charles-Guillaume-Frédéric Dumas (Dec. 9, 1775), https://founders.archives.gov/documents/Franklin/01-22-02-0172; Alexander Hamilton, Opin. of the Secretary of the Treasury (Sept. 15, 1790), https://founders.archives.gov/documents/Jefferson/01-17-02-0016-0018 (describing Vattel as "perhaps the most accurate and approved of the writers on the laws of Nations"). The Supreme Court has repeatedly cited Vattel's work with favor. *See Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1493 (2019); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 714 (2004); *United States v. Arjona*, 120 U.S. 479, 484 (1887); *Brown v. United States*, 12 U.S. 110, 112 (1814).

The text of the Constitution reflects Congress's broad power to protect American nationals and American interests against foreign threats. Thus, Article I empowers Congress to "provide for the common defense," "regulate commerce with foreign nations," "establish a uniform rule of naturalization," "define and punish piracies and felonies committed on the high seas, and offenses against the law of nations," "declare war," and to "make all laws which shall be necessary and proper for carrying into execution the foregoing powers." U.S. Const. art. I, § 8, cl. 1, 3-4, 10-11, 18.

The power to enact such substantive protections would mean little if the Constitution did not also authorize the federal government to enforce those protections by executive and judicial action. Thus, Founding-era sources embrace the notion that the judicial power is "coextensive" or "commensurate" with the legislative power. At the Constitutional Convention, James Madison explained that "[a]n effective Judiciary establishment commensurate to the legislative authority, was

essential." 1 *Records of the Federal Convention of 1787*, at 124 (Max Farrand, ed., Yale Univ. Press 1911).[3]

Others expressed the same views at ratifying conventions, most prominently James Wilson of Pennsylvania.[4] In response to an anti-federalist complaint "that the judicial powers were coëxtensive with the legislative powers," Wilson replied:

> I believe they ought to be coëxtensive; otherwise, laws would be framed that could not be executed. Certainly, therefore, the executive and judicial departments ought to have power commensurate to the extent of the laws; for, as I have already asked, are we to give power to make laws, and no power to carry them into effect?

2 *Debates in the Several State Conventions on the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia in 1787*, at 469 (Jonathan Elliot, ed., J.B. Lippincott Co.

---

[3] Madison was the "master-builder of the constitution"—and "unquestionably the leading spirit" of the constitutional convention. Max Farrand, *The Framing of the Constitution of the United States* 196 (1913).

[4] Wilson is traditionally viewed by historians as second only to Madison in his influence on the Constitution. Farrand, *The Framing of the Constitution of the United States* 197. Recent scholarship suggests that Wilson drafted the document. Ian Bartrum, *James Wilson and the Moral Foundations of Popular Sovereignty*, 64 Buffalo L. Rev. 225, 256 n.154 (2016). His widely circulated State House Yard speech was "perhaps the single most influential and important contribution to the ratification debates." *Id.* at 256.

1891) (hereinafter "*Debates*"). Wilson also expressed his view that "the objects of the judicial department" under the Constitution will "extend beyond the bounds of any particular State" and that "a great number of the civil causes there enumerated, depend either upon the law of nations, or the marine law, that is, the general law of mercantile countries." 3 *Records of the Federal Convention* 167.[5] In *The Federalist* No. 80, Alexander Hamilton echoed this understanding: "If there are such things as political axioms, the propriety of the judicial power of a government being co-extensive with its legislative, may be ranked among the number." Alexander Hamilton, *The Federalist* No. 80 (1788).

