# 15-3135(L)

## 15-3151(XAP), 22-1060(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

❖

EVA WALDMAN, REVITAL BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA, MINOR, BY HIS NEXT FRIEND AND GUARDIAN VARDA GUETTA, VARDA GUETTA, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFF OZ JOSEPH GUETTA, NORMAN GRITZ, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DAVID GRITZ, MARK I. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAMIE A. SOKOLOW, RENA M. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAIME A. SOKOLOW, JAMIE A. SOKOLOW, MINOR, BY HER NEXT FRIENDS AND GUARDIAN

*(Caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

KENT A. YALOWITZ
ARNOLD & PORTER KAYE
  SCHOLER LLP
250 West 55th Street
New York, New York 10019
(212) 836-8000

ALLON KEDEM
DIRK C. PHILLIPS
STEPHEN K. WIRTH
BAILEY M. ROE
ARNOLD & PORTER KAYE
  SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000

*Attorneys for Plaintiffs-Appellants*

Mark I. Sokolow and Rena M. Sokolow, Lauren M. Sokolow, Elana R. Sokolow, Shayna Eileen Gould, Ronald Allan Gould, Elise Janet Gould, Jessica Rine, Shmuel Waldman, Henna Novack Waldman, Morris Waldman, Alan J. Bauer, individually and as natural guardian of plaintiffs Yehonathon Bauer, Binyamin Bauer, Daniel Bauer and Yehuda Bauer, Yehonathon Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Binyamin Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Daniel Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Yehuda Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Rabbi Leonard Mandelkorn, Katherine Baker, individually and as personal representative of the Estate of Benjamin Blutstein, Rebekah Blutstein, Richard Blutstein, individually and as personal representative of the Estate of Benjamin Blutstein, Larry Carter, individually and as personal representative of the Estate of Diane ("Dina") Carter, Shaun Coffel, Dianne Coulter Miller, Robert L Coulter, Jr., Robert L. Coulter, Sr., individually and as personal representative of the Estate of Janis Ruth Coulter, Chana Bracha Goldberg, minor, by her next friend and guardian Karen Goldberg, Eliezer Simcha Goldberg, minor, by her next friend and guardian Karen Goldberg, Esther Zahava Goldberg, minor, by her next friend and guardian Karen Goldberg, Karen Goldberg, individually, as personal representative of the Estate of Stuart Scott Goldberg/ natural guardian of plaintiffs Chana Bracha Goldberg, Esther Zahava Goldberg, Yitzhak Shalom Goldberg, Shoshana Malka Goldberg, Eliezer Simcha Goldberg, Yaakov Moshe Goldberg,Tzvi Yehoshua Goldberg, Shoshana Malka Goldberg, minor, by her next friend and guardian Karen Goldberg, Tzvi Yehoshua Goldberg, minor, by her next friend and guardian Karen Goldberg, Yaakov Moshe Goldberg, minor, by her next friend and guardian Karen Goldberg, Yitzhak Shalom Goldberg, minor, by her next friend and guardian Karen Goldberg, Nevenka Gritz, sole heir of Norman Gritz, deceased,

*Plaintiffs-Appellants,*

United States of America,

*Intervenor-Appellant,*

—against—

Palestine Liberation Organization, Palestinian Authority, AKA Palestinian Interim Self-Government Authority and or Palestinian Council and or Palestinian National Authority,

*Defendants-Appellees,*

Yasser Arafat, Marwin Bin Khatib Barghouti, Ahmed Taleb Mustapha Barghouti, AKA Al-Faransi, Nasser Mahmoud Ahmed Aweis, Majid Al-Masri, AKA Abu Mojahed, Mahmoud Al-Titi, Mohammed Abdel Rahman Salam Masalah, AKA Abu Satkhah, Faras Sadak Mohammed Ghanem, AKA Hitawi, Mohammed Sami Ibrahim Abdullah, Esatate of Said Ramadan, deceased, Abdel Karim Ratab Yunis Aweis, Nasser Jamal Mousa Shawish, Toufik Tirawi, Hussein Al-Shaykh, Sana'a Muhammed Shehadeh, Kaira Said Ali Sadi, Estate of Mohammed Hashaika, deceased, Munzar Mahmoud Khalil Noor, Estate of Wafa Idris, deceased, Estate of Mazan Faritach, deceased, Estate of Muhanad Abu Halawa, deceased, John Does, 1-99, Hassan Abdel Rahman,

*Defendants.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ............................................................................ 1

ARGUMENT ................................................................................... 4

I.   THE COURT SHOULD SALVAGE JURISDICTION AND REINSTATE THE
     DISTRICT COURT'S JUDGMENT ............................................... 4

     A.   This Court Has Power To Salvage Jurisdiction ................... 5

          1.   Defendants' Futility Argument Cannot Be Reconciled
               With Cases Salvaging Jurisdiction ............................... 5

          2.   Defendants' Cases Are Inapposite ............................... 8

     B.   The Interests In Finality And Justice Favor Reinstating the
          District Court's Judgment ................................................ 11

     C.   Reinstating the District Court's Judgment Will Reflect
          Fidelity To The Supreme Court's Mandate ....................... 14

II.  THE PSJVTA DOES NOT VIOLATE THE DUE PROCESS CLAUSE ............. 16

     A.   The PSJVTA Meets The Touchstones Of Due Process: Fair
          Notice And Reasonableness .............................................. 16

          1.   The Correct Standard Is Fair Notice And
               Reasonableness ........................................................ 16

          2.   The PSJVTA Gave Defendants Fair Notice, Such That
               Their Conduct Was Knowing And Voluntary ............... 21

          3.   The PSJVTA Is Reasonable In The Context Of Our
               Federal System ......................................................... 24

     B.   Territory-Based Consent Is Independently Constitutional ............. 27

     C.   The Reasoning Of The District Courts In This Case And In
          *Fuld* Was Incorrect ......................................................... 28

          1.   The District Court's Reasoning In This Case Is
               Indefensible .............................................................. 28

          2.   Defendants Have Abandoned The *Fuld* District Court
               Decision ................................................................... 31

     D.   Defendants' "Benefit" Theories Are Unavailing ................. 31

i

1.     The Initial Variant Of Defendants' "Benefit" Theory Is Incorrect ...................................................32

2.     The Modified Version Of Defendants' "Benefit" Theory Is Also Incorrect ................................................33

3.     Defendants Consented To Jurisdiction Even Under Their Own "Benefit" Theory.................................35

III.   THE PSJVTA DOES NOT INVADE THE JUDICIAL POWER .......................36

IV.    THE COURT SHOULD DENY DEFENDANTS' REQUEST FOR A NEW TRIAL ............................................................................40

A.     Defendants' *Daubert* Objections Provide No Basis For A New Trial ..........................................................41

1.     Defendants Waived Their *Daubert* Objection ............................41

2.     Defendants Demonstrate No Plain Error....................................43

B.     Defendants' Specific Objections To Expert Testimony Provide No Basis For A New Trial ........................................52

1.     The District Court Did Not Abuse Its Discretion By Overruling Defendants' Objections.............................................53

2.     Any Error Was Harmless .....................................59

CONCLUSION...................................................................61

CERTIFICATE OF COMPLIANCE ...................................................62

# TABLE OF AUTHORITIES

**Cases**                                                                 Page(s)

*Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*,
   817 F.3d 755 (Fed. Cir. 2016) ...........................................................18

*Aetna Ins. Co. v. Earnest*,
   112 So. 145 (Ala. 1927) ...................................................................8

*Agostini v. Felton*,
   521 U.S. 203 (1997) ........................................................................28

*Alden v. Maine*,
   527 U.S. 706 (1999) ........................................................................24

*In re Aluminum Warehousing Antitrust Litig.*,
   336 F.R.D. 5 (S.D.N.Y. 2020) ........................................................58

*Andrus v. Charlestone Stone Prods.*,
   436 U.S. 604 (1978) ..........................................................................7

*BAC Home Loans Servicing, LP v. Mitchell*,
   6 N.E.3d 162 (Ill. 2014) ....................................................................9

*Banco Nacional de Cuba v. Farr*,
   383 F.2d 166 (2d Cir. 1967) ...........................................................15

*Bank Markazi v. Peterson*,
   578 U.S. 212 (2016) ...................................................................36, 37

*Beastie Boys v. Monster Energy Co.*,
   66 F. Supp. 3d 424 (S.D.N.Y. 2014) ...............................................59

*Bristol-Myers Squibb v. Superior Court*,
   137 S. Ct. 1773 (2017) ....................................................................25

*Brown v. Lockheed Martin Corp.*,
   814 F.3d 619 (2d Cir. 2016) .......................................................19, 20

*Burnham v. Superior Court*,
   495 U.S. 604 (1990) ........................................................................35

*Carnival Cruise Lines, Inc. v. Shute,*
   499 U.S. 585 (1991)....................................................................30, 34

*Caterpillar Inc. v. Lewis,*
   519 U.S. 61 (1996)..............................................................................8

*Chloé v. Queen Bee of Beverly Hills, LLC,*
   616 F.3d 158 (2d Cir. 2010) .............................................................17

*City of New York v. Mickalis Pawn Shop,*
   645 F.3d 114 (2d Cir. 2011) .......................................................30, 34

*Collazos v. United States,*
   368 F.3d 190 (2d Cir. 2004) .............................................................29

*College Savings Bank v. Florida Prepaid Postsecondary*
   *Education Expense Board,*
   527 U.S. 666 (1999).................................................................23-24, 31

*Colorado v. Connelly,*
   479 U.S. 157 (1986)..........................................................................22

*Corporación Mexicana de Mantenimiento Integral, S. de R.L. v.*
   *Pemex-Exploración y Producción,*
   832 F.3d 92 (2d Cir. 2016) .............................................................6, 7

*Danziger & De Llano, LLP v. Morgan Verkamp LLC,*
   948 F.3d 124 (3d Cir. 2020) .............................................................17

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
   509 U.S. 579 (1993).............................................3, 41, 42, 43, 44, 48

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.,*
   805 F.2d 1074 (1st Cir. 1986) ............................................................7

*Dickerson v. United States,*
   530 U.S. 428 (2000)....................................................................36, 37

*Douglass v. Nippon Yusen Kabushiki Kaisha,*
   46 F.4th 226 (5th Cir. 2022) .............................................................18

*Edwards v. Vannoy,*
  141 S. Ct. 1547 (2021) ...................................................................14

*In re Ephedra Prods. Liab. Litig.,*
  393 F. Supp. 2d 181 (S.D.N.Y. 2005)...........................................59

*Fidrych v. Marriott Int'l, Inc.,*
  952 F.3d 124 (4th Cir. 2022).......................................................17

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.,*
  141 S. Ct. 1017 (2021) ................................................16, 21, 25, 26

*Gen. Contracting & Trading Co., LLC v. Interpole, Inc.,*
  940 F.2d 20 (1st Cir. 1991) ............................................................6

*Gill v. Arab Bank, PLC,*
  893 F. Supp. 2d 542 (E.D.N.Y. 2012).....................................45, 48

*Gilmore v. Palestinian Interim Self-Government Auth.,*
  53 F. Supp. 3d 191 (D.D.C. 2014), *aff'd*, 843 F.3d 958 (D.C. Cir.
  2016) .............................................................................................46

*Gondeck v. Pan American World Airways, Inc.,*
  382 U.S. 25 (1965)........................................................................11

*Guam v. Guerroro,*
  290 F.3d 1210 (9th Cir. 2001) ......................................................37

*Hamdan v. Rumsfeld,*
  548 U.S. 557 (2006)......................................................................39

*Hammond Packing Co. v. Arkansas,*
  212 U.S. 322 (1909)......................................................................28

*Henry v. Wyeth Pharms., Inc.,*
  616 F.3d 134 (2d Cir. 2010) ....................................................51-52

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010)..........................................................................25

*Hovey v. Elliott,*
  167 U.S. 409 (1897)................................................................28, 29

*Hygh v. Jacobs*,
 961 F.2d 359 (2d Cir. 1992) ..............................................................52

*Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*,
 456 U.S. 694 (1982)......................................7, 23, 24, 29, 30, 31, 33

*J. McIntyre Machinery, Ltd. v. Nicastro*,
 564 U.S. 873 (2011)................................................................... 26-27