Article III expresses this intention by extending "the judicial power" to "all cases, in law and equity, arising under this Constitution, the laws

---

[5] *Accord* 2 *Debates* at 445 (Wilson: "I would not have the legislature sit to make laws which cannot be executed. It is not meant here that the laws shall be a dead letter."), *id.* at 515 (Wilson: judicial power "commensurate with the legislative powers"); 3 *Debates* 517 (Edmund Pendleton, Virginia: "Taking it for granted, then, that a judiciary is necessary, the power of that judiciary must be coëxtensive with the legislative power, and reach to all parts of society intended to be governed."); 4 *Debates* 158 (William Richardson Davie, North Carolina: "I thought, if there were any political axiom under the sun, it must be, that the judicial power ought to be coëxtensive with the legislative. . . . If laws are not to be carried into execution by the interposition of the judiciary, how is it to be done?").

of the United States, and treaties made, or which shall be made, under their authority," and to "all cases of admiralty and maritime jurisdiction," U.S. Const. art. III, § 2, cl. 1. That language does not impose a territorial limitation. The First Congress similarly granted the federal district courts jurisdiction to hear cases arising outside the geographic territory of the United States. The Judiciary Act of 1789 granted jurisdiction in "all causes where an alien sues for a tort only in violation of the law of nations" as well as over "civil causes of admiralty and maritime jurisdiction" arising "upon the high seas," and over crimes committed "upon the high seas," Act of Sept. 24, 1789, ch. 20, § 9, 1 Stat. 76-77, which were defined in the Crimes Act of 1790, Act of Apr. 30, 1790, ch. 9, §§ 8-13, 1 Stat. 113-15.[6]

The Fifth Amendment—approved by Congress on the day the Judiciary Act became law—did not add any territorial limitation on the judicial power. Indeed, no less an authority than Madison himself said, during the deliberations on the Judiciary Act of 1789, that the judicial system "ought to be commensurate with the other branches of the

---

[6] This early congressional practice provides contemporaneous and weighty evidence of the Constitution's meaning. *See, e.g.*, *Alden v. Maine*, 527 U.S. 706, 743-44 (1999).

Government," and that "the Executive [power] is co-extensive with the Legislative, and it is equally proper that this should be the case with the judiciary." 1 *Annals of Cong.* 843 (Aug. 29, 1789). And indeed, the historical record is devoid of any evidence that any of the framers believed the Due Process Clause of the Fifth Amendment meant anything different.

Practice after ratification of the Fifth Amendment likewise shows that it did not impose any territorial limitation on the judicial power. For example, in 1791, Edmund Randolph, the first Attorney General, prepared a report on the First Judiciary Act in which he noted that the federal courts had the exclusive power "to decide all cases arising wholly on the sea, and not within the precincts of any county" as well as rights "created by Congress [which] may have a special remedy given to them in the federal courts." Edmund Randolph, Report from the Attorney General on the Judiciary System of the United States, Communicated to the House of Representatives on Dec. 31, 1790, reprinted in I *Am. State Papers, Misc.* No. 17, at 22 (Walter Lowrie & Walter S. Franklin, eds., 1834). Consistent with that view, the Supreme Court embraced the axiom that "the judicial power of every well constituted government must be co-

extensive with the legislative, and must be capable of deciding every judicial question which grows out of the constitution and laws." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 384 (1821) (Marshall, C.J.); *Osborn v. Bank of United States*, 22 U.S. (9 Wheat.) 738, 818 (1824) (Marshall, C.J.) (similar); *Kendall v. United States ex rel. Stokes*, 37 U.S. (1 Pet.) 524, 619 (1838) ("[I]n every well organized government the judicial power should be coextensive with the legislative, so far at least as private rights are to be enforced by judicial proceedings"); *Waring v. Clarke*, 46 U.S. (5 How.) 441, 504 (1847) ("The object of the framers of the Constitution was to make the judicial co-extensive with the legislative power.").

Many early cases involving extraterritorial statutes dealt with piracy, which, like international terrorism, was a form of organized non-state violence that occurred outside the territorial United States. Blackstone said of pirates that "every community hath a right by the rule of self-defence, to inflict that punishment upon him." 4 William Blackstone, *Commentaries on the Laws of England* 71 (1770). Congress enacted extraterritorial criminal laws against piracy in 1790, and the Supreme Court upheld those laws without requiring any proof that the pirates had intentionally targeted the territory of the United States.