*Johnson v. United States*,
 520 U.S. 461 (1997).........................................................................44

*Katt v. City of New York*,
 151 F. Supp. 2d 313 (S.D.N.Y. 2001), *aff'd*, 372 F.3d 83 (2d Cir. 2004).......59

*Katz v. Donna Karan Co., L.L.C.*,
 872 F.3d 114 (2d Cir. 2017) ............................................................35

*Leonard v. USA Petroleum Corp.*,
 829 F. Supp. 882 (S.D. Tex. 1993) ..................................................33

*Linde v. Arab Bank, PLC*,
 922 F. Supp. 2d 316 (E.D.N.Y. 2011) ..............................................48

*Machleder v. Diaz*,
 801 F.2d 46 (2d Cir. 1986) ..............................................................33

*Mallory v. Norfolk Southern Ry. Co.*,
 142 S. Ct. 2646 (2022) ....................................................................27

*McCulley v. Brooks & Co.*,
 816 S.E.2d 270 (Va. 2018)..................................................................8

*In re Mid-Atl. Toyota Antitrust Litig.*,
 525 F. Supp. 1265 (D. Md. 1981) ....................................................33

*Mullaney v. Anderson*,
 342 U.S. 415 (1952)............................................................................8

*Nat'l Equip. Rental, Ltd. v. Szukhent*,
 375 U.S. 311 (1964)....................................................................30, 34

*Newman-Green, Inc. v. Alfonzo-Larrain,*
   490 U.S. 826 (1989)..................................................................8

*Nimely v. City of New York,*
   414 F.3d 381 (2d Cir. 2005) ...................................................48

*North Carolina v. Alford,*
   400 U.S. 25 (1970).................................................................23

*Oregon v. Elstad,*
   470 U.S. 298 (1985).................................................................22

*Parke v. Raley,*
   506 U.S. 20 (1992)..................................................................21

*Parker v. Reda,*
   327 F.3d 211 (2d Cir. 2003) ...................................................52

*Patchak v. Zinke,*
   138 S. Ct. 897 (2018) ..............................................................36

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of*
   *Am. Secs., LLC,*
   691 F. Supp. 2d 448 (S.D.N.Y. 2010)....................................56

*Peterson v. Islamic Republic of Iran,*
   758 F.3d 185 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v.*
   *Peterson,* 578 U.S. 212 (2016) .........................................36, 37

*Plaut v. Spendthrift Farm, Inc.,*
   514 U.S. 211 (1995)................................................36, 38, 39, 40

*Restivo v. Hessemann,*
   846 F.3d 547 (2d Cir. 2017) ...............................................44, 58

*Roman Catholic Archdiocese of San Juan, Puerto Rico v.*
   *Acevedo Feliciano,*
   140 S. Ct. 696 (2020) ..........................................................10, 11

*Salazar v. Buono,*
   559 U.S. 700 (2010)..................................................................2

vii

*Schneckloth v. Bustamonte*,
  412 U.S. 218 (1973)............................................................31

*Shatsky v. Palestine Liberation Org.*,
  955 F.3d 1016 (D.C. Cir. 2020).........................................6, 14, 22, 37

*Shinseki v. Sanders*,
  556 U.S. 396 (2009)............................................................60

*Sioux Tribe v. United States*,
  97 Ct. Cl. 613 (1942)..........................................................39

*Sitts v. Dairy Farmers of Am., Inc.*,
  2020 WL 3467993 (D. Vt. June 24, 2020).........................................58

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
  779 F.3d 191 (2d Cir. 2015) ..................................................33

*South Carolina v. Moore*,
  447 F.2d 1067 (4th Cir. 1971)..............................................10, 11

*Spann v. Colonial Village, Inc.*,
  899 F.2d 24 (D.C. Cir. 1990) ..................................................6

*Strauss v. Credit Lyonnais, S.A.*,
  925 F. Supp. 2d 414 (E.D.N.Y. 2013)...........................................45

*Sun Forest Corp. v. Shvili*,
  152 F. Supp. 2d 367 (S.D.N.Y. 2001)...........................................32

*In re Terrorist Attacks on September 11, 2001*,
  741 F.3d 353 (2d Cir. 2013) ..................................................11

*Thai-Lao Lignite (Thailand) Co. v. Lao People's Democratic Republic*,
  864 F.3d 172 (2d Cir. 2017) ..................................................13

*United Republic Ins. Co. v. Chase Manhattan Bank*,
  315 F.3d 168 (2d Cir. 2003) ...............................................1, 9, 10

*United States v. Agrawal*,
  726 F.3d 235 (2d Cir. 2013) ..................................................51

*United States v. Alabama,*
362 U.S. 602 (1960) ........................................................7

*United States v. Bacchus,*
108 F.3d 1370 (2d Cir. 1997) ........................................43

*United States v. Blum,*
329 F.2d 49 (2d Cir. 1964) ........................................ 60-61

*United States v. Brown,*
352 F.3d 654 (2d Cir. 2003) ........................................48

*United States v. Defreitas,*
2011 WL 317964 (E.D.N.Y. Jan. 31, 2011) ....................48

*United States v. Diaz,*
176 F.3d 52, 80 (2d Cir. 1999) ......................................54

*United States v. Farhane,*
634 F.2d 127 (2d Cir. 2011) ...................................44, 48

*United States v. Gatto,*
986 F.3d 104 (2d Cir. 2021) ........................................44

*United States v. Gomez,*
877 F.3d 76 (2d Cir. 2017) ...........................................33

*United States v. Kadir,*
718 F.3d 115 (2d Cir. 2013) .........................................48

*United States v. Kassir,*
2009 WL 910767 (S.D.N.Y. Apr. 2, 2009) ....................46

*United States v. Khoury,*
901 F.2d 948 (11th Cir. 1990) ......................................42

*United States v. Lopez,*
547 F.3d 364 (2d Cir. 2008) ........................................45

*United States v. Marcus,*
560 U.S. 258 (2010) ..............................................48, 49

*United States v. Mejia,*
  545 F.3d 179 (2d Cir. 2008) ...................................................................49

*United States v. Miller,*
  626 F.3d 682 (2d Cir. 2010) ............................................................44, 52

*United States v. Moye,*
  793 F. App'x 19 (2d Cir. 2019) ..............................................................51

*United States v. Napout,*
  963 F.3d 163 (2d Cir. 2020) ............................................................44, 58

*United States v. Paracha,*
  2006 WL 12768 (S.D.N.Y. Jan. 3, 2006), *aff'd*, 313 F. App'x 347
  (2d Cir. 2008) ........................................................................................46

*United States v. Sioux Nation,*
  448 U.S. 371 (1980).........................................................................39, 40

*United States v. Sioux Nation,*
  518 F.2d 1298 (Ct. Cl. 1975) .................................................................39

*United States v. Smith,*
  919 F.3d 825 (4th Cir. 2019)............................................................56-57

*United States v. Sokolov,*
  814 F.2d 864 (2d Cir. 1987) ..................................................................57

*United States v. Taylor,*
  745 F.3d 15 (2d Cir. 2014) ...............................................................21, 22

*United States v. Union Gas Co.,*
  832 F.2d 1343 (3d Cir. 1987), *aff'd*, 419 U.S. 1 (1989) .....................7

*United States v. Vasquez,*
  267 F.3d 79 (2d Cir. 2001) ...............................................................54, 56

*United States v. Villafuerte,*
  502 F.3d 204 (2d Cir. 2007) ..................................................................52

*United States v. Wexler,*
  522 F.3d 194 (2d Cir. 2008) ..................................................................47

*United States v. Williams*,
930 F.3d 44 (2d Cir. 2019) .................................................................43

*United States v. Yu-Leung*,
51 F.3d 1116 (2d Cir. 1995) ...............................................41, 42, 43

*Universal Reins. Co. v. St. Paul Fire & Marine Ins. Co.*,
312 F.3d 82 (2d Cir. 2002) .............................................................8

*Waite v. All Acquisition Corp.*,
901 F.3d 1307 (11th Cir. 2018) ....................................................18

*Walden v. Georgia-Pacific Corp.*,
126 F.3d 506, 520 (3d Cir. 1997) ..................................................43

*Waldman v. Palestine Liberation Organization*,
835 F.3d 317 (2d Cir. 2016) ...........................................3, 10, 16, 17

*Warren v. Pataki*,
823 F.3d 125 (2d Cir. 2016) ...........................................................60

*Weaver Const. Co. v. Dist. Ct.*,
545 P.2d 1042 (Colo. 1976) .............................................................9

*Wechsler v. Hunt Health Sys., Ltd.*,
381 F. Supp. 2d 135 (S.D.N.Y. 2003 ............................................57

**Statutes**

8 U.S.C. § 1182(a)..............................................................................27

18 U.S.C. § 2334(e)......................................................................22, 35

22 U.S.C. § 2378b..............................................................................27

28 U.S.C.
§ 1446(d)....................................................................................10
§ 2111.........................................................................................60

31 U.S.C. § 5318(k)...........................................................................19

Immigration Act of 1990, Pub. L. 101-649, § 601 .............................27

Middle East Peace Commitments Act of 2002, Pub. L. No. 107-228, tit. VI, § 601-04 .................................................................27

Middle East Peace Facilitation Act of 1994, Pub. L. No. 103-236, § 583 ........27

Palestinian Anti-Terrorism Act of 2006, Pub. L. No. 109-446.........................27

PLO Commitments Compliance Act of 1989, Pub. L. No. 101-246, tit. VII (1990).............................................................................27

Promoting Security and Justice for Victims of Terrorism Act, Pub. L. 116-94, div. J, title IX, § 903 (Dec. 20, 2019) ...........................*passim*
§ 903(b).........................................................................................11
§ 903(d)...................................................................................10, 25

**Rules**

Federal Rule of Civil Procedure 61 .................................................................60

Federal Rules of Evidence
Rule 103 .......................................................................................43
Rule 702 ..................................................................................44, 45

**Legislative Materials**

164 Cong. Rec. S.2926.................................................................................13

H.R. Rep. 115-858 (2018)............................................................................25

**Treatises & Scholarly Works**

*The Constitution of the United States of America: Analysis, and Interpretation*, S. Doc. No. 112-9 (2012 & Supp. 2020)................................17

16 James Wm. Moore et al., *Moore's Fed. Prac.—Civil* (2020) .......................17

Jon O. Newman, *Suing the Lawbreakers*, 87 Yale L.J. 447 (1978) ............ 25-26

*Restatement (Third) of Agency* (2006)..........................................................26

Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* ..................................................12, 17, 32, 42, 48

## INTRODUCTION

The Court should recall its mandate and restore the district court's original judgment. Defendants offer two procedural arguments against applying the PSJVTA in *this* case—finality and futility—but neither helps them. The interest in finality favors Plaintiffs, not Defendants: If the Court applies the PSJVTA in this case, the case will be resolved; but if the Court adopts Defendants' position, litigation of the same claims between the same parties will continue before the same district judge for years, including a second trial.

Defendants' "futility" argument is also meritless. Defendants' theory is that jurisdiction cannot appear for the first time after final judgment in the district court. But this Court and the Supreme Court have held repeatedly that a defendant's conduct, or an act of Congress, or an order of an appellate court adding or dismissing parties can salvage jurisdiction that was absent at the time of a district court's judgment. Indeed, this Court recalled its mandate for the purpose of salvaging jurisdiction in *United Republic Ins. Co. v. Chase Manhattan Bank*, 315 F.3d 168 (2d Cir. 2003), a case discussed extensively in Plaintiffs' opening brief (at 2, 14, 20, 22) but not mentioned by Defendants.

Finally, and perhaps most important, Defendants' procedural position entirely disregards the text of the Supreme Court's mandate to this Court, by

pretending that the Supreme Court vacated this Court's 2019 *order* denying the motion to recall the mandate, rather than its 2016 *judgment*. Due respect for the structure of our judicial system requires treating the Supreme Court's decretal language as meaningful, especially since the parties actually litigated whether the Supreme Court should vacate this Court's *order* or its *judgment*, and Plaintiffs prevailed.