Thus, Chief Justice Marshall's opinion in *United States v. Palmer*, 16 U.S. (3 Wheat.) 610, 630 (1818), stated that "there can be no doubt of the right of the legislature to enact laws punishing pirates, although they may be foreigners, and may have committed no particular offence against the United States." Similarly, in *Talbot v. Jansen*, 3 U.S. (3 Dall.) 133, 159-60 (1795) (opin. of Iredell, J.), the Court confirmed jurisdiction over a civil claim for damages arising out of acts of piracy on the high seas, explaining that "all piracies and trespasses committed against the general law of nations, are enquirable, and maybe proceeded against, in any nation where no special exemption can be maintained, either by the general law of nations, or by some treaty which forbids or restrains it." *See also United States v. Smith*, 18 U.S. 153, 161 (1820) ("[A]ll nations [may punish] all persons, whether natives or foreigners, who have committed this offence against any persons whatsoever, with whom they are in amity."); *The Marianna Flora*, 24 U.S. (11 Wheat.) 1, 40-41 (1825) (Story, J.) (holding that any pirate, wherever found, "may be justly subjected to the penalty of confiscation for such a gross breach of the law of nations"). "From the very organization of the government, and without intermission, Congress has also asserted the power . . . to punish crimes

committed on vessels of the United States while on the high seas or on navigable waters not within the territorial jurisdiction of a state." *United States v. Flores*, 289 U.S. 137, 151-52 (1933).

In addition to these Founding-era sources, modern principles of customary international law support the understanding that Congress has the power to grant U.S. courts jurisdiction to decide cases arising from extraterritorial violations. Indeed, "modern customary international law generally does not impose limits on jurisdiction to adjudicate" violations of validly prescribed laws. Restatement (Fourth) of the Foreign Relations Law of the United States § 422, Reporters' Note 1 (Am. L. Inst. May 2022 Update); *see* William S. Dodge, *A Modest Approach to the Customary International Law of Jurisdiction*, 32 Eur. J. Int'l L. 1471, 1473 (2021) ("[N]o customary international law rules limiting personal jurisdiction currently exist."). Instead, the general rule is that, if a sovereign has the power to enact a statute that regulates extraterritorial conduct, it also has the power to enforce that statute.

Customary international law further recognizes that nations have prescriptive jurisdiction over extraterritorial conduct that has substantial effects within their territory (effect jurisdiction),

15

Restatement (Fourth) of Foreign Relations Law § 409, cmt a; conduct that harms their nationals (passive personality jurisdiction), *id.* § 411, cmt. a; conduct that threatens their security (protective principle jurisdiction), *id.* § 412; and "certain offenses of universal concern, such as . . . certain acts of terrorism" (universal jurisdiction), *id.* § 413; *see also United States v. Yousef*, 327 F.3d 56, 91 n.24 (2d Cir. 2003) (summarizing bases for jurisdiction under customary international law).

Consistent with these authorities, Congress has, over the years, enacted a variety of laws that have extraterritorial effect, including statutes intended to "deter and prevent price manipulation" in "international commerce,"[7] to provide damages to the victims of torture,[8] to control the unauthorized transshipment of U.S.-origin military equipment and services outside the United States,[9] and to impose sanctions (including on non-U.S. persons) to deal with unusual and

---

[7] *See* 7 U.S.C. § 5.

[8] Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350 note.

[9] *See* 22 U.S.C. § 2778(a)(1).

16

extraordinary external threats to the national security, foreign policy, or economy of the United States,[10] among others.