Due respect for Congress is also implicated here. Congress has now enacted two statutes to address this case and others like it. Defendants belittle Congress's work, accusing Congress of "attempt[ing] an end-run around this Court's settled constitutional analysis" and demanding that this Court reject the "ruse." Def. Br. 1-3. But Defendants have things backwards. "Congress's prerogative to balance opposing interests and its institutional competence to do so provide one of the principal reasons for deference to its policy determinations." *Salazar v. Buono*, 559 U.S. 700, 717 (2010) (plurality opinion). Defendants are wrong to dismiss this work as "evasion, for the statute brought about a change of law and a congressional statement of policy applicable to the case," which is "due great respect from the other [branches]." *Id.* (quotation marks omitted).

Defendants assert that the PSJVTA's constitutionality is foreclosed by

this Court's analysis in *Waldman v. Palestine Liberation Organization*, 835 F.3d 317 (2d Cir. 2016) (*Waldman I*). That is incorrect. An entity is amenable to suit in any jurisdiction where it is at home (general jurisdiction); where its suit-related conduct creates a substantial connection with the forum (specific jurisdiction); or where it agrees to be sued (consent jurisdiction). In *Waldman I*, this Court determined that Defendants were not amenable to suit under principles of general jurisdiction or specific jurisdiction but did not address consent jurisdiction.

The PSJVTA easily satisfies the relevant due process requirements: fair notice and a reasonable link between the statute and a legitimate governmental interest. And Defendants' separation-of-powers argument is meritless, because Congress engaged in the quintessential legislative task of making law, leaving to the Judiciary the tasks of finding facts, applying law to facts, and exercising discretion to reopen cases.

Finally, the Court should reject Defendants' evidentiary challenges to the trial testimony of three experts. Defendants contend that the district court should have excluded the testimony *in toto* under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), but Defendants waived their *Daubert* objection, so no review is available to them. Even if review were

available, the district court did not commit plain error. The witnesses easily met the liberal standard for admissibility of expert testimony—that the expert is qualified, reliable, and helpful. Each had years of relevant experience; each testified on the basis of documents admitted in evidence and evaluated under well-established professional standards; and the testimony of each illuminated issues unfamiliar to the jury: the activities and structure of middle-eastern terror organizations; and the interpretation of unfamiliar documents, such as criminal convictions from a foreign legal system, and Defendants' own intelligence reports, pay and promotion records, and "martyr files."

Defendants also cherry-pick a handful of objections that the district judge overruled to suggest that they did not receive a fair trial. However, the district judge acted well within his broad discretion in overruling those objections, and Defendants have failed to carry their burden of showing prejudice in light of the overwhelming evidence of liability and the district court's even-handed jury instructions.

## ARGUMENT

### I. THE COURT SHOULD SALVAGE JURISDICTION AND REINSTATE THE DISTRICT COURT'S JUDGMENT

Our opening brief demonstrated that (a) this Court has the power to salvage jurisdiction; (b) the Court should exercise that power in order to end the

litigation, thereby advancing the Judiciary's dual interests in finality and justice; and (c) doing so would reflect fidelity to the Supreme Court's mandate. Insofar as Defendants respond to these points at all, their arguments are meritless.

## A. This Court Has Power To Salvage Jurisdiction

This Court has the power to recall its mandate for the purpose of salvaging jurisdiction. Pl. Br. 19-22. Defendants respond that recalling the mandate would be "futile." Their theory is that "[b]ecause the district court lacked personal jurisdiction when it held a jury trial and entered judgment in 2015, those proceedings are void and cannot be reinstated." Def. Br. 77. Defendants are incorrect.

### 1. Defendants' Futility Argument Cannot Be Reconciled With Cases Salvaging Jurisdiction

Defendants say (at 78) that the cases we cited do not allow for "creating personal jurisdiction after final judgment" in the district court. Not so. The cases show that jurisdiction (both personal and subject-matter) may arise for the first time after a final judgment in the district court—whether by the conduct of the defendant, by an act of Congress, or by order of the appellate tribunal.

Of direct relevance here, even if a district court lacks personal

5

jurisdiction at the moment it enters judgement, jurisdiction can be established on appeal by the defendant's conduct. *See Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1029 (D.C. Cir. 2020) (objections to lack of personal jurisdiction "can be forfeited at any stage of a proceeding, including by failing to challenge the district court's exercise of jurisdiction on appeal"); *Gen. Contracting & Trading Co., LLC v. Interpole, Inc.*, 940 F.2d 20, 22 (1st Cir. 1991) ("having objected to the absence of *in personam* jurisdiction, a defendant may rescind the objection, *i.e.*, consent to the forum court's jurisdiction, at any stage of the proceedings"); *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 32 (D.C. Cir. 1990) ("forum objections, *i.e.*, personal jurisdiction and venue, can be waived at any stage of a proceeding").

Thus, in *Corporación Mexicana de Mantenimiento Integral, S. de R.L. v. Pemex-Exploración y Producción*, 832 F.3d 92 (2d Cir. 2016), the defendant raised jurisdictional and merits arguments on appeal, but then asked this Court to remand for further consideration of the merits based on new developments. *Id.* at 99-100. The defendant again lost in the district court, and this Court held that when the defendant "affirmatively and successfully sought relief from this Court remanding for a new merits determination in the Southern District, it forfeited its argument that personal jurisdiction is lacking." *Id.* at

101. In other words, the defendant's conduct during appellate proceedings in this Court amounted to a "legal submission" to personal jurisdiction even if the district court did not have jurisdiction. *Id.* at 100 (quoting *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982)). Defendants' theory here (at 77) that a district court judgment entered without personal jurisdiction is "absolutely void" no matter what happens later cannot be squared with *Corporación Mexicana*.

Similarly, if Congress makes an intervening law-change granting subject-matter jurisdiction, appellate courts apply that new law, even if the district court lacked jurisdiction under the prior law. *See, e.g.*, *Andrus v. Charlestone Stone Prods.*, 436 U.S. 604, 607 n.6 (1978) ("The fact that in 1973 respondent in its complaint did not allege $10,000 in controversy is now of no moment," given Congress's 1976 amendment "to eliminate the amount-in-controversy requirement" in cases against the United States); *United States v. Alabama*, 362 U.S. 602, 604 (1960) (even though district court and court of appeals lacked subject-matter jurisdiction, statue enacted while the case was pending in the Supreme Court required decision "on the basis of law now controlling"); *United States v. Union Gas Co.*, 832 F.2d 1343, 1357 (3d Cir. 1987) (same), *aff'd*, 491 U.S. 1 (1989); *Dedham Water Co. v. Cumberland Farms*

7

*Dairy, Inc.*, 805 F.2d 1074, 1084 (1st Cir. 1986) (same, while case was pending in court of appeals).

An appellate court also has authority to salvage jurisdiction by adding or dismissing parties—even if the district court lacked jurisdiction at the time it entered judgment. *See, e.g.*, *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 75 (1996) (removal jurisdiction); *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 836 (1989) (diversity); *Mullaney v. Anderson*, 342 U.S. 415, 417 (1952) (standing); *Universal Reins. Co. v. St. Paul Fire & Marine Ins. Co.*, 312 F.3d 82, 89 (2d Cir. 2002) (diversity).

### 2. *Defendants' Cases Are Inapposite*

Defendants rely (at 77) on state-court cases holding that a defendant does not waive its personal-jurisdiction objection by entering a general appearance after the entry of a default judgment. *See McCulley v. Brooks & Co.*, 816 S.E.2d 270, 273-74 (Va. 2018). The state-law cases are divided on this issue. *See id.* at 273-74 & nn.4-5; *see also Aetna Ins. Co. v. Earnest*, 112 So. 145, 145 (Ala. 1927) (following the "great weight of authority" that "'a general appearance validates a judgment that was theretofore absolutely void for want of jurisdiction'" (quoting 4 *Corp. Jur.* 1365, § 65 (1916))). But even the cases that go Defendants' way do not help them here. Those cases are based on concerns

8

about "the due process concept of allowing the defendant his day in court before entering judgment against him." *BAC Home Loans Servicing, LP v. Mitchell*, 6 N.E.3d 162, 168 (Ill. 2014); *see Weaver Const. Co. v. Dist. Ct.*, 545 P.2d 1042, 1046 (Colo. 1976) (default judgment obtained after improper service should be vacated to give the defaulting party "his day in court"). Obviously, that concern is absent here, where Defendants *had* their day in court and are looking for a do-over on the merits.

Indeed, the difference between the default-judgment cases and this one confirms not only that this Court has *power to* salvage jurisdiction, but also why it *should* do so. As this Court explained in *United Republic Ins. Co. v. Chase Manhattan Bank*, 315 F.3d 168 (2d Cir. 2003), "the nature of the jurisdictional inquiry is affected by the fact that a final judgment issued in the district court." *Id.* at 170. In cases that have reached judgment on the merits, "federal courts *must* salvage jurisdiction where possible," lest they "impose unnecessary and wasteful burdens on the parties, judges, and other litigants waiting for judicial attention." *Id.* (emphasis added; quotation marks omitted). Indeed, "the interests of justice, fairness and judicial economy *require* some additional opportunity to cure such [jurisdictional] defects." *Id.* (emphasis added; citation omitted). In *United Republic*, neither the fact that the district

9

court's final judgment had been entered without jurisdiction, nor that this Court's mandate had already issued, made it "futile" to try salvage jurisdiction, as Defendants here contend. *Id.* Plaintiffs discussed *United Republic* extensively (at 2, 14, 20, 22), but Defendants do not mention it.

Defendants also rely (at 77) on *Roman Catholic Archdiocese of San Juan, Puerto Rico v. Acevedo Feliciano*, 140 S. Ct. 696, 701 (2020), and *South Carolina v. Moore,* 447 F.2d 1067, 1073 (4th Cir. 1971), but those cases also undermine Defendants' argument. At issue there were orders of state courts that had been divested of jurisdiction by removal to federal court, under a statute providing that once a removal petition is filed, "the State court shall proceed no further unless and until the case is remanded." 28 U.S.C. § 1446(d). Under those circumstances, federal courts were bound to honor Congress's jurisdictional instructions that "proceedings in the state court after the filing of the petition and prior to a federal remand order [we]re absolutely void." *Moore*, 447 F.2d at 1073.

Here, by contrast, Congress has *empowered* this Court to salvage jurisdiction and *encouraged* it to do so. Congress made the PSJVTA expressly retroactive to the day before this Court's ruling in *Waldman I*. PSJVTA § 903(d)(2). And the PSJVTA contains a "sense of Congress" that cases that

10

had previously been "dismissed for lack of personal jurisdiction" "should be resolved in a manner that provides just compensation to the victims," "to the fullest extent possible and without subjecting victims to unnecessary litigation." *Id.* § 903(b)(4)(A)-(B), (b)(5). The circumstances here are thus the opposite of what they were in *Acevedo Feliciano* and *Moore*.

### B. The Interests In Finality And Justice Favor Reinstating the District Court's Judgment

In *Gondeck v. Pan American World Airways, Inc.*, 382 U.S. 25 (1965), the Court recalled its mandate under "the established doctrine that 'the interest in finality of litigation must yield where the interests of justice would make unfair the strict application of our rules.'" *Id.* at 26-27 (quoting *United States v. Ohio Power Co.*, 353 U.S. 98, 99 (1957)). Defendants attempt to limit *Gondeck* to its facts, but the principle that the Supreme Court invoked in that case was not so cabined. This Court's decision in *In re Terrorist Attacks on September 11, 2001*, 741 F.3d 353 (2d Cir. 2013), on which Defendants rely (at 19, 34, 36, 38), similarly affirmed that a change in law can justify reopening a case when doing so would serve "the interests of justice." *Id.* at 358. In that case, like *Gondeck*, a relevant interest of justice was "treating victims of the same tort consistently." *Id.* at 357. But neither decision indicated that treating victims alike is the *only* interest that would ever justify overriding the finality

11

of a closed case.

In this case, *both* the interest in finality *and* the interests of justice support reinstating the district court's original judgment on the jury verdict.

**1. Finality.** In assessing the interest in finality, the Court must consider conservation of judicial resources and the parties' reliance interests. Pl. Br. 22-25. Defendants have nothing to say about the conservation of judicial resources, because the best way to conserve judicial resources is obviously not to send the parties back to the district court for a second trial, as Defendants request.