## II. Congress Has Repeatedly Exercised its Broad Powers to Enact Legislation with Extraterritorial Effect to Prevent, Punish, and Redress Terrorism

Congress's power to enact laws with extraterritorial effect is at its zenith with respect to issues of foreign affairs, national security, and the protection of American nationals—including addressing terrorism, which "threatens the vital interests of the United States," Justice Against Sponsors of Terrorism Act (JASTA), Pub. L. No. 114-222, § 2(a)(1), 130 Stat. 852 (2016), and violates the law of nations, *e.g.*, *United States v. Ahmed*, 94 F. Supp. 3d 394, 415 n.8 (E.D.N.Y. 2015).[11]

---

[10] *See* 50 U.S.C. §§ 1701-1708.

[11] Some courts, including this one, previously reasoned that "terrorism" is not sufficiently well-defined to constitute a violation of the law of nations. *See Yousef*, 327 F.3d at 106. But international consensus—as reflected in treaties and other international instruments—has moved, such that "there is sufficient international agreement suggesting the existence of a specific, identifiable, uncontroversial and universal prohibition on terrorism," especially as to certain "specific acts, such as deliberate attacks on innocent civilians, hostage taking and aircraft hijacking." Daniel J. Hickman, *Terrorism as a Violation of the "Law of Nations:" Finally Overcoming the Definitional Problem*, 29 Wis. Int'l L.J. 447, 462 (2011); *see also Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 284 (E.D.N.Y. 2007) (holding that certain terrorist acts violate the law of nations).

Pursuant to this broad authority, Congress has created what the Supreme Court describes as "a comprehensive statutory and regulatory regime that prohibits terrorism and terrorism financing." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1405 (2018). This regime includes anti-terrorism conventions joined not only by the United States but also by nearly every nation in the world[12]; statutes including the ATA, JASTA, and criminal material support statutes; executive orders[13]; regulatory regimes[14]; and administrative actions such as designating organizations as Foreign Terrorist Organizations (FTOs) and Specially Designated Global Terrorists (SDGTs).

---

[12] The International Convention for the Suppression of the Financing of Terrorism, art. 7(2)(a), Dec. 9, 1999, S. Treaty Doc. No. 106-49, 39 I.L.M. 268, provides for universal jurisdiction over the financing of terrorism and, by necessary implication, recognizes universal jurisdiction over acts of terrorism. *See also* International Convention for the Suppression of Terrorist Bombings, Jan. 12, 1998, S. Treaty Doc. No. 106-6, 2149 U.N.T.S. 256.4.

[13] *E.g.*, Exec. Order 13,886, 84 Fed. Reg. 48,041 (Sept. 9, 2019); Exec. Order No. 13,372, 70 Fed. Reg. 8499 (Feb. 16, 2005); Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001); Exec. Order No. 13,099, 63 Fed. Reg. 45,167 (Aug. 20, 1998).

[14] *E.g.*, 31 C.F.R. Part 594 (Global Terrorism Sanctions Regulations); 31 C.F.R. Part 595 (Terrorism Sanctions Regulations); 31 C.F.R. Part 596 (Terrorism List Governments Sanctions Regulations); 31 C.F.R. Part 597 (Foreign Terrorist Organizations Sanctions Regulations).

One key extraterritorial federal regime is the International Emergency Economic Powers Act (IEEPA), which authorizes the President to effectuate foreign policy and national security by freezing "any property" that is "subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(A), (B).[15] Under this and related laws, "[t]he United States has long asserted jurisdiction over certain activities abroad, such as those involving the reexport of U.S. origin goods . . . [which] is necessary to insure that export controls are not circumvented by shipment through third countries." *Export Administration Act: Hearing Before the Subcomm. on Int'l Econ. Pol'y of the S. Comm. on Foreign Rels.*, 98th Cong. 44 (1983) (testimony of Kenneth W. Dam, Deputy Secretary of State). The Department of Justice has long taken the position "that the President would have broad discretion under the IEEPA to determine whether a foreign nation or national has an 'interest' in property subject to U.S. jurisdiction," and also "whether any of the authority granted in [50 U.S.C. § 1702] should be exercised over that property, provided the President does not attempt

---

[15] IEEPA is not limited to terrorism but has been used extensively to prevent support to terrorists.

to regulate transactions that are purely domestic in nature." *Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Prods.*, 6 U.S. Op. O.L.C. 644, 681-82 (1982).