Defendants also invoke their "interests in repose," Def. Br. 73, but that makes no sense: They are seeking a second trial, not a dismissal on the merits. Indeed, "it is perilous to develop any sense of repose around a disposition based on a procedural shortcoming rather than the merits." 16 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 3938 (3d ed.).

**2. Justice**. Of the four factors relevant to the interests of justice, *see* Pl. Br. at 25-32, Defendants address only two: the lapse of time and the equities.

With regard to the lapse of time, Defendants try to move the goal posts, looking back from today rather than from the date of Plaintiffs' motion to recall the mandate. By any fair metric, there is no timeliness problem here:

Defendants' "repose" lasted less than two months, from April 2, 2018 (when the Supreme Court denied certiorari) to May 24, 2018 (when the Anti-Terrorism Clarification Act was introduced in Congress). *See* 138 S. Ct. 1438; 164 Cong. Record S.2926.[1] Only six months elapsed between the Supreme Court's denial of certiorari and Plaintiffs' motion to recall the mandate. And even if the Court ignored the pendency of the petition for certiorari, only 23 months passed between issuance of the mandate and the motion to recall it—a period well within the time approved by this Court. *See Thai-Lao Lignite (Thailand) Co. v. Lao People's Democratic Republic*, 864 F.3d 172, 189 (2d Cir. 2017) ("ten years" would be too long); Pl. Br. 27-29. Defendants cite cases in which motions were made with shorter time-frames, Def. Br. 75-76, but not a single one held that six months—or even 23 months—was too long.

With regard to the equities, Defendants do not and cannot dispute that ATA claims like those in this case advance the public interest and fundamental international-law norms reflected in statutes and conventions designed to punish and deter terrorism and to compensate terror victims. *See supra* pp. 10-11;

---

[1] Defendants appear to have started lobbying against the bill in June 2018. Squire Patton Boggs FARA Supp. Statement Attachment C (July 19, 2018), https://efile.fara.gov/docs/2165-Supplemental-Statement-20180719-29.pdf.

*infra* p. 27 & n.2; Pl. Br. 30-32; Gov. Br. 9 n.3, 22-23; Br. of Members of Congress at 5-11, 20-22, 29-30 (ECF No. 541).

Defendants claim (at 74) that Plaintiffs will not be prejudiced by a second trial. Not true. As Plaintiffs and *amici* have explained, there is tremendous prejudice in retrying a case, particularly given the time that has passed and the emotionally wrenching nature of the testimony and evidence in this case. *See* Pl. Br. 23-24; Br. of Organizations Providing Support to Victims of Terror at 3-14 (ECF No. 487); *see also Edwards v. Vannoy*, 141 S. Ct. 1547, 1554-55 (2021) ("conducting retrials years later inflicts substantial pain on crime victims who … would have to relive their trauma and testify again"). Since the first trial, one Plaintiff has died, and the delay associated with a retrial poses the risk that other evidence will be unavailable. *See id.* at 1554. Defendants cite (at 74) the D.C. Circuit's ruling in *Shatsky* as support for their theory that no prejudice arises from proceeding in a new case, but *Shatsky* did not go to trial, so it was not a case in which the terror-victim plaintiffs would suffer such prejudice.

## C. Reinstating the District Court's Judgment Will Reflect Fidelity To The Supreme Court's Mandate

Defendants do not dispute that the Supreme Court vacated this Court's 2016 "judgment," not its 2019 "order," and that the Supreme Court is careful

about which term it uses. Pl. Br. 33-35. Nor do Defendants dispute that the Supreme Court's use of the word "judgment" was legally significant: Where a judgment has been vacated, the case remains open and "must be decided according to the law as it exists at the time" of the ultimate decision. *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 173 (2d Cir. 1967); *see* Pl. Br. 35-36.

Defendants also silently accept our showing that the parties *actually litigated* whether to apply the PSJVTA in this case or in Plaintiffs' backup case; Defendants lost that fight. *Id.* at 36-37. They do point out that a GVR order like the one in this case "requires only 'further consideration' of the appellate status quo ante." Def. Br. 79 (italics omitted). But that only raises, rather than answers, the key question: status quo before *what*? The 2016 *judgment*, or the 2019 *order*? Given the parties' active litigation of that issue in the Supreme Court, and the Supreme Court's vacatur of the "judgment," it is fair to conclude that the Supreme Court's mandate directs this Court to treat its 2016 judgment as vacated, to reopen the case, and to apply the law as it currently exists. Doing so means considering whether the PSJVTA provides a basis for the exercise of personal jurisdiction in this case.

15

## II.    THE PSJVTA DOES NOT VIOLATE THE DUE PROCESS CLAUSE

We demonstrate below that: (a) the PSJVTA easily meets the relevant due process standards of fair notice and reasonableness; (b) the PSJVTA's territory-based provision is independently constitutional; (c) the district courts' decisions in this case and *Fuld* were incorrect; and (d) Defendants' alternative "benefit" theories are unavailing.

### A.    The PSJVTA Meets The Touchstones Of Due Process: Fair Notice And Reasonableness

#### 1.    *The Correct Standard Is Fair Notice And Reasonableness*

In our opening brief, we demonstrated that a statute providing for the exercise of personal jurisdiction satisfies due process if it gives defendants fair warning of what conduct will subject them to jurisdiction and reasonably advances legitimate government interests in the context of our federal system of government. *See Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1023-25 (2021); Pl. Br. 41-43.

**a.** Defendants assert that Congress based consent on "the same conduct" that this Court held in *Waldman I* was "insufficient to support the exercise of personal jurisdiction under the Due Process Clause." Def. Br. 1, 3, 47, 54, 59 (emphasis omitted). Defendants are wrong. An entity is amenable to suit in any jurisdiction where it is headquartered or incorporated (general

16

jurisdiction); where its suit-related conduct creates a substantial connection with the forum (specific jurisdiction); or where it agrees to be sued (consent jurisdiction). *See Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 129 (3d Cir. 2020). A minimum-contacts inquiry speaks to general jurisdiction and specific jurisdiction. *See Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010). That was the ground that this Court covered in *Waldman I*.

Contrary to Defendants' theory, the minimum-contacts inquiry is irrelevant in evaluating a consent statute. "Consent is a traditional basis of jurisdiction that may be upheld even in the absence of minimum contacts between the defendant and the forum state." 16 James Wm. Moore et al., *Moore's Fed. Prac.—Civil* § 108.53 (2020) (citation omitted); *see* 4 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1067.3 (4th ed.) (similar); *The Constitution of the United States of America: Analysis, and Interpretation*, S. Doc. No. 112-9, at 1967 (2012 & Supp. 2020) ("Consent has always been sufficient to create [personal] jurisdiction, even in the absence of any other connection between the litigation and the forum."); *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 131 (4th Cir. 2022) ("Absent consent, the exercise of personal jurisdiction must comport with the requirements of … minimum contacts") (quotation

17

marks omitted); *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1312 (11th Cir. 2018) ("Even where neither the forum state's long-arm statute nor the due process minimum contacts analysis is satisfied, a court may exercise personal jurisdiction over a party if the party consents."); *Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*, 817 F.3d 755, 769 (Fed. Cir. 2016) (O'Malley, J., concurring) ("consent to jurisdiction is an alternative to the minimum contacts analysis").

Defendants rely (at 66) on *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226 (5th Cir. 2022) (en banc), but that decision contradicts their argument. There, the Fifth Circuit majority expressly left open whether "*Congress* could pass a law to subject foreign defendants to American federal court jurisdiction for any injuries inflicted on American citizens or claims arising abroad." *Id.* at 232 n.8 (emphasis in original). The fact that the Fifth Circuit *rejected* the existence of minimum contacts (general jurisdiction and specific jurisdiction), yet recognized that Congress could nevertheless create a basis to exercise personal jurisdiction, further illustrates that consent jurisdiction is distinct. The Fifth Circuit also observed that "the impact of foreign relations and national security surely can affect the United States' 'sovereign reach.'" *Id.* at 237. Exactly right.

18

**b.** In our opening brief, we demonstrated that Defendants' theory of the case would jeopardize numerous federal statutes and regulations based on inferred consent to jurisdiction, including enforcement tools used to protect the financial system in 31 U.S.C. § 5318(k) and Federal Reserve Board of Governors Form FR K-2. *See* Pl. Br. 49-51. Defendants have nothing to say about these federal statutes and regulations. They do not cite a single case holding any such laws unconstitutional, and our research has found none. Indeed, as far as Plaintiffs are aware, no other federal consent-to-jurisdiction statute or regulation has *ever* been invalidated on due process grounds.

Nor do Defendants dispute that this Court's reasoning in *Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir. 2016), supports the conclusion that the relevant due process concerns are fair warning and reasonableness within the context of our federal system. The considerations that led to the holding in *Brown*—the absence of "express language alerting the potential registrant" to the jurisdictional consequences of registering under the Connecticut long-arm statute, *id.* at 636; concern about subjecting an out-of-state corporation to "general jurisdiction…with regard to all matters," *id.*; the lack of any meaningful limitation on "the class of plaintiffs entitled to avail themselves of the long-arm statute," *id.*; and the forum state's "limited" interest in adjudicating

19

the dispute, *id.* at 637—all point in precisely the opposite direction here. *See* Pl. Br. 46-51.

Indeed, *Brown* strongly suggested the right result in this case: The Court observed there that a "carefully drawn" statute, such as one that "expressly required consent to general jurisdiction as a condition on a foreign corporation's doing business in the state, at least in cases brought by state residents, might well be constitutional." 814 F.3d at 641. The PSJVTA—which expressly provides for consent to jurisdiction over a narrow class of federal antiterrorism cases involving harm to American citizen plaintiffs—is even *more narrowly* tailored than the statute hypothesized in *Brown*.

Defendants posit a hypothetical statute "declaring that any foreign corporation that distributed vehicles to California dealerships 'shall be deemed to have consented to personal jurisdiction' in the state." Def. Br. 58. But Defendants' hypothetical illustrates the importance of identifying the governmental interests at stake. Defendants' hypothetical statute would allow for general jurisdiction over foreign corporations without furthering any legitimate state interest, so by design it would fail constitutional scrutiny of the type identified in *Brown*. The PSJVTA, by contrast, easily survives such scrutiny by

reasonably advancing core interests of the national government in disputes involving its citizens.

### 2. The PSJVTA Gave Defendants Fair Notice, Such That Their Conduct Was Knowing And Voluntary

Defendants agree that inferred consent to personal jurisdiction is permissible if the defendant's conduct was "knowing and voluntary," but they ignore the accepted meaning of those terms. In the Fifth Amendment context, "'knowing' means with full awareness of the nature of the right being abandoned and the consequences of abandoning it, and 'voluntary' means by deliberate choice free from intimidation, coercion, or deception." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014); *see Ford*, 141 S. Ct. at 1024-25 ("fair warning" means "knowledge that 'a particular activity may subject [defendant] to the jurisdiction of a foreign sovereign'") (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)); *Parke v. Raley*, 506 U.S. 20, 28-29 (1992) ("knowing and voluntary" waiver of constitutional rights occurs if it reflects "a voluntary and intelligent choice among the alternative courses of action open to the defendant") (quotation marks omitted).

Defendants do not dispute that they had "full awareness of the nature of the right being abandoned," *Taylor*, 745 F.3d at 23, by engaging in the conduct specified in the PSJVTA. Indeed, Defendants received actual notice of the

21

PSJVTA before it took effect and represented to the D.C. Circuit that they "might never make covered payments." *Shatsky*, 955 F.3d at 1038. Nor do Defendants dispute that their conduct was "free from intimidation, coercion, or deception," *Taylor*, 745 F.3d at 23, and thus "voluntary" within the meaning of the Due Process Clause. *See Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (product of "a free and unconstrained will"); *Colorado v. Connelly*, 479 U.S. 157, 163, 165 (1986). Defendants concede (at 42) that their decision to make such payments reflected their "own…policy choices."

Shockingly, Defendants attempt to whitewash their "policy choices" to pay monthly salaries to families of hundreds of terrorists responsible for murdering Americans. Their repeated claim (Br. 5, 16, 41-46, 85) that these salaries are mere "social welfare payments" is not only morally repugnant; it is false: Defendants have *conceded* that they made these payments "by reason of" the terrorists' imprisonment for murders committed against Americans or the terrorists' deaths in committing such crimes. 18 U.S.C. § 2334(e)(1)(A).