Some IEEPA-authorized regulatory regimes operate directly on non-U.S. persons. For example, the Iranian Transactions and Sanctions Regulations prohibit *all* re-exportation of U.S.-origin goods, technology, and services, "wherever located," to Iran, 31 C.F.R. § 560.204, and *all* re-exportation of goods subject to the Export Administration Regulations to Iran, *id*. § 560.205(a); *see* 15 C.F.R. § 746.7(e). Similarly, the Cuban Assets Control Regulations regulate *all* interests in "property subject to the jurisdiction of the United States," "wheresoever located." 31 C.F.R. § 515.201(a). The Export Administration Regulations apply to "[a]ll U.S. origin items wherever located," 15 C.F.R. § 734.3(a)(2), and specifically prohibit "[r]eexport and export from abroad of foreign-made items incorporating more than a de minimis amount of controlled U.S. content," *id*. § 736.2(b)(2).

Federal enforcement actions frequently reach extraterritorial conduct. For example, the Treasury Department has frozen tens of

20

millions of dollars in assets of designated organizations—including entities that have not attacked within the territory of the United States—such as Hamas and Hizballah. *See* Office of Foreign Assets Control, U.S. Department of Treasury, *Terrorist Assets Report* 8-10 (2020) (reporting $63 million in assets blocked from designated organizations). The Treasury Department also takes enforcement actions against foreign actors that make prohibited wire transfers using U.S. financial institutions—even if those transfers originate and terminate abroad. *See, e.g.*, Press Release, U.S. Dep't of Treasury, *Settlement Agreement between the U.S. Department of the Treasury's Office of Foreign Assets Control and Sojitz (Hong Kong) Limited* (Jan. 11, 2022), https://home.treasury.gov/policy-issues/financial-sanctions/recent-actions/20220111_33. The CFTC has taken administrative enforcement actions against persons acting abroad to manipulate market benchmarks such as LIBOR. *See, e.g.*, Press Release, CFTC, *CFTC Orders Glencore to Pay $1.186 Billion for Manipulation and Corruption* (May 24, 2022), https://www.cftc.gov/PressRoom/PressReleases/8534-22. Similarly, the Commerce Department has taken enforcement action against Russian companies operating abroad because those companies were using U.S.-

origin goods, and the Commerce Department wanted to use "every tool at its disposal to demonstrate the power and reach of U.S. law and disrupt Russia's ability to wage war." Press Release, U.S. Dep't of Commerce, *BIS Takes Enforcement Action Against Russian Cargo Airline Operating in Violation of U.S. Export Controls* (Apr. 21, 2022), https://www.commerce.gov/news/press-releases/2022/04/bis-takes-enforcement-action-against-russian-cargo-airline-operating.

The ATA is an extraterritorial statute designed to advance U.S. foreign policy and national security. The statute was motivated by the PLO's murder of U.S. citizen Leon Klinghoffer aboard an Italian cruise ship. H.R. Rep. No. 102-1040, at 5 (1992). Recognizing that existing law was inadequate to "provid[e] victims of terrorism with a remedy for a wrong that, by its nature, falls outside the usual jurisdictional categories," S. Rep. No. 102-342, at 22 (1992), Congress determined that the "extension of civil jurisdiction" to terrorism cases was necessary to fill a damaging "gap in our efforts to develop a comprehensive legal response to international terrorism," H.R. Rep. No. 102-1040, at 5. The ATA thus "provid[es] extraterritorial jurisdiction over terrorist acts abroad against United States nationals." S. 2465, 101st Cong. (1990). In this way, it

complements legislation "provid[ing] extraterritorial criminal jurisdiction for acts of international terrorism against U.S. nationals." H.R. Rep. No. 102-1040, at 5.