Regardless of what Defendants *call* these payments, they are wrong to assert (at 14, 21) that they did not have a "knowing and voluntary choice" to avoid personal jurisdiction by refraining from making them. They may not have relished the choice Congress gave them, but hard choices are not

22

"involuntary" choices; or, as the Supreme Court put it in *Bauxites*, "not all rules that establish legal consequences to a party's own behavior are 'mere assertions' of power." 456 U.S. at 705.

The Supreme Court illustrated the extent to which courts reject claims of "coercion" based on unwelcome choices in *North Carolina v. Alford*, 400 U.S. 25 (1970). There, a criminal defendant argued that his guilty plea to a murder charge was not "voluntary" in the sense required by the Due Process Clause. He had pleaded guilty while maintaining his innocence because the overwhelming evidence against him presented a serious risk that the State would put him to death if he insisted on proceeding to trial. *Id.* at 27-28. The Supreme Court rejected his claim that these circumstances prevented him from making a voluntary decision, holding that even the risk of a death sentence did not make the defendant's plea a product of "fear and coercion." *Id.* at 29, 37. If Alford's difficult choice to plead guilty and accept a sentence of life imprisonment was voluntary, so was Defendants' choice to pay terrorists and their families by reason of their imprisonment for murdering Americans; the same goes for their choice to engage in activities within the United States.

Finally, Defendants do not and cannot dispute our showing (Pl. Br. 60-63) that the passages on which they rely in *College Savings Bank v. Florida*

23

*Prepaid Postsecondary Education Expense Board*, 527 U.S. 666 (1999), were *dicta*. Pl. Br. 60-63. *College Savings* held that Congress does not have authority "to exact constructive waivers of sovereign immunity through the exercise of Article I powers." 527 U.S. at 683. This holding is uninstructive, because state sovereign immunity differs from personal jurisdiction in ways that matter here: State sovereign immunity supports a "fundamental aspect" of our constitutional structure, "central to sovereign dignity." *Alden v. Maine*, 527 U.S. 706, 713-15 (1999). Personal jurisdiction can be "waived like other rights." *Bauxites*, 456 U.S. at 702-03, 706.

Nor do Defendants rebut our showing that the *dicta* in *College Savings* was incorrect, because the Supreme Court has repeatedly upheld constructive consent in many constitutional contexts. Pl. Br. 62-63 & nn.10-12. It would thus be a mistake to elevate the *dicta* in *College Savings* over the reasoning in *Bauxites*, which approved of "implied consent to the personal jurisdiction of the court," *Bauxites*, 456 U.S. at 703-04.

### 3. *The PSJVTA Is Reasonable In The Context Of Our Federal System*

Defendants dispute whether the PSJVTA reasonably advances legitimate governmental interests, claiming that "the PSJVTA is [not] *necessary* for the war on terror." Def. Br. 63 (emphasis added). Of course, *necessity* is

not the relevant question. The cases require only that the forum have "significant interests at stake." *Ford*, 141 S. Ct. at 1030; *see Bristol-Myers Squibb v. Superior Court*, 137 S. Ct. 1773, 1780 (2017) ("legitimate interests in the claims in question").

That is undoubtedly the case here. Congress reasonably determined that § 2334(e) advances "a legitimate governmental purpose: to halt, deter, and disrupt international terrorism and to compensate U.S. victims of international terrorism," *see* H.R. Rep. 115-858 at 7-8 (2018), and that it serves the purpose of "provid[ing] relief for victims of terrorism," PSJVTA § 903(d)(1)(A). These national security and foreign affairs interests are plainly "significant." *Ford*, 141 S. Ct. at 1030. Indeed, a group of Senators and Representatives appear as amici in this Court to highlight the interests of the United States served by the extraterritorial statutes addressing the scourge of terrorism, including this one. Br. of Members of Congress (ECF No. 541).

The statutory text and legislative history reflect a "reasonable evaluation by the Legislative Branch." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) (cleaned up). "The private suit for civil damages can both compensate and deter. In the battle to restrain official misconduct, it is our most promising weapon…." Jon O. Newman, *Suing the Lawbreakers*, 87 Yale

L.J. 447, 451 (1978). Civil liability for misconduct compensates victims, forces organizations to internalize costs they inflict on others, and aligns the organization's incentives with desired conduct. *See Restatement (Third) of Agency* § 503, comment b (2006). As Professors Bobbitt, Dorf, and Powell document, such liability has special utility in the context of foreign affairs: "[t]he United States has long used the threat of civil litigation as a bargaining chip in resolving international crises." Br. of Constitutional Law Scholars 12 (ECF No. 488) (collecting examples). Striking down the PSJVTA "could inadvertently" "crippl[e]" one of the United States' "strongest tactical options" in combatting international terrorism. *Id.* at 11, 13-14. And compared to other powers undeniably available to the Government, the PSJVTA was a measured response to Defendants' pro-terror policies, as Judges Sofaer and Freeh point out. Br. of Abraham D. Sofaer and Louis J. Freeh 2-3 (ECF No. 489).

The PSJVTA furthers these interests in a manner that is reasonable "in the context of our federal system of government." *Ford*, 141 S. Ct. at 1024 (citation omitted). The PSJVTA concerns a limited class of anti-terrorism cases within the heartland of federal concern; it applies to a limited class of plaintiffs who are citizens of the forum; and it does not infringe on the interests of other sovereigns within our constitutional framework. *See J. McIntyre Machinery,*

*Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (plurality opinion) ("[P]ersonal juris-diction requires a forum-by-forum, or sovereign-by-sovereign, analysis."). In-deed, the PSJVTA is consistent with decades of legislation in this area, in which Congress determined it to be in the national and foreign policy interests of the United States to find ways to halt terrorism sponsored by these very Defendants. *See* Statutes cited and discussed in the Government's Brief at pp. 9 n.3, 22-23.[2]

## B.   Territory-Based Consent Is Independently Constitutional

Numerous Supreme Court cases, dating back to the Nineteenth Cen-tury, uphold personal jurisdiction over artificial entities on the basis of deemed consent when those entities conduct activities within the territory of a sover-eign. *See* Pl. Br. 58-59. Defendants acknowledge (at 36 n.10) that the Supreme Court recently granted certiorari to consider such a statute. *Mallory v. Nor-folk Southern Ry. Co.*, 142 S. Ct. 2646 (2022). The Supreme Court may well leave the existing doctrine undisturbed. The district court's determination that

---

[2] *See also* PLO Commitments Compliance Act of 1989, Pub. L. No. 101-246, tit. VII (1990); Immigration Act of 1990, Pub. L. 101-649, § 601 (amending 8 U.S.C. § 1182(a)(3)(B)); Middle East Peace Facilitation Act of 1994, Pub. L. No. 103-236, § 583; Middle East Peace Commitments Act of 2002, Pub. L. No. 107-228, tit. VI, § 601-04; Palestinian Anti-Terrorism Act of 2006, Pub. L. No. 109-446 (adding 22 U.S.C. § 2378b).

Supreme Court holdings are "now obsolete," SPA-17, was improper. It is not the prerogative of a district court to disregard the Supreme Court precedent that has direct application in a case, even where the "continued vitality" of the precedent is open to question. *Agostini v. Felton*, 521 U.S. 203, 238 (1997).

### C. The Reasoning Of The District Courts In This Case And In *Fuld* Was Incorrect

The reasoning of the district court in this case is incorrect, and Defendants have correctly abandoned the reasoning of the *Fuld* district court.

#### 1. *The District Court's Reasoning In This Case Is Indefensible*

The district court's principal basis for striking down the statute reflected a logical error: the court held that this case did not involve a refusal to obey jurisdictional discovery orders, and thus did not "support a *Hammond Packing* presumption." SPA-11 (citing *Hammond Packing Co. v. Arkansas*, 212 U.S. 322 (1909)). Defendants say that this reasoning should not be taken literally, but rather should be read as a sort of metaphor, to help "explain" that "the nature of the activity" must "support the presumption that Defendants knowingly and voluntarily submitted to jurisdiction in the United States" in any context. Def. Br. 42-43 n.13. Defendants also rely on an earlier case (not cited by the district court), *Hovey v. Elliott*, 167 U.S. 409 (1897), as authority

28

for their argument that conduct "unrelated" to jurisdiction cannot support "a valid presumption of constructive waiver." Def. Br. 32.

Defendants' attempt to rehabilitate the district court's reasoning is untenable. To begin, neither *Hammond Packing* nor *Hovey* supports the proposition for which Defendants cite them. Rather, as this Court has explained, they stand for the rule that a person's right to mount a defense (or claim a right) in court may not be foreclosed "simply 'as punishment.'" *Collazos v. United States*, 368 F.3d 190, 203 (2d Cir. 2004) (discussing *Hovey* and *Hammond Packing*). But that principle does not help Defendants here. Just as "no punishment in violation of due process occurs when a court, pursuant to statutory authority, strikes a party's answer and enters default judgment," *id.*, Defendants are not being "punished" by being subject to suit in federal court based on their choice to engage in jurisdiction-triggering conduct.

Defendants' broader reading of these cases would sweep away more than one hundred years of doctrine holding that "[w]hat acts of the defendant shall be deemed a submission to [a court's] power is a matter upon which States may differ." *Bauxites*, 456 U.S. at 704 (quoting *Chicago Life Ins. Co. v. Cherry*, 244 U.S. 25, 29-30 (1917)). There is nothing "unique about the requirement of personal jurisdiction, which prevents it from being established or

waived like other rights." *Id.* at 706. The constitutional question is whether this particular form of waiver gave Defendants fair notice and reasonably advanced legitimate governmental interests.

The district court also went astray by holding that "[t]he activities at issue here … are insufficient to support any meaningful consent to jurisdiction," because "these types of conduct do not infer any intention on the part of Defendants to legally submit to suit in the United States." SPA-16. As we have demonstrated, "voluntary" submission to jurisdiction does not mean that the defendant *subjectively intends* to submit to jurisdiction, as reflected in many cases overlooked by the district court (likely because Defendants did not make this argument). Pl. Br. 42-43, 54-57 (discussing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991), *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311 (1964), and *City of New York v. Mickalis Pawn Shop*, 645 F.3d 114 (2d Cir. 2011)). Defendants attempt to shoehorn these cases into their own alternate theory of the case, *see infra* pp. 34-35, but they cannot dispute that their subjective intent is irrelevant to the constitutional analysis, given the undisputable fact that these cases all involved conduct that did not signal a subjective intent to submit to personal jurisdiction.

### 2. *Defendants Have Abandoned The Fuld District Court Decision*

Defendants have correctly abandoned the *Fuld* district court's "fundamental rights" analysis. Def. Br. at 29 n.6. Defendants also ignore the *Fuld* district court's disregard of Supreme Court cases permitting constructive consent in contexts erroneously highlighted as troublesome by the *Fuld* district court. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 237 (1973); Pl. Br. 62-63. And, as described above, Defendants have nothing to say about the fact that the *Fuld* district court elevated the *dicta* from *College Savings* over the reasoning in *Bauxites*. Pl. Br. 62-63; *see supra* p. 24.

### D. Defendants' "Benefit" Theories Are Unavailing

A very strong indication that the district court decisions in this case and in *Fuld* are indefensible is the fact that the PLO and PA do not defend them. Instead, their brief labors to develop an alternative theory to support the judgment. All three district courts to have considered Defendants' theory rejected it. Yet Defendants have not only renewed it, but mutated it into a new variant. Neither variation is coherent, and Defendants would lose even under their own theory.

31

### 1. The Initial Variant Of Defendants' "Benefit" Theory Is Incorrect

Defendants assert (at 38) that "implied consent becomes a disguised form of legislatively-imposed jurisdiction when the forum does not offer any corresponding benefit for the defendant to accept or reject, in exchange for its consent to jurisdiction." The district court joined the *Fuld* district court in rejecting this argument. SPA-17 (citing *Fuld*, 578 F. Supp. 3d at 595 n.10). As the *Fuld* district court said, "[a]lthough there are cases holding that a defendant's receipt of a benefit can be deemed to be consent, Defendants do not cite, and the Court has not found, any case holding that such receipt of a benefit is a necessary condition." 578 F. Supp. 3d at 595 n.10 (citations omitted).