To ensure its efficacy, Congress imbued the ATA with broad jurisdictional and venue provisions, 18 U.S.C. §§ 2334(a), 2338, designed to "extend[] the same jurisdictional structure that undergirds the reach of American criminal law to the civil remedies that it defines," S. Rep. No. 102-342, at 45. Congress also sharply limited *forum non conveniens* arguments, 18 U.S.C. § 2334(d), to ensure that Americans harmed by terrorism can pursue "broad remedies in a procedurally privileged U.S. forum," *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 422 (E.D.N.Y. 2009). Those features account for "the unusual mobility of terrorists, their organizations, and their financiers." H.R. Rep. No. 102-1040, at 6. They also reflect Congress's view that "vital interests in protecting U.S. nationals and combating terrorism are linked directly to the assertion of jurisdiction over ATA civil claims." Amicus Br. of U.S. Senators Charles E. Grassley *et al.* at 7, *Sokolow v. Palestine Liberation Org.*, No. 16-1071 (U.S. Apr. 6, 2017), 2017 WL 1291691 ("Grassley Br.").

Over the years, Congress has repeatedly re-emphasized the need for U.S. courts to maintain jurisdiction over terrorism-related offenses that occur abroad. For example, when Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, it found that international terrorism "threatens the vital interests of the United States," and that a legislative response was authorized by Congress's "power to punish crimes against the law of nations and to carry out the treaty obligations of the United States," *id.* § 301(a)(1), (2). Congress also found that "international terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States." *Id.* § 301(a)(4).

Later, when Congress enacted JASTA, it found that entities that "contribute material support or resources" to terrorists that attack Americans "necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court" here. JASTA § 2(a)(6). JASTA's "purpose" is "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United

24

States, to seek relief against persons, entities, and foreign countries, *wherever acting and wherever they may be found*, that have provided material support, directly or indirectly," to foreign terrorists. *Id*. § 2(b) (emphasis added). Those findings confirm "Congress's considered judgment" that personal "jurisdiction over ATA claims is appropriate and consistent with the Due Process Clause." Grassley Br. 4.

## III. The Promoting Security and Justice for Victims of Terrorism Act Does Not Violate the Due Process Clause of the Fifth Amendment

Against this backdrop, the PSJVTA is a measured response to the PLO and PA's conduct, and easily satisfies the requirements of due process.[16] The "'touchstone of due process is protection of the individual against arbitrary action of government," including "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (quoting *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974)). In this context, these principles entitle defendants to "'fair warning'—knowledge

---

[16] This assumes that entities like the PLO and PA have due process rights in the first instance. This Court accepted that proposition in its prior decision in *Waldman v. Palestine Liberation Organization*, 835 F.3d 317, 329 (2d Cir. 2016)—but it is highly debatable.

25

that 'a particular activity may subject [them] to the jurisdiction of a foreign sovereign.'" *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). There is no question that the PSJVTA provides the PLO and PA fair notice of exactly what conduct will subject them to jurisdiction in civil ATA actions in the United States.

Consistent with Congress's broad power to enact legislation to prevent, redress, and punish terrorism, Congress determined that if the PLO and PA continued (after the notice provided in the legislation) to make pay-for-slay payments to terrorists and their families, or continued to maintain a U.S. presence beyond the minimal presence that serves the U.S. national interest (*e.g.*, official business of the United Nations, or interacting with U.S. lawmakers), they must be deemed to have consented to personal jurisdiction in civil ATA cases. 18 U.S.C. § 2334(e). In practical terms, this means only that such entities or individuals must appear in court to defend allegations that they played a role in acts of international terrorism that injured American nationals. In those court proceedings, the PLO and PA will have all the procedural and substantive protections that any American litigant would have.