These courts were right to reject Defendants' theory. "'[I]mplied consent' [is] a traditional basis for personal jurisdiction" in which "voluntary consent to jurisdiction need not be supported by consideration" at all. *Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 380 (S.D.N.Y. 2001) (Lynch, J.) (quoting 4 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1065 (2d ed. 1990)). Many obvious examples, such as disobeying discovery orders or failing to raise a timely objection to personal jurisdiction, *see Bauxites*, 456 U.S. at 704-05, involve no bargain with the state and no reciprocity.

32

More generally, consent requires no "bargain" with anyone to be effective, even when constitutional rights are at stake. Persons may consent without reciprocity to law-enforcement searches, *United States v. Gomez*, 877 F.3d 76, 98 (2d Cir. 2017), to the presence of individuals on private property, *Machleder v. Diaz*, 801 F.2d 46, 59 (2d Cir. 1986), or even to the publication of libelous statements, *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 199 (2d Cir. 2015). None of these consents fail for lack of a "benefit" or "bargain."

Defendants rely heavily (at 37, 38, 39, 52) on snippets from two outdated, out-of-circuit district court cases holding that consent "necessarily incorporates the Due Process 'minimum contacts' requirement." *In re Mid-Atl. Toyota Antitrust Litig.*, 525 F. Supp. 1265, 1278 (D. Md. 1981); *see Leonard v. USA Petroleum Corp.*, 829 F. Supp. 882, 889 (S.D. Tex. 1993). This Court has never cited either case; and those cases are contrary to black-letter law that even without minimum contacts, personal jurisdiction can be based on the defendant's consent. *See supra* pp. 17-18.

### 2. *The Modified Version Of Defendants' "Benefit" Theory Is Also Incorrect*

Defendants have now shifted ground in this Court, arguing for the first time that the law recognizes three (and only three) forms of consent:

(1) "express consent," (2) consent via "litigation-related activities," and (3) accepting a "benefit or privilege conferred upon the defendant in exchange for its consent." Def. Br. 40. This new theory is made up out of whole cloth. No court has ever suggested this three-part rule, which makes no sense.

The receipt of a "benefit" is not a "barometer" (Def. Br. 14, 35) of consent in any other context. *See supra* pp. 32-33. And Defendants' "express consent" category is difficult to take seriously, as they offer no theory on why cases like *Shute* and *Szukhent* were "express consent" cases rather than implied-consent cases. In *Shute*, the cruise-ship ticket said that "acceptance of this ticket … shall be deemed to be an acceptance and agreement by each [passenger] of all of the terms and conditions," and it was "doubtful" that passengers "could be deemed to have had knowledge of the clause." 499 U.S. at 587, 590. Similarly, in *Szukhent*, it "strain[ed] credulity to suggest that these Michigan farmers ever read this contractual provision." 375 U.S. at 332 (Black, J., dissenting).

Defendants also fail to explain what makes litigation-related conduct different from other conduct. A court may deem litigation conduct a submission to personal jurisdiction even if the defendant announces specifically that it "[does] not intend to waive that defense." *Mickalis Pawn Shop*, 645 F.3d at 122. What neutral principle deems the conduct of such a litigant to be

34

"voluntary" submission to jurisdiction, *id.* at 134, yet deems the conduct of *these* Defendants to be "involuntarily"?

### 3. Defendants Consented To Jurisdiction Even Under Their Own "Benefit" Theory

Even where the receipt of a benefit is constitutionally relevant, the bar is quite low. Concurring in *Burnham v. Superior Court*, 495 U.S. 604, 637-38 (1990), Justice Brennan viewed the enjoyment of the benefits of California for just a few days as sufficient to make the exercise of personal jurisdiction fair. Defendants enjoy far more substantial benefits from their presence in the United States. Their extensive U.S.-based activities would be impossible without this country's physical public infrastructure and safe, stable, and free economy and society.[3]

---

[3] Defendants ask (at 50 n.24) that this Court hold that their U.S. activities meet the PSJVTA's carve-out for "official business of the United Nations." 18 U.S.C. § 2334(e)(3)(B). The Court should not indulge that request. The district court specifically accepted Defendants' request *not* make findings of fact on that question, SPA-16, and indeed denied Plaintiffs' request for discovery, Dist. Ct. ECF No. 1011 n.1. If facts are to be found, that work must be done by the district court, after Plaintiffs have had a fair opportunity to develop a record. *See Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 121 (2d Cir. 2017) ("we have encouraged district courts to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction where necessary") (quotation marks omitted).

### III.   THE PSJVTA DOES NOT INVADE THE JUDICIAL POWER

Defendants' separation-of-powers arguments are meritless. They argue that Congress crossed the line between legislative power and judicial power by: (a) "directing the result" in a particular case, *see Bank Markazi v. Peterson*, 578 U.S. 212, 228 (2016); (b) purporting to alter a constitutional rule announced by the Supreme Court, *see Dickerson v. United States*, 530 U.S. 428, 437 (2000); and (c) imposing a "legislative mandate to reopen" a final judgment on the merits, *see Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 233-34 (1995). Congress did none of those things. Rather, it properly exercised its power "to make law." *Patchak v. Zinke*, 138 S. Ct. 897, 904-05 (2018).

**A.** Defendants argue (at 68) that the "PSJVTA usurps judicial power by directing courts to *always* find consent if its factual predicates are met." That makes no sense: Determining whether statutory factors have been met—the task assigned to the Judiciary by the PSJVTA—is a quintessential judicial function. As this Court explained in *Peterson v. Islamic Republic of Iran*, 758 F.3d 185, 191 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v. Peterson*, 578 U.S. 212 (2016), a statute does not "usurp the judicial function" if it "leaves the determination of certain facts to the courts."

36

In *Peterson*, a statute that "formally [gave] discretion to the courts" to make findings did not usurp the judicial function, even though the outcome-determinative facts *already* "had been established by the time Congress enacted [the statute]." *Id.* at 192. The Supreme Court affirmed this holding: Congress "may amend the law and make the change applicable to pending cases, even when the amendment is outcome determinative." 578 U.S. at 215. This case follows *a fortiori* from that one: The operative facts here did not arise until *after* Congress enacted the statute; indeed, Defendants represented to the D.C. Circuit that they "might never make" payments triggering the PSJVTA. *Shatsky*, 955 F.3d at 1038.

**B.** Defendants also argue (at 69-70) that the PSJVTA is an attempt by Congress to "legislatively supersede" judicial "decisions interpreting and applying the Constitution." *See Dickerson v. United States*, 530 U.S. at 437. To be sure, once the Supreme Court establishes a constitutional rule, Congress does not have authority to alter *that rule* by legislation, lest it "usurp the U.S. Supreme Court's judicial function." *Guam v. Guerroro*, 290 F.3d 1210, 1220 (9th Cir. 2001). That principle has no application here, since Congress has not attempted to supersede any judicial decision, let alone one by the Supreme Court. The PSJVTA created a statutory basis under which Defendants may

*consent* to personal jurisdiction in ATA suits through certain post-enactment conduct in the absence of minimum contacts. The question here—whether that statutory basis for jurisdiction by consent is constitutional—has not been addressed by this Court or the Supreme Court.

**C.** Finally, Defendants argue (at 70-71) that the PSJVTA runs afoul of the rule that a statute violates the separation of powers if it "require[s] federal courts to reopen final judgments." *Plaut*, 514 U.S. at 215. That rule is inapplicable here. As Defendants have conceded, "the PSJVTA has no provision requiring the reopening of closed cases." Defendants' Post-Argument Letter Br. at 14, (July 17, 2020) (ECF No. 354). Rather, Congress left the decision whether to reopen this case to the Judiciary. In the words of *Plaut*, the PSJVTA "merely reflects and confirms the courts' own inherent and discretionary power…to set aside a judgment." 514 U.S. at 233-34.

*Plaut* is distinguishable for another reason. There, as the Supreme Court emphasized, the petitioners sought to reopen judgments that had been dismissed *on the merits*. 514 U.S. at 228-29. Congress was thus attempting to "nullif[y]" those merits decisions. *Id.* at 228. That is not the case here, where Plaintiffs' claims were dismissed without prejudice for lack of personal jurisdiction. This difference is meaningful: "a jurisdiction-conferring … statute

38

usually takes away no substantive right but simply changes the tribunal that is to hear the case." *Hamdan v. Rumsfeld*, 548 U.S. 557, 576-77 (2006) (citations and quotation marks omitted). A statute that merely empowers the judiciary to reopen a case previously dismissed for lack of jurisdiction therefore does not "interfere[]" with the judicial power, as would a statute requiring the reopening of a case previously decided on the merits. *Plaut*, 514 U.S. at 230.

Because the PSJVTA concerns the circumstances in which a party may consent to personal jurisdiction, this case is more like *United States v. Sioux Nation*, 448 U.S. 371 (1980). In *Sioux Nation*, the Court of Claims ruled that the plaintiffs had no legal claim under the Takings Clause. *Sioux Tribe v. United States*, 97 Ct. Cl. 613, 670 (1942). The Court of Claims later held that its earlier determination had preclusive effect, so that the plaintiffs could not sue. *United States v. Sioux Nation*, 518 F.2d 1298, 1302 (Ct. Cl. 1975). Congress then enacted a statute "providing for Court of Claims review of the merits" of the claim "without regard to the defenses of res judicata and collateral estoppel." *Sioux Nation*, 448 U.S. at 389. The Supreme Court held that this "waiver … does not violate the doctrine of separation of powers," because Congress "only was providing a forum so that a new judicial review of the Black Hills claim could take place" and "in no way attempted to prescribe the

outcome" of that review. *Id.* at 407. Just as Congress was free in *Sioux Nation* to provide for judicial review on the merits on a consent basis, *see id.* at 397, so too Congress was free to enact the PSJVTA, which creates a statutory mechanism for defendants to consent to judicial review on the merits by engaging in specifically defined conduct. *Plaut* itself recognizes that "[w]aiver subject to the control of the courts themselves would obviously raise no issue of separation of powers." 514 U.S. at 231-32.

## IV. THE COURT SHOULD DENY DEFENDANTS' REQUEST FOR A NEW TRIAL

Defendants assert that they are entitled to a retrial on the theory that the district court allowed "three liability experts to testify at trial despite failing to apply any discernable methodology." Br. 19, 79-88. In addition to this generalized objection, Defendants also claim that a new trial is required because of a few passages of expert testimony that Defendants objected to at trial. *Id.* 83-87. Neither assertion is colorable.

Defendants waived their generalized objection to these experts' testimony; it is therefore unreviewable. And even if Defendants had merely forfeited the objection, they would not come close to demonstrating plain error. As for Defendants' specific objections, the district court did not abuse its

discretion in overruling them, and any error would have been harmless in light of the overwhelming evidence of liability and the district court's instructions.

## A. Defendants' *Daubert* Objections Provide No Basis For A New Trial

Defendants assert that they are entitled to a new trial on the theory that the district court should have excluded all the testimony of Eviatar, Shrenzel, and Kaufman under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Defendants' tactical waiver of this objection forecloses appellate review of this issue; and the district court committed no plain error anyway.

### 1. Defendants Waived Their Daubert Objection

When a party "consciously refrains from objecting as a tactical matter, then that action constitutes a true 'waiver,' which will negate even plain error review." *United States v. Yu-Leung*, 51 F.3d 1116, 1122 (2d Cir. 1995). Here, Defendants made an *in limine* motion to block the testimony of Kaufman, Eviatar, and Shrenzel. JA-1427-58. The district court heard argument on that motion a few weeks before trial and deferred ruling. JA-3246 (re Kaufman: "most of these issues … usually don't get resolved until you have a context in which to resolve them"), JA-3287 (re Eviatar: "let me look at that more carefully"), JA-3300 ("I will review [Shrenzel's proposed testimony] in that context").