26

This federal legislation does not violate due process. It is based on Congress' powers—not only over interstate commerce and the resolution of conventional commercial litigation, but also its broad authority over international affairs and the protection of U.S. nationals. Congress has found that the PLO's and PA's pay-for-slay payments provide "an incentive to commit acts of terror." Taylor Force Act, Pub. L. No. 115-141, tit. X, § 1002(1), 132 Stat. 348, 1143 (2018). Congress would be well within its constitutional powers to respond to such conduct with reasonable force, economic sanctions, or criminal liability—and the federal courts would not interfere with those remedies on due process grounds.

Courts should show the same deference here because the PSJVTA has less stringent consequences, and greater procedural protections, than these frequently used extraterritorial remedies. Indeed, the PSJVTA is a comparatively mild remedial option to achieve Congress's legitimate objective of deterring conduct that furthers terrorism, since it provides notice to the PLO and PA that if they continue to make pay-for-slay payments to reward people for injuring or killing Americans they will be

treated as having consented to defend civil actions by their victims in federal courts.

Consent implied from U.S. presence and activities also satisfies due process. Congress has found that the PLO has been directly responsible for the murder of American nationals, and effectively excluded the organization from the United States. *See* 22 U.S.C. §§ 5201-5202. This action was "clearly within the constitutional power of the government." *Palestine Information Office v. Shultz*, 853 F.2d 932, 940 (D.C. Cir. 1988). The PLO has no due process right to be present in the United States— and the power to exclude the organization altogether necessarily encompasses the authority to condition the organization's presence on consent to jurisdiction in a limited class of lawsuits directly related to the reasons its prior exclusion. And the PSJVTA does not even place conditions on all of the PLO and PA's presence and activities; instead, the statute allows these entities to carry on certain activities (*e.g.*, official U.N. business) without consequence. Again, the statute is a milder response to these organizations' history of supporting violence against Americans than those Congress could enforce, and well within the limits of Congress' power in such a distinctly foreign-affairs context.

In the district court, the PLO's and PA's argument to the contrary was that the PSJVTA is a congressional attempt to circumvent this Court's prior decision in *Waldman*, which held that specific personal jurisdiction over these entities was lacking. For the reasons explained in the plaintiffs' brief and the government's brief, that decision is inapposite: the PSJVTA is based on consent, a separate basis for jurisdiction from the minimum-contacts analysis. And for the reasons stated above, Congress may utilize such a consent mechanism in the context of Congress's broad powers to both redress terrorism (including extraterritorial pay-for-slay payments) and to condition a foreign organization's presence in the United States.

Independently, circumstances have changed since *Waldman* was decided. Congress has now spoken directly and unequivocally to the specific question whether courts should assert personal jurisdiction against foreign entities in ATA cases. It did so in JASTA, where it explained that:

> Persons, entities, or countries that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States, necessarily

direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities.

JASTA § 2(a)(6).[17] And it did so in the PSJVTA, when it specified the conditions under which the PLO and PA shall be deemed to have consented to jurisdiction in ATA cases. Ruling in the defendants' favor now requires this Court to reject Congress's power to make these determinations—a step that cannot be squared with the deference owed to the political branches in the area of foreign affairs.

## CONCLUSION

The judgment below should be reversed.

Respectfully submitted,

s/Tejinder Singh
Tejinder Singh
SPARACINO PLLC
1920 L Street NW
Suite 835
Washington, DC 20036
(202) 629-3520
tejinder@sparacinopllc.com

---

[17] JASTA became law September 28, 2016. *See* 130 Stat. 852. This Court issued its decision in *Waldman* on August 31, 2016.

30

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of 2d Cir. R. 29.1(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5998 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.


/s/ Tejinder Singh
Tejinder Singh

**CERTIFICATE OF SERVICE**

I hereby certify that on November 4, 2022, I caused the foregoing document to be electronically filed with the Clerk of Court for the U.S. Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in this case are registered users of that system and that service will be accomplished by that system.


/s/ Tejinder Singh
Tejinder Singh