41

Defendants did not renew their *Daubert* objection at trial. Kaufman testified without objection to his qualifications. *See* JA-3631 (Defendants' counsel: expecting Kaufman's testimony to be "pretty clean"), 3881 (Kaufman testimony). The district court qualified Eviatar as an expert on the PLO, PA, Fatah, AAMB, and Hamas; the policies and practices of the PA and the PLO as they relate to support of terrorism; the relationship between Defendants and the AAMB; and the relationship between Defendants and Hamas. JA-4185 (Defendants' counsel: "No voir dire."). And the court qualified Shrenzel an "expert on terrorism as it relates to the policies and practices of the PA and the PLO." JA-5197 (Defendants' counsel: "I have no objection to that.").

Defendants thus waived any *Daubert* objection to these witnesses. An objection to a witness's qualification to testify "must be made when the person is first called to the stand." 21 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 5037.2 (2d ed.); *see United States v. Khoury*, 901 F.2d 948, 966 (11th Cir. 1990). An *in limine* motion does not preserve an objection unless it is "ruled upon without equivocation by the trial judge" in advance of trial. *Yu-Leung*, 51 F.3d at 1121. The "obligation [is] on counsel to clarify whether an *in limine* or other evidentiary ruling is definitive when there is doubt on that

point." *See* Advisory Committee Note, Fed. R. Evid. 103 (2000 Amendment) (citing *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 520 (3d Cir. 1997)).

Defendants failure to object at trial only a few weeks after arguing their *Daubert* motion was a waiver, not a forfeiture, because they have offered no indication that it was due to "mistake or oversight." *United States v. Williams*, 930 F.3d 44, 64-65 (2d Cir. 2019); *United States v. Bacchus*, 108 F.3d 1370 (2d Cir. 1997) (waiver was tactical when counsel was aware of government's intention to call witness before trial). Such a contention would be suspect, given Defendants' large trial team led by an attorney who has served as lead counsel in more than 160 jury trials, according to his website: https://www.millerchevalier.com/professional/mark-rochon.

Defendants' failure to preserve their *Daubert* objection thus reflected a tactical waiver, foreclosing review under any standard. *See Yu-Leung*, 51 F.3d at 1122.

### 2. *Defendants Demonstrate No Plain Error*

Even if Defendants had merely forfeited their *Daubert* objections, any claim of plain error would not long detain the Court. A party claiming plain error must show (1) error that (2) is plain, (3) affects substantial rights, and

(4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See Johnson v. United States*, 520 U.S. 461, 467 (1997).

**a. No Error.** The district court would not have committed any error by letting the three experts testify over a *Daubert* objection had one been made. "Rule 702 embodies a liberal standard of admissibility for expert opinions," *United States v. Napout*, 963 F.3d 163, 187 (2d Cir. 2020) (quotation marks omitted), and this Court applies "a highly deferential standard" on review. *Restivo v. Hessemann*, 846 F.3d 547, 575 (2d Cir. 2017) (quotation marks omitted). This Court "will not disturb a ruling respecting expert testimony absent a showing of manifest error," *United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011), which occurs only where "the trial judge ruled in an arbitrary and irrational fashion," *United States v. Miller*, 626 F.3d 682, 689 (2d Cir. 2010).

Under Rule 702, expert testimony is permitted if the expert is "qualified, reliable, and helpful." *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021). Each criterion was met here.

### i. Qualified

Kaufman was an English Barrister and Israeli lawyer; for fourteen years before entering private practice, he prosecuted terrorism and war crimes in the courts of Israel, the International War Crimes Tribunal, and the

44

International Criminal Court; he also served as a judge in the Israeli military courts. JA-3883-86. Eviatar served in an elite unit charged with "the entire system of coordination and liaising with the [PA]" for 15 years. JA-4142. Shrenzel served in an agency charged with prevention of terrorism for nearly two decades; for ten years, he was the "head of the department that dealt with the analysis of Palestinian affairs, especially the policies of the PLO [and] PA." JA-4933-34. His job was "to understand the ideas, the ideologies, the motivation and…deeds of the PA." JA-4935.

Qualifying such experts is well within the discretion of a district court. *See United States v. Lopez*, 547 F.3d 364, 373 (2d Cir. 2008) (detective with 17 years of experience investigating drug crimes was "well qualified" to give expert opinion); *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 443 (E.D.N.Y. 2013) (former Israeli intelligence agent); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 549 (E.D.N.Y. 2012) (Weinstein, J.) (same).

### ii. Reliable

The experts "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(d). Kaufman explained relevant criminal procedures based on convictions in evidence. *E.g.*, JA-3936-38. Eviatar and Shrenzel relied almost exclusively on documents in evidence, assessing them using the

45

methodology followed by intelligence officers: collecting information, cross-referencing it, verifying it, researching it, processing it, and never relying on only a single source. *See* JA-4184; JA-4936 JA-5195-96. This methodology was "similar to that employed by experts that have been permitted to testify in other federal courts involving terrorist organizations." *United States v. Paracha*, 2006 WL 12768, at *20 (S.D.N.Y. Jan. 3, 2006), *aff'd*, 313 F. App'x 347 (2d Cir. 2008); *see, e.g.*, *United States v. Kassir*, 2009 WL 910767, at *6 (S.D.N.Y. Apr. 2, 2009) (upholding similar methodology).

Defendants cite *Gilmore v. Palestinian Interim Self-Government Auth.*, 53 F. Supp. 3d 191, 212 (D.D.C. 2014), *aff'd*, 843 F.3d 958 (D.C. Cir. 2016), but the holding in *Gilmore* was case-specific: that Eviatar's proposed expert testimony there—based exclusively on documents the court had ruled were hearsay—was "not admissible to prove that Abu Halawa killed Gilmore." *Id.* at 214. That is not this case. Eviatar relied on documents *admitted in evidence*, including "original reports of the Palestinian General Intelligence Service," "martyr's files," "payroll records," personnel files, criminal convictions, official government reports, Defendants' own public statements, and publications of AAMB, Hamas, Fatah. He cross-referenced all materials and used methods that were "[i]dentical to all of the professional tools and instruments

46

that I made use of and that I worked with during the course of my years in the military." JA-4182-84.

### iii. Helpful

Expert testimony is helpful if it "shed[s] light on activities not within the common knowledge of the average juror." *United States v. Wexler*, 522 F.3d 194, 204 (2d Cir. 2008). Kaufman helped the jury understand criminal procedures in a foreign country. *E.g.*, JA-3936-38. Eviatar and Shrenzel provided background about Defendants' functions and policies, *e.g.*, JA-4191-94, and relevant terror organizations' activities, *e.g.*, JA-4450-51, 4190-91. They explained how Defendants' policies related to those organizations, as well to the perpetrators of the six terror attacks, *e.g.*, JA-4453-54. They also explained the purpose of documents created by Defendants, such as "Martyr Files," and explained terminology in them that was unfamiliar to the jury, *e.g.*, JA-4385, 5212, 5219-20, 5286-87. This testimony was helpful for a jury hearing a complex case involving six terror attacks, two U.S.-designated Foreign Terrorist Organizations, 30 perpetrators with unfamiliar names, and hundreds of documents like "Martyr Files," all of which are unfamiliar to ordinary jurors.

Because the structure, organization, and operational methods of terrorist organizations are "beyond the knowledge of the average citizen,"

*Farhane*, 634 F.2d at 158-59, courts in this Circuit regularly allow expert testimony by intelligence agents like that provided by Eviatar and Shrenzel. *See, e.g., United States v. Defreitas*, 2011 WL 317964, at *7 (E.D.N.Y. Jan. 31, 2011), *aff'd sub nom. United States v. Kadir*, 718 F.3d 115 (2d Cir. 2013); *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 329-31 (E.D.N.Y. 2011); *Gill*, 893 F. Supp. 2d at 530-34.

\* \* \*

In sum, had Defendants made a *Daubert* objection at trial, it would not have been "arbitrary and irrational" for the court to allow the testimony.

**b. No Plain Error.** An error is "plain" if it is "clear or obvious, rather than subject to reasonable dispute." *United States v. Marcus*, 560 U.S. 258, 262 (2010). Only an "egregious abuse of discretion" can qualify as plain error. 21 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 5043 (2d ed.)

Ordinarily, an error is "plain" only when it "contravenes clearly established precedent." *United States v. Brown*, 352 F.3d 654, 665 n.10 (2d Cir. 2003). Defendants do not come close to meeting this standard. They rely on cases that are inapposite. In *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005), this Court found expert testimony improper where a *medical expert* opined that other witnesses were "telling the truth." Plaintiffs' experts offered

48

no such testimony. In *United States v. Mejia*, 545 F.3d 179, 191, 195 (2d Cir. 2008), a pattern of predicate murders was an element of the charged RICO offense. Instead of introducing direct evidence of the murders—such as arrest records and death certificates—the government offered hearsay testimony from an investigating case agent as the only evidence of the murders. That is, the Government "substitute[d] expert testimony for factual evidence." *Id.* at 194-95. Here, Plaintiffs submitted actual convictions, pay records, promotion records, and internal files created by Defendants themselves. *See infra* pp. 50-51. The district court did not violate "clearly established precedent" by allowing expert testimony to explain these documents in evidence.

    ***c. No Effect On Substantial Rights.*** Defendants cannot meet the third element of plain-error analysis either. An error affects a defendant's substantial rights where there is a "reasonable probability that the error affected the outcome of the trial." *Marcus*, 560 U.S. at 262 (2010).

    Here, overwhelming documentary evidence inculpated fifteen PA security officers who planned or participated in the attacks, *see* JA-9436,[4] and an

---

[4] PTE-1121 (summarizing PTEs 1-4, 6, 8, 22, 27-29, 36A-36D, 43-49, 58, 60, 62, 75, 90-91, 93, 96, 103, 105-07, 109, 113, 116, 118, 120, 122-23, 130, 143, 250B, 262, 297, 364, 377, 384, 418-19, 447, 486, 891-92, 895).

equal number of co-conspirators, *see* JA-9436.[5] This evidence included actual convictions of the perpetrators for committing the crimes giving rise to this case, JA-3924-4122, plus internal PA documents supporting the jury's conclusion that these perpetrators acted within the scope of their employment, including:

- Official PA records reflecting pay increases and promotions for convicted perpetrators while in prison, *e.g.*, JA-4362, 4397, 5246, 5310, 5313-14, 5566; posthumously, *e.g.*, JA-5226-31; and in once case after being warned not to disobey orders on pain of dismissal, JA-5255-56;

- Internal PA documents approving payments to convicted perpetrators after concluding that each perpetrator was incarcerated "as a result of his fight for his country," JA-5243, 5309-10, 5570, 5622, 5696-97;

- PA/PLO "martyr" files approving "martyr payments" to the families of the suicide terrorists who died committing the attacks in this case and calling the perpetrators "heroic," JA-5406; *see* JA-5219, 5300-02, 5414-15; and

- Internal PA intelligence documents assessing the perpetrators in this case as "good" in terms of "security" and "morals," *e.g.*, JA-5240-41, 5247, 5281-82, 5561.

The jury also saw "martyr" videos of suicide terrorists preparing for attacks on Plaintiffs, and video interviews of terrorists convicted of participating

---

[5] PTE-1120 (summarizing PTEs 26, 39-42, 50-51, 53-54, 63, 64, 66, 83-87, 249, 259, 288, 292, 324, 345, 350, 367, 388, 433, 425, 894).

in the attack. *E.g.*, JA-5235, 5412-13, D. Ct. Dkt. 702-4. It heard testimony of percipient witnesses, JA-3310-18, 4659 (Yousef), 7860-70 (Reehan), and Defendants' own officers, JA-6324-29 (Abu-Libdeh), 6328-29 (Shaqbu'a), 6329-6341 (al-Sheikh), 6343 (Fayyad), 7109-94 (Faraj), 7377-421 (Ashrawi), 7535-45 (Issa). And it had government reports from the United States and Israel implicating Defendants in the terror campaign, *e.g.*, JA-4702-05; official PA "political guidance" magazines distributed to PA security officers at the time of the attacks urging "open, bloody and fierce" action by PA security forces, JA-4491, 5597, 5406; and PLO Chairman Arafat's written approval of payments from the PLO and the PA to terrorists, JA-4426-29.

As here, "there is no reasonable probability" that the alleged error "affected the outcome" of the trial when the other evidence is overwhelming. *See United States v. Agrawal*, 726 F.3d 235, 257 (2d Cir. 2013) (analogizing to harmless error standard); *United States v. Moye*, 793 F. App'x 19, 22 (2d Cir. 2019) ("even if the admission of Modesto's testimony to show a common scheme or plan *did* amount to clear or obvious error, Moye still fails to demonstrate how it affected his substantial rights given the overwhelming evidence introduced at trial"); *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 151 (2d Cir. 2010) ("We find it unlikely that a juror would have been persuaded to change

his vote on the basis of the excluded testimony, in light of the overwhelming evidence that Wardrop was not so motivated."); *Parker v. Reda*, 327 F.3d 211, 215 (2d Cir. 2003) (harmless error where record included opposing accounts of disputed fact, "to permit the jurors to draw their own conclusions"); *Hygh v. Jacobs*, 961 F.2d 359, 365 (2d Cir. 1992) (harmless where "impermissible testimony was expressed within a larger body of otherwise unobjectionable testimony").

*d. No Miscarriage Of Justice.* Defendants make no attempt to meet the fourth element of plain-error review, which is to explain how allowing these three expert witnesses to testify at a civil trial "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *See United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007) (quotation marks omitted).

## B. Defendants' Specific Objections To Expert Testimony Provide No Basis For A New Trial

Defendants cherry-pick a handful of brief passages from a 4,000-page trial transcript, contending that these passages prove that the experts "strayed" beyond the limits established by the district court. Br. 83-88. But Defendants fail to show that the court overruled their objections in "an arbitrary and irrational fashion," *Miller*, 626 F.3d at 689, and fail to show prejudice.

52

### 1. The District Court Did Not Abuse Its Discretion By Overruling Defendants' Objections

**a. Shrenzel's Redirect Testimony About PA Political Guidance Magazines**. Defendants complain about Shrenzel's testimony on redirect that Defendants' "Political Guidance" magazines reflected an "intensification of the level of incitement" to violence, "creating an atmosphere" that "grew more and more violent," so that "the potential reader" of these magazines "understands" that he should not "condemn terrorist activity." JA-5689-91. The district court did not act arbitrarily or irrationally in admitting this testimony. Contrary to Defendants' assertion (at 84), this testimony did not come "from nowhere." It was corroborated by the U.S. government in an official report admitted in evidence: "[S]enior PLO and PA leaders did little to prevent—and in some cases encouraged—acts of violence and an atmosphere of incitement to violence in the Palestinian media and through public statements of Palestinian officials." JA-9221. Indeed, Defendants themselves elicited very similar testimony from the witness. JA-5683-84.

Moreover, the redirect testimony followed a very particular sequence of events at trial. The district court had recently admonished Defendants for improperly politicizing their cross-examination of Shrenzel. JA-5603-04, 5610 (The Court: "I don't think I have to say it, but I will say, in general, that if my

53

orders are not followed, there will be consequences. I made it clear. I don't want any of those kinds of questions…. I believe that those questions were inappropriate. I sustained the objections. I warned him. I admonished him. If it continues, I will take stronger action.").

Yet disregarding the district court's warning, Defendants *again* infused their cross-examination of Shrenzel with politicized questioning about Political Guidance magazines, reading to the jury passages asserting that "the Palestinian people … continue to suffer under the most extreme example of occupation in the world," JA-5687, and that the Palestinians are "seeking to reclaim usurped rights that are so inconsistent with the spilling of blood and killing of innocent children." JA-5689. It was in *this* context that the district court on redirect allowed testimony about the nature of the Political Guidance magazines. JA-5690-92. That was appropriate: "The scope of redirect examination is a matter entrusted to a trial judge's broad discretion. Such redirect may be used to rebut false impressions arising from cross-examination and the trial judge is in the best position to determine whether such a false impression was created." *United States v. Vasquez*, 267 F.3d 79, 85 (2d Cir. 2001) (quoting *United States v. Diaz*, 176 F.3d 52, 80 (2d Cir. 1999)).

54

**b. Shrenzel's Redirect Testimony About Exhibit 233 And Tawfik Tirawi.** Defendants complain about Shrenzel's redirect testimony (JA-5716) concerning Exhibit 233. The document explained that Tawfik Tirawi (the head of the PA general intelligence service) tried to conceal information about suicide bomber Wafa Idris (an intelligence agent) and stated: "This information proves that the [PA's] general intelligence are involved in the issue of Wafa Idris." PTX-233 (quoted at JA-5711).

Defendants contend (at 87) that Shrenzel's testimony about this document was transmitting hearsay, but that is incorrect. Exhibit 233 was not hearsay; it was prepared by *Defendants' own employees*. JA-5421. Nor was the document unreliable, as the document's author testified that it contained "important" information that was distributed to very senior PA security officers. JA-7868, 7870-72.

Consistent with Shrenzel's methodology, his professional assessment of Tirawi's involvement was based not only on Exhibit 233 (which plainly inculpated Tirawi) but on the *whole* Tirawi file in evidence, JA-5716. Again, it was within the district court's very broad discretion to permit this testimony on redirect because Defendants had opened the door (JA-5634-35) by suggesting

that Tirawi was innocent of any involvement in any of the attacks. *See Vasquez*, 267 F.3d at 85.

**c. The Number Of PA Security Officers In Prison For Terrorism Crimes.** Defendants attempt (Br. 86) to portray Eviatar's assessment that 700 PA security officers were convicted of terrorism (JA-4597) as speculation. But Eviatar based his estimate on a government report, JA-4923-24, 4929-30, as well as Defendants' own public statements, JA-4299-4305, 7249-51.

**d. "Narratives."** Defendants complain (at 79, 81) that the experts offered "narratives." They cite testimony of Shrenzel that "a very lethal act of terror" was perpetrated by a "squad" that included two PA employees, who then received "payments, promotions," and praise for "loving their nation" by murdering civilians. JA-5326-27. This testimony was based on documents in a binder that was literally in the hands of each juror. JA-5286-5326.

Allowing this testimony was within the bounds of discretion, because an expert is permitted "to intertwine his factual narrative with his opinion testimony." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 691 F. Supp. 2d 448, 466-67 (S.D.N.Y. 2010). Such testimony is admissible where "necessary to provide context for his interpretations," if the context can "reduce[] the risk of jury confusion by providing a more coherent

narrative…and a proper framework for [the] expert opinions." *United States v. Smith*, 919 F.3d 825, 83-38 (4th Cir. 2019) (emphasis omitted), or where the complexity of the facts "might confuse the trier of fact in the absence of such testimony." *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 147 (S.D.N.Y. 2003).

**e. Testimony Concerning Prisoner And Martyr Payments.** Defendants argue (at 85-86) that the district court abused its discretion by allowing expert testimony concerning Defendants' pay and promotion practices for rewarding convicted or suicide terrorists and their families. *See* JA-4281, 4351, 4353, 4372-74, 4385. That argument is meritless for two separate reasons.

*First*, it was not irrational for the district judge to conclude, contrary to Defendants' argument, that Eviatar and Shrenzel had an adequate basis to provide opinions about the climate and incentives created by Defendants' policies and practices, given their extensive experience studying and preventing Palestinian terrorism. In *United States v. Sokolov*, 814 F.2d 864, 874 (2d Cir. 1987), this Court approved the admission of testimony from an expert on Nazi propaganda, who concluded that a person who created Nazi propaganda himself engaged in persecution "by creating a climate of opinion in which such persecution is acceptable." Further, there is no bar to allowing experts to

57

"testify concerning economic incentives." *Sitts v. Dairy Farmers of Am., Inc.*, 2020 WL 3467993, at *7 (D. Vt. June 24, 2020); *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 31 (S.D.N.Y. 2020) (expert properly used experience "to assess the economic incentives and rationales" of relevant parties).

*Second*, to the extent Defendants believed that some of the testimony was insufficiently supported, any such gaps would go to the *weight* of the evidence, not to its *admissibility*. *See Napout*, 963 F.3d at 188; *Restivo*, 846 F.3d at 577. Judge Daniels gave defendants a full and fair opportunity to advance their own explanation of their so-called "social welfare" policies—both in their opening, JA-3862 ("These payments are routine in my client's society. My client is essentially a social welfare state"), and during their case in chief, JA-7184-90, 7360 (defense witness Majed Faraj); JA-7539-44 (defense witness Shawqi Issa). Defendants even made a conscious choice not to call their own expert witness, who was prepared to testify that Defendants' policies are "a form of social welfare." JA-1549 (Robinson expert report); *see* JA-7601 (decision not to call Robinson). And in summation, Defendants themselves highlighted Shrenzel's testimony that the prisoner and martyr payments were not the terrorists' primary motivation. JA-8030-33.

**f. *"Brazen Partisanship."*** Defendants claim (at 83) that Shrenzel acted as a partisan because he said that a particular set of facts "contributes to our case." JA-5289. Defendants also complain (at 83-84) that Shrenzel's analogy of Defendants' Political Commissioners to Soviet political commissars (JA-5329) was inflammatory. But these were Defendants' *own employees*; Defendants were free to cross-examine on this topic (they did not) and free to offer their own evidence on the role of these employees (they did not). Defendants themselves used an analogy to Soviet techniques in their own questioning of Shrenzel. JA-5626. Experts are allowed to use analogies. *See Beastie Boys v. Monster Energy Co.*, 66 F. Supp. 3d 424, 464 (S.D.N.Y. 2014); *In re Ephedra Prods. Liab. Litig.*, 393 F. Supp. 2d 181, 189 (S.D.N.Y. 2005).

Of course, to the extent that Shrenzel "appeared unduly partisan in any respect, such an appearance went not to the admissibility of his testimony, but to the determination of its ultimate weight and credibility—a subject that falls squarely within the jury's prerogative." *Katt v. City of New York*, 151 F. Supp. 2d 313, 363 (S.D.N.Y. 2001) (Lynch, J.), *aff'd*, 372 F.3d 83 (2d Cir. 2004).

## 2. *Any Error Was Harmless*

Even where an error has been properly preserved, this Court "will not grant a new trial if [it] find[s] that the improperly admitted evidence was

59

harmless—*i.e.*, that the evidence was unimportant in relation to everything else the jury considered on the issue in question." *Warren v. Pataki*, 823 F.3d 125, 138 (2d Cir. 2016) (quotation marks omitted); *see* 28 U.S.C. § 2111; Fed. R. Civ. P. 61. This is a civil case in which Defendants seek a new trial, so, they carry the burden "of showing that prejudice resulted." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (quotation marks omitted).

Defendants cannot meet that burden, given the overwhelming evidence—the admission of which is unchallenged on appeal. *See supra* pp. 50-52. Indeed, Defendants relegate their harmless-error argument to a single sentence. Def. Br. 88.

Moreover, Judge Daniels' even-handed rulings and instructions ensured that Defendants suffered no prejudice. He sustained 122 of Defendants' 234 objections to the experts' testimony; and, where appropriate, he instructed the jury to disregard certain answers. *E.g.,* JA-4216; JA-4389-91; JA-5305; JA-5426; JA-5585. He also gave a robust instruction on expert witnesses. JA-8202. These rulings and instructions negate any possible argument that the district court abused its discretion, or that any error affected the verdict. *See United States v. Blum,* 329 F.2d 49, 51 (2d Cir. 1964) ("Whether or not [defendant's]

objection[s were] well taken, the judge's action in striking the evidence and instructing the jury to disregard it cured any possible prejudicial error.").

## CONCLUSION

The Court should RECALL its mandate, AFFIRM the district court's judgment entered on October 1, 2015, and REMAND to the district court with instructions to reinstate that judgment.

Respectfully submitted,

March 13, 2023
New York, New York

ARNOLD & PORTER KAYE SCHOLER LLP

By: _____
    Kent A. Yalowitz
    250 West 55th Street
    New York, NY 10019-9710
    212-836-8000
    kent.yalowitz@arnoldporter.com

    – and –

    Allon Kedem
    Dirk C. Phillips
    Stephen K. Wirth
    Bailey M. Roe
    601 Massachusetts Ave., NW
    Washington, DC 20001-3743

    *Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and the Court's order dated March 13, 2023, that the foregoing document contains 12,938 words and complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Century font.

Dated: March 13, 2023                    _/s/ Stephen K. Wirth_
                                         Stephen K. Wirth