# 15-3135(L)

## 15-3151(XAP), 22-1060(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

❖❖

EVA WALDMAN, REVITAL BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA, MINOR, BY HIS NEXT FRIEND AND GUARDIAN VARDA GUETTA, VARDA GUETTA, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFF OZ JOSEPH GUETTA, NORMAN GRITZ, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DAVID GRITZ, MARK I. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAMIE A. SOKOLOW, RENA M. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAIME A. SOKOLOW, JAMIE A. SOKOLOW, MINOR, BY HER NEXT FRIENDS AND GUARDIAN

*(Caption continued on inside cover)*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## PETITION FOR REHEARING *EN BANC*

---

KENT A. YALOWITZ
ARNOLD & PORTER KAYE
  SCHOLER LLP
250 West 55th Street
New York, New York 10019
(212) 836-8000

ALLON KEDEM
DIRK C. PHILLIPS
STEPHEN K. WIRTH
BAILEY ROE
ARNOLD & PORTER KAYE
  SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000

*Attorneys for Plaintiffs-Appellants*

MARK I. SOKOLOW AND RENA M. SOKOLOW, LAUREN M. SOKOLOW, ELANA R. SOKOLOW, SHAYNA EILEEN GOULD, RONALD ALLAN GOULD, ELISE JANET GOULD, JESSICA RINE, SHMUEL WALDMAN, HENNA NOVACK WALDMAN, MORRIS WALDMAN, ALAN J. BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, YEHONATHON BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, BINYAMIN BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, DANIEL BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, YEHUDA BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, RABBI LEONARD MANDELKORN, KATHERINE BAKER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN, RICHARD BLUTSTEIN, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, LARRY CARTER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DIANE ("DINA") CARTER, SHAUN COFFEL, DIANNE COULTER MILLER, ROBERT L COULTER, JR., ROBERT L. COULTER, SR., INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JANIS RUTH COULTER, CHANA BRACHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ELIEZER SIMCHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ESTHER ZAHAVA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, KAREN GOLDBERG, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STUART SCOTT GOLDBERG/ NATURAL GUARDIAN OF PLAINTIFFS CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG,TZVI YEHOSHUA GOLDBERG, SHOSHANA MALKA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, TZVI YEHOSHUA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YAAKOV MOSHE GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YITZHAK SHALOM GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, NEVENKA GRITZ, SOLE HEIR OF NORMAN GRITZ, DECEASED,

*Plaintiffs-Appellants,*

UNITED STATES OF AMERICA,

*Intervenor-Appellant,*

—against—

PALESTINE LIBERATION ORGANIZATION, PALESTINIAN AUTHORITY, AKA PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY and or PALESTINIAN COUNCIL and or PALESTINIAN NATIONAL AUTHORITY,

*Defendants-Appellees,*

YASSER ARAFAT, MARWIN BIN KHATIB BARGHOUTI, AHMED TALEB MUSTAPHA BARGHOUTI, AKA AL-FARANSI, NASSER MAHMOUD AHMED AWEIS, MAJID AL-MASRI, AKA ABU MOJAHED, MAHMOUD AL-TITI, MOHAMMED ABDEL RAHMAN SALAM MASALAH, AKA ABU SATKHAH, FARAS SADAK MOHAMMED GHANEM, AKA HITAWI, MOHAMMED SAMI IBRAHIM ABDULLAH, ESATATE OF SAID RAMADAN, DECEASED, ABDEL KARIM RATAB YUNIS AWEIS, NASSER JAMAL MOUSA SHAWISH, TOUFIK TIRAWI, HUSSEIN AL-SHAYKH, SANA'A MUHAMMED SHEHADEH, KAIRA SAID ALI SADI, ESTATE OF MOHAMMED HASHAIKA, DECEASED, MUNZAR MAHMOUD KHALIL NOOR, ESTATE OF WAFA IDRIS, DECEASED, ESTATE OF MAZAN FARITACH, DECEASED, ESTATE OF MUHANAD ABU HALAWA, DECEASED, JOHN DOES, 1-99, HASSAN ABDEL RAHMAN,

*Defendants.*

# TABLE OF CONTENTS

Page

INTRODUCTION.......................................................................1

DISCUSSION...........................................................................4

  A.  The Full Court Should Reconsider *Waldman I* .........................4

  B.  The Full Court Should Consider the Constitutionality of § 2334(e).......13

CONCLUSION.........................................................................17

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*,
  582 U.S. 255 (2017)........................................................................4

*Brown v. Lockheed Martin Corp.*,
  814 F.3d 619 (2d Cir. 2016) .........................................................15

*Burnet v. Brooks*,
  288 U.S. 378 (1933)......................................................................10

*Burnham v. Superior Court*,
  495 U.S. 604 (1990)......................................................................16

*Chew v. Dietrich*,
  143 F.3d 24 (2d Cir. 1998) ...........................................................13

*Cook v. Tait*,
  265 U.S. 47 (1924)........................................................................10

*Dennis v. JPMorgan Chase & Co.*,
  343 F. Supp. 3d 122 (S.D.N.Y. 2018) ...........................................12

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
  46 F.4th 226 (5th Cir. 2022) ......................................................4, 5

*Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*,
  140 S. Ct. 1649 (2020)....................................................................7

*Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*,
  141 S. Ct. 1017 (2021)..................................................................14

*Fuld v. The Palestine Liberation Org.*,
  578 F. Supp. 3d 577 (S.D.N.Y. 2022)............................................15

*Fuld v. Palestine Liberation Org.*,
  82 F.4th 74 (2d Cir. 2023)..............................2, 3, 14, 15, 16, 17

*Gamble v. United States,*
  139 S. Ct. 1960 (2019)..................................................................10

*Gater Assets Ltd. v. AO Moldovagaz,*
  2 F.4th 42 (2d Cir. 2021)...............................................................3, 5

*Hanson v. Denckla,*
  357 U. S. 235 (1958)..................................................................10, 16

*Lewis v. Mutond,*
  62 F.4th 587 (D.C. Cir. 2023) .......................................................3, 5

*The Malek Adhel,*
  43 U.S. 210 (1844).............................................................................9

*Mallory v. Norfolk S. Ry. Co.,*
  600 U.S. 122 (2023)...............................................................9, 15, 16

*The Marianna Flora,*
  24 U.S. 1 (1825)................................................................................9

*Missouri v. McNeely,*
  569 U.S. 141 (2013).........................................................................17

*Picquet v. Swann,*
  19 F. Cas. 609 (C.C.D. Mass. 1828) ................................................9

*Prime Int'l Trading, Ltd. v. BP P.L.C.,*
  784 F. App'x 4 (2d Cir. 2019) ........................................................12

*Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.,*
  No. 19 Civ. 8359 (VEC), 2020 WL 4194962 (S.D.N.Y. July 20, 2020) .........12

*Sokolow v. Palestine Liberation Org.,*
  140 S. Ct. 2714 (2020).......................................................................2

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG,*
  277 F. Supp. 3d 521 (S.D.N.Y. 2017)..............................................12

*In re SSA Bonds Antitrust Litig.,*
  420 F. Supp. 3d 219 (S.D.N.Y. 2019)..............................................12

*Talbot v. Jansen*,
  3 U.S. (3 Dall.) 133 (1795)...................................................................8

*In re Terrorist Attacks on Sept. 11, 2001*,
  538 F.3d 71 (2d Cir. 2008) ................................................................13

*In re Terrorist Attacks on Sept. 11, 2001*,
  714 F.3d 659 (2d Cir. 2013) ..............................................................13

*Texas Trading & Milling Corp. v. Federal Republic of Nigeria*,
  647 F.2d 300 (2d Cir. 1981) ..............................................................13

*United States ex rel. TZAC, Inc. v. Christian Aid*,
  No. 17-CV-4135 (PKC), 2021 WL 2354985 (S.D.N.Y. June 9, 2021)...........12

*United States ex rel. TZAC, Inc. v. Christian Aid*,
  No. 21-1542, 2022 WL 2165751 (2d Cir. June 16, 2022)................................12

*United States v. Bennett*,
  232 U.S. 299 (1914)............................................................................10

*United States v. Curtiss-Wright Exp. Corp.*,
  299 U.S. 304 (1936)..............................................................................6

*United States v. Epskamp*,
  832 F.3d 154 (2d Cir. 2016) ..............................................................11

*United States v. Furlong*,
  18 U.S. 184 (1820)................................................................................9

*United States v. Klintock*,
  18 U.S. 144 (1820)................................................................................9

*United States v. Murillo*,
  826 F.3d 152 (4th Cir. 2016)..............................................................11

*United States v. Palmer*,
  16 U.S. 610 (1818)................................................................................8

*United States v. Smith*,
  18 U.S. 153 (1820)................................................................................8

*Waldman v. Palestine Liberation Org.*,
    82 F.4th 64 (2d Cir. 2023) ..................................................................... 3

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016) ......................................... 1, 2, 7, 11, 12

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 10 ....................................................................... 6

U.S. Const. art. III
    § 2, cl. 1 .................................................................................................... 6
    § 2, cl. 3 .................................................................................................... 6

**Statutes**

18 U.S.C.
    § 981(a) .................................................................................................. 11
    § 2332b(c) .............................................................................................. 11
    § 2334(e) ........................................................................................ 1, 2, 16

Judiciary Act of 1789, ch. 20, 1 Stat. 73 .................................................. 7

**Other Authorities**

*American State Papers, Miscellaneous* (1834) ....................................... 8

*Annals of Congress* (1789) ........................................................................ 7

Max Crema & Lawrence B. Solum, *The Original Meaning of "Due
    Process of Law" in the Fifth Amendment*, 108 Va. L. Rev. 447 (2022) ........ 7

*The Complete Bill of Rights* (Neil H. Cogan ed., 2d ed. 2015) ............. 7

*Debates on the Federal Constitution* (Jonathan Elliot, 2d ed. 1836) .............. 6

*The Federalist* (Hamilton ed. 1864) ........................................................ 6

James Kent, *Commentaries on American Law* (1826) ........................... 9

Edmund Randolph, *Report from the Attorney General on the
    Judiciary System of the United States* (Dec. 31, 1790) ................... 8

*The Records of the Federal Convention of 1787*
(Max Farrand ed., 1911) .....................................................................6

Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*,
106 Va. L. Rev. 1703 (2020)................................................3, 4, 5, 9

James Y. Stern, Note, *Choice of Law, the Constitution, and Lochner*,
94 Va. L. Rev. 1509 (2008)..............................................................10

## INTRODUCTION

These cases present a question of exceptional importance: Whether the panel erred in facially invalidating a federal anti-terrorism statute, 18 U.S.C. § 2334(e), based on a novel expansion of due process principles. The full Court's intervention would restore proper respect for Congress's constitutional authority to establish jurisdiction over acts of overseas terrorism committed against Americans—consistent with the original public meaning of the Fifth Amendment and longstanding Supreme Court precedent.

In an initial decision, the panel reversed a judgment for plaintiffs entered after a seven-week trial, in which the jury found the Palestine Liberation Organization (PLO) and the Palestinian Authority (PA) liable for orchestrating a horrific string of terror attacks against American victims. *Waldman v. Palestine Liberation Org.*, 835 F.3d 317 (2d Cir. 2016) (*Waldman I*). The panel held that Congress's power to authorize jurisdiction in civil cases involving extraterritorial conduct harming U.S. citizens or interests is restricted by the Fifth Amendment in the "same" manner that the Fourteenth Amendment restricts the power of a State to authorize jurisdiction in cases involving conduct occurring in a different State. *Id.* at 331. The panel thus held that the Due Process Clause of the Fifth Amendment bars the exercise of personal jurisdiction in civil cases arising from terror attacks on U.S. citizens abroad unless

"the defendants participated in [tortious activities] in the United States or …
their liability for these acts resulted from their actions that did occur in the
United States." *Id.* at 337. The panel acknowledged that its territory-based
standard "would impose a unilateral [constitutional] constraint…, even when
the political branches conclude that personal jurisdiction over a defendant for
extraterritorial conduct is in the national interest." *Id.* at 330.

In response to the panel's decision, Congress enacted and the President
signed into law a new statute designed to advance important national-security
and foreign-policy interests by disrupting and deterring the PLO and PA's
systematic support for terrorism. Under the statute, codified as amended at
18 U.S.C. § 2334(e), the PLO and PA consent to federal court jurisdiction in
anti-terrorism cases brought by American victims if, following the law's effec-
tive date, they: (a) pay financial rewards to terrorists convicted of, or killed
while committing, terror attacks harming U.S. nationals; or (b) engage in "any
activity" within U.S. territory, with specified exceptions not relevant here. The
Supreme Court vacated the judgment and remanded for reconsideration in
light of the new law. 140 S. Ct. 2714 (2020).

On remand from the Supreme Court, the panel (deciding *Waldman* in
tandem with a second case raising the same issues) struck down the statute as
facially unconstitutional. *Fuld v. Palestine Liberation Org.*, 82 F.4th 74 (2d

2

Cir. 2023); *Waldman v. Palestine Liberation Org.*, 82 F.4th 64 (2d Cir. 2023).

The panel accepted that the PLO and PA had engaged in *both* categories of jurisdiction-triggering conduct—including by paying terrorists for murdering Americans. The panel also acknowledged that § 2334(e) meets "minimum due process requirements" by providing fair warning to the defendants of the relevant jurisdiction-triggering conduct and by reasonably advancing legitimate governmental interests. *Fuld*, 82 F.4th at 93.

But doubling down on its prior ruling, the panel held that the Fifth Amendment forbids Congress from specifying the conduct that triggers consent to federal jurisdiction unless it provides the defendant with some "governmental benefit" in return. *Fuld*, 82 F.4th at 90. Remarkably, the panel also held that the PLO and PA's permission to be present and engage in self-promotional activity in the United States does *not* count as such a benefit. *Id.* at 90-93.

The panel's decision is as wrong as it is dangerous. The panel's conflation of the Fifth and Fourteenth Amendments is inconsistent with the original public meaning of the Due Process Clause, as illustrated by extensive scholarly and judicial criticism. *See, e.g.*, Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 Va. L. Rev. 1703, 1704-06 (2020); *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 66 n.23 (2d Cir. 2021) (Menashi, J.); *Lewis v.*

*Mutond*, 62 F.4th 587, 597-98 (D.C. Cir. 2023) (Rao, J., concurring); *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 284 (5th Cir. 2022) (en banc) (Oldham, J., dissenting). And the "governmental benefit" standard for consent jurisdiction—which the panel invented and is the first ever to endorse—is contrary both to longstanding (century-old) and recent (last Term) Supreme Court precedent. The panel's decision effectively guts the Antiterrorism Act of 1992, which was enacted, pursuant to the political branches' expertise in and plenary authority over national security and foreign policy, with PLO-orchestrated terror specifically in mind.

The Court should grant rehearing *en banc* and vacate these decisions.

## DISCUSSION

### A.    The Full Court Should Reconsider *Waldman I*

The Supreme Court has reserved the precise question answered by the panel: whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court as the Fourteenth Amendment does on the exercise of personal jurisdiction by a State. *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 269 (2017). However, there is a growing consensus that the panel decided this issue incorrectly—by using reasoning that "takes the Fourteenth Amendment as given, and remakes the Fifth Amendment in its image." Sachs, *supra*, at 1705. As Professor Sachs

explains: "A federal court's *subject-matter* jurisdiction is affirmatively limited by the Constitution. Its territorial, *personal* jurisdiction is not." *Id.* at 1704.

Several judges have observed this flaw in *Waldman I*. As a panel of this Court noted, "[r]ecent scholarship suggests that we err in viewing due process as an independent constraint on a court's exercise of personal jurisdiction." *Gater Assets*, 2 F.4th at 66 n.23. Judge Rao of the D.C. Circuit has agreed that "there are reasons to reconsider whether the personal jurisdiction limits required by the Due Process Clause of the Fifth Amendment are identical to those of the Fourteenth." *Lewis*, 62 F.4th at 598 (concurring). And even more pointedly, five judges of the Fifth Circuit have asserted that *Waldman I* "cannot be right." *Douglass* 46 F.4th at 281 (Elrod, J., dissenting). As Judge Oldham explained: "as originally understood, the Fifth Amendment did not impose any limits on the personal jurisdiction of the federal courts. Instead, it was up to Congress to impose such limits by statute." *Id.* at 284 (Oldham, J., dissenting).

This growing chorus is correct. Both the original public meaning of the Fifth Amendment's Due Process Clause and its historical application by the Supreme Court lead inescapably to the conclusion that it imposes no territorial restriction on the judicial power of the United States.

**1.** Begin with the constitutional plan. Upon separation of the United States from Great Britain, all "powers of external sovereignty" were "vested in the federal government as necessary concomitants of nationality." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 316-18 (1936). The Framers expressly vested *all three* Departments with enumerated powers over matters arising outside the Nation's borders. *See* U.S. Constitution art. I, § 8, cl. 10 (define-and-punish clause); *id.* art. III, § 2, cl. 1 (admiralty and maritime jurisdiction), *id.* art. III, § 2, cl. 3 (trial of crimes "not committed within any State").

The Constitution's leading proponents stated repeatedly that the new Nation's judicial power would be "coextensive" or "commensurate" with its legislative power. At the Constitutional Convention, Madison explained that "[a]n effective Judiciary establishment commensurate to the legislative authority, was essential." 1 *The Records of the Federal Convention of 1787* 124 (June 5, 1787) (Max Farrand ed., 1911). Hamilton echoed Madison's understanding: "If there are such things as political axioms, the propriety of the judicial power of a government being co-extensive with its legislative, may be ranked among the number." *The Federalist* No. 80 at 588 (Hamilton ed. 1864). Prominent Founders also expressed this view at ratifying conventions. *E.g.*, 3 *Debates on the Federal Constitution* 532 (Madison) (Jonathan Elliot, 2d ed. 1836); *id.*, vol. 2, at 469 (Wilson).

Unsurprisingly, the First Congress granted the federal courts extraterritorial jurisdiction, including over "civil causes of admiralty and maritime jurisdiction" arising "upon the high seas," and over crimes committed "upon the high seas." Judiciary Act of 1789, ch. 20, § 9, 1 Stat. 76-77. Contrary to the panel's decision in this case, Congress perceived *no* constitutional bar to vesting the federal courts with authority to exercise "personal jurisdiction over a defendant [in a civil case] for extraterritorial conduct [where doing so] is in the national interest." *Waldman I*, 835 F.3d at 330. "[T]he practice of the First Congress is strong evidence of the original meaning of the Constitution." *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1659 (2020).

Nothing in the historical record of the Bill of Rights suggests that *anyone* understood the Due Process Clause as creating territorial restrictions on the judicial power of the United States. *See* Max Crema & Lawrence B. Solum*, The Original Meaning of "Due Process of Law" in the Fifth Amendment*, 108 Va. L. Rev. 447, 507 (2022); *The Complete Bill of Rights* 529-71 (Neil H. Cogan ed., 2d ed. 2015). To the contrary, during deliberations on the Judiciary Act of 1789, Madison (who earlier that summer had drafted and introduced the Bill of Rights) reiterated that the judicial branch's power "ought to be commensurate with the other branches of the Government." 1 *Annals of Cong.* 843 (Aug.

29, 1789). Since Congress could *regulate* extraterritorial conduct, federal courts could *adjudicate* such conduct.

**2.** In ensuing decades, prominent Framers—now implementing the Constitution they drafted, advocated for, and voted to ratify—affirmatively determined that the judicial power extended to cases arising outside the Nation's borders. For example, in 1790, Randolph prepared a report on the Judiciary Act stating that the federal courts had the exclusive power "to decide all causes arising wholly on the sea, and not within the precincts of any county." Edmund Randolph, *Report from the Attorney General on the Judiciary System of the United States* (Dec. 31, 1790), *reprinted in* 1 *American State Papers, Miscellaneous* 21-22 (1834).

In *Talbot v. Jansen*, 3 U.S. (3 Dall.) 133 (1795), the Supreme Court unanimously affirmed the exercise of jurisdiction over a civil claim for damages arising out of acts of piracy on the high seas. Justice Iredell explained that "all piracies and trespasses committed against the general law of nations, are enquirable, and may be proceeded against, in any nation where no special exemption can be maintained, either by the general law of nations, or by some treaty which forbids or restrains it." *Id.* at 159-60.

*Talbot* was no outlier. Many antebellum cases adjudicated extraterritorial conduct. *E.g.*, *United States v. Smith*, 18 U.S. 153, 158 (1820); *United*

*States v. Palmer*, 16 U.S. 610, 630-31 (1818); *United States v. Klintock*, 18 U.S. 144, 151-52 (1820); *United States v. Furlong*, 18 U.S. 184, 193 (1820); *The Marianna Flora*, 24 U.S. 1, 40-41 (1825); *The Malek Adhel*, 43 U.S. 210, 232 (1844). As Justice Story explained in *Picquet v. Swann*, Congress could enact a law providing that "a subject of England, or France, or Russia, having a controversy with one of our own citizens, may be summoned from the other end of the globe to obey our process, and submit to the judgment of our courts." 19 F. Cas. 609, 613 (C.C.D. Mass. 1828) (No. 11,134). And "[i]f congress had prescribed such a rule, the court would certainly be bound to follow it, and proceed upon the law." *Id.* at 615.

No case went the other way. As Professor Sachs observes, "not until the Civil War did a single court, state or federal, hold a personal-jurisdiction statute invalid on due process grounds." Sachs, *supra*, at 1712. Treatises of the era similarly contain no mention of a territorial restriction arising from the Due Process Clause. *E.g.*, 1 James Kent, *Commentaries on American Law* 174 (1826) ("It is of no importance, for the purpose of giving jurisdiction, *on whom* or *where* a piratical offence has been committed.") (emphasis in original). As Justice Gorsuch put it recently, an *in personam* suit "could be maintained by anyone on any claim in any place the defendant could be found." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 128 (2023) (plurality).

**3.** Territorial restrictions on legislative authority to provide for personal jurisdiction first emerged in the *Lochner* era, when the Supreme Court began sustaining constitutional challenges to *state* laws on the theory that the State was "exceeding its territorial jurisdiction." James Y. Stern, Note, *Choice of Law, the Constitution, and Lochner*, 94 Va. L. Rev. 1509, 1512 & nn. 13-14 (2008). Even then, the Court repeatedly reaffirmed that the territorial limitations imposed on the States by the Fourteenth Amendment afford "no ground for constructing an imaginary constitutional barrier around the exterior confines of the United States for the purposes of shutting th[e] government off from the exertion of powers which inherently belong to it by virtue of its sovereignty." *United States v. Bennett*, 232 U.S. 299, 306 (1914); *accord Cook v. Tait*, 265 U.S. 47, 55-56 (1924); *Burnet v. Brooks*, 288 U.S. 378, 403-05 (1933).

The Supreme Court has retained the *Lochner*-era concept that due-process limits on a State's power to exercise personal jurisdiction "are a consequence of territorial limitations on the power of the respective States." *Hanson v. Denckla*, 357 U. S. 235, 251 (1958). At the same time, the Court has expressed the opposite view about the territorial competence of the *National* Government: "The murder of a U.S. national is an offense to the United States as much as it is to the country where the murder occurred.... [S]pecial protection for U.S. nationals serves key national interests." *Gamble v. United States*,

10

139 S. Ct. 1960, 1967 (2019). Indeed, the Supreme Court has *never* applied personal jurisdiction limitations in any case under the Fifth Amendment.

**4.** Conflating territorial limitations on the judicial power under the Fifth and Fourteen Amendments also creates doctrinal incongruities and problematic consequences. In *criminal* cases, due process under the Fifth Amendment is satisfied if a defendant acting abroad caused harm to "U.S. citizens or interests," even if the defendant "[did] not know" of those interests or the victim's citizenship. *United States v. Epskamp*, 832 F.3d 154, 167-68 (2d Cir. 2016) (quotation marks omitted); *accord United States v. Murillo*, 826 F.3d 152, 157 (4th Cir. 2016). Yet the panel rejected that principle for *civil* cases, stating (without explanation) that "the due process test for asserting jurisdiction over extraterritorial criminal conduct…differs from the test applicable in this civil case." *Waldman I.*, 835 F.3d at 340.

That makes no sense. There is only one Fifth Amendment, so its due process standard must be the same for civil and criminal cases. How could it be constitutional for the Government to seek a sentence of death against a foreign national for acts committed abroad, but *un*constitutional for the Government to seek a civil forfeiture of the same defendant's property based on the same conduct? *Compare* 18 U.S.C. § 2332b(c)(1)(A), *with id.* § 981(a)(1)(G)(i).

The panel's decision has *already* produced devastating real-world

11

consequences, including dismissal of civil cases brought under federal statutes authorizing civil and criminal remedies.[1] Perhaps most egregiously, in *United States ex. rel. TZAC, Inc. v. Christian Aid*, a district court dismissed a case under the False Claims Act because the "allegedly fraudulent [documents] were signed by [defendant's] executives in cities outside of the United States." No. 17-CV-4135 (PKC), 2021 WL 2354985, at *4 (S.D.N.Y. June 9, 2021). This Court, following the panel decision in *Waldman I*, summarily affirmed. *United States ex rel. TZAC, Inc. v. Christian Aid*, No. 21-1542, 2022 WL 2165751, at *2 (2d Cir. June 16, 2022). Thus, in this Circuit, a fraud perpetrated *against the United States* is beyond the judicial power of the United States to redress through civil litigation if the fraudster acted abroad.

**5.** The panel did not explain why it thought the Fifth and Fourteenth Amendment tests must be "the same." 835 F.3d at 331. Indeed, the panel performed no independent analysis whatsoever. It simply declared the issue "settled" within the Circuit, pointing for support to four cases. *Id.* at 330. But that

---

[1] *E.g.*, *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 784 F. App'x 4, 9 (2d Cir. 2019); *Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*, No. 19 Civ. 8359 (VEC), 2020 WL 4194962, at *7 n.12 (S.D.N.Y. July 20, 2020); *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 240-41 (S.D.N.Y. 2019); *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 199-207 (S.D.N.Y. 2018); *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 596 (S.D.N.Y. 2017).

12

was incorrect: Two of the cited cases had stated in *dicta* in footnotes that the Fourteenth Amendment due process jurisdictional limitations applied in cases governed by the Fifth Amendment,[2] and two simply applied the Fourteenth Amendment standard to dismiss cases for lack of personal jurisdiction without discussing whether a different standard should apply under the Fifth Amendment.[3] That is not "settled law." And even if it were, it is wrong and should be corrected by the *en banc* Court.

## B.    The Full Court Should Consider the Constitutionality of § 2334(e)

Even assuming the Fourteenth Amendment's due process standard applies to federal jurisdictional statutes, the panel's decision misapplied it. Congress enacted § 2334(e) to advance our Nation's vital anti-terror objectives. Most urgently, Congress incentivized Defendants to end their notorious "pay-for-slay" program, under which Defendants reward terrorists for their crimes. The terrorists who organized and carried out the attacks at issue in these cases—all of whom, the jury found, were Defendants' employees or agents acting within the scope of their authority—receive a lifetime salary from

---

[2] *Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 315 n.37 (2d Cir. 1981). The discussion in these footnotes did not affect the outcome of either case.

[3] *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 681-82 (2d Cir. 2013); *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 93 (2d Cir. 2008). The issue whether the legal standard is the same was neither briefed nor discussed in either case.

Defendants for murdering and maiming their American victims, and the families of suicide terrorists similarly receive payments because of the atrocities their relatives committed.[4]

Yet the panel struck the statute down, saying that it goes too far by "divesting the defendants of their Fifth Amendment liberty interest." *Fuld*, 82 F.4th at 92. What "liberty interest," exactly, is being protected here, so that the PLO and PA can continue their policy of paying the murderers of American citizens without consequence? None.

**1.** Under the Fourteenth Amendment, exercises of jurisdiction must provide the defendant with "fair warning" and must be "reasonable, in the context of our federal system of government." *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1024-25 (2021) (citation omitted). The panel did not dispute that those standards were satisfied here. *Fuld*, 82 F.4th at 93. Nor could it have: The conditions that trigger consent to jurisdiction under § 2334(e) are explicit, and the law serves legitimate—indeed, vital—interests of the federal governmental.

Yet the panel rejected that well-established test in favor of a new one of its own creation: For a consent-to-jurisdiction statute to be constitutional, it

---

[4] The families of terrorists killed while committing the atrocities of October 7 will receive the same financial benefits, as will those who were captured.

held, the defendant must receive a "government benefit" in return for agreeing to face suit. *Id.* at 90; *see id.* at 92-93. In the district court, Judge Furman correctly rejected this test as unprecedented: "Defendants do not cite, and the Court has not found, any case holding that such receipt of a benefit is a necessary condition" to the exercise of personal jurisdiction by consent. *Fuld v. The Palestine Liberation Org.*, 578 F. Supp. 3d 577, 595 n.10 (S.D.N.Y. 2022).

As the Supreme Court's recent *Mallory* decision explains, under still-controlling caselaw stretching back more than a century, while "accepting an in-state benefit with jurisdictional strings attached" is *one* way to consent to personal jurisdiction, it is *not* the only way. 600 U.S. at 145 (plurality). Even a "trivial thing" like taking "one step" across an "invisible state line" can lead to "jurisdictional consequences [that] are immediate and serious." *Id.* Consent thus may lawfully rest on types of conduct that "may seem like technicalities." *Id.* at 146. Business-registration statutes are a good example: they "justify the exercise of general jurisdiction over a corporation in a state in which the corporation ha[s] done *no business at all*." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 640 (2d Cir. 2016).

Justice Alito's concurrence went even further. He suggested abandoning the entire enterprise of using the Due Process Clause to impose jurisdictional limitations on the courts. Instead, he argued, "'territorial limitations' on

state power" are more "naturally" addressed under the Commerce Clause. *Mallory*, 600 U.S. at 155-57 (quoting *Hanson*, 357 U.S. at 251). But for present purposes, what matters is what the majority agreed on: Statutes providing for jurisdiction by implied consent do not violate due process, even if the conduct triggering consent is "trivial," so long as the defendant has fair notice. *Id.* at 145 (plurality).

**2.** Even if a reciprocal "benefit" were required, moreover, the panel's application of its new rule is indefensible. Under § 2334(e)(1)(B)(iii), a defendant consents to jurisdiction by "conduct[ing] any activity while physically present in the United States on behalf of the [PLO] or [PA]," so long as the activities were not for the exclusive purpose of official United Nations business. As the panel did not dispute, Defendants in fact conducted many such activities following the law's effective date. *Fuld*, 82 F.4th at 91. That far exceeds the forum-based conduct involved in other cases. *Burnham v. Superior Court*, 495 U.S. 604, 637 (1990) (Brennan, J., concurring) (defendant received "significant benefits" when visiting the forum for three days).

The panel nevertheless dismissed the significance of Defendants' U.S.-based conduct under its own "benefit" test. According to the panel, Congress has already "prohibited" some of Defendants' conduct, so Defendants are not

16

really receiving a meaningful "benefit" by engaging in that very conduct. *Fuld*, 82 F.4th at 92. That reasoning is nonsensical.

To understand this heads-I-win, tails-you-lose approach, consider a slightly different consent statute. "[A]ll 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to [blood alcohol content] testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense." *Missouri v. McNeely*, 569 U.S. 141, 161 (2013). Under the panel's test, these implied-consent statues are constitutional as applied to validly licensed drivers, because they exchange consent for the "privilege of driving on state roads." *Fuld*, 82 F.4th at 97 n.14 (citation omitted). But these statutes would be *unconstitutional* as applied to motorists whose licenses have been suspended or revoked, because such persons are "prohibited" from driving under existing law. *Id.* at 92. No principle of due process requires such absurdities.

## CONCLUSION

If any case meets the bar for *en banc* consideration, it is these two. The panel has declared unconstitutional a federal statute addressing issues of foreign affairs and national security; and it has endorsed a due process doctrine incompatible with the original public meaning of the Fifth Amendment or

17

common sense. This Court should grant rehearing *en banc* and vacate the panel decisions in both cases.

Respectfully submitted,

November 22, 2023
New York, New York

ARNOLD & PORTER KAYE SCHOLER LLP

By:_____

Kent A. Yalowitz
250 West 55th Street
New York, NY 10019-9710
212-836-8000
kent.yalowitz@arnoldporter.com

– and –

Allon Kedem
Dirk C. Phillips
Stephen K. Wirth
601 Massachusetts Ave., NW
Washington, DC 20001-3743

*Attorneys for Plaintiffs-Appellants*

18

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 35(b)(2)(A), that the foregoing document contains 3,896 words and complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Century font.

Dated: November 22, 2023         */s/ Stephen K. Wirth*
                                                 Stephen K. Wirth

# ADDENDUM

15-3135(L)
Sokolow v. Palestine Liberation Organization

# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT
_____

August Term, 2015

Argued: April 12, 2016          Decided: August 31, 2016

Docket Nos. 15-3135-cv(L); 15-3151-cv(XAP)
_____

EVA WALDMAN, REVITAL BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF
PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA
BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA, MINOR,
BY HIS NEXT FRIEND AND GUARDIAN VARDA GUETTA, VARDA GUETTA,
INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFF OZ JOSEPH GUETTA,
NORMAN GRITZ, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF DAVID GRITZ, MARK I. SOKOLOW, INDIVIDUALLY AND AS A
NATURAL GUARDIAN OF PLAINTIFF JAMIE A. SOKOLOW, RENA M. SOKOLOW,
INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAIME A. SOKOLOW,
JAMIE A. SOKOLOW, MINOR, BY HER NEXT FRIENDS AND GUARDIAN MARK I.
SOKOLOW AND RENA M. SOKOLOW, LAUREN M. SOKOLOW, ELANA R. SOKOLOW,
SHAYNA EILEEN GOULD, RONALD ALLAN GOULD, ELISE JANET GOULD, JESSICA
RINE, SHMUEL WALDMAN, HENNA NOVACK WALDMAN, MORRIS WALDMAN, ALAN
J. BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS
YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER,
YEHONATHON BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN
J. BAUER AND REVITAL BAUER, BINYAMIN BAUER, MINOR, BY HIS NEXT
FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, DANIEL
BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND
REVITAL BAUER, YEHUDA BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS
DR. ALAN J. BAUER AND REVITAL BAUER, RABBI LEONARD MANDELKORN,
KATHERINE BAKER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN, RICHARD BLUTSTEIN,
INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN
BLUTSTEIN, LARRY CARTER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF DIANE ("DINA") CARTER, SHAUN COFFEL, DIANNE
COULTER MILLER, ROBERT L COULTER, JR., ROBERT L. COULTER, SR.,
INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JANIS
RUTH COULTER, CHANA BRACHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND

GUARDIAN KAREN GOLDBERG, ELIEZER SIMCHA GOLDBERG, MINOR, BY HER NEXT
FRIEND AND GUARDIAN KAREN GOLDBERG, ESTHER ZAHAVA GOLDBERG, MINOR,
BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, KAREN GOLDBERG,
INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STUART
SCOTT GOLDBERG/NATURAL GUARDIAN OF PLAINTIFFS CHANA BRACHA GOLDBERG,
ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA
GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG, TZVI
YEHOSHUA GOLDBERG, SHOSHANA MALKA GOLDBERG, MINOR, BY HER NEXT
FRIEND AND GUARDIAN KAREN GOLDBERG, TZVI YEHOSHUA GOLDBERG, MINOR,
BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YAAKOV MOSHE
GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG,
YITZHAK SHALOM GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN
GOLDBERG, NEVENKA GRITZ, SOLE HEIR OF NORMAN GRITZ, DECEASED,

*Plaintiffs – Appellees - Cross-Appellants*,

—v.—

PALESTINE LIBERATION ORGANIZATION, PALESTINIAN AUTHORITY, AKA
PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY AND OR PALESTINIAN
COUNCIL AND OR PALESTINIAN NATIONAL AUTHORITY,

*Defendants - Appellants - Cross-Appellees*,

YASSER ARAFAT, MARWIN BIN KHATIB BARGHOUTI, AHMED TALEB MUSTAPHA
BARGHOUTI, AKA AL-FARANSI, NASSER MAHMOUD AHMED AWEIS, MAJID AL-
MASRI, AKA ABU MOJAHED, MAHMOUD AL-TITI, MOHAMMED ABDEL RAHMAN
SALAM MASALAH, AKA ABU SATKHAH, FARAS SADAK MOHAMMED GHANEM, AKA
HITAWI, MOHAMMED SAMI IBRAHIM ABDULLAH, ESTATE OF SAID RAMADAN,
DECEASED, ABDEL KARIM RATAB YUNIS AWEIS, NASSER JAMAL MOUSA
SHAWISH, TOUFIK TIRAWI, HUSSEIN AL-SHAYKH, SANA'A MUHAMMED
SHEHADEH, KAIRA SAID ALI SADI, ESTATE OF MOHAMMED HASHAIKA,
DECEASED, MUNZAR MAHMOUD KHALIL NOOR, ESTATE OF WAFA IDRIS,
DECEASED, ESTATE OF MAZAN FARITACH, DECEASED, ESTATE OF MUHANAD ABU
HALAWA, DECEASED, JOHN DOES, 1-99, HASSAN ABDEL RAHMAN,

*Defendants*.

————————————————————

2

Before: LEVAL AND DRONEY, <u>Circuit Judges</u>, and KOELTL, <u>District Judge</u>.[*]

1  The defendants-appellants-cross-appellees ("defendants")

2  appeal from a judgment of the United States District Court for

3  the Southern District of New York (Daniels, *J.*) in favor of the

4  plaintiffs-appellees-cross-appellants ("plaintiffs").  A jury

5  found the defendants---the Palestine Liberation Organization and

6  the Palestinian Authority---liable under the Anti-Terrorism Act

7  ("ATA"), 18 U.S.C. § 2333(a), for various terror attacks in

8  Israel that killed or wounded United States citizens.  The jury

9  awarded the plaintiffs damages of $218.5 million, an amount that

10 was trebled automatically pursuant to the ATA, 18 U.S.C.

11 § 2333(a), bringing the total award to $655.5 million.  The

12 defendants appeal, arguing that the district court lacked

13 general and specific personal jurisdiction over the defendants,

14 and, in the alternative, seek a new trial because the district

15 court abused its discretion by allowing certain testimony by two

16 expert witnesses.  The plaintiffs cross-appeal, asking this

17 Court to reinstate claims the district court dismissed.

18 We vacate the judgment of the district court and remand the

19 case with instructions to dismiss the action because the federal

20 courts lack personal jurisdiction over the defendants with

---

[*]    The Honorable John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

3

1  respect to the claims in this action.  We do not reach the

2  remaining issues.

3  _____

4  KENT A. YALOWITZ, Arnold & Porter, LLP, for Plaintiffs-
5  Appellees-Cross-Appellants.

6
7  GASSAN A. BALOUL (Mitchell R. Berger, Pierre H. Bergeron, John
8  A. Burlingame, Alexandra E. Chopin, on the brief), Squire Patton
9  Boggs (US), LLP, for Defendants-Appellants-Cross-Appellees.

10
11  David A. Reiser, Zuckerman Spaeder, LLP, and Peter Raven-Hansen,
12  George Washington University Law School, on the brief for Amici
13  Curiae Former Federal Officials in Support of Plaintiffs-
14  Appellees-Cross-Appellants.

15
16  James P. Bonner, Stone, Bonner & Rocco, LLP, and Steven R.
17  Perles, Perles Law Firm, on the brief for Amici Curiae Arthur
18  Barry Sotloff, Shirley Goldie Pulwer, Lauren Sotloff, and the
19  Estate of Steven Joel Sotloff in Support of Plaintiffs-
20  Appellees-Cross-Appellants.

21
22  _____

23  John G. Koeltl, District Judge:

24
25      In this case, eleven American families sued the Palestine

26  Liberation Organization ("PLO") and the Palestinian Authority

27  ("PA") (collectively, "defendants")[1] under the Anti-Terrorism Act

28  ("ATA"), 18 U.S.C. § 2333(a), for various terror attacks in

29  Israel that killed or wounded the plaintiffs-appellees-cross-

30  appellants ("plaintiffs") or their family members.[2]

_____

[1] While other defendants, such as Yasser Arafat, were named as
defendants in the case, they did not appear, and the Judgment
was entered only against the PLO and the PA.
[2] The plaintiffs are United States citizens, and the guardians,
family members, and personal representatives of the estates of

4

1      The defendants repeatedly argued before the District Court

2  for the Southern District of New York that the court lacked

3  personal jurisdiction over them in light of their minimal

4  presence in, and the lack of any nexus between the facts

5  underlying the plaintiffs' claims and the United States.  The

6  district court (Daniels, *J.*) concluded that it had general

7  personal jurisdiction over the defendants, even after the

8  Supreme Court narrowed the test for general jurisdiction in

9  <u>Daimler AG v. Bauman</u>, 134 S. Ct. 746 (2014).  <u>See</u> <u>Sokolow v.</u>

10  <u>Palestine Liberation Org.</u>, No. 04-cv-397 (GBD), 2014 WL 6811395,

11  at *2 (S.D.N.Y. Dec. 1, 2014); <u>see also</u> <u>Sokolow v. Palestine</u>

12  <u>Liberation Org.</u>, No. 04-cv-397 (GBD), 2011 WL 1345086, at *7

13  (S.D.N.Y. Mar. 30, 2011).

14      After a seven-week trial, a jury found that the defendants,

15  acting through their employees, perpetrated the attacks and that

16  the defendants knowingly provided material support to

17  organizations designated by the United States State Department

18  as foreign terrorist organizations.  The jury awarded the

19  plaintiffs damages of $218.5 million, an amount that was trebled

20  automatically pursuant to the ATA, 18 U.S.C. § 2333(a), bringing

21  the total award to $655.5 million.

---

United States citizens, who were killed or injured in the
terrorist attacks.

1       On appeal, the defendants seek to overturn the jury's

2  verdict by arguing that the United States Constitution precludes

3  the exercise of personal jurisdiction over them.  In the

4  alternative, the defendants seek a new trial, arguing that the

5  district court abused its discretion by allowing certain

6  testimony by two expert witnesses.  The plaintiffs cross-appeal,

7  asking this Court to reinstate non-federal claims that the

8  district court dismissed, and reinstate the claims of two

9  plaintiffs for which the district court found insufficient

10  evidence to submit to the jury.

11       We conclude that the district court erred when it concluded

12  it had personal jurisdiction over the defendants with respect to

13  the claims at issue in this action.  Therefore, we VACATE the

14  judgment of the district court and REMAND the case to the

15  district court with instructions to DISMISS the case for want of

16  personal jurisdiction.  Accordingly, we do not consider the

17  defendants' other arguments on appeal or the plaintiffs' cross-

18  appeal, all of which are now moot.

19                                **I.**

20                                **A.**

21       The PA was established by the 1993 Oslo Accords as the

22  interim and non-sovereign government of parts of the West Bank

23  and the Gaza Strip (collectively referred to here as

24  "Palestine").  The PA is headquartered in the city of Ramallah

6

1  in the West Bank, where the Palestinian President and the PA's

2  ministers reside.

3      The PLO was founded in 1964.  At all relevant times, the

4  PLO was headquartered in Ramallah, the Gaza Strip, and Amman,

5  Jordan. Because the Oslo Accords limit the PA's authority to

6  Palestine, the PLO conducts Palestine's foreign affairs.

7      During the relevant time period for this action, the PLO

8  maintained over 75 embassies, missions, and delegations around

9  the world.  The PLO is registered with the United States

10 Government as a foreign agent.  The PLO has two diplomatic

11 offices in the United States: a mission to the United States in

12 Washington, D.C. and a mission to the United Nations in New York

13 City.  The Washington, D.C. mission had fourteen employees

14 between 2002 and 2004, including two employees of the PA,

15 although not all at the same time.[3]  The Washington, D.C. and New

16 York missions engaged in diplomatic activities during the

17 relevant period.  The Washington, D.C. mission "had a

18 substantial commercial presence in the United States." Sokolow,

19 2011 WL 1345086, at *4.  It used dozens of telephone numbers,

20 purchased office supplies, paid for certain living expenses for

21 Hassan Abdel Rahman, the chief PLO and PA representative in the

_____

[3] The district court concluded that "the weight of the evidence
indicates that the D.C. office simultaneously served as an
office for the PLO and the PA."  Sokolow, 2011 WL 1345086, at
*3.

7

1  United States, and engaged in other transactions. Id. The PLO

2  also retained a consulting and lobbying firm through a multi-

3  year, multi-million-dollar contract for services from about 1999

4  to 2004. Id. The Washington, D.C. mission also promoted the

5  Palestinian cause in speeches and media appearances. Id.

6    Courts have repeatedly held that neither the PA nor the PLO

7  is a "state" under United States or international law. See

8  Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 47-48 (2d Cir.

9  1991) (holding the PLO, which had no defined territory or

10 permanent population and did not have capacity to enter into

11 genuine formal relations with other nations, was not a "state"

12 for purposes of the Foreign Sovereign Immunities Act); Estates

13 of Ungar v. Palestinian Auth., 315 F. Supp. 2d 164, 178-86

14 (D.R.I. 2004) (holding that neither the PA nor the PLO is a

15 state entitled to sovereign immunity under the Foreign Sovereign

16 Immunities Act because neither entity has a defined territory

17 with a permanent population controlled by a government that has

18 the capacity to enter into foreign relations); see also Knox v.

19 Palestine Liberation Org., 306 F. Supp. 2d 424, 431 (S.D.N.Y.

20 2004) (holding that neither the PLO nor the PA was a "state" for

21 purposes of the Foreign Sovereign Immunities Act).

22   While the United States does not recognize Palestine or the

23 PA as a sovereign government, see Sokolow v. Palestine

24 Liberation Org., 583 F. Supp. 2d 451, 457-58 (S.D.N.Y. 2008)

1    ("Palestine, whose statehood is not recognized by the United

2    States, does not meet the definition of a 'state,' under United

3    States and international law . . . .") (collecting cases), the

4    PA is the governing authority in Palestine and employs tens of

5    thousands of security personnel in Palestine.  According to the

6    PA's Minister of Finance, the "PA funds conventional government

7    services, including developing infrastructure; public safety and

8    the judicial system; health care; public schools and education;

9    foreign affairs; economic development initiatives in

10   agriculture, energy, public works, and public housing; the

11   payment of more than 155,000 government employee salaries and

12   related pension funds; transportation; and, communications and

13   information technology services."

14                                 **B.**

15       The plaintiffs sued the defendants in 2004, alleging

16   violations of the ATA for seven terror attacks committed during

17   a wave of violence known as "the al Aqsa Intifada," by

18   nonparties who the plaintiffs alleged were affiliated with the

19   defendants.  The jury found the plaintiffs liable for six of the

20   attacks.[4] At trial, the plaintiffs presented evidence of the

21   following attacks.

_____

[4] The district court found claims relating to an attack on
January 8, 2001 that wounded Oz Guetta speculative and did not
allow those claims to proceed to the jury.  The plaintiffs argue
that this Court should reinstate the Guetta claims.  Because we

9

1    **i.   January 22, 2002: Jaffa Road Shooting**

2        On January 22, 2002, a PA police officer opened fire on a

3    pedestrian mall in Jerusalem.  He shot "indiscriminately at the

4    people who were on Jaffa Street," at a nearby bus stop and

5    aboard a bus that was at the stop, and at people in the stores

6    nearby "with the aim of causing the death of as many people as

7    possible."  The shooter killed two individuals and wounded

8    forty-five others before he was killed by police.  The attack

9    was carried out, according to trial evidence, by six members of

10   the PA police force who planned the shooting. Two of the

11   plaintiffs were injured.

12   **ii.   January 27, 2002: Jaffa Road Bombing**

13       On January 27, 2002, a PA intelligence informant named Wafa

14   Idris detonated a suicide bomb on Jaffa Road in Jerusalem,

15   killing herself and an Israeli man and seriously wounding four

16   of the plaintiffs, including two children.  Evidence presented

17   at trial showed that the bombing was planned by a PA

18   intelligence officer who encouraged the assailant to conduct the

19   suicide bombing, even after the assailant had doubts about doing

20   so.

21

22

---

conclude that there is no personal jurisdiction over the
defendants for the ATA claims, it is unnecessary to reach this
issue.

1     **iii. March 21, 2002: King George Street Bombing**

2     On March 21, 2002, Mohammed Hashaika, a former PA police

3 officer, detonated a suicide bomb on King George Street in

4 Jerusalem. Hashaika's co-conspirators chose the location

5 because it was "full of people during the afternoon." Hashaika

6 set-off the explosion while in a crowd "with the aim of causing

7 the deaths of as many civilians as possible." Two plaintiffs

8 were grievously wounded, including a seven-year-old American

9 boy. Evidence presented at trial showed that a PA intelligence

10 officer named Abdel Karim Aweis orchestrated the attack.

11     **iv. June 19, 2002: French Hill Bombing**

12     On June 19, 2002, a seventeen-year-old Palestinian man

13 named Sa'id Awada detonated a suicide bomb at a bus stop in the

14 French Hill neighborhood of Jerusalem. Awada was a member of a

15 militant faction of the PLO's Fatah party called the Al Aqsa

16 Martyr Brigades ("AAMB"), which the United States Department of

17 State had designated as a "foreign terrorist organization"

18 ("FTO"). The bombing killed several people and wounded dozens,

19 including an eighteen-year-old plaintiff who was stepping off a

20 bus when the bomb exploded.

21     **v. July 31, 2002: Hebrew University Bombing**

22     On July 31, 2002, military operatives of Hamas---a United

23 States-designated FTO---detonated a bomb hidden in a black cloth

24 bag that was packed with hardware nuts in a café at Hebrew

11

1   University in Jerusalem.  The explosion killed nine, including

2   four United States citizens, whose estates bring suit here.

3   **vi.  January 29, 2004: Bus No. 19 Bombing**

4       On January 29, 2004, in an AAMB attack, a PA police officer

5   named Ali Al-Ja'ara detonated a suicide vest on a crowded bus,

6   Bus No. 19 traveling from Malha Mall toward Paris Square in

7   central Jerusalem.  The suicide bombing killed eleven people,

8   including one of the plaintiffs.  The bomber's aim, according to

9   evidence submitted at trial, was to "caus[e] the deaths of a

10  large number of individuals."

11                              **C.**
12
13      In 2004, the plaintiffs filed suit in the Southern District

14  of New York.  The defendants first moved to dismiss the claims

15  for lack of personal jurisdiction in July 2007.  The district

16  court denied the motion, subject to renewal after jurisdictional

17  discovery.  After the close of jurisdictional discovery, the

18  district court denied the defendants' renewed motion, holding

19  that the court had general personal jurisdiction over the

20  defendants.  See Sokolow, 2011 WL 1345086, at *7.

21      The district court concluded, as an initial matter,  that

22  the service of process was properly effected by serving the

23  Chief Representative of the PLO and the PA, Hassan Abdel Rahman,

24  at his home in Virginia, pursuant to Federal Rule of Civil

25  Procedure 4(h)(1)(B) (providing that a foreign association "must

                                12

1    be served[ ] . . . in a judicial district of the United States .

2    . . by delivering a copy of the summons and of the complaint to

3    an officer, a managing or general agent . . . ."); see also 18

4    U.S.C. § 2334(a) (providing for nationwide service of process

5    and venue under the ATA); Sokolow, 2011 WL 1345086, at *2.

6         The district court then engaged in a two-part analysis to

7    determine whether the exercise of personal jurisdiction

8    comported with the due process protections of the United States

9    Constitution.  First, it determined whether the defendants had

10   sufficient minimum contacts with the forum such that the

11   maintenance of the action did not offend traditional notions of

12   fair play and substantial justice.  Sokolow, 2011 WL 1345086, at

13   *2 (citing Frontera Res. Azerbaijan Corp. v. State Oil Co. of

14   Azerbaijan Republic, 582 F.3d 393, 396 (2d Cir. 2009)).

15        The district court distinguished between specific and

16   general personal jurisdiction---specific jurisdiction applies

17   where the defendants' contacts are related to the litigation and

18   general jurisdiction applies where the defendants' contacts are

19   so substantial that the defendants could be sued on all claims,

20   even those unrelated to contacts with the forum---and found that

21   the district court had general jurisdiction over the defendants.

22   Id. at *3.  The court considered what it deemed the defendants'

23   "substantial commercial presence in the United States," in

24   particular "a fully and continuously functional office in

13

1   Washington, D.C.," bank accounts and commercial contracts, and

2   "a substantial promotional presence in the United States, with

3   the D.C. office having been permanently dedicated to promoting

4   the interests of the PLO and the PA."   Id. at *4.

5        The district court concluded that activities involving the

6   defendants' New York office were exempt from jurisdictional

7   analysis under an exception for United Nations' related activity

8   articulated in Klinghoffer, 937 F.2d at 51-52 (UN participation

9   not properly considered basis for jurisdiction); see Sokolow,

10  2011 WL 1345086, at *5.  The district court held that the

11  activities involving the Washington, D.C. mission were not

12  exempt from analysis and provided "a sufficient basis to

13  exercise general jurisdiction over the Defendants."  Id. at *6

14  ("The PLO and the PA were continuously and systematically

15  present in the United States by virtue of their extensive public

16  relations activities.").

17       Next, the district court considered "'whether the assertion

18  of personal jurisdiction comports with "traditional notions of

19  fair play and substantial justice"---that is, whether it is

20  reasonable under the circumstances of the particular case.'"

21  Id. (quoting Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84

22  F.3d 560, 568 (2d Cir. 1996)).  The court found that the

23  exercise of jurisdiction did not offend "traditional notions of

24  fair play and substantial justice," pursuant to the standard

14

1   articulated by International Shoe Co. v. Washington, 326 U.S.

2   310, 316 (1945), and its progeny.  See Sokolow, 2011 WL 1345086,

3   at *6-7.  The district court concluded that "[t]here is a strong

4   inherent interest of the United States and Plaintiffs in

5   litigating ATA claims in the United States," and that the

6   defendants "failed to identify an alternative forum where

7   Plaintiffs' claims could be brought, and where the foreign court

8   could grant a substantially similar remedy."  Id. at *7.

9        In January 2014, after the Supreme Court had significantly

10  narrowed the general personal jurisdiction test in Daimler, 134

11  S. Ct. 746, the defendants moved for reconsideration of the

12  denial of their motion to dismiss.

13       On April 11, 2014, the district court denied the

14  defendants' motions for reconsideration, ruling that Daimler did

15  not compel dismissal.  The district court also denied the

16  defendants' motions to certify the jurisdictional issue for an

17  interlocutory appeal.  See Sokolow, 2014 WL 6811395, at *1.  The

18  defendants renewed their jurisdictional argument in their

19  motions for summary judgment, arguing that this Court's decision

20  in Gucci America, Inc. v. Weixing Li, 768 F.3d 122 (2d Cir.

21  2014), altered the controlling precedent in this Circuit,

22  requiring dismissal of the case.  See Sokolow, 2014 WL 6811395,

23  at *1.  The district court concluded that it still had general

24  personal jurisdiction over the defendants, describing the action

15

1   as presenting "'an exceptional case,'" id. at *2, of the kind

2   discussed in Daimler, 134 S. Ct. at 761 n.19, and Gucci, 768

3   F.3d at 135.

4       The district court held that "[u]nder both Daimler and

5   Gucci, the PA and PLO's continuous and systematic business and

6   commercial contacts within the United States are sufficient to

7   support the exercise of general jurisdiction," and that the

8   record before the court was "insufficient to conclude that

9   either defendant is 'at home' in a particular jurisdiction other

10   than the United States." Sokolow, 2014 WL 6811395, at *2.

11       Following the summary judgment ruling, the defendants

12   sought mandamus on the personal jurisdiction issue.  This Court

13   denied the defendants' petition.  See In re Palestine Liberation

14   Org., Palestinian Authority, No. 14-4449 (2d Cir. Jan. 6, 2015)

15   (summary order).

16       The case proceeded to trial in January 2015.  During the

17   trial, the defendants introduced evidence about the PA's and

18   PLO's home in Palestine.  The trial evidence showed that the

19   terrorist attacks occurred in the vicinity of Jerusalem.  The

20   plaintiffs did not allege or submit evidence that the plaintiffs

21   were targeted in any of the six attacks at issue because of

22   their United States citizenship or that the defendants engaged

23   in conduct in the United States related to the attacks.

1        At the conclusion of plaintiffs' case in chief, the

2   defendants moved for judgment as a matter of law under Federal

3   Rule of Civil Procedure 50(a), arguing, among other grounds,

4   that the district court lacked personal jurisdiction over the

5   defendants.  The Court denied the motion.  The defendants

6   renewed that motion at the close of all the evidence and again

7   asserted that the court lacked personal jurisdiction.

8        During and immediately after trial, the District Court for

9   the District of Columbia issued three separate decisions

10  dismissing similar suits for lack of personal jurisdiction by

11  similar plaintiffs in cases against the PA and the PLO.  See

12  Estate of Klieman v. Palestinian Auth., 82 F. Supp. 3d 237, 245-

13  46 (D.D.C. 2015), *appeal docketed*, No. 15-7034 (D.C. Cir. Apr.

14  8, 2015); Livnat v. Palestinian Auth., 82 F. Supp. 3d 19, 30

15  (D.D.C. 2015), *appeal docketed*, No. 15-7024 (D.C. Cir. Mar. 18,

16  2015); Safra v. Palestinian Auth., 82 F. Supp. 3d 37, 47-48

17  (D.D.C. 2015), *appeal docketed*, No. 15-7025 (D.C. Cir. Mar. 18,

18  2015).

19       In light of these cases, on May 1, 2015, the defendants

20  renewed their motion to dismiss for lack of both general and

21  specific personal jurisdiction.  The defendants also moved, in

22  the alternative, for judgment as a matter of law or for a new

23  trial pursuant to Federal Rules of Civil Procedure 50(b) and 59.

24  The district court reviewed the decisions by the District Court

17

1 for the District of Columbia, but, for the reasons articulated

2 in its 2014 decision and at oral argument, concluded that the

3 district court had general personal jurisdiction over the

4 defendants.  The district court did not rule explicitly on

5 whether it had specific personal jurisdiction over the

6 defendants.

7    The jury found the defendants liable for all six attacks

8 and awarded the plaintiffs damages of $218.5 million, an amount

9 that was trebled automatically pursuant to the ATA, 18 U.S.C.

10 § 2333(a), bringing the total award to $655.5 million.

11    The parties engaged in post-trial motion practice not

12 relevant here, the defendants timely appealed, and the

13 plaintiffs cross-appealed.

14                         **II.**

15                         **A.**

16    "We review a district court's assertion of personal

17 jurisdiction *de novo*."  Dynegy Midstream Servs. v. Trammochem,

18 451 F.3d 89, 94 (2d Cir. 2006).[5]

---

[5] The standard of review in this case is complicated because the
issue of personal jurisdiction was raised initially on a motion
to dismiss, both before and after discovery, and as a basis for
Rule 50 motions at the conclusion of the plaintiffs' case and
after all the evidence was presented. This Court typically
reviews factual findings in a district court's decision on
personal jurisdiction for clear error and its legal conclusions
*de novo*. See Frontera Res., 582 F.3d at 395. In this case, the
parties agree that this Court should review *de novo* whether the
district court's exercise of personal jurisdiction was

18

1    To exercise personal jurisdiction lawfully, three

2  requirements must be met. "First, the plaintiff's service of

3  process upon the defendant must have been procedurally proper.

4  Second, there must be a statutory basis for personal

5  jurisdiction that renders such service of process

6  effective. . . . Third, the exercise of personal jurisdiction

7  must comport with constitutional due process principles." Licci

8  ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 59-60

9  (2d Cir. 2012) (footnotes and internal citations omitted),

10  certified question accepted sub nom. Licci v. Lebanese Canadian

11  Bank, 967 N.E.2d 697 (N.Y. 2012), and certified question

12  answered sub nom. Licci v. Lebanese Canadian Bank, 984 N.E.2d

13  893 (N.Y. 2012).

14    Constitutional due process assures that an individual will

15  only be subjected to the jurisdiction of a court where the

16  maintenance of a lawsuit does not offend "traditional notions of

17  fair play and substantial justice." Int'l Shoe, 326 U.S. at 316

18  (internal quotation marks omitted). Personal jurisdiction is "a

19  matter of individual liberty" because due process protects the

20  individual's right to be subject only to lawful power. J.

21  McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 884 (2011)

---

constitutional. See Pls.' Br. at 27; Defs.' Br. at 23. In any
event, the issues relating to general jurisdiction are
essentially legal questions that should be reviewed de novo.
Assuming without deciding the question, we review the district
court's assertion of personal jurisdiction de novo.

1  (plurality opinion) (quoting <u>Ins. Corp. of Ir. v. Compagnie des</u>

2  <u>Bauxites de Guinee</u>, 456 U.S. 694, 702 (1982)).

3      The ATA provides that process "may be served in any

4  district where the defendant resides, is found, or has an agent

5  . . . ." 18 U.S.C § 2334(a).  The district court found that the

6  plaintiffs properly served the defendants because they served

7  the complaint, pursuant to Federal Rule of Civil Procedure

8  4(h)(1)(B) (providing that service on an unincorporated

9  association is proper if the complaint is served on a "general

10  agent" of the entity), on Hassan Abdel Rahman, who "based upon

11  the overwhelming competent evidence produced by Plaintiffs, was

12  the Chief Representative of the PLO and the PA in the United

13  States at the time of service." <u>Sokolow</u>, 2011 WL 1345086, at *2.[6]

14      The defendants have not disputed that service was proper

15  and that there was a statutory basis pursuant to the ATA for

16  that service of process.  Therefore, the only question before

17  the Court is whether the third jurisdictional requirement is

18  met---whether jurisdiction over the defendants may be exercised

19  consistent with the Constitution.

20                          **B.**

21      Before we reach the analysis of constitutional due process,

22  the plaintiffs raise three threshold issues: First, whether the

_____

[6] The district court found that the defendants are
"unincorporated associations."  <u>See Sokolow v. Palestine
Liberation Org.</u>, 60 F. Supp. 3d 509, 523-24 (S.D.N.Y. 2014).

20

1    defendants waived their objections to personal jurisdiction;

2    second, whether the defendants have due process rights at all;

3    and third, whether the due process clause of the Fifth Amendment

4    to the Constitution and not the Fourteenth Amendment controls

5    the personal jurisdiction analysis in this case.

6        First, the plaintiffs argue that the defendants waived

7    their argument that the district court lacked personal

8    jurisdiction over them. The plaintiffs contend that the

9    defendants could have argued that they were not subject to

10   general jurisdiction under the "at home" test before Daimler was

11   decided because the "at home" general jurisdiction test existed

12   after Goodyear Dunlop Tire Operations, S.A. v. Brown, 564 U.S.

13   915 (2011). This argument is unavailing because this Court in

14   Gucci looked to the test in Daimler as the appropriate test for

15   general jurisdiction over a corporate entity. See Gucci, 768

16   F.3d at 135-36.  The defendants did not waive or forfeit their

17   objection to personal jurisdiction because they repeatedly and

18   consistently objected to personal jurisdiction and invoked

19   Daimler after this Court's decision in Gucci.  Furthermore, the

20   district court explicitly noted that the "Defendants' motions

21   asserting lack of personal jurisdiction are *not* denied based on

22   a theory of waiver."  Sokolow, 2014 WL 6811395, at *2 n.2

23   (emphasis added).

1    Second, the plaintiffs argue that the defendants have no

2  due process rights because the defendants are foreign

3  governments and share many of the attributes typically

4  associated with a sovereign government.  Foreign sovereign

5  states do not have due process rights but receive the protection

6  of the Foreign Sovereign Immunities Act.  See Frontera Res., 582

7  F.3d at 396-400.  The plaintiffs argue that entities, like the

8  defendants, lack due process rights, because they do not view

9  themselves as part of a sovereign and are treated as a foreign

10  government in other contexts. The plaintiffs do not cite any

11  cases indicating that a non-sovereign entity with governmental

12  attributes lacks due process rights. All the cases cited by the

13  plaintiffs stand for the proposition that *sovereign* governments

14  lack due process rights, and these cases have not been extended

15  beyond the scope of entities that are separate sovereigns,

16  recognized by the United States government as sovereigns, and

17  therefore enjoy foreign sovereign immunity.

18    While sovereign states are not entitled to due process

19  protection, see id. at 399, neither the PLO nor the PA is

20  recognized by the United States as a sovereign state, and the

21  executive's determination of such a matter is conclusive.  See

22  Zivotofsky v. Kerry, 135 S. Ct. 2076, 2088 (2015); see also

23  Ungar, 315 F. Supp. 2d at 177 ("The PA and PLO's argument must

24  fail because Palestine does not satisfy the four criteria for

22

1   statehood and is not a State under prevailing international

2   legal standards."); Knox, 306 F. Supp. 2d at 431 ("[T]here does

3   not exist a state of Palestine which meets the legal criteria

4   for statehood. . . ."); accord Klinghoffer, 937 F.2d at 47 ("It

5   is quite clear that the PLO meets none of those requirements

6   [for a state]."). Because neither defendant is a state, the

7   defendants have due process rights. See O'Neill v. Asat Trust

8   Reg. (In re Terrorist Attacks on Sept. 11, 2001), 714 F.3d 659,

9   681-82 (2d Cir. 2013) ("O'Neill") (dismissing for lack of

10  personal jurisdiction claims against charities, financial

11  institutions, and other individuals who are alleged to have

12  provided support to Osama Bin Laden and al Qaeda); Livnat, 82 F.

13  Supp. 3d at 26 (due process clause applies to the PA (collecting

14  cases)).

15      Third, the plaintiffs and *amici curiae* Former Federal

16  Officials argue that the restrictive Fourteenth Amendment due

17  process standards cannot be imported into the Fifth Amendment

18  and that the due process clause of the Fifth Amendment to the

19  Constitution,[7] and not the Fourteenth Amendment,[8] applies to the

---

[7] The Fifth Amendment states in relevant part: ". . . nor shall
any person . . . be deprived of life, liberty, or property,
without due process of law . . . ." U.S. Const. amend. V.

[8] The Fourteenth Amendment states in relevant part: ". . . nor
shall any State deprive any person of life, liberty, or
property, without due process of law . . . ." U.S. Const. amend.
XIV., § 1.

23

1   ATA and controls the analysis in this case. The argument is

2   particularly important in this case because the defendants rely

3   on the standard for personal jurisdiction set out in Daimler and

4   the Daimler Court explained that it was interpreting the due

5   process clause of the Fourteenth Amendment. Daimler, 134 S. Ct.

6   at 751.

7       The plaintiffs and amici argue that the Fourteenth

8   Amendment due process clause restricts state power but the Fifth

9   Amendment should be applied to the exercise of federal power.

10  Their argument is that the Fourteenth Amendment imposes stricter

11  limits on the personal jurisdiction that courts can exercise

12  because that Amendment, grounded in concepts of federalism, was

13  intended to referee jurisdictional conflicts among the sovereign

14  States.  The Fifth Amendment, by contrast, imposes more lenient

15  restrictions because it contemplates disputes with foreign

16  nations, which, unlike States, do not follow reciprocal rules

17  and are not subject to our constitutional system.  See, e.g., J.

18  McIntyre Mach., 564 U.S. at 884 (plurality opinion) ("Because

19  the United States is a distinct sovereign, a defendant may in

20  principle be subject to the jurisdiction of the courts of the

21  United States but not of any particular State. This is

22  consistent with the premises and unique genius of our

23  Constitution.").  To conflate the due process requirements of

24  the Fourteenth and Fifth Amendments, the plaintiffs and amici

24

1 argue, would impose a unilateral constraint on United States

2 courts, even when the political branches conclude that personal

3 jurisdiction over a defendant for extraterritorial conduct is in

4 the national interest.[9]

5     This Court's precedents clearly establish the congruence of

6 due process analysis under both the Fourteenth and Fifth

7 Amendments. This Court has explained: "[T]he due process

8 analysis [for purposes of the court's *in personam* jurisdiction]

9 is basically the same under both the Fifth and Fourteenth

10 Amendments. The principal difference is that under the Fifth

11 Amendment the court can consider the defendant's contacts

12 throughout the United States, while under the Fourteenth

13 Amendment only the contacts with the forum state may be

14 considered." Chew v. Dietrich, 143 F.3d 24, 28 n.4 (2d Cir.

15 1998).

16     Indeed, this Court has already applied Fourteenth Amendment

17 principles to Fifth Amendment civil terrorism cases. For

---

[9] The plaintiffs also point to the brief filed by the United States Solicitor General in Daimler to support their argument that the due process standards for the Fifth and Fourteenth Amendments vary. However, the United States never advocated that the Fourteenth Amendment standard would be inapplicable to Fifth Amendment cases and, instead, urged the Court not to reach the issue. See Brief for the United States as Amicus Curiae Supporting Petitioner, DaimlerChrysler AG v. Bauman, 134 S. Ct. 746 (2014) (No. 11-965), 2013 WL 3377321, at *3 n.1 ("This Court has consistently reserved the question whether its Fourteenth Amendment personal jurisdiction precedents would apply in a case governed by the Fifth Amendment, and it should do so here.").

1  example, in O'Neill, 714 F.3d at 673-74, this Court applied

2  Fourteenth Amendment due process cases to terrorism claims

3  brought pursuant to the ATA in federal court. See In re

4  Terrorist Attacks on Sept. 11, 2001, 538 F.3d 71, 93 (2d Cir.

5  2008), abrogated on other grounds by Samantar v. Yousuf, 560

6  U.S. 305 (2010); see also Tex. Trading & Milling Corp. v. Fed.

7  Republic of Nigeria, 647 F.2d 300, 315 n.37 (2d Cir. 1981)

8  (declining to apply different due-process standards in a case

9  governed by the Fifth Amendment compared to one governed by the

10  Fourteenth Amendment), overruled on other grounds by Frontera

11  Res., 582 F.3d at 400; GSS Grp. Ltd v. Nat'l Port Auth., 680

12  F.3d 805, 816-17 (D.C. Cir. 2012) (applying Fourteenth Amendment

13  case law when considering minimum contacts under the Fifth

14  Amendment).

15      Amici Federal Officials concede that our precedents settle

16  the issue, but they argue those cases were wrongly decided and

17  urge us not to follow them. We decline the invitation to upend

18  settled law.[10]

19      Accordingly, we conclude that the minimum contacts and

20  fairness analysis is the same under the Fifth Amendment and the

---

[10] Amici argue for "universal"---or limitless---personal
jurisdiction in terrorism cases. This Court has already rejected
that suggestion. See United States v. Yousef, 327 F.3d 56, 107-
08 (2d Cir. 2003) (per curiam) ("[T]errorism---unlike piracy,
war crimes, and crimes against humanity---does not provide a
basis for universal jurisdiction.").

1   Fourteenth Amendment in civil cases and proceed to analyze the

2   jurisdictional question.

3                              **III.**

4        Pursuant to the due process clauses of the Fifth and

5   Fourteenth Amendments, there are two parts to the due process

6   test for personal jurisdiction as established by International

7   Shoe, 326 U.S. 310, and its progeny: the "minimum contacts"

8   inquiry and the "reasonableness" inquiry.  See Bank Brussels

9   Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d

10  Cir. 2002) (Sotomayor, J.).  The minimum contacts inquiry

11  requires that the court determine whether a defendant has

12  sufficient minimum contacts with the forum to justify the

13  court's exercise of personal jurisdiction over the defendant.

14  See Daimler, 134 S. Ct. at 754; Calder v. Jones, 465 U.S. 783,

15  788 (1984); Int'l Shoe, 326 U.S. at 316; Metro. Life Ins., 84

16  F.3d at 567-68.  The reasonableness inquiry requires the court

17  to determine whether the assertion of personal jurisdiction over

18  the defendant comports with "'traditional notions of fair play

19  and substantial justice'" under the circumstances of the

20  particular case.  Daimler, 134 S. Ct. at 754 (quoting Goodyear,

21  564 U.S. at 923); Burger King Corp. v. Rudzewicz, 471 U.S. 462,

22  476-78 (1985).

23       International Shoe distinguished between two exercises of

24  personal jurisdiction: general jurisdiction and specific

27

1  jurisdiction.  The district court in this case ruled only on the

2  issue of general jurisdiction. We conclude that general

3  jurisdiction is absent; the question remains whether the court

4  may nonetheless assert its jurisdiction under the doctrine of

5  specific jurisdiction.

6      A court may assert general personal jurisdiction over a

7  foreign defendant to hear any and all claims against that

8  defendant only when the defendant's affiliations with the State

9  in which suit is brought "are so constant and pervasive 'as to

10  render [it] essentially at home in the forum State.'" Daimler,

11  134 S. Ct. at 751 (quoting Goodyear, 564 U.S. at 919); see also

12  Goodyear, 564 U.S. at 924.  "Since International Shoe, 'specific

13  jurisdiction has become the centerpiece of modern jurisdiction

14  theory, while general jurisdiction [has played] a reduced

15  rule.'" Daimler, 134 S. Ct. at 755 (quoting Goodyear, 564 U.S.

16  at 925).  Accordingly, there are "few" Supreme Court opinions

17  over the past half-century that deal with general jurisdiction.

18  Id.

19      "Specific jurisdiction, on the other hand, depends on an

20  affiliation between the forum and the underlying controversy,

21  principally, activity or an occurrence that takes place in the

22  forum State and is therefore subject to the State's regulation."

23  Goodyear, 564 U.S. at 919 (alterations, internal quotation

24  marks, and citation omitted).  The exercise of specific

28

1  jurisdiction depends on in-state activity that "*gave rise to the*

2  *episode-in-suit*."  Id. at 923 (quoting Int'l Shoe, 326 U.S. at

3  317) (emphasis in original).  In certain circumstances, the

4  "commission of certain 'single or occasional acts' in a State

5  may be sufficient to render a corporation answerable in that

6  State with respect to those acts, though not with respect to

7  matters unrelated to the forum connections."  Id. (quoting Int'l

8  Shoe, 326 U.S. at 318).

9                                A.

10      The district court concluded that it had general

11  jurisdiction over the defendants; however, that conclusion

12  relies on a misreading of the Supreme Court's decision in

13  Daimler.

14      In Daimler, the plaintiffs asserted claims under the Alien

15  Tort Statute and the Torture Victim Protection Act of 1991, see

16  28 U.S.C. §§ 1350 & note, as well as other claims, arising from

17  alleged torture that was committed in Argentina by the

18  Argentinian government with the collaboration of an Argentina-

19  based subsidiary of the German corporate defendant.  See

20  Daimler, 134 S. Ct. at 750-52.  The Supreme Court rejected the

21  argument that the California federal court could exercise

22  general personal jurisdiction over the German corporation based

23  on the continuous activities in California of the German

24  corporation's indirect United States subsidiary.  See id. at

29

1   751.  Daimler concluded that the German corporate parent, which

2   was not incorporated in California and did not have its

3   principal place of business in California, could not be

4   considered to be "at home in California" and subject to general

5   jurisdiction there.  Id. at 762.

6        Daimler analogized its "at-home test" to that of an

7   individual's domicile.  "[F]or a corporation, it is an equivalent

8   place, one in which the corporation is fairly regarded as at

9   home.  With respect to a corporation, the place of incorporation

10  and principal place of business are paradigm bases for general

11  jurisdiction."  Id. at 760 (alterations, internal quotation

12  marks, and citations omitted).

13       As an initial matter, while Daimler involved corporations,

14  and neither the PA nor the PLO is a corporation---the PA is a

15  non-sovereign government and the PLO is a foreign agent, and

16  both are unincorporated associations, see Part I.A---Daimler's

17  reasoning was based on an analogy to general jurisdiction over

18  individuals, and there is no reason to invent a different test

19  for general personal jurisdiction depending on whether the

20  defendant is an individual, a corporation, or another entity.

21  Indeed, in Gucci this Court relied on Daimler when it found

22  there was no general personal jurisdiction over the Bank of

23  China, a non-party bank that was incorporated and headquartered

24  in China and owned by the Chinese government.  The Court

30

1  described the Daimler test as applicable to "entities."

2  "General, all-purpose jurisdiction permits a court to hear 'any

3  and all claims' against an *entity*."  Gucci, 768 F.3d at 134

4  (emphasis added); see id. at 134 n.13 ("The essence of general

5  personal jurisdiction is the ability to entertain 'any and all

6  claims' against an entity based solely on the entity's

7  activities in the forum, rather than on the particulars of the

8  case before the court."). Consequently, we consider the PLO and

9  the PA entities subject to the Daimler test for general

10  jurisdiction. See Klieman, 82 F. Supp. 3d at 245-46; Livnat, 82

11  F. Supp. 3d at 28; Safra, 82 F. Supp. 3d at 46.

12      Pursuant to Daimler, the question becomes, where are the PA

13  and PLO "'fairly regarded as at home'"?  134 S. Ct. at 761

14  (quoting Goodyear, 564 U.S. at 924).  The overwhelming evidence

15  shows that the defendants are "at home" in Palestine, where they

16  govern.  Palestine is the central seat of government for the PA

17  and PLO.  The PA's authority is limited to the West Bank and

18  Gaza, and it has no independently operated offices anywhere

19  else.  All PA governmental ministries, the Palestinian

20  president, the Parliament, and the Palestinian security services

21  reside in Palestine.

22      As the District Court for the District of Columbia

23  observed, "[i]t is common sense that the single ascertainable

24  place where a government such a[s] the Palestinian Authority

31

1   should be amenable to suit for all purposes is the place where

2   it governs.  Here, that place is the West Bank, not the United

3   States." Livnat, 82 F. Supp. 3d at 30; see also Safra, 82 F.

4   Supp. 3d at 48.  The same analysis applies equally to the PLO,

5   which during the relevant period maintained its headquarters in

6   Palestine and Amman, Jordan.  See Klieman, 82 F. Supp. 3d at 245

7   ("Defendants' alleged contacts . . . do not suffice to render

8   the PA and the PLO 'essentially at home' in the United States.")

9       The activities of the defendants' mission in Washington,

10  D.C.---which the district court concluded simultaneously served

11  as an office for the PLO and the PA, see Sokolow, 2011 WL

12  1345086, at *3---were limited to maintaining an office in

13  Washington, promoting the Palestinian cause in speeches and

14  media appearances, and retaining a lobbying firm.  See id. at

15  *4.

16      These contacts with the United States do not render the PA

17  and the PLO "essentially at home" in the United States.  See

18  Daimler, 134 S. Ct. at 754.  The commercial contacts that the

19  district court found supported general jurisdiction are like

20  those rejected as insufficient by the Supreme Court in Daimler.

21  In Daimler, the Supreme Court held as "unacceptably grasping" a

22  formulation that allowed for "the exercise of general

23  jurisdiction in every State in which a corporation 'engages in a

24  substantial, continuous, and systematic course of business.'"

32

1   134 S. Ct. at 761.  The Supreme Court found that a court in

2   California could not exercise general personal jurisdiction over

3   the German parent company even though that company's indirect

4   subsidiary was the largest supplier of luxury vehicles to the

5   California market.  Id. at 752.  The Supreme Court deemed

6   Daimler's contacts with California "slim" and concluded that

7   they would "hardly render it at home" in California.  Id. at

8   760.

9      Daimler's contacts with California were substantially

10   greater than the defendants' contacts with the United States in

11   this case.  But still the Supreme Court rejected the proposition

12   that Daimler should be subjected to general personal

13   jurisdiction in California for events that occurred anywhere in

14   the world.  Such a regime would allow entities to be sued in

15   many jurisdictions, not just the jurisdictions where the

16   entities were centered, for worldwide events unrelated to the

17   jurisdiction where suit was brought.  The Supreme Court found

18   such a conception of general personal jurisdiction to be

19   incompatible with due process.  The Supreme Court explained:

20      General jurisdiction . . . calls for an appraisal of a
21      corporation's activities in their entirety, nationwide
22      and worldwide.  A corporation that operates in many
23      places can scarcely be deemed at home in all of them.
24      Otherwise, "at home" would be synonymous with "doing
25      business" tests framed before specific jurisdiction
26      evolved in the United States.  Nothing in
27      International Shoe and its progeny suggests that "a
28      particular quantum of local activity" should give a

1    State authority over a "far larger quantum of . . .
2    activity" having no connection to any in-state
3    activity.

5 Id. at 762 n.20 (internal citations omitted). Regardless of the

6 commercial contacts occasioned by the defendants' Washington,

7 D.C. mission, there is no doubt that the "far larger quantum" of

8 the defendants' activities took place in Palestine.

9    The district court held that the record before it was

10 "insufficient to conclude that either defendant is 'at home' in

11 a particular jurisdiction other than the United States."

12 Sokolow, 2014 WL 6811395, at *2. That conclusion is not

13 supported by the record. The evidence demonstrates that the

14 defendants are "at home" in *Palestine*, where these entities are

15 headquartered and from where they are directed. See Daimler,

16 134 S. Ct. at 762 n.20.[11]

17    The district court also erred in placing the burden on the

18 defendants to prove that there exists "an alternative forum

19 where Plaintiffs' claims could be brought, and where the foreign

20 court could grant a substantially similar remedy." Sokolow,

21 2011 WL 1345086, at *7. Daimler imposes no such burden. In

22 fact, it is the plaintiff's burden to establish that the court

23 has personal jurisdiction over the defendants. See Koehler v.

---

[11] It appears that the district court, when considering where the
defendants were "at home," limited its inquiry to areas that are
within a sovereign nation. We see no basis in precedent for
this limitation.

34

1  Bank of Bermuda Ltd., 101 F.3d 863, 865 (2d Cir. 1996) ("[T]he

2  plaintiff bears the ultimate burden of establishing jurisdiction

3  over the defendant by a preponderance of evidence . . . .");

4  Metro. Life Ins., 84 F.3d at 566-67; see also Klieman, 82 F.

5  Supp. 3d at 243; Livnat, 82 F. Supp. 3d at 30; Safra, 82 F.

6  Supp. 3d at 49.[12]

7     Finally, the district court did not dispute the defendants'

8  ties to Palestine but concluded that the court had general

9  jurisdiction pursuant to an "exception" that the Supreme Court

10  alluded to in a footnote in Daimler.  In Daimler, the Supreme

11  Court did not "foreclose the possibility that in an exceptional

12  case, a corporation's operations in a forum other than its

13  formal place of incorporation or principal place of business may

14  be so substantial and of such a nature as to render the

15  corporation at home in that State." 134 S. Ct. at 761 n.19

16  (citing Perkins v. Benguet Consol. Mining Co., 342 U.S. 437,

17  447-48 (1952)).

---

[12] The district court's focus on the importance of identifying an
alternative forum may have been borrowed inappositely from *forum
non conveniens* jurisprudence, pursuant to which a court
considers (1) the degree of deference to be afforded to the
plaintiff's choice of forum; (2) whether there is an adequate
alternative forum for adjudicating the dispute; and (3) whether
the balance of private and public interests tips in favor of
adjudication in one forum or the other.  See Norex Petroleum
Ltd. v. Access Indus., Inc., 416 F.3d 146, 153 (2d Cir. 2005).
However, that is not the test for general jurisdiction under
Daimler, 134 S. Ct. at 762 n.20.

1      *Daimler* analyzed the 1952 *Perkins* case, "'the textbook case

2  of general jurisdiction appropriately exercised over a foreign

3  corporation that has not consented to suit in the forum.'"  *Id.*

4  at 755-56 (quoting *Goodyear*, 564 U.S. at 928).  The defendant in

5  *Perkins* was a company, Benguet Consolidated Mining Company

6  ("Benguet"), which was incorporated under the laws of the

7  Philippines, where it operated gold and silver mines.  During

8  World War II, the Japanese occupied the Philippines, and

9  Benguet's president relocated to Ohio, where he kept an office,

10  maintained the company's files, and oversaw the company's

11  activities. *Perkins*, 342 U.S. at 447-48.  The plaintiff, a

12  nonresident of Ohio, sued Benguet in a state court in Ohio on a

13  claim that neither arose in Ohio nor related to the

14  corporation's activities in Ohio, but the Supreme Court

15  nevertheless held that the Ohio courts could constitutionally

16  exercise general personal jurisdiction over the defendant.  *Id.*

17  at 438, 440.  As the Supreme Court later observed: "'Ohio was

18  the corporation's principal, if temporary, place of business.'"

19  *Daimler*, 134 S. Ct. at 756 (quoting *Keeton v. Hustler Magazine,*

20  *Inc.*, 465 U.S. 770, 780 n.11 (1984)).

21      Such exceptional circumstances did not exist in *Daimler*,

22  *id.* at 761 n.19, or in *Gucci*.  In *Gucci*, this Court held that,

23  while a nonparty bank had branch offices in the forum, it was

24  not an "exceptional case" in which to exercise general personal

36

1  jurisdiction where the bank was incorporated and headquartered

2  elsewhere, and its contacts were not "'so continuous and

3  systematic as to render [it] essentially at home in the forum.'"

4  768 F.3d at 135 (quoting Daimler, 134 S. Ct. at 761 n.19).

5      The defendants' activities in this case, as with those of

6  the defendants in Daimler and Gucci, "plainly do not approach"

7  the required level of contact to qualify as "exceptional."

8  Daimler, 134 S. Ct. at 761 & n.19.  The PLO and PA have not

9  transported their principle "home" to the United States, even

10  temporarily, as the defendant had in Perkins.  See Brown v.

11  Lockheed Martin Corp., 814 F.3d 619, 628-30 (2d Cir. 2016).

12      Accordingly, pursuant to the Supreme Court's recent

13  decision in Daimler, the district court could not properly

14  exercise general personal jurisdiction over the defendants.

15                                **B.**

16      The district court did not rule explicitly on whether it

17  had specific personal jurisdiction over the defendants, but the

18  question was sufficiently briefed and argued to allow us to

19  reach that issue.

20      "The inquiry whether a forum State may assert specific

21  jurisdiction over a nonresident defendant focuses on the

22  relationship among the defendant, the forum, and the litigation.

23  For a State to exercise jurisdiction consistent with due

24  process, the defendant's suit-related conduct must create a

37

1  substantial connection with the forum State." Walden v. Fiore,

2  134 S. Ct. 1115, 1121 (2014) (internal quotation marks and

3  citations omitted).  The relationship between the defendant and

4  the forum "must arise out of contacts that the 'defendant

5  *himself*' creates with the forum."  Id. at 1122 (citing Burger

6  King, 471 U.S. at 475) (emphasis in original). The "'minimum

7  contacts' analysis looks to the defendant's contacts with the

8  forum State itself, not the defendant's contacts with persons

9  who reside there."  Id.  And the "same principles apply when

10 intentional torts are involved."  Id. at 1123.

11     The question in this case is whether the defendants' suit-

12 related conduct---their role in the six terror attacks at issue-

13 --creates a substantial connection with the forum State pursuant

14 to the ATA. The relevant "suit-related conduct" by the

15 defendants was the conduct that could have subjected them to

16 liability under the ATA. On its face, the conduct in this case

17 did not involve the defendants' conduct in the United States in

18 violation of the ATA.  While the plaintiff-victims were United

19 States citizens, the terrorist attacks occurred in and around

20 Jerusalem, and the defendants' activities in violation of the

21 ATA occurred outside the United States.

22     The ATA provides:

23     Any national of the United States injured in his or
24     her person, property, or business by reason of an act
25     of international terrorism, or his or her estate,

38

1     survivors, or heirs, may sue therefor in any
2     appropriate district court of the United States and
3     shall recover threefold the damages he or she sustains
4     and the cost of the suit, including attorney's fees.
5
6  18 U.S.C. § 2333(a)

7     To prevail under the ATA, a plaintiff must prove "three

8  formal elements: unlawful *action*, the requisite *mental state*,

9  and *causation*." Sokolow, 60 F. Supp. 3d at 514 (quoting Gill v.

10  Arab Bank, PLC, 893 F. Supp. 2d 542, 553 (E.D.N.Y. 2012))

11  (emphasis in original).

12     To establish an "unlawful action," the plaintiffs must show

13  that their injuries resulted from an act of "international

14  terrorism." The ATA defines "international terrorism" as

15  activities that, among other things, "involve violent acts or

16  acts dangerous to human life that are a violation of the

17  criminal laws of the United States or of any State, or that

18  would be a criminal violation if committed within the

19  jurisdiction of the United States or of any State." 18 U.S.C.

20  § 2331(1)(A). The acts must also appear to be intended "(i) to

21  intimidate or coerce a civilian population; (ii) to influence

22  the policy of a government by intimidation or coercion; or

23  (iii) to affect the conduct of a government by mass destruction,

24  assassination, or kidnapping." 18 U.S.C. § 2331(1)(B)(i)-(iii).

25     The plaintiffs asserted that the defendants were

26  responsible on a *respondeat superior* theory for a variety of

1  predicate acts, including murder and attempted murder, 18 U.S.C.

2  §§ 1111, 2332, use of a destructive device on a mass

3  transportation vehicle, 18 U.S.C. § 1992, detonating an

4  explosive device on a public transportation system, 18 U.S.C.

5  § 2332f, and conspiracy to commit those acts, 18 U.S.C. § 371.

6  See Sokolow, 60 F. Supp. 3d at 515.  They also asserted that the

7  defendants directly violated federal and state antiterrorism

8  laws, including 18 U.S.C. § 2339B, by providing material support

9  to FTO-designated groups (the AAMB and Hamas) and by harboring

10 persons whom the defendants knew or had reasonable grounds to

11 believe committed or were about to commit an offense relating to

12 terrorism, see 18 U.S.C. § 2339 et seq.; see also Sokolow, 60 F.

13 Supp. 3d at 520-21, 523.

14      The ATA further limits international terrorism to

15 activities that "occur primarily outside the territorial

16 jurisdiction of the United States, or transcend national

17 boundaries in terms of the means by which they are accomplished,

18 the persons they appear intended to intimidate or coerce, or the

19 locale in which their perpetrators operate or seek asylum."  18

20 U.S.C. § 2331(1)(C) (emphasis added).

21      The bombings and shootings here occurred entirely outside

22 the territorial jurisdiction of the United States.  Thus, the

23 question becomes: What other constitutionally sufficient

40

1  connection did the commission of *these* torts by *these* defendants

2  have to *this* jurisdiction?

3      The jury found in a special verdict that the PA and the PLO

4  were liable for the attacks under several theories.  In all of

5  the attacks, the jury found that the PA and the PLO were liable

6  for providing material support or resources that were used in

7  preparation for, or in carrying out, each attack.

8      In addition, the jury found that in five of the attacks---

9  the January 22, 2002 Jaffa Road Shooting, the January 27, 2002

10  Jaffa Road Bombing, the March 21, 2002 King George Street

11  Bombing, the July 31, 2002 Hebrew University Bombing, and the

12  January 29, 2004 Bus No. 19 Bombing---the PA was liable because

13  an employee of the PA, acting within the scope of the employee's

14  employment and in furtherance of the activities of the PA,

15  either carried out, or knowingly provided material support or

16  resources that were used in preparation for, or in carrying out,

17  the attack.

18      The jury also found that in one of the attacks---the July

19  31, 2002 Hebrew University Bombing---the PLO and the PA harbored

20  or concealed a person who the organizations knew, or had

21  reasonable grounds to believe, committed or was about to commit

22  the attack.

23      Finally, the jury found that in three attacks---the June

24  19, 2002 French Hill Bombing, the July 31, 2002 Hebrew

41

1  University Bombing, and the January 29, 2004 Bus No. 19 Bombing-

2  --the PA and PLO knowingly provided material support to an FTO-

3  designated group (the AAMB or Hamas).

4      But these actions, as heinous as they were, were not

5  sufficiently connected to the United States to provide specific

6  personal jurisdiction in the United States.  There is no basis

7  to conclude that the defendants participated in these acts in

8  the United States or that their liability for these acts

9  resulted from their actions that did occur in the United States.

10     In short, the defendants were liable for tortious

11  activities that occurred outside the United States and affected

12  United States citizens only because they were victims of

13  indiscriminate violence that occurred abroad.  The residence or

14  citizenship of the plaintiffs is an insufficient basis for

15  specific jurisdiction over the defendants.  A focus on the

16  relationship of the defendants, the forum, and the defendants'

17  suit-related conduct points to the conclusion that there is no

18  specific personal jurisdiction over the defendants for the torts

19  in this case.  See Walden, 134 S. Ct. at 1121; see also

20  Goodyear, 564 U.S. at 923.

21     In the absence of such a relationship, the plaintiffs argue

22  on appeal that the Court has specific jurisdiction for three

23  reasons.  First, the plaintiffs argue that, under the "effects

24  test," a defendant acting entirely outside the United States is

42

1    subject to jurisdiction "if the defendant expressly aimed its

2    conduct" at the United States.  Licci ex rel. Licci v. Lebanese

3    Canadian Bank, SAL, 732 F.3d 161, 173 (2d Cir. 2013).  The

4    plaintiffs point to the jury verdict that found that the

5    defendants provided material support to designated FTOs---the

6    AAMB and Hamas---and that the defendants' employees, acting

7    within the scope of their employment, killed and injured United

8    States citizens.  They also argue that the defendants' terror

9    attacks were intended to influence United States policy to favor

10   the defendants' political goals.  Second, the plaintiffs argue

11   that the defendants purposefully availed themselves of the forum

12   by establishing a continuous presence in the United States and

13   pressuring United States government policy by conducting terror

14   attacks in Israel and threatening further terrorism unless

15   Israel withdrew from Gaza and the West Bank.  See Banks Brussels

16   Lambert, 305 F.3d at 128.  Third, the plaintiffs argue that the

17   defendants consented to personal jurisdiction under the ATA by

18   appointing an agent to accept process.

19       Walden forecloses the plaintiffs' arguments.  First, with

20   regard to the effects test, the defendant must "expressly aim[]"

21   his conduct at the United States.  See Licci, 732 F. 3d at 173.

22   Pursuant to Walden, it is "insufficient to rely on a defendant's

23   'random, fortuitous, or attenuated contacts' or on the

24   'unilateral activity' of a plaintiff" with the forum to

43

1   establish specific jurisdiction.  <u>Walden</u>, 134 S. Ct. at 1123

2   (quoting <u>Burger King</u>, 471 U.S. at 475).  While the killings and

3   related acts of terrorism are the kind of activities that the

4   ATA proscribes, those acts were unconnected to the forum and

5   were not expressly aimed at the United States.  And "[a] forum

6   State's exercise of jurisdiction over an out-of-state

7   intentional tortfeasor must be based on intentional conduct by

8   the defendant that creates the necessary contacts with the

9   forum."  <u>Id.</u>  That is not the case here.

10      The plaintiffs argue that United States citizens were

11   targets of these attacks, but their own evidence establishes the

12   random and fortuitous nature of the terror attacks.  For

13   example, at trial, the plaintiffs emphasized how the "killing

14   was indeed random" and targeted "Christians and Jews, Israelis,

15   Americans, people from all over the world."  J.A. 3836.

16   Evidence at trial showed that the shooters fired

17   "indiscriminately," J.A. 3944, and chose sites for their suicide

18   bomb attacks that were "full of people," J.A. 4030-31, because

19   they sought to kill "as many people as possible," J.A. 3944<u>; see</u>

20   <u>also</u> J.A. 4031.

21      The plaintiffs argue that "[i]t is a fair inference that

22   Defendants <i>intended to</i> hit American citizens by continuing a

23   terror campaign that continuously hit Americans . . . ."  Pls.'

24   Br. at 37 (emphasis in original).  But the Constitution requires

44

1  much more purposefully directed contact with the forum.  For

2  example, the Supreme Court has "upheld the assertion of

3  jurisdiction over defendants who have purposefully 'reach[ed]

4  out beyond' their State and into another by, for example,

5  entering a contractual relationship that 'envisioned continuing

6  and wide-reaching contacts' in the forum State," Walden, 134 S.

7  Ct. at 1122 (alteration in original) (quoting Burger King, 472

8  U.S. at 479-80), or "by circulating magazines to 'deliberately

9  exploi[t]' a market in the forum State." Id. (alteration in

10 original) (quoting Keeton, 465 U.S. at 781).  But there was no

11 such purposeful connection to the forum in this case, and it

12 would be impermissible to speculate based on scant evidence what

13 the terrorists intended to do.

14     Furthermore, the facts of Walden also suggest that a

15 defendant's mere knowledge that a plaintiff resides in a

16 specific jurisdiction would be insufficient to subject a

17 defendant to specific jurisdiction in that jurisdiction if the

18 defendant does nothing in connection with the tort in that

19 jurisdiction.  In Walden, the petitioner was a police officer in

20 Georgia who was working as a deputized Drug Enforcement

21 Administration ("DEA") agent at the Atlanta airport.  He was

22 informed that the respondents, Gina Fiore and Keith Gipson, were

23 flying from San Juan, Puerto Rico through Atlanta en route to

24 their final destination in Las Vegas, Nevada.  See Joint

45

1   Appendix, <u>Walden v. Fiore</u>, 2013 WL 2390248, *41-42 (U.S.) (Decl.

2   of Anthony Walden).  Walden and his DEA team stopped the

3   respondents and searched their bags in Atlanta and examined

4   their California drivers' licenses.  <u>Id.</u>; <u>Walden</u>, 134 S. Ct. at

5   1119.  Walden found almost $100,000 in cash in the respondents'

6   carry-on bag and seized it, giving rise to a claim for an

7   unconstitutional search under <u>Bivens v. Six Unknown Named Agents</u>

8   <u>of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971).  <u>See</u>

9   <u>Walden</u>, 134 S. Ct. at 1119-20.  The Supreme Court found that the

10   petitioner's contacts with Nevada were insufficient to establish

11   personal jurisdiction over the petitioner in a Nevada federal

12   court, even though Walden knew that the respondents were

13   destined for Nevada.  <u>See</u> <u>id.</u> at 1119.

14       In this case, the plaintiffs point us to no evidence that

15   these indiscriminate terrorist attacks were specifically

16   targeted against United States citizens, and the mere knowledge

17   that United States citizens might be wronged in a foreign

18   country goes beyond the jurisdictional limit set forth in

19   <u>Walden</u>.

20       The plaintiffs cite to several cases to support their

21   argument that specific jurisdiction is warranted under an

22   "effects test."  Those cases are easily distinguishable from

23   this case.  Indeed, they point to the kinds of circumstances

1   that would give rise to specific jurisdiction under the ATA,

2   which are not present here.

3        For example, in Mwani v. Bin Laden, 417 F.3d 1 (D.C. Cir.

4   2005), the Court of Appeals for the District of Columbia Circuit

5   found that specific personal jurisdiction over Osama Bin Laden

6   and al Qaeda was supported by allegations that they

7   "orchestrated the bombing of the *American* embassy in Nairobi,

8   not only to kill both American and Kenyan employees inside the

9   building, but to cause pain and sow terror in the embassy's home

10  country, *the United States*," as well as allegations of "an

11  ongoing conspiracy to attack the United States, with overt acts

12  occurring *within* this country's borders." Id. at 13 (emphasis

13  added).  The plaintiffs pointed to the 1993 World Trade Center

14  bombing, as well as the plot to bomb the United Nations, Federal

15  Plaza, and the Lincoln and Holland Tunnels in New York.  Id.

16  Furthermore, the Court of Appeals found that bin Laden and al

17  Qaeda "'purposefully directed' [their] activities at residents"

18  of the United States, and that the case "result[ed] from

19  injuries to the plaintiffs 'that arise out of or relate to those

20  activities,'" id. (quoting Burger King, 471 U.S. at 472).

21       "[E]xercising specific jurisdiction because the victim of a

22  foreign attack happened to be an American would run afoul of the

23  Supreme Court's holding that '[d]ue process requires that a

24  defendant be haled into court in a forum State based on his own

47

1   affiliation with the State, not based on the "random,

2   fortuitous, or attenuated" contacts he makes by interacting with

3   other persons affiliated with the State.'" <u>Klieman</u>, 82 F. Supp.

4   3d at 248 (quoting <u>Walden</u>, 134 S. Ct. at 1123); <u>see Safra</u>, 82 F.

5   Supp. 3d at 52 (distinguishing <u>Mwani</u>); <u>see also</u> <u>In re Terrorist</u>

6   <u>Attacks on Sept. 11, 2001</u>, 538 F.3d at 95–96 (holding that even

7   if Saudi princes could and did foresee that Muslim charities

8   would use their donations to finance the September 11 attacks,

9   providing indirect funding to an organization that was openly

10   hostile to the United States did not constitute the type of

11   intentional conduct necessary to constitute purposeful direction

12   of activities at the forum); <u>Livnat</u>, 82 F. Supp. 3d at 33.

13       The plaintiffs also rely on <u>O'Neill</u>, 714 F.3d at 659, which

14   related to the September 11 attacks. In that case, this Court

15   first clarified that "specific personal jurisdiction properly

16   exists where the defendant took 'intentional, and allegedly

17   tortious, actions . . . expressly aimed' at the forum." <u>Id.</u> at

18   674 (quoting <u>Calder</u>, 465 U.S. at 789). This Court also noted

19   that, "the fact that harm in the forum is foreseeable . . . is

20   insufficient for the purpose of establishing specific personal

21   jurisdiction over a defendant." <u>Id.</u> This Court then held that

22   the plaintiffs' allegations were insufficient to establish

23   personal jurisdiction over about two dozen defendants, but that

24   jurisdictional discovery was warranted for twelve other

1   defendants whose "alleged support of al Qaeda [was] more

2   direct." Id. at 678; see also id. at 656-66. Those defendants

3   "allegedly controlled and managed some of [the front]

4   'charitable organizations' and, through their positions of

5   control, they allegedly sent financial and other material

6   support *directly* to al Qaeda when al Qaeda allegedly was known

7   to be *targeting the United States*." Id. (second emphasis

8   added).

9       The plaintiffs argue that this Court should likewise find

10  jurisdiction because the defendants' "direct, knowing provision

11  of material support to designated FTOs [in this case, Hamas and

12  the AAMB] is enough---standing alone---to sustain specific

13  jurisdiction because they knowingly aimed their conduct at U.S.

14  interests." Pls.' Br. at 36. But that argument misreads

15  O'Neill. In O'Neill, this Court emphasized that the mere "fact

16  that harm in the forum is foreseeable" was "insufficient for the

17  purpose of establishing specific personal jurisdiction over a

18  defendant," 714 F.3d at 674, and the Court did not end its

19  inquiry when it concluded that the defendants may have provided

20  support to terror organizations. Indeed, the Court held that

21  "factual issues persist with respect to whether this support was

22  'expressly aimed' at the United States," warranting

23  jurisdictional discovery. Id. at 678-79. The Court looked at

24  the specific aim of the group receiving support---particularly

1  that al Qaeda was "known to be targeting the United States"---

2  and not simply that it and other defendants were "terrorist

3  organizations."  Id. at 678.[13]

4       The plaintiffs also cite Calder v. Jones, 465 U.S. at 783.

5  In that case, a California actress brought a libel suit in

6  California state court against a reporter and an editor, both of

7  whom worked for a tabloid at the tabloid's Florida headquarters.

8  Id. at 784.  The plaintiff's claims were based on an article

9  written and edited by the defendants in Florida for the tabloid,

10  which had a California circulation of about 600,000.  Id. at

11  784-86.  The Supreme Court held that California's assertion of

12  personal jurisdiction over the defendants for a libel action was

13  proper based on the effects of the defendants' conduct in

14  California.  Id. at 788.  "The article was drawn from California

15  sources, and the brunt of the harm, in terms both of

16  respondent's emotional distress and the injury to her

17  professional reputation, was suffered in California," the

18  Supreme Court held.  Id. at 788-89.  "In sum, California is the

---

[13] Furthermore, the mere designation of a group as an FTO does
not reflect that the organization has aimed its conduct at the
United States.  The Secretary of State may "designate an
organization as a foreign terrorist organization" if the
Secretary finds "the organization is a foreign organization,"
"the organization engages in terrorist activity," "or retains
the capability and intent to engage in terrorist activity or
terrorism," and "the terrorist activity or terrorism of the
organization threatens the security of United States nationals
or the national security of the United States."  8 U.S.C.
§ 1189(a)(1)(A)-(C).

50

1   *focal point* both of the story and of the harm suffered." Id. at

2   789 (emphasis added); see also Walden, 134 S. Ct. at 1123

3   (describing the contacts identified in Calder as "ample" to

4   support specific jurisdiction).  As the Supreme Court explained

5   in Walden, the jurisdictional inquiry in Calder focused on the

6   relationship among the defendant, the forum, and the litigation.

7   Walden, 134 S. Ct. at 1123.

8       Unlike in Calder, it cannot be said that the United States

9   is the focal point of the torts alleged in this litigation.  In

10  this case, the United States is not the nucleus of the harm---

11  Israel is.  See Safra, 82 F. Supp. 3d at 51.

12      Finally, the plaintiffs rely on two criminal cases, United

13  States v. Yousef, 327 F.3d 56 (2d Cir. 2003) (per curiam), and

14  United States v. Al Kassar, 660 F.3d 108 (2d Cir. 2011), for

15  their argument that the "effects test" supports jurisdiction.

16  In both cases, this Court applied the due process test for

17  asserting jurisdiction over extraterritorial criminal conduct,

18  which differs from the test applicable in this civil case, see

19  Al Kassar, 660 F.3d at 118; Yousef, 327 F.3d at 111-12, and does

20  not require a nexus between the specific criminal conduct and

21  harm within the United States.  See also United States v.

22  Murillo, No. 15-4235, 2016 WL 3257016, at *3 (4th Cir. June 14,

23  2016)("[I]t is not arbitrary to prosecute a defendant in the

24  United States if his actions affected significant American

51

1  interests---even if the defendant did not mean to affect those

2  interests." (internal citation and quotation marks omitted)).

3  In order to apply a federal criminal statute to a defendant

4  extraterritorially consistent with due process, "'there must be

5  a sufficient nexus between the defendant and the United States,

6  so that such application would not be arbitrary or fundamentally

7  unfair.' For non-citizens acting entirely abroad, a

8  jurisdictional nexus exists when the aim of that activity is to

9  cause harm inside the United States *or* to U.S. citizens *or*

10  interests." Al Kassar, 660 F.3d 108, 118 (emphasis added)

11  (quoting Yousef, 327 F.3d at 111).

12      In a civil action, as Walden makes clear, "the defendant's

13  suit-related conduct must create a substantial connection with

14  the forum State." 134 S. Ct. at 1121.

15      Even setting aside the fact that both Yousef and Al Kassar

16  applied the more expansive due process test in criminal cases,

17  the defendants in both cases had more substantial connections

18  with the United States than the defendants have in the current

19  litigation. Yousef involved a criminal prosecution for the

20  bombing of an airplane traveling from the Philippines to Japan.

21  See 327 F.3d at 79. The Yousef defendants "conspired to attack

22  a dozen United States-flag aircraft in an effort to inflict

23  injury on this country and its people and influence American

24  foreign policy, and their attack on the Philippine Airlines

52

1  flight was a 'test-run' in furtherance of this conspiracy."  <u>Id.</u>

2  at 112.

3  In <u>Al Kassar</u>, several defendants were convicted of

4  conspiring to kill United States officers, to acquire and export

5  anti-aircraft missiles, and knowingly to provide material

6  support to a terrorist organization; two were also convicted of

7  conspiring to kill United States citizens and of money

8  laundering.  660 F.3d at 115.  On appeal, the defendants

9  challenged their convictions on a number of grounds, including

10  that the defendants' Fifth Amendment due process rights were

11  violated by prosecuting them for activities that occurred

12  abroad.  <u>Id.</u> at 117-18.  This Court rejected that argument

13  because the defendants conspired to sell arms to a group "with

14  the understanding that they would be used to kill Americans and

15  destroy U.S. property; the aim therefore was to harm U.S.

16  citizens and interests and to threaten the security of the

17  United States."  <u>Id.</u> at 118.

18  In this case, the defendants undertook terror attacks

19  within Israel, and there is no evidence the attacks specifically

20  targeted United States citizens.  <u>See</u> <u>Safra</u>, 82 F. Supp. 3d at

21  53-54; <u>see also</u> <u>Livnat</u>, 82 F. Supp. 3d at 34.

22  Accordingly, in the present case, specific jurisdiction is

23  not appropriate under the "effects test."

53

1    Second, _Walden_ undermines the plaintiffs' arguments that

2 the defendants met the "purposeful availment" test by

3 establishing a continuous presence in the United States and

4 pressuring United States government policy.  The emphasis on the

5 defendants' Washington, D.C. mission confuses the issue: _Walden_

6 requires that the "suit-related conduct"---here, the terror

7 attacks in Israel---have a "substantial connection with the

8 forum." 134 S. Ct. at 1121.  The defendants' Washington mission

9 and its associated lobbying efforts do not support specific

10 personal jurisdiction on the ATA claims.  The defendants cannot

11 be made to answer in this forum "with respect to matters

12 unrelated to the forum connections." _Goodyear_, 564 U.S. at 923;

13 see also _Klieman_, 82 F. Supp. 3d at 247 ("Courts typically

14 require that the plaintiff show some sort of causal relationship

15 between a defendant's U.S. contacts and the episode in suit.").

16    The plaintiffs argue on appeal that the defendants intended

17 their terror campaign to influence not just Israel, but also the

18 United States.  They point to trial evidence---specifically

19 pamphlets published by the PA---that, the plaintiffs argue,

20 shows that the defendants were attempting to influence United

21 States policy toward the Israel-Palestinian conflict.  The

22 exhibits themselves speak in broad terms of how United States

23 interests in the region are in danger and how the United States

24 and Europe should exert pressure on Israel to change its

54

1 practices toward the Palestinians. It is insufficient for

2 purposes of due process to rely on evidence that a political

3 organization sought to influence United States policy, without

4 some other connection among the activities underlying the

5 litigation, the defendants, and the forum.  Such attenuated

6 activity is insufficient under Walden.

7      The plaintiffs cite Licci, 732 F.3d 161, to support their

8 argument that the defendants meet the purposeful availment test.

9 But the circumstances of that case are distinguishable and

10 illustrate why the defendants here do not meet that test.  In

11 Licci, American, Canadian, and Israeli citizens who were injured

12 or whose family members were killed in a series of terrorist

13 rocket attacks by Hizbollah in Israel brought an action under

14 the ATA and other laws against the Lebanese Canadian Bank, SAL

15 ("LCB"), which allegedly facilitated Hizbollah's acts by using

16 correspondent banking accounts at a defendant New York bank

17 (American Express Bank Ltd.) to effectuate wire transfers

18 totaling several million dollars on Hizbollah's behalf.  Id. at

19 164-66.  This Court concluded that the exercise of personal

20 jurisdiction over the defendants was constitutional because of

21 the defendants' "repeated use of New York's banking system, as

22 an instrument for accomplishing the alleged wrongs for which the

23 plaintiffs seek redress."  Id. at 171.  These contacts

24 constituted "'purposeful[] avail[ment] . . . of the privilege of

55

1    doing business in [New York],' so as to permit the subjecting of

2    LCB to specific jurisdiction within the Southern District of New

3    York . . . ." Id. (quoting Bank Brussels Lambert, 305 F.3d at

4    127).

5         "It should hardly be unforeseeable to a bank that selects

6    and makes use of a particular forum's banking system that it

7    might be subject to the burden of a lawsuit in that forum for

8    wrongs *related to*, and *arising from*, *that use*." Id. at 171-72

9    (emphasis added) (footnote omitted).

10        In Licci, this Court also distinguished the "effects test"

11   theory of personal jurisdiction which is "typically invoked

12   where (*unlike here*) the conduct that forms the basis for the

13   controversy occurs entirely out-of-forum, and the only relevant

14   jurisdictional contacts with the forum are therefore in-forum

15   effects harmful to the plaintiff." Id. at 173 (emphasis added)

16   (footnote omitted). The Court held that the effects test was

17   inappropriate because "the constitutional exercise of personal

18   jurisdiction over a foreign defendant" turned on conduct that

19   "occur[ed] *within* the forum," id. (emphasis in original), namely

20   the repeated use of bank accounts in New York to support the

21   alleged wrongs for which the plaintiffs sued.

22        In this case, there is no such connection between the

23   conduct on which the alleged personal jurisdiction is based and

24   the forum. And the connections the defendants do have with the

56

1 United States---the Washington, D.C. and New York missions---

2 revolve around lobbying activities that are not proscribed by

3 the ATA and are not connected to the wrongs for which the

4 plaintiffs here seek redress.

5     At a hearing before the district court, the plaintiffs also

6 cited Bank Brussels Lambert, 305 F.3d 120, as their "best case"

7 for their purposeful availment argument.  See J.A. 1128.  But

8 that case, too, is distinguishable.  There, a client bank sued

9 its lawyers for legal malpractice that occurred in Puerto Rico.

10 Bank Brussels Lambert, 305 F.3d at 123.  This Court held that

11 the Puerto Rican law firm defendant had sufficient minimum

12 contacts with the New York forum and purposely availed itself of

13 the privilege of doing business in New York, because, although

14 the law firm did not solicit the bank as a client in New York,

15 the firm maintained an apartment in New York partially for the

16 purpose of better servicing its New York clients, the firm faxed

17 newsletters regarding Puerto Rican legal developments to persons

18 in New York, the firm had numerous New York clients, and its

19 marketing materials touted the firm's close relationship with

20 the Federal Reserve Bank of New York.  Id. at 127-29.  "The

21 engagement which gave rise to the dispute here is not simply one

22 of a string of fortunate coincidences for the firm.  Rather, the

23 picture which emerges from the above facts is that of a law firm

24 which seeks to be known in the New York legal market, makes

1   efforts to promote and maintain a client base there, and profits

2   substantially therefrom." <u>Id.</u> at 128. This Court held that

3   there was "nothing fundamentally unfair about requiring the firm

4   to defend itself in the New York courts when a dispute arises

5   from its representation of a New York client---a representation

6   which developed in a market it had deliberately cultivated and

7   which, after all, the firm voluntarily undertook." <u>Id.</u> at 129.

8   In short, the defendants' contacts with the forum were

9   sufficiently related to the malpractice claims that were at

10   issue in the suit.

11      That is not the case here. The plaintiffs' claims did not

12   arise from the defendants' purposeful contacts with the forum.

13   And where the defendant in <u>Bank Brussels Lambert</u> purposefully

14   and repeatedly reached into New York to obtain New York clients-

15   --and as a result of those activities, it obtained a

16   representation for which it was sued---in this case, the

17   plaintiffs' claims did not arise from any activity by the

18   defendants in this forum.

19      Thus, in this case, unlike in <u>Licci</u> and <u>Bank Brussels</u>

20   <u>Lambert</u>, the defendants are not subject to specific personal

21   jurisdiction based on a "purposeful availment" theory because

22   the plaintiffs' claims do not arise from the defendants'

23   activity in the forum.

58

1      Third, the plaintiffs' argue that the defendants consented

2  to personal jurisdiction under the ATA by appointing an agent to

3  accept process.  It is clear that the ATA permitted service of

4  process on the representative of the PLO and PA in Washington.

5  See 18 U.S.C. § 2334(a).  However, the statute does not answer

6  the constitutional question of whether due process is satisfied.

7      The plaintiffs contend that under United States v. Scophony

8  Corp. of America, 333 U.S. 795 (1948), meeting the statutory

9  requirement for service of process suffices to establish

10 personal jurisdiction.  But Scophony does not stand for that

11 proposition.  The defendant in Scophony "was 'transacting

12 business' of a substantial character in the New York district at

13 the times of service, so as to establish venue there," and so

14 that "such a ruling presents no conceivable element of offense

15 to 'traditional notions of fair play and substantial justice.'"

16 Id. at 818 (quoting Int'l Shoe, 326 U.S. at 316).  Thus,

17 Scophony affirms the understanding, echoed by this Court in

18 Licci, 673 F.3d at 60, and O'Neill, 714 F.3d at 673-74, that due

19 process analysis---considerations of minimum contacts and

20 reasonableness---applies even when federal service-of-process

21 statutes are satisfied.  Simply put, "the exercise of personal

22 jurisdiction must comport with constitutional due process

23 principles."  Licci, 673 F.3d at 60; see also Brown, 814 F.3d at

24 641.  As explained above, due process is not satisfied in this

1    case, and the courts have neither general nor specific personal

2    jurisdiction over the defendants, regardless of the service-of-

3    process statute.

4         In sum, because the terror attacks in Israel at issue here

5    were not expressly aimed at the United States and because the

6    deaths and injuries suffered by the American plaintiffs in these

7    attacks were "random [and] fortuitous" and because lobbying

8    activities regarding American policy toward Israel are

9    insufficiently "suit-related conduct" to support specific

10   jurisdiction, the Court lacks specific jurisdiction over these

11   defendants.  Walden, 134 S. Ct. at 1121, 1123.

12                                  ***

13        The terror machine gun attacks and suicide bombings that

14   triggered this suit and victimized these plaintiffs were

15   unquestionably horrific.  But the federal courts cannot exercise

16   jurisdiction in a civil case beyond the limits prescribed by the

17   due process clause of the Constitution, no matter how horrendous

18   the underlying attacks or morally compelling the plaintiffs'

19   claims.

20        The district court could not constitutionally exercise

21   either general or specific personal jurisdiction over the

22   defendants in this case.  Accordingly, this case must be

23   dismissed.

24

                                   60

1                            **CONCLUSION**

2        We have considered all of the arguments of the parties.  To

3    the extent not specifically addressed above, they are either

4    moot or without merit.  For the reasons explained above, we

5    **VACATE** the judgment of the district court and **REMAND** the case to

6    the district court with instructions to **DISMISS** the case for

7    want of jurisdiction.

61

15-3135-cv (L)
Waldman v. Palestine Liberation Organization

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT
_____

August Term 2022
Argued: May 3, 2023
Decided: September 8, 2023

Docket Nos. 15-3135-cv (L), 15-3151-cv (XAP), 22-1060-cv (Con)
_____

EVA WALDMAN, REVITAL BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF
PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA
BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA, MINOR,
BY HIS NEXT FRIEND AND GUARDIAN VARDA GUETTA, VARDA GUETTA,
INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFF OZ JOSEPH GUETTA,
NORMAN GRITZ, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE
OF DAVID GRITZ, MARK I. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN
OF PLAINTIFF JAMIE A. SOKOLOW, RENA M. SOKOLOW, INDIVIDUALLY AND AS A
NATURAL GUARDIAN OF PLAINTIFF JAIME A. SOKOLOW, JAMIE A. SOKOLOW, MINOR,
BY HER NEXT FRIENDS AND GUARDIAN MARK I. SOKOLOW AND RENA M. SOKOLOW,
LAUREN M. SOKOLOW, ELANA R. SOKOLOW, SHAYNA EILEEN GOULD, RONALD
ALLAN GOULD, ELISE JANET GOULD, JESSICA RINE, SHMUEL WALDMAN, HENNA
NOVACK WALDMAN, MORRIS WALDMAN, ALAN J. BAUER, INDIVIDUALLY AND AS
NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER,
DANIEL BAUER AND YEHUDA BAUER, YEHONATHON BAUER, MINOR, BY HIS NEXT
FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, BINYAMIN
BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND
REVITAL BAUER, DANIEL BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR.
ALAN J. BAUER AND REVITAL BAUER, YEHUDA BAUER, MINOR, BY HIS NEXT FRIEND
AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, RABBI LEONARD
MANDELKORN, KATHERINE BAKER, INDIVIDUALLY AND AS PERSONAL

REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN, RICHARD BLUTSTEIN, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, LARRY CARTER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DIANE ("DINA") CARTER, SHAUN COFFEL, DIANNE COULTER MILLER, ROBERT L COULTER, JR., ROBERT L. COULTER, SR., INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JANIS RUTH COULTER, CHANA BRACHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ELIEZER SIMCHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ESTHER ZAHAVA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, KAREN GOLDBERG, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STUART SCOTT GOLDBERG/NATURAL GUARDIAN OF PLAINTIFFS CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG, TZVI YEHOSHUA GOLDBERG, SHOSHANA MALKA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, TZVI YEHOSHUA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YAAKOV MOSHE GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YITZHAK SHALOM GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, NEVENKA GRITZ, SOLE HEIR OF NORMAN GRITZ, DECEASED,

*Plaintiffs – Appellants,*

UNITED STATES OF AMERICA,

*Intervenor – Appellant,*

—v.—

PALESTINE LIBERATION ORGANIZATION, PALESTINIAN AUTHORITY, AKA PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY AND/OR PALESTINIAN COUNCIL AND/OR PALESTINIAN NATIONAL AUTHORITY,

*Defendants – Appellees,*

YASSER ARAFAT, MARWIN BIN KHATIB BARGHOUTI, AHMED TALEB MUSTAPHA
BARGHOUTI, AKA AL-FARANSI, NASSER MAHMOUD AHMED AWEIS, MAJID AL-
MASRI, AKA ABU MOJAHED, MAHMOUD AL-TITI, MOHAMMED ABDEL RAHMAN
SALAM MASALAH, AKA ABU SATKHAH, FARAS SADAK MOHAMMED GHANEM, AKA
HITAWI, MOHAMMED SAMI IBRAHIM ABDULLAH, ESTATE OF SAID RAMADAN,
DECEASED, ABDEL KARIM RATAB YUNIS AWEIS, NASSER JAMAL MOUSA SHAWISH,
TOUFIK TIRAWI, HUSSEIN AL-SHAYKH, SANA'A MUHAMMED SHEHADEH, KAIRA
SAID ALI SADI, ESTATE OF MOHAMMED HASHAIKA, DECEASED, MUNZAR MAHMOUD
KHALIL NOOR, ESTATE OF WAFA IDRIS, DECEASED, ESTATE OF MAZAN FARITACH,
DECEASED, ESTATE OF MUHANAD ABU HALAWA, DECEASED, JOHN DOES, 1-99,
HASSAN ABDEL RAHMAN,

*Defendants.*\*

_____

Before: LEVAL AND BIANCO, *Circuit Judges*, AND KOELTL, *District Judge*.\*\*

The plaintiffs, a group of United States citizens injured during terror attacks
in Israel and the estates or survivors of United States citizens killed in such attacks,
brought this action against the Palestine Liberation Organization ("PLO") and the
Palestinian Authority ("PA") pursuant to the Anti-Terrorism Act ("ATA"), 18
U.S.C. § 2333, seeking damages for alleged violations of the ATA related to those
attacks. This Court concluded on appeal that the district court lacked both general
and specific jurisdiction over the PLO and the PA, and we therefore vacated the
judgment entered against the defendants and remanded the action for dismissal.
The plaintiffs later moved to recall the mandate in this case based on a new statute,
the Anti-Terrorism Clarification Act of 2018, Pub. L. No. 115-253, 132 Stat. 3183.
We denied that motion because the statute's prerequisites had not been met.

Congress responded with the statute now at issue, the Promoting Security
and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), Pub. L. No. 116-94,
§ 903(c), 133 Stat. 2534, 3082. The PSJVTA provides that the PLO and the PA "shall
be deemed to have consented to personal jurisdiction" in any civil ATA action if,
after a specified time, those entities either (1) make payments, directly or

---

\* The Clerk of Court is directed to amend the official caption as set forth above.

\*\* Judge John G. Koeltl, of the United States District Court for the Southern District of
New York, sitting by designation.

indirectly, to the designees or families of incarcerated or deceased terrorists, respectively, whose acts of terror injured or killed a United States national, or (2) undertake any activities within the United States, subject to limited exceptions. 18 U.S.C. § 2334(e). In light of this new statute, the Supreme Court vacated and remanded our decision denying the motion to recall the mandate, and we in turn remanded the case to the district court for the limited purpose of considering the PSJVTA. The district court (Daniels, <u>J.</u>) concluded that the defendants had engaged in jurisdiction-triggering conduct under the statute, but that the PSJVTA violated constitutional due process requirements. Both the plaintiffs and the Government now dispute the latter conclusion, and the plaintiffs argue generally that the PSJVTA justifies recalling the mandate.

In <u>Fuld v. Palestine Liberation Organization</u>, __ F.4th __, No. 22-76 (2d Cir. Sept. 8, 2023), which we also decide today, we conclude that the PSJVTA's provision for "deemed consent" to personal jurisdiction is inconsistent with the Fifth Amendment's Due Process Clause. Thus, no basis exists to recall the mandate in this case, and the plaintiffs' motion to recall the mandate is **DENIED**.

_____

KENT A. YALOWITZ, Arnold & Porter Kaye Scholer LLP, New York, NY (Avishai D. Don, Arnold & Porter Kaye Scholer LLP, New York, NY, Allon Kedem, Dirk C. Phillips, Stephen K. Wirth, Bailey M. Roe, Arnold & Porter Kaye Scholer LLP, Washington, D.C., *on the brief*), *for Plaintiffs-Appellants.*

MITCHELL R. BERGER, Squire Patton Boggs (US) LLP, Washington, D.C. (Gassan A. Baloul, Squire Patton Boggs (US) LLP, Washington, D.C., *on the brief*), *for Defendants-Appellees.*

BENJAMIN H. TORRANCE, Assistant United States Attorney, Of Counsel *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY (Brian M. Boynton, Principal Deputy Assistant Attorney General, Sharon Swingle, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice,

4

Washington, D.C., *on the brief*), *for Intervenor-Appellant United States of America.*

Tejinder Singh, Sparacino PLLC, Washington, D.C., *for Amici Curiae Abraham D. Sofaer and Louis J. Freeh in Support of Plaintiffs-Appellants and Intervenor-Appellant.*

J. Carl Cecere, Cecere PC, Dallas, TX, *for Amici Curiae Senators and Representatives Charles E. Grassley, Jerrold Nadler, Richard Blumenthal, James Lankford, Sheldon Whitehouse, Kathleen Rice, Bradley E. Schneider, and Grace Meng in Support of Plaintiffs-Appellants and Intervenor Appellant.*

Joshua E. Abraham, Abraham Esq. PLLC, New York, NY, *for Amici Curiae Constitutional Law Scholars Philip C. Bobbitt, Michael C. Dorf, and H. Jefferson Powell in Support of Plaintiffs-Appellants.*

Dina Gielchinsky, Osen LLC, Hackensack, NJ, *for Amici Curiae Organizations Providing Support to Victims of Terror in Support of Plaintiffs-Appellants.*

Tad Thomas, Jeffrey R. White, American Association for Justice, Washington, D.C., *for Amici Curiae American Association for Justice in Support of Plaintiffs-Appellants.*

_____

PER CURIAM:

The plaintiffs, a group of United States citizens injured during terror attacks in Israel and the estates or survivors of United States citizens killed in such attacks, brought this action against the Palestine Liberation Organization ("PLO") and the

Palestinian Authority ("PA") pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, seeking damages for alleged violations of the ATA related to those attacks. See id. § 2333(a). On appeal from a substantial post-trial judgment entered against the defendants, this Court concluded that the district court lacked both general and specific personal jurisdiction over the PLO and the PA. See Waldman v. Palestine Liberation Org., 835 F.3d 317, 344 (2d Cir. 2016) ("Waldman I"), cert. denied sub nom. Sokolow v. Palestine Liberation Org., 138 S. Ct. 1438 (2018) (mem.). We accordingly vacated the judgment and remanded the action for dismissal of the plaintiffs' claims. Id. Our mandate issued on November 28, 2016.

Since that time, Congress has twice enacted statutes purporting to establish personal jurisdiction over the PLO and the PA on the basis of consent, which, when validly given, may constitute an independent basis for subjecting a defendant to suit in a forum lacking general and specific jurisdiction. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 & n.14 (1985); Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703–04 (1982); see also Mallory v. Norfolk S. Ry. Co., 143 S. Ct. 2028, 2039 (2023) (plurality opinion). After the passage of the first such statute, the Anti-Terrorism Clarification Act of 2018 ("ATCA"), Pub. L. No. 115-253, 132 Stat. 3183, the plaintiffs moved to recall the

6

mandate in this case. In June 2019, we denied that motion because the ATCA's prerequisites for personal jurisdiction had not been satisfied. See Waldman v. Palestine Liberation Org., 925 F.3d 570, 574–76 (2d Cir. 2019) ("Waldman II") (per curiam), cert. granted, judgment vacated sub nom. Sokolow v. Palestine Liberation Org., 140 S. Ct. 2714 (2020) (mem.).

Congress responded with the enactment of the statute now at issue, the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), Pub. L. No. 116-94, § 903(c), 133 Stat. 2534, 3082. The PSJVTA provides that the PLO and the PA "shall be deemed to have consented to personal jurisdiction" in any civil ATA action, irrespective of "the date of the occurrence" of the underlying "act of international terrorism," upon engaging in certain forms of post-enactment conduct, namely (1) making payments, directly or indirectly, to the designees or families of incarcerated or deceased terrorists, respectively, whose acts of terror injured or killed a United States national, or (2) undertaking any activities within the United States, subject to a handful of exceptions. 18 U.S.C. § 2334(e)(1).

The Supreme Court vacated and remanded our decision in Waldman II in light of the PSJVTA's enactment, see Sokolow, 140 S. Ct. 2714, and we in turn remanded to the district court for the limited purpose of considering the new

7

statute's effect on this case. The district court (Daniels, <u>J.</u>) concluded that the defendants had engaged in jurisdiction-triggering conduct under the statute, but that the PSJVTA's "deemed consent" provision violated constitutional due process requirements. The plaintiffs dispute the latter conclusion, and they argue generally that the PSJVTA justifies recalling this Court's mandate. The Government, as intervenor pursuant to 28 U.S.C. § 2403(a) and Federal Rule of Civil Procedure 5.1(c), joins the plaintiffs in defending the PSJVTA's constitutionality.

We address the very same constitutional issue in <u>Fuld v. Palestine Liberation Organization</u>, __ F.4th __, No. 22-76 (2d Cir. Sept. 8, 2023), which we also decide today. In <u>Fuld</u>, we conclude that the PSJVTA's provision for "deemed consent" to personal jurisdiction is inconsistent with the Due Process Clause of the Fifth Amendment. Thus, the statute cannot be applied to establish personal jurisdiction over the PLO or the PA, and as a result, no basis exists to recall the mandate in this case.

## I. BACKGROUND

We assume familiarity with <u>Waldman I</u>, <u>Waldman II</u>, and our decision today in <u>Fuld</u>, which collectively detail the history of this litigation and the relevant statutory background.

The plaintiffs commenced this action against the PLO and the PA in 2004, invoking the ATA's civil damages remedy for "national[s] of the United States injured . . . by reason of an act of international terrorism."[1] 18 U.S.C. § 2333(a). Throughout the pretrial proceedings, the PLO and the PA repeatedly moved to dismiss the claims against them for lack of personal jurisdiction. All of those motions were denied. The district court determined that it could exercise general jurisdiction over the defendants, see Sokolow v. Palestine Liberation Org., No. 04-cv-397, 2011 WL 1345086, at *7 (S.D.N.Y. Mar. 30, 2011), even after the Supreme Court narrowed the applicable test for general jurisdiction in Daimler AG v. Bauman, 571 U.S. 117 (2014).[2] See Sokolow v. Palestine Liberation Org., No. 04-cv-397, 2014 WL 6811395, at *1 (S.D.N.Y. Dec. 1, 2014).

After a seven-week trial beginning in January 2015, a jury found the defendants liable for six of the terror attacks at issue and awarded damages of

---

[1] As explained in Fuld, the PA was established under the 1993 Oslo Accords to serve as the non-sovereign and interim governing body of parts of the Gaza Strip and the West Bank (collectively referred to here as "Palestine"). The PLO, an entity founded in 1964, conducts Palestine's foreign affairs and serves as a Permanent Observer to the United Nations on behalf of the Palestinian people.

[2] For procedural reasons not relevant here, the proceedings before the district court are captioned differently, as Sokolow v. Palestine Liberation Organization, No. 04-cv-397 (S.D.N.Y.).

$218.5 million, an amount automatically trebled to $655.5 million pursuant to the ATA. See Waldman I, 835 F.3d at 322, 324; 18 U.S.C. § 2333(a). During the trial and again in post-trial briefing, the defendants unsuccessfully reasserted their argument that the case should be dismissed for lack of personal jurisdiction. The district court rejected those arguments and entered final judgment. The defendants then made the same arguments on appeal to this Court.

In Waldman I, this Court agreed with the defendants. The decision explained that the PLO and the PA have a Fifth Amendment due process right not to be sued in a forum with which they have insufficient contacts, see Waldman I, 835 F.3d at 329, and that the personal jurisdiction analysis is "basically the same under both the Fifth and Fourteenth Amendments," id. at 330. Applying Daimler, we determined that the district court lacked general jurisdiction because the PLO and the PA are not "at home" in the United States, but "in Palestine, where these entities are headquartered and from where they are directed." Id. at 334 (emphasis omitted) (citing Daimler, 571 U.S. at 139 n.20). We also found that the district court could not subject the defendants to specific jurisdiction, given the absence of any "substantial connection" between their "suit-related conduct — their role in the six terror attacks at issue — [and] . . . the forum." Id. at 335 (citing Walden v. Fiore,

10

571 U.S. 277, 284 (2014)). Thus, "[t]he district court could not constitutionally exercise either general or specific personal jurisdiction over the defendants." Id. at 344. We vacated the judgment of the district court and remanded the action "with instructions to dismiss the case for want of personal jurisdiction."[3] Id. at 322.

Our mandate issued on November 28, 2016. See Judgment Mandate, No. 15-3135, Doc. No. 248 (2d Cir. Nov. 28, 2016). The plaintiffs then filed a petition for a writ of certiorari, which was denied in April 2018. See Sokolow, 138 S. Ct. at 1438.

Congress responded to Waldman I and similar decisions with the enactment of the ATCA, Pub. L. No. 115-253, 132 Stat. 3183, a precursor to the statute at issue here. The ATCA amended the ATA to include a new subsection, 18 U.S.C. § 2334(e), which provided that a defendant would "be deemed to have consented to personal jurisdiction in . . . [a civil ATA] action if," following a 120-day period after the ATCA's enactment, the defendant (1) "accept[ed]" certain "form[s] of

---

[3] As discussed in Fuld, the United States Court of Appeals for the District of Columbia Circuit similarly concluded that federal courts lacked both general and specific jurisdiction over the PLO and the PA in civil ATA cases related to terrorist activity abroad. See Livnat v. Palestinian Auth., 851 F.3d 45, 54–58 (D.C. Cir. 2017) (concluding that exercising general or specific jurisdiction over the PA would not "meet the requirements of the Fifth Amendment's Due Process Clause"), cert. denied, 139 S. Ct. 373 (2018) (mem.); see also Shatsky v. Palestine Liberation Org., 955 F.3d 1016, 1036–37 (D.C. Cir. 2020) (same as to both the PLO and the PA); Est. of Klieman v. Palestinian Auth., 923 F.3d 1115, 1123–26 (D.C. Cir. 2019) (same), judgment vacated on other grounds, 140 S. Ct. 2713 (2020) (mem.), opinion reinstated in part, 820 F. App'x 11 (D.C. Cir. 2020) (mem.).

11

assistance" from the United States, or (2) "maintain[ed]" an office "within the jurisdiction of the United States" pursuant to a waiver or suspension of 22 U.S.C. § 5202, a provision barring the PLO from operating any such office. ATCA § 4, 132 Stat. at 3184. The ATCA took effect on October 3, 2018.

Several days later, on October 8, 2018, the plaintiffs filed a motion to recall the November 2016 mandate issued in this action. The plaintiffs argued that the ATCA established personal jurisdiction over the defendants with regard to the previously dismissed claims. We rejected that contention in Waldman II, reasoning that "[t]he plaintiffs ha[d] not shown that either factual predicate . . . of the ATCA [was] satisfied." 925 F.3d at 574. Specifically, the plaintiffs did not dispute that the PLO and the PA were no longer "accept[ing] qualifying assistance" from the United States, and they had failed to show that the defendants were maintaining any offices "within the jurisdiction of the United States" while "benefit[ing] from a waiver or suspension" of 22 U.S.C. § 5202. Id. at 574–75. For these reasons, and in light of "[t]his Court's interest in finality," we concluded that the circumstances did not "warrant invoking the extraordinary remedy of recalling a mandate issued two and a half years" earlier. Id. at 575–76.

12

Accordingly, on June 3, 2019, the plaintiffs' motion to recall the mandate was denied. Id. at 576.

While the plaintiffs' petition for a writ of certiorari from Waldman II was pending, Congress acted again, this time enacting the PSJVTA on December 20, 2019. See Pub. L. No. 116-94, § 903(c), 133 Stat. 2534, 3082. A detailed description of the PSJVTA is set forth in Fuld. Briefly, § 903(c) of the PSJVTA superseded the ATCA provision codified at 18 U.S.C. § 2334(e), resulting in a narrowed definition of the term "defendant," which now refers solely to the PLO, the PA, and any "successor[s]" or "affiliate[s]" thereof.[4] 18 U.S.C. § 2334(e)(5). The PSJVTA also specified new post-enactment conduct that would be "deemed" to constitute "consent" to personal jurisdiction in civil ATA actions, "regardless of the date of the occurrence of the act of international terrorism upon which such civil action was filed." Id. § 2334(e)(1).

These new factual predicates for "deemed consent" are listed in two prongs, subparagraphs (A) and (B) of 18 U.S.C. § 2334(e)(1). The first prong provides that

---

[4] As stated in Fuld, the PSJVTA also includes a number of additional provisions, but we do not pass on the constitutionality of any portion of the PSJVTA other than § 903(c). For purposes of clarity, this opinion refers to § 903(c) as the PSJVTA, which is consistent with the opinion in Fuld, as well as with the nomenclature used in the district court's decisions and the parties' briefs on appeal.

13

"a defendant shall be deemed to have consented to personal jurisdiction" if, after

April 18, 2020, the defendant "makes any payment, directly or indirectly":

> (i) to any payee designated by any individual who, after being fairly tried or pleading guilty, has been imprisoned for committing any act of terrorism that injured or killed a national of the United States, if such payment is made by reason of such imprisonment; or

> (ii) to any family member of any individual, following such individual's death while committing an act of terrorism that injured or killed a national of the United States, if such payment is made by reason of the death of such individual.

Id. § 2334(e)(1)(A). Under the second prong, "a defendant shall be deemed to have

consented to personal jurisdiction" if, after January 4, 2020, the defendant

"continues to maintain," "establishes," or "procures any office, headquarters,

premises, or other facilities or establishments in the United States," or otherwise

"conducts any activity while physically present in the United States on behalf of

the [PLO] or the [PA]." Id. § 2334(e)(1)(B). The PSJVTA exempts "certain activities

and locations" from the reach of this second prong, including, among others,

conduct related to "official business of the United Nations."[5]  Id. § 2334(e)(3).

---

[5] In particular, and as discussed in Fuld, the PSJVTA includes exceptions for facilities and activities devoted "exclusively [to] the purpose of conducting official business of the United Nations," id. § 2334(e)(3)(A)–(B), specified activities related to engagements with United States officials or legal representation, id. § 2334(e)(3)(C)–(E), and any activities "ancillary to [those] listed" in these exceptions, id. § 2334(e)(3)(F). Congress also provided

Several months after the PSJVTA's enactment, the Supreme Court granted the plaintiffs' petition for a writ of certiorari, vacated the judgment in Waldman II, and remanded the case "for further consideration in light of the [PSJVTA]." Sokolow, 140 S. Ct. at 2714. On September 8, 2020, this Court in turn issued an order pursuant to United States v. Jacobson, 15 F.3d 19, 22 (2d Cir. 1994), remanding the action to the district court "for the limited purposes of determining the applicability of the PSJVTA to this case, and, if the PSJVTA is determined to apply, any issues regarding its application to this case including its constitutionality," Order, No. 15-3135, Doc. No. 368 (Sept. 8, 2020). We stated that "[a]fter the district court has concluded its consideration, the case will be returned to this Court for further proceedings," and that in the meantime, the plaintiffs' motion to recall the November 2016 mandate would be "held in abeyance." Id.

After this limited remand to the district court, the Government intervened in the action to defend the constitutionality of the PSJVTA. See 28 U.S.C. § 2403(a); Fed. R. Civ. P. 5.1(c). Several months later, on March 10, 2022, the district court issued a decision related to the questions presented in our Jacobson remand order. See Sokolow v. Palestine Liberation Org., 590 F. Supp. 3d 589 (S.D.N.Y.),

---

that the PSJVTA "shall apply to any case pending on or after August 30, 2016," PSJVTA § 903(d)(2), 133 Stat. at 3085, just one day before this Court's decision in Waldman I.

15

reconsideration denied, 607 F. Supp. 3d 323 (S.D.N.Y. 2022). The district court found that the defendants had triggered the PSJVTA's first prong, 18 U.S.C. § 2334(e)(1)(A), because the "[p]laintiffs ha[d] presented sufficient evidence to support the determination that [the] [d]efendants . . . made [qualifying] payments after April 18, 2020."[6] Id. at 594. Nonetheless, the district court determined that "[t]he conduct identified in the [first prong] is insufficient to support a finding that [the] [d]efendants have consented to personal jurisdiction," id. at 596, and accordingly, the statute "violate[s] [constitutional] due process," id. at 597.

On March 24, 2022, we reinstated the proceedings concerning the plaintiffs' motion to recall the mandate. The plaintiffs then moved for reconsideration of the district court's March 10, 2022 decision, specifically requesting that the district court make factual findings under the PSJVTA's second prong and consider its constitutionality. We stayed the proceedings in this Court pending the resolution of that motion.

---

[6] Specifically, the district court found that the defendants had made payments "to the families of individuals killed while committing acts of terrorism . . . [that] harmed U.S. nationals," thereby triggering 18 U.S.C. § 2334(e)(1)(A)(ii). Sokolow, 590 F. Supp. 3d at 594. The district court did not address whether the defendants had made payments to the designees of incarcerated terrorists, see 18 U.S.C. § 2334(e)(1)(A)(i), and it also declined to "reach the issue of whether the factual predicates in . . . 18 U.S.C. § 2334(e)(1)(B)," the PSJVTA's second prong, "ha[d] been met." Sokolow, 590 F. Supp. 3d at 595 n.3.

The district court denied the motion for reconsideration on June 15, 2022. See Sokolow v. Palestine Liberation Org., 607 F. Supp. 3d 323, 324 (S.D.N.Y. 2022). It declined to resolve the parties' factual dispute as to whether the defendants' United States activities were exempt from the PSJVTA's second prong, because "[e]ven accepting [the] [p]laintiffs' argument" that no exception applied, the "types of conduct" at issue did not evince "any intention on the part of [the] [d]efendants to legally submit to suit in the United States."[7] Id. at 326. In light of that determination and its March 10, 2022 decision, the district court concluded that "the exercise of [personal] jurisdiction under either of the PSJVTA's two jurisdiction-triggering prongs would violate due process." Id. at 327–28.

With the plaintiffs' motion for reconsideration resolved, we lifted the stay on these proceedings concerning the motion to recall the mandate.

---

[7] To support their argument that the defendants had engaged in nonexempt activities "while physically present in the United States," 18 U.S.C. § 2334(e)(1)(B)(iii), the plaintiffs pointed to the defendants' "provision of consular services in the United States, their interviews with prominent media and social media activity, and their maintenance of an office in New York." Sokolow, 607 F. Supp. 3d at 325. The defendants did "not dispute" that they had engaged in these activities; instead, the defendants argued that all of the conduct in question fell within the PSJVTA's exemptions for UN-related conduct. Id. at 325–26; see 18 U.S.C. § 2334(e)(3)(A), (F). The district court found that it was unnecessary to resolve this issue, and we need not resolve it on appeal.

17

## II. DISCUSSION

Our principal task is to give "further consideration" to the motion at issue in Waldman II — that is, the plaintiffs' October 2018 motion to recall this Court's November 2016 mandate — "in light of the [PSJVTA]." Sokolow, 140 S. Ct. at 2714.

"We possess an inherent power to recall a mandate, subject to review for abuse of discretion." Taylor v. United States, 822 F.3d 84, 90 (2d Cir. 2016) (internal quotation marks omitted and alteration adopted). However, "[i]n recognition of the need to preserve finality in judicial proceedings, . . . we exercise [this] authority sparingly and only in exceptional circumstances." Id. (internal quotation marks omitted and alteration adopted); see also Calderon v. Thompson, 523 U.S. 538, 550 (1998). In some cases, the enactment of a new statute might justify the exercise of our power to recall a previously issued mandate. Cf. Sargent v. Columbia Forest Prods., Inc., 75 F.3d 86, 90 (2d Cir. 1996) (noting that a recall may be warranted where changes in governing law cast serious doubt on a previous judgment). But given today's decision in Fuld, this case is not one of them.

The plaintiffs make a variety of arguments in support of their position that "[t]his Court should recall the mandate, apply the PSJVTA in this case, and remand to the district court with instructions to reinstate its original judgment

based on the jury's verdict." Pls.' Br. at 2. All of those arguments, however, flow from the premise that the PSJVTA "establishes [consent-based] personal jurisdiction" over the PLO and the PA in a manner consistent with due process. Id. at 26. We reach the opposite conclusion today in Fuld, and we incorporate the entirety of Fuld's analysis here. Thus, as set forth in Fuld, the PSJVTA's provision for "deemed consent" to personal jurisdiction violates the Fifth Amendment's Due Process Clause.

Because we find in Fuld that the PSJVTA is unconstitutional, the statute cannot be applied to establish personal jurisdiction over the PLO or the PA in this case. Accordingly, no basis exists to recall the November 2016 mandate that issued after Waldman I, where we determined that the plaintiffs' claims had to be "dismiss[ed] . . . for want of personal jurisdiction." 835 F.3d at 322. In view of this conclusion, it is unnecessary to address the parties' various disputes that assume the constitutionality of the PSJVTA.

We reiterate that the terror attacks at issue in this litigation were "unquestionably horrific." Id. at 344. But as we stated in Waldman I and reaffirm today in Fuld, "the federal courts cannot exercise jurisdiction in a civil case beyond the limits" of the Due Process Clause, "no matter how horrendous the underlying

attacks or morally compelling the plaintiffs' claims." Id. The PSJVTA's provision for "deemed consent" to personal jurisdiction exceeds those constitutional limits, and accordingly, the statute supplies no basis for taking the extraordinary step of recalling this Court's mandate.

## CONCLUSION

We have considered all of the arguments of the parties and their amici. To the extent not specifically addressed above, those arguments are either moot or without merit. For the foregoing reasons, the plaintiffs' motion to recall the November 2016 mandate is **DENIED.**

22-76-cv (L)
Fuld v. Palestine Liberation Organization

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒

August Term 2022
Argued: May 3, 2023
Decided: September 8, 2023

Docket Nos. 22-76-cv (L), 22-496-cv (Con)

‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒

MIRIAM FULD, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE AND ADMINISTRATOR
OF THE ESTATE OF ARI YOEL FULD, DECEASED, AND AS NATURAL GUARDIAN OF
PLAINTIFF NATAN SHAI FULD, NATAN SHAI FULD, MINOR, BY HIS NEXT FRIEND AND
GUARDIAN MIRIAM FULD, NAOMI FULD, TAMAR GILA FULD, AND ELIEZER YAKIR
FULD,

*Plaintiffs – Appellants*,

UNITED STATES OF AMERICA,

*Intervenor – Appellant*,

—v.—

THE PALESTINE LIBERATION ORGANIZATION AND THE PALESTINIAN AUTHORITY
(A/K/A "THE PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY," AND/OR "THE
PALESTINIAN COUNCIL," AND/OR "THE PALESTINIAN NATIONAL AUTHORITY"),

*Defendants – Appellees.**

‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒

‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒

* The Clerk of Court is directed to amend the official caption as set forth above.

Before: LEVAL AND BIANCO, *Circuit Judges*, AND KOELTL, *District Judge*.[**]

The plaintiffs, several family members of a United States citizen killed in an overseas terrorist attack, appeal from a judgment of the United States District Court for the Southern District of New York (Furman, J.) dismissing their claims against the Palestine Liberation Organization ("PLO") and the Palestinian Authority ("PA") for lack of personal jurisdiction. The Government, as intervenor in accordance with 28 U.S.C. § 2403(a) and Federal Rule of Civil Procedure 5.1(c), also appeals from that judgment. On appeal, both the plaintiffs and the Government argue that the district court erred in finding unconstitutional the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), Pub. L. No. 116-94, § 903(c), 133 Stat. 2534, 3082, the statute on which the plaintiffs relied to allege personal jurisdiction over the defendants. The PSJVTA specifically provides that the PLO and the PA "shall be deemed to have consented to personal jurisdiction" in any civil action pursuant to the Anti-Terrorism Act, 18 U.S.C. § 2333, irrespective of "the date of the occurrence of the act of international terrorism" at issue, upon engaging in certain forms of post-enactment conduct, namely (1) making payments, directly or indirectly, to the designees or families of incarcerated or deceased terrorists, respectively, whose acts of terror injured or killed a United States national, or (2) undertaking any activities within the United States, subject to a handful of exceptions. Id. § 2334(e). We conclude that the PSJVTA's "deemed consent" provision is inconsistent with the dictates of the Fifth Amendment's Due Process Clause. Accordingly, we **AFFIRM** the judgment of the district court.

_____

> ALLON KEDEM, Arnold & Porter Kaye Scholer LLP, Washington, D.C. (Kent A. Yalowitz, Avishai D. Don, David C. Russell, Arnold & Porter Kaye Scholer LLP, New York, NY, Dirk C. Phillips, Stephen K. Wirth, Arnold & Porter Kaye Scholer LLP, Washington, D.C., Jeffrey Fleischmann, The Law Office of Jeffrey Fleischmann, P.C., New York, NY, Samuel Silverman,

_____

[**] Judge John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

2

The Silverman Law Firm PLLC, New City, NY, *on the brief*), *for Plaintiffs-Appellants.*

MITCHELL R. BERGER, Squire Patton Boggs (US) LLP, Washington, D.C. (Gassan A. Baloul, Squire Patton Boggs (US) LLP, Washington, D.C., *on the brief*), *for Defendants-Appellees.*

BENJAMIN H. TORRANCE, Assistant United States Attorney, Of Counsel *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY (Brian M. Boynton, Principal Deputy Assistant Attorney General, Sharon Swingle, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, Washington, D.C., *on the brief*), *for Intervenor-Appellant United States of America.*

Tejinder Singh, Sparacino PLLC, Washington, D.C., *for Amici Curiae Abraham D. Sofaer and Louis J. Freeh in Support of Plaintiffs-Appellants and Intervenor-Appellant.*

J. Carl Cecere, Cecere PC, Dallas, TX, *for Amici Curiae Sen. Charles E. Grassley, Sen. Richard Blumenthal, Rep. Jerrold Nadler, Rep. Claudia Tenney, Rep. Bradley E. Schneider, Sen. James Lankford, Sen. Marco Rubio, Rep. Kathleen Rice, Rep. Lee Zeldin, Rep. Theodore Deutch, and Rep. Grace Meng in Support of Plaintiffs-Appellants and Intervenor-Appellant.*

Joshua E. Abraham, Abraham Esq. PLLC, New York, NY, *for Amici Curiae Constitutional Law Scholars Philip C. Bobbitt, Michael C. Dorf, and H. Jefferson Powell in Support of Plaintiffs-Appellants.*

------

3

KOELTL, *District Judge*:

The plaintiffs, several family members of a United States citizen killed in an overseas terrorist attack, appeal from a judgment of the United States District Court for the Southern District of New York (Furman, <u>J.</u>) dismissing their claims against the Palestine Liberation Organization ("PLO") and the Palestinian Authority ("PA"). The district court dismissed those claims for lack of personal jurisdiction over the defendants. The Government, as intervenor in accordance with 28 U.S.C. § 2403(a) and Federal Rule of Civil Procedure 5.1(c), also appeals from the judgment.

At issue in this appeal is the constitutionality of the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), Pub. L. No. 116-94, § 903(c), 133 Stat. 2534, 3082, the federal statute on which the plaintiffs relied to allege personal jurisdiction over the defendants. The PSJVTA was enacted for the precise purpose of preventing dismissals based on lack of personal jurisdiction in cases just like this one — civil actions against the PLO and the PA pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, which provides a damages remedy for United States nationals injured "by reason of an act of international terrorism," <u>id.</u> § 2333(a).

4

Congress crafted the PSJVTA in response to a series of judicial decisions, all arising out of civil ATA cases related to terrorist activity abroad, which held that federal courts had no general or specific personal jurisdiction over the PLO and the PA. The resulting statute reflects a legislative effort to create personal jurisdiction over those entities based on alleged consent, which, when validly given, may constitute an independent constitutional basis for subjecting a nonresident defendant to litigation in a particular forum. The PSJVTA specifically provides that the PLO and the PA "shall be deemed to have consented to personal jurisdiction in [any] civil [ATA] action," irrespective of "the date of the occurrence of the act of international terrorism" at issue, upon engaging in certain forms of post-enactment conduct, namely (1) making payments, directly or indirectly, to the designees or families of incarcerated or deceased terrorists, respectively, whose acts of terror injured or killed a United States national, or (2) undertaking any activities within the United States, subject to a handful of exceptions. Id. § 2334(e).

The district court determined that this "deemed consent" provision was an unconstitutional attempt to create personal jurisdiction over the defendants where none existed, and it accordingly dismissed the plaintiffs' civil ATA action for lack

of personal jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(2). Both the plaintiffs and the Government (together, "appellants") challenge that conclusion on appeal, arguing principally that the exercise of this "deemed consent" jurisdiction under the PSJVTA satisfies the Fifth Amendment's Due Process Clause.

We conclude that the PSJVTA's provision for "deemed consent" to personal jurisdiction is inconsistent with the requirements of constitutional due process. Accordingly, we **AFFIRM** the district court's judgment dismissing this case.

## I. BACKGROUND

The plaintiffs are the widowed spouse and children of Ari Yoel Fuld, a United States citizen who was fatally stabbed during a September 2018 terrorist attack outside a shopping mall in the West Bank. In the aftermath of Fuld's death, the plaintiffs commenced this action against the PLO and the PA, alleging that these defendants had "encouraged, incentivized, and assisted" the nonparty who committed the attack on Fuld. Am. Compl. ¶ 4. The PA, established in 1993 pursuant to the Oslo Accords, is the non-sovereign and interim governing body of parts of the Gaza Strip and the West Bank (collectively referred to here as "Palestine"). The PLO, an entity founded in 1964, conducts Palestine's foreign

affairs and serves as a Permanent Observer to the United Nations ("UN") on behalf

of the Palestinian people. The plaintiffs seek monetary relief from both defendants

pursuant to the ATA, 18 U.S.C. § 2333, which, as relevant here, provides

United States nationals "injured . . . by reason of an act of international terrorism"

with a civil damages remedy against "any person who aids and abets, by

knowingly providing substantial assistance [to]," the perpetrator of the attack.

Id. § 2333(a), (d)(2).

Several years before these plaintiffs initiated their case, and prior to the

passage of the PSJVTA, this Court decided Waldman v. Palestine Liberation

Organization, 835 F.3d 317 (2d Cir. 2016) ("Waldman I"), cert denied sub nom.

Sokolow v. Palestine Liberation Organization, 138 S. Ct. 1438 (2018) (mem.), which

arose out of litigation involving civil ATA claims similar in key respects to those

asserted here.[1] The Waldman plaintiffs, a group of United States citizens injured

or killed during terror attacks in Israel and the estates or survivors of such citizens,

sued the PLO and the PA for money damages pursuant to the ATA, alleging that

the defendants had provided material support to the nonparties who carried out

---

[1] The procedural history of the Waldman litigation (captioned Sokolow v. Palestine
Liberation Organization, No. 04-cv-397 (S.D.N.Y.) in the district court) is set forth in
greater detail in Waldman v. Palestine Liberation Organization, ___ F.4th ___, No. 15-
3135 (2d Cir. Sept. 8, 2023) ("Waldman III") (per curiam), which we also decide today.

7

the attacks. After more than a decade of litigation and a substantial jury verdict in favor of the plaintiffs, the defendants filed their appeal in this Court, where they reasserted their longstanding objection that the claims against them should be dismissed for lack of personal jurisdiction.

This Court ultimately agreed with the defendants, concluding that dismissal was required because, notwithstanding the "unquestionably horrific" nature of the attacks underlying the plaintiffs' claims, "[t]he district court could not constitutionally exercise either general or specific personal jurisdiction over the defendants." Waldman I, 835 F.3d at 344. We explained, as a threshold matter, that while sovereign governments lack due process rights, "neither the PLO nor the PA is recognized by the United States as a sovereign state," and accordingly, both defendants are entitled to due process protections. Id. at 329. Moreover, we noted that our precedents established that the "due process analysis" in the personal jurisdiction context "is basically the same under both the Fifth and Fourteenth Amendments," except that "under the Fifth Amendment the court can consider the defendant's contacts throughout the United States, while under the Fourteenth Amendment only the contacts with the forum state may be considered." Id. at 330 (quoting Chew v. Dietrich, 143 F.3d 24, 28 n.4 (2d Cir. 1998)).

8

With these background principles in mind, we concluded that the district court lacked general personal jurisdiction over the defendants "pursuant to the Supreme Court's recent decision" in Daimler AG v. Bauman, 571 U.S. 117 (2014), because neither defendant's contacts with the forum were "so constant and pervasive as to render [it] essentially at home" in the United States. Waldman I, 835 F.3d at 331, 335 (quoting Daimler, 571 U.S. at 122). We rejected the notion that the defendants could be considered "essentially at home" in this country based on their activities in Washington, D.C., which were "limited to maintaining an office [there], promoting the Palestinian cause in speeches and media appearances, and retaining a lobbying firm." Id. at 333. Rather, both the PLO and the PA "are 'at home' in Palestine, where these entities are headquartered and from where they are directed." Id. at 334 (citing Daimler, 571 U.S. at 139 n.20).

This Court likewise held that the district court could not properly exercise specific personal jurisdiction over the PLO and the PA, in view of the absence of any "substantial connection" between "the defendants' suit-related conduct — their role in the six terror attacks at issue — [and] . . . the forum." Id. at 335 (citing Walden v. Fiore, 571 U.S. 277, 284 (2014)). We explained that the terrorist attacks themselves took place outside the United States, that "the defendants' [related]

9

activities in violation of the ATA occurred outside the United States," and that

none of these acts were "specifically targeted" or "expressly aimed" at the United

States. <u>Id.</u> at 335, 337–38. Indeed, the attacks in question were "random," such that

they "affected United States citizens only because [those citizens] were victims of

indiscriminate violence . . . abroad." <u>Id.</u> at 337. Thus, the actions for which the

defendants had been sued "were not sufficiently connected to the United States to

provide specific personal jurisdiction," and the "limits prescribed by

[constitutional] due process" required that the case be dismissed. <u>Id.</u> at 337, 344.

In a series of comparable cases, the United States Court of Appeals for the District

of Columbia Circuit reached the same conclusions. <u>See</u> <u>Livnat v. Palestinian Auth.,</u>

851 F.3d 45, 54–58 (D.C. Cir. 2017) (concluding, in a civil ATA case arising out of

overseas terror attacks, that exercising general or specific jurisdiction over the PA

would not "meet the requirements of the Fifth Amendment's Due Process

Clause"), <u>cert. denied</u>, 139 U.S. 373 (2018) (mem.); <u>see also</u> <u>Shatsky v. Palestine</u>

<u>Liberation Org.</u>, 955 F.3d 1016, 1036–37 (D.C. Cir. 2020) (same as to both the PLO

and the PA); <u>Est. of Klieman v. Palestinian Auth.</u>, 923 F.3d 1115, 1123–26 (D.C. Cir.

2019) ("<u>Klieman</u>") (same), <u>judgment vacated on other grounds</u>, 140 S. Ct. 2713

(2020) (mem.), <u>opinion reinstated in part</u>, 820 F. App'x 11 (D.C. Cir. 2020) (mem.).

Congress responded to Waldman I and similar decisions with federal legislation known as the Anti-Terrorism Clarification Act of 2018 ("ATCA"), Pub. L. No. 115-253, 132 Stat. 3183, which modified an existing ATA provision, 18 U.S.C. § 2334, to include a new subsection (e) concerning the "[c]onsent of certain parties to personal jurisdiction." See ATCA § 4, 132 Stat. at 3184. This new subsection provided that "regardless of the date of the occurrence of the act of international terrorism upon which [a] civil action [pursuant to the ATA] was filed," a defendant would "be deemed to have consented to personal jurisdiction in such civil action if," after more than 120 days following the ATCA's enactment, the defendant (1) "accept[ed]" certain "form[s] of assistance" from the United States, or (2) "maintain[ed]" an office "within the jurisdiction of the United States" while "benefiting from a waiver or suspension" of 22 U.S.C. § 5202, a statutory provision expressly barring the PLO from operating any such office. ATCA § 4, 132 Stat. at 3184.

Before the expiration of the 120-day period, both the PLO and the PA formally terminated their acceptance of any relevant assistance from the United States, and the PLO shuttered its diplomatic mission in Washington, D.C. — its

only office operating in the United States pursuant to a waiver of 22 U.S.C. § 2502.[2]

See Klieman, 923 F.3d at 1128–30.

This Court subsequently denied a motion to recall the mandate in Waldman I based on the ATCA, because neither of the statute's "factual predicates" for personal jurisdiction could be satisfied. Waldman v. Palestine Liberation Org., 925 F.3d 570, 574–75 (2d Cir. 2019) ("Waldman II") (per curiam), cert. granted, judgment vacated sub nom. Sokolow v. Palestine Liberation Org., 140 S. Ct. 2714 (2020) (mem.). Around the same time, the D.C. Circuit Court of Appeals made a similar finding. See Klieman, 923 F.3d at 1128 (dismissing ATA

---

[2] The PLO had previously maintained this Washington, D.C. office pursuant to an express waiver of 22 U.S.C. § 5202, which expired around the time of the office's closure. At that point, no waivers or suspensions of this provision remained in effect. See Klieman, 923 F.3d at 1130. The PLO has continued to operate its UN Permanent Observer Mission in New York, but it does so without any need for a waiver or suspension of 22 U.S.C. § 5202, which forbids the PLO from "maintain[ing] an office . . . within the jurisdiction of the United States." 22 U.S.C. § 5202(3); see Klieman, 923 F.3d at 1129–30. That statutory prohibition "does not apply . . . to the PLO's Mission in New York," because the PLO's UN office falls beyond the jurisdiction of the United States in light of the UN Headquarters Agreement. Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria, 937 F.2d 44, 46, 51 (2d Cir. 1991) ("[T]he PLO's participation in the UN is dependent on the legal fiction that the UN Headquarters is not really United States territory at all, but is rather neutral ground over which the United States has ceded control."); see also United States v. Palestine Liberation Org., 695 F. Supp. 1456, 1471 (S.D.N.Y. 1988) ("The PLO Mission to the United Nations is an invitee of the United Nations under the Headquarters Agreement and its status is protected by that agreement.").

claims against the PLO and the PA for lack of personal jurisdiction and explaining, in relevant part, that the ATCA's "factual predicates" had not been "triggered").

While petitions for writs of certiorari from <u>Waldman II</u> and <u>Klieman</u> were pending, Congress stepped in again, this time enacting the PSJVTA on December 20, 2019. <u>See</u> Pub. L. No. 116-94, § 903(c), 133 Stat. 2534, 3082 (2019). Section 903(c) of the PSJVTA superseded the relevant portions of the ATCA, resulting in various amendments to the personal jurisdiction provisions of 18 U.S.C. § 2334(e).[3] 133 Stat. at 3083–85. Those amendments included a narrowed definition of the term "defendant," which now refers exclusively to the PLO, the PA, and any "successor[s]" or "affiliate[s]" thereof. 18 U.S.C. § 2334(e)(5). In drafting the PSJVTA, Congress also specified new post-enactment conduct that would be "deemed" to constitute "consent" to personal jurisdiction in "any civil action" under the ATA, "regardless of the date of the occurrence of the act of international terrorism upon which such civil action was filed." <u>Id.</u> § 2334(e)(1).

---

[3] The PSJVTA also includes a number of additional provisions, but only the jurisdictional amendments of § 903(c) are at issue in this case. We do not pass on the constitutionality of any portion of the PSJVTA other than § 903(c). However, for purposes of clarity, this opinion refers to § 903(c) as the PSJVTA, which is consistent with the nomenclature used in the district court's decision and the parties' briefs on appeal.

As amended pursuant to the PSJVTA, 18 U.S.C. § 2334(e)(1) includes two subparagraphs that list the circumstances under which "a defendant shall be deemed to have consented to personal jurisdiction" in a civil ATA case. Subparagraph (A) provides, first, that a defendant "shall be deemed to have consented" to such jurisdiction if, "after . . . 120 days" following the enactment of the PSJVTA (that is, after April 18, 2020), the defendant "makes any payment, directly or indirectly":

> (i) to any payee designated by any individual who, after being fairly tried or pleading guilty, has been imprisoned for committing any act of terrorism that injured or killed a national of the United States, if such payment is made by reason of such imprisonment; or

> (ii) to any family member of any individual, following such individual's death while committing an act of terrorism that injured or killed a national of the United States, if such payment is made by reason of the death of such individual.

Id. § 2334(e)(1)(A). This subparagraph refers, in the words of other federal legislation on the subject, to a "practice of paying salaries to terrorists serving in Israeli prisons[] [and] to the families of deceased terrorists," Taylor Force Act, Pub. L. No. 115-141, § 1002, 132 Stat. 348, 1143 (2018), which Congress has previously condemned as "an incentive to commit acts of terror." Id.

Subparagraph (B) of the PSJVTA provides that "a defendant shall be deemed to have consented to personal jurisdiction" in a civil ATA action if, "after 15 days" following the PSJVTA's enactment (that is, after January 4, 2020), the defendant "continues to maintain," "establishes," or "procures any office, headquarters, premises, or other facilities or establishments in the United States," or otherwise "conducts any activity while physically present in the United States on behalf of the [PLO] or the [PA]." 18 U.S.C. § 2334(e)(1)(B). The PSJVTA exempts "certain activities and locations" from the reach of subparagraph (B), including facilities and activities devoted "exclusively [to] the purpose of conducting official business of the United Nations," id. § 2334(e)(3)(A)–(B), specified activities related to engagements with United States officials or legal representation, id. § 2334(e)(3)(C)–(E), and any "personal or official activities conducted ancillary to activities listed" in these exceptions, id. § 2334(e)(3)(F).

The PSJVTA includes a "rule[] of construction," which provides that the legislation's terms "should be liberally construed to carry out the purposes of Congress to provide relief for victims of terrorism." PSJVTA § 903(d)(1)(A), 133 Stat. at 3085. Congress also specified that the PSJVTA "shall apply to any case

pending on or after August 30, 2016," id. § 903(d)(2), 133 Stat. at 3085, referring to the date just one day before this Court's decision in Waldman I.

On April 27, 2020, several months after the PSJVTA's enactment, the Supreme Court granted certiorari in Waldman II and Klieman, vacated both judgments, and remanded the cases "for further consideration in light of the [PSJVTA]." Sokolow, 140 S. Ct. at 2714; see Klieman, 140 S. Ct. at 2713. Three days later, on April 30, 2020, the plaintiffs commenced this action. The plaintiffs invoked the PSJVTA as the sole basis for personal jurisdiction, and their amended complaint alleged that both prongs of the statute's "deemed consent" provision had been satisfied. With respect to the first prong, the plaintiffs alleged that, after April 18, 2020, the defendants continued an existing practice of making payments to (1) the designees of incarcerated terrorists who were fairly convicted of attacks that killed or injured United States nationals, and (2) the families of deceased terrorists who died while committing attacks that killed or injured United States nationals. See 18 U.S.C. § 2334(e)(1)(A). For the second prong, the plaintiffs alleged that, after January 4, 2020, the defendants (1) used an office maintained in the United States, namely their UN Permanent Observer Mission in New York City, for purposes other than official UN business, and (2) engaged in various activities

16

on their own behalf while in the United States, including providing consular services, holding press conferences, and publishing various online and print materials designed to influence American foreign policy. See id. § 2334(e)(1)(B).

The PLO and the PA moved to dismiss the plaintiffs' amended complaint for lack of personal jurisdiction and for failure to state a claim, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), respectively. In connection with their Rule 12(b)(2) motion, the defendants challenged the constitutionality of the PSJVTA, arguing that the statute's provision for "deemed consent" to personal jurisdiction violated due process requirements. The district court certified this constitutional challenge to the United States Attorney General, and the Government intervened in the action to defend the PSJVTA. See 28 U.S.C. § 2403(a); Fed. R. Civ. P. 5.1.

In a January 6, 2022 decision, the district court granted the defendants' Rule 12(b)(2) motion to dismiss on the ground that it could not validly exercise personal jurisdiction under the PSJVTA's "deemed consent" provision. See Fuld v. Palestine Liberation Org., 578 F. Supp. 3d 577, 580, 596 (S.D.N.Y. 2022). The court noted at the outset that "a defendant's knowing and voluntary consent, whether express or implied," can serve as an "independent" basis for personal jurisdiction, separate

and apart from "general jurisdiction[] . . . [and] specific jurisdiction." Id. at 579.

Moreover, the court observed that the PLO and the PA did "not dispute" the

plaintiffs' allegation that they had made payments triggering the PSJVTA's first

"deemed consent" prong.[4] Id. at 583. Nevertheless, the district court concluded

that "deemed consent" under the PSJVTA could not "constitutionally provide for

personal jurisdiction over [the] [d]efendants." Id. at 587. The court reasoned that

the predicate activities under the PSJVTA do not "even remotely signal[] approval

or acceptance of," or an "inten[t] to submit to," jurisdiction in the United States,

id. (internal quotation marks omitted), that the statute "push[es] the concept of

consent well beyond its breaking point," id. at 595, and that "legislature[s] [cannot]

simply create [personal] jurisdiction out of whole cloth by deeming any conduct

[whatsoever] to be 'consent,'" id. at 580. In short, the district court concluded that

"deemed consent jurisdiction" under the PSJVTA is not "consistent with the

---

[4] The defendants did, however, "contest [the] [p]laintiffs' allegations that the PSJVTA's second 'deemed consent' prong ha[d] been met." Fuld, 578 F. Supp. 3d at 583 n.3. The defendants argued that to the extent they had conducted activities within the United States after the relevant post-enactment date, all of those activities fell within the exceptions for UN-related undertakings and "ancillary" conduct. 18 U.S.C. § 2334(e)(3). In light of its finding that "the PSJVTA's first prong ha[d] been met," the district court declined to consider "whether [the] [d]efendants' conduct also implicate[d] the second prong." Fuld, 578 F. Supp. 3d at 583 n.3. It is also unnecessary to address that question on this appeal.

requirements of due process," and accordingly, the action had to be dismissed for lack of personal jurisdiction. Id. (internal quotation marks omitted).

The district court entered final judgment on January 7, 2022. Both the plaintiffs and the Government timely appealed.

## II. DISCUSSION

We review the dismissal of a complaint for lack of personal jurisdiction de novo, construing the pleadings in the light most favorable to the plaintiffs and resolving all doubts in the plaintiffs' favor. V&A Collection, LLC v. Guzzini Props. Ltd., 46 F.4th 127, 131 (2d Cir. 2022). Likewise, we review de novo questions of law, including challenges to the constitutionality of a statute. United States v. Wasylyshyn, 979 F.3d 165, 172 (2d Cir. 2020).

"Before a court may exercise personal jurisdiction over a defendant, three requirements must be met: (1) 'the plaintiff's service of process upon the defendant must have been procedurally proper'; (2) 'there must be a statutory basis for personal jurisdiction that renders such service of process effective'; and (3) 'the exercise of personal jurisdiction must comport with constitutional due process principles.'" Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC, 22 F.4th 103, 121 (2d Cir. 2021) (quoting Waldman I, 835 F.3d at 327–28). In this case, the parties do not dispute that the first and second requirements were waived and

satisfied, respectively.[5] See Fuld, 578 F. Supp. 3d at 583. We therefore consider only the third requirement — "whether jurisdiction over the defendants may be exercised consistent with the Constitution." Waldman I, 835 F.3d at 328.

The principle that a court must have personal jurisdiction over a defendant "recognizes and protects an individual liberty interest" flowing from the Constitution's guarantees of due process. Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982). As we explained in Waldman I, that principle extends to both the PLO and the PA, each of whom enjoys a due process right "to be subject only to [a court's] lawful power." 835 F.3d at 328–29 (citing J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 884 (2011) (plurality opinion)). In particular, constitutional due process ensures that a court will exercise personal jurisdiction over a defendant only if "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). The Supreme Court's precedents discussing that requirement, including its canonical opinion in International Shoe, have arisen under the Due Process

---

[5] Specifically, the defendants "waived any defenses regarding proper service of process," and with respect to the second requirement, the defendants do not dispute that they "made payments" sufficient to satisfy the PSJVTA's first statutory prong for "deemed consent." Fuld, 578 F. Supp. 3d at 583.

Clause of the Fourteenth Amendment — a constraint on the power of state tribunals. <u>See</u> U.S. CONST. amend. XIV, § 1; <u>see also</u> <u>Int'l Shoe</u>, 326 U.S. at 311. But we have previously explained that the personal jurisdiction analysis is "basically the same" under the Fifth Amendment's Due Process Clause, which limits the power of the federal courts and governs the inquiry here.[6] <u>Waldman I</u>, 835 F.3d at 330 (internal quotation marks omitted); <u>see</u> U.S. CONST. amend. V.

The Supreme Court has recognized three distinct bases for exercising personal jurisdiction over an out-of-forum defendant in accordance with the dictates of due process: general jurisdiction, specific jurisdiction, and consent. <u>See,</u> <u>e.g.</u>, <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 472–73 & 472 n.14 (1985); <u>J. McIntyre Mach.</u>, 564 U.S. at 880–81 (plurality opinion). The first two bases, "general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction," "giv[e] content" to the holding of <u>International Shoe</u>, which established that a court may hear claims against a defendant who has not submitted to its authority only where the defendant has certain "contacts"

---

[6] As noted above, the "principal difference" between these due process standards arises in the context of a minimum-contacts inquiry: the analysis under the Fourteenth Amendment is limited to the defendant's contacts with the forum state, while the Fifth Amendment permits consideration of the defendant's contacts with the United States as a whole. <u>Waldman I</u>, 835 F.3d at 330 (citing <u>Chew</u>, 143 F.3d at 28 n.4).

with the forum. Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1024 (2021); see Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 923–24 (2011); Int'l Shoe, 326 U.S. at 316. General jurisdiction, as its name suggests, allows a court to hear "any and all claims" against a defendant — but, for businesses and organizations, only when that defendant is "essentially at home" in the forum. Ford, 141 S. Ct. at 1024 (quoting Goodyear, 564 U.S. at 919); see Daimler, 571 U.S. at 127. Specific jurisdiction, in contrast, covers a "narrower class of claims," Ford, 141 S. Ct. at 1024, and depends "on the relationship among the defendant, the forum, and the litigation," Walden, 571 U.S. at 284 (internal quotation marks omitted). In particular, a court may exercise specific jurisdiction if the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum," Hanson v. Denckla, 357 U.S. 235, 253 (1958), or if the defendant has intentionally directed wrongdoing at the forum, Calder v. Jones, 465 U.S. 783, 790 (1984). Even then, the court's authority is limited solely to claims that "arise out of or relate to" the defendant's forum contacts. Ford, 141 S. Ct. at 1025 (quoting Bristol-Myers Squibb Co. v. Super. Ct. of Cal., 582 U.S. 255, 262 (2017)); see Burger King, 471 U.S. at 472–73.

Neither of those two bases for personal jurisdiction is at issue here. In the proceedings before the district court, the plaintiffs never argued for general or specific jurisdiction over the PLO and the PA. Nor do they contest the district court's conclusion that "[a]ny such argument would be foreclosed by . . . Waldman I." Fuld, 578 F. Supp. 3d at 584. Instead, the plaintiffs rely exclusively on consent, the third independent basis for exercising personal jurisdiction over an out-of-forum defendant. See Ins. Corp. of Ireland, 456 U.S. at 703; Burger King, 471 U.S. at 472 & n.14. The plaintiffs contend that the PLO and the PA are deemed to have consented to personal jurisdiction in this civil ATA action pursuant to the PSJVTA, because engaging in the statute's predicate conduct amounts to "implied" or "constructive" consent. See, e.g., Pls.' Br. at 13. Both the plaintiffs and the Government argue that the PSJVTA establishes consent-based jurisdiction in accordance with due process principles, and that the district court erred in holding otherwise.

We disagree. For the reasons set forth below, we conclude that the PSJVTA's "deemed consent" provision is inconsistent with the Due Process Clause of the Fifth Amendment. Because the statute does not establish a federal court's authority over the PLO and the PA consistent with the Fifth Amendment's

23

requirement of due process, this case against those defendants was properly dismissed for lack of personal jurisdiction.

## A.

Consent to personal jurisdiction is a voluntary agreement on the part of a defendant to proceed in a particular forum. See Nat'l Equip. Rental, Ltd. v. Szukhent, 375 U.S. 311, 316 (1964) (a defendant "may agree . . . to submit to the jurisdiction of a given court"); J. McIntyre Mach., 564 U.S. at 880–81 (plurality opinion) ("explicit consent" is among the "circumstances, or . . . course[s] of conduct, from which it is proper to infer . . . an intention to submit to the laws of the forum"); Knowlton v. Allied Van Lines, Inc., 900 F.2d 1196, 1199 (8th Cir. 1990) ("A defendant may voluntarily consent or submit to the jurisdiction of a court which otherwise would not have jurisdiction over it."). In several of its decisions, including, most recently, Mallory v. Norfolk Southern Railway Co., 143 S. Ct. 2028 (2023), the Supreme Court has explained why such consent suffices to establish personal jurisdiction: "Because the [due process] requirement of personal jurisdiction [is] first of all an individual right, it can, like other such rights, be waived." Ins. Corp. of Ireland, 456 U.S. at 703; see Burger King, 471 U.S. at 472 n.14 ("[T]he personal jurisdiction requirement is a waivable right[.]"); Mallory, 143 S.

Ct. at 2043 (plurality opinion) ("[P]ersonal jurisdiction is a <u>personal</u> defense that may be waived or forfeited." (emphasis in original)); <u>id.</u> at 2051 (Alito, J., concurring in part and concurring in the judgment) ("If a person voluntarily waives th[e] [personal jurisdiction] right, that choice should be honored."). Thus, when a defendant has validly consented to personal jurisdiction, a court may exercise authority over that defendant in conformity with the Due Process Clause, even in the absence of general or specific jurisdiction. <u>See, e.g.,</u> <u>Mallory</u>, 143 S. Ct. at 2039 (plurality opinion) (explaining that "consent can . . . ground personal jurisdiction" apart from a defendant's forum contacts (internal quotation marks omitted)); <u>see also</u> <u>Knowlton</u>, 900 F.2d at 1199.

The Supreme Court has recognized a "variety of legal arrangements [that] have been taken to represent express or implied consent" to personal jurisdiction consistent with due process. <u>Ins. Corp. of Ireland</u>, 456 U.S. at 703; <u>see</u> <u>Mallory</u>, 143 S. Ct. at 2038 n.5 (majority opinion). For example, a defendant's consent to personal jurisdiction may be implied based on litigation-related conduct, or where a defendant accepts a benefit from the forum in exchange for its amenability to suit in the forum's courts. <u>See, e.g.,</u> <u>Ins. Corp. of Ireland</u>, 456 U.S. at 703–05; <u>Mallory</u>, 143 S. Ct. at 2033 (majority opinion); <u>id.</u> at 2041 n.8 (plurality opinion). In such

cases, it is often fair and reasonable to infer the defendant's voluntary agreement to submit itself to a court's authority. But consent cannot be found based solely on a government decree pronouncing that activities unrelated to being sued in the forum will be "deemed" to be "consent" to jurisdiction there. 18 U.S.C. § 2334(e)(1); cf. Ins. Corp. of Ireland, 456 U.S. at 705 (distinguishing between litigation-related conduct that establishes personal jurisdiction and "mere assertions of . . . power" over a defendant (quoting Chicago Life Ins. Co. v. Cherry, 244 U.S. 25, 29 (1917))). A prospective defendant's activities do not signify consent to personal jurisdiction simply because Congress has labeled them as such.

Thus, while "[a] variety of legal arrangements . . . [may] represent . . . consent to . . . personal jurisdiction," id. at 703, the PSJVTA is not among them. The PSJVTA's provision for consent-based jurisdiction over the PLO and the PA, in which Congress has "deemed" the continuation of certain conduct to constitute "consent," falls outside any reasonable construction of valid consent to proceed in a particular forum's courts.

## 1.

We begin with some of the "various ways" in which "consent may be manifested," either "by word or [by] deed." Mallory, 143 S. Ct. at 2039 (plurality

opinion). It is well-established that a defendant may expressly consent to personal jurisdiction in a particular court by contract, usually through an agreed-upon forum-selection clause. <u>See</u> <u>Ins. Corp. of Ireland</u>, 456 U.S. at 703–04; <u>see also</u> <u>Szukhent</u>, 375 U.S. at 316 ("[P]arties to a contract may agree in advance to submit to the jurisdiction of a given court."). So long as such "forum-selection provisions have been obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust,' their enforcement [against a defendant] does not offend due process." <u>Burger King</u>, 471 U.S. at 472 n.14 (quoting <u>Bremen v. Zapata Off-Shore Co.</u>, 407 U.S. 1, 15 (1972)); <u>see also</u> <u>Carnival Cruise Lines, Inc. v. Shute</u>, 499 U.S. 585, 595 (1991) ("[F]orum selection clauses . . . are subject to judicial scrutiny for fundamental fairness."). Likewise, a court may exercise authority over a defendant on the basis of express consent provided in a stipulation. <u>See</u> <u>Ins. Corp. of Ireland</u>, 456 U.S. at 704; <u>Petrowski v. Hawkeye-Sec. Co.</u>, 350 U.S. 495, 496 (1956) (per curiam) ("[The] respondent, by its stipulation, waived any right to assert a lack of personal jurisdiction over it.").

The Supreme Court has acknowledged that a defendant may, in certain circumstances, impliedly consent to personal jurisdiction through litigation-related conduct. <u>See, e.g.</u>, <u>Ins. Corp. of Ireland</u>, 456 U.S. at 703–05. Such conduct

includes a defendant's voluntary in-court appearance, see id. at 703, unless the

defendant has appeared for the limited purpose of contesting personal jurisdiction

(in which case, the defendant typically preserves the defense), see Mallory, 143 S.

Ct. at 2044 (plurality opinion). Moreover, in keeping with the principle that "[t]he

expression of legal rights is often subject to certain procedural rules," a

defendant's "failure to follow [such] rules" with regard to personal jurisdiction

may "result in a curtailment of [its] right[]" to enforce that requirement. Ins. Corp.

of Ireland, 456 U.S. at 705. "Thus, the failure to enter a timely objection to personal

jurisdiction constitutes, under Rule 12(h)(1), a waiver of the objection." Id.

Similarly, a defendant's failure to comply with certain pretrial orders concerning

jurisdictional discovery may justify a "sanction under Rule 37(b)(2)(A) consisting

of a finding of personal jurisdiction." Id. The Supreme Court has found that other

litigation activities can subject a litigant to personal jurisdiction as well. See, e.g.,

id. at 704; Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 451 (1932).[7]

---

[7] Among these other examples, the only instances in which findings of "implied consent" have been premised on a defendant's omission are those where the defendant "fail[ed] to follow" litigation rules and orders related to personal jurisdiction, Ins. Corp. of Ireland, 456 U.S. at 703, 705, and thereby "forfeited" — rather than waived — the defense. See, e.g., City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 133–34, 135 (2d Cir. 2011) ("Personal jurisdiction . . . can . . . be purposely waived or inadvertently forfeited. . . . [A] defendant forfeits its jurisdictional defense if it appears before a district court to press that defense but then willfully withdraws from the litigation and defaults[.]");

The Supreme Court has also recognized that a prospective defendant may be subject to personal jurisdiction if it has accepted a government benefit from the forum, in return for which the defendant is required to submit itself to suit in the forum. See Mallory, 143 S. Ct. at 2044 (plurality opinion) (explaining that personal jurisdiction may exist where the defendant has "accept[ed] an in-state benefit with jurisdictional strings attached"). The Supreme Court's recent decision in Mallory highlighted such an arrangement: Mallory approved the exercise of consent-based jurisdiction pursuant to a state business registration statute that "require[d] an out-of-state firm to answer any suits against it in exchange for status as a registered

_____

Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 61–62 (2d Cir. 1999) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right. . . . [The defendant] participated in pretrial proceedings but never moved to dismiss for lack of personal jurisdiction despite several clear opportunities to do so during the four-year interval after filing its answer. These circumstances establish a forfeiture." (internal quotation marks and citations omitted)). It can be said that in failing to follow such rules or orders, a defendant effectively concedes the issue. See Ins. Corp. of Ireland, 456 U.S. at 705, 709 (where noncompliance with litigation rules and orders supports a "presumption of fact" as to the "want of merit in the asserted [personal jurisdiction] defense," "[t]he preservation of due process [is] secured" (quoting Hammond Packing Co. v. Arkansas, 212 U.S. 322, 350–51 (1909))). While forfeiture of a personal jurisdiction defense may be the product of mistake or inadvertence, rather than affirmative conduct evincing agreement, the Supreme Court has counted such forfeitures among the "legal arrangements [that] have been taken to represent . . . implied consent to . . . personal jurisdiction." Id. at 703. But beyond these forfeitures in the context of litigation, the existing precedent suggests that the conduct necessary to support an inference of implied consent, whether related to the litigation or not, must be some "intentional[]" act that can reasonably be construed as a waiver of the personal jurisdiction requirement. Id. at 704.

foreign corporation and the benefits that entails." <u>Id.</u> at 2033 (majority opinion). A plurality of the Justices noted that this sort of "exchange" between the defendant and the forum — in other words, "consent to suit in exchange for access to a State's markets" — "can signal consent to jurisdiction" in at least some cases. <u>Id.</u> at 2041 n.8 (plurality opinion) (alterations adopted).

The litigation-related activities or reciprocal bargains described above, just like "explicit consent," can supply a basis "from which it is proper to infer . . . an intention to submit" to the forum, <u>J. McIntyre Mach.</u>, 564 U.S. at 880–81 (plurality opinion), or are otherwise "of such a nature as to justify the fiction" of consent to a court's authority, <u>Int'l Shoe</u>, 326 U.S. at 318; <u>see also</u> <u>Ins. Corp. of Ireland</u>, 456 U.S. at 705 (explaining, with regard to litigation conduct, that "due process [is] secured" where the conduct supports a "presumption of fact" as to the existence of personal jurisdiction). Under such circumstances, the assertion of consent-based personal jurisdiction does "not offend traditional notions of fair play and substantial justice," and is therefore consistent with constitutional due process. <u>Ins. Corp. of Ireland</u>, 456 U.S. at 702–03 (quoting <u>Int'l Shoe</u>, 326 U.S. at 316).

**2.**

The appellants argue that the PSJVTA's "deemed consent" provision subjects the PLO and the PA to personal jurisdiction in a manner consistent with due process limits. But the statute's terms are insufficient to establish the defendants' valid consent, either express or implied, to waive their constitutional right not to be sued in a court that lacks personal jurisdiction over them.

It is undisputed that this case does not involve a defendant's express consent in any form — and for that reason, the plaintiffs' argument that a finding of consent "follows a fortiori from" Carnival Cruise is misplaced. See Pls.' Br. at 12–13, 28–29. In that case, the Supreme Court held that a specific forum-selection clause in a cruise ticket was enforceable against the parties who had assented to the agreement at issue. See Carnival Cruise, 499 U.S. at 587–89. The decision in Carnival Cruise did not "infer[] consent" at all, see Pls.' Br. at 27–29, but instead enforced the express jurisdiction-conferring language of a contract after accounting for considerations of notice and fundamental fairness.[8] See Carnival Cruise, 499 U.S. at 593–95.

---

[8] The plaintiffs also rely on Szukhent, 375 U.S. 311. But Szukhent concerned the validity under the Federal Rules of Civil Procedure of a contract provision that expressly appointed an agent for service of process. Id. at 315. As in Carnival Cruise, Szukhent enforced the express terms of a contract. No express contract is at issue here.

31

The appellants characterize the PSJVTA as establishing implied consent, but the statute provides no basis for a finding that the defendants have agreed to submit to the jurisdiction of the United States courts. The PSJVTA does not purport to determine that any litigation-related conduct on the part of the PLO or the PA constitutes implied consent to jurisdiction. Nor does the PSJVTA require submission to the federal courts' jurisdiction in exchange for, or as a condition of, receiving some in-forum benefit or privilege. Instead, Congress selected certain non-litigation activities in which the PLO and the PA had already engaged (or were alleged to have engaged) and decreed that those activities, if continued or resumed after a certain date, "shall be deemed" to constitute "consent[] to personal jurisdiction." 18 U.S.C. § 2334(e)(1); see, e.g., Klieman, 923 F.3d at 1123–24, 1127, 1129–30 (describing allegations of PLO and PA activity in the United States); Taylor Force Act § 1002, 132 Stat. at 1143 (discussing the relevant payments). The defendants' support for terrorism not targeted at the United States and their limited activities within the United States have already been found to be insufficient to establish general or specific jurisdiction over the PLO and the PA in similar ATA cases, see, e.g., Waldman I, 835 F.3d at 339–42, and those same activities cannot reasonably be interpreted as signaling the defendants' "intention

32

to submit" to the authority of the United States courts, see J. McIntyre Mach., 564 U.S. at 881 (plurality opinion). Rather, such activities allegedly constitute "consent" under the PSJVTA only because Congress has labeled them that way. Thus, under the statute, the defendants incur a jurisdictional penalty for the continuation of conduct that they were known to partake in before the PSJVTA's enactment — conduct which, on its own, cannot support a fair and reasonable inference of the defendants' voluntary agreement to proceed in a federal forum. This declaration of purported consent, predicated on conduct lacking any of the indicia of valid consent previously recognized in the case law, fails to satisfy constitutional due process.

Pursuant to the PSJVTA's first prong, the PLO and the PA "shall be deemed to have consented to personal jurisdiction" for "mak[ing] any payment" to the designees of incarcerated terrorists, or to the families of deceased terrorists, whose acts of terror "injured or killed a national of the United States." 18 U.S.C. § 2334(e)(1)(A). This specific non-litigation conduct cannot reasonably be understood as signaling the defendants' agreement to submit to the United States courts. Accordingly, the effect of the first prong is to subject the defendants to a jurisdictional sanction — "deemed consent" to the federal courts' authority — for

33

continuing to make the payments at issue. Illustrating the point, the appellants themselves repeatedly emphasize that the PSJVTA's first prong serves to deter a congressionally disfavored activity. See, e.g., Pls.' Br. at 11 (the first prong "incentivizes [the] [d]efendants to halt the universally condemned practice of making [the] payments" at issue); Intervenor Br. at 25–26 (the first prong "discourage[s]" payments that Congress has linked to terrorist activity). But Congress has a variety of other tools at its disposal for discouraging the payments in question. See, e.g., 22 U.S.C. § 2378c-1(a)(1)(B) (barring certain U.S. foreign aid that "directly benefits" the PA until both the PLO and the PA have "terminated" the relevant payments). Imposing consent to personal jurisdiction as a consequence for those payments, and thereby divesting the defendants of their Fifth Amendment liberty interest, is not among them.

The second prong of the PSJVTA similarly specifies predicate conduct that does not evince the defendants' agreement to subject themselves to the jurisdiction of the United States courts. This prong provides that the PLO and the PA "shall be deemed to have consented to personal jurisdiction" for "maintain[ing] any office" or "conduct[ing] any activity while physically present in the United States," with a limited set of exceptions. 18 U.S.C. § 2334(e)(1)(B). The appellants repeatedly

34

suggest that this prong is consistent with relevant precedents because it "[c]ondition[s] permission" for the defendants to engage in such activities, and to receive the attendant benefits of doing so, "on their consent to personal jurisdiction in ATA actions." Intervenor Br. at 24; see Pls.' Br. at 48 (the defendants' "receipt of [certain] benefits" is "condition[ed] . . . on their consent"). But this characterization is inaccurate, given that the statute does not provide the PLO or the PA with any such benefit or permission. With the exception of UN-related conduct and offices, which are protected pursuant to international treaty (and which, as set forth in 18 U.S.C. § 2334(e)(3), are exempt from the PSJVTA's second prong), federal law has long prohibited the defendants from engaging in any activities or maintaining any offices in the United States, absent specific executive or statutory waivers.[9] See,

---

[9] For example, the Anti-Terrorism Act of 1987 imposes a "wide gauged restriction of PLO activity within the United States [that], depending on the nature of its enforcement, could effectively curtail any PLO activities in the United States, aside from the Mission to the United Nations." Palestine Liberation Org., 695 F. Supp. at 1471; accord Klinghoffer, 937 F.2d at 51 ("[W]ere the PLO not a permanent observer at the UN, it would not be entitled to enter New York at all."); see Anti-Terrorism Act of 1987, Pub. L. 100-204, tit. X, §§ 1002–1005, 101 Stat. 1331, 1406–1407 (codified at 22 U.S.C. §§ 5201–5203) (stating Congress's "determin[ation] that the PLO and its affiliates are a terrorist organization . . . and should not benefit from operating in the United States," 22 U.S.C. § 5201(b), and prohibiting various activities related to the PLO, including "expend[ing] [PLO] funds," id. § 5202). Similar restrictions apply to the PA. See, e.g., Palestinian Anti-Terrorism Act of 2006 ("PATA"), Pub. L. No. 109-446, § 7(a), 120 Stat. 3318, 3324 (codified at 22 U.S.C. § 2378b note) (barring the PA from "establish[ing] or maintain[ing] an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States" absent a specified certification). The Government acknowledges that these restrictions

e.g., Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille

Lauro in Amministrazione Straordinaria, 937 F.2d 44, 46, 51 (2d Cir. 1991)

(explaining that "the PLO is prohibited from engaging in any activities in this

country other than the maintenance of a mission to the UN"). The PSJVTA does

not purport to relax or override these prohibitions, and the appellants have not

identified any other change in existing law (for example, a statutory or executive

waiver) that would otherwise authorize the restricted conduct. Thus, the statute's

second prong cannot reasonably be construed as requiring a defendant's consent

to jurisdiction in exchange for permission to engage in the predicate activities,

because the defendants have not been granted permission to engage in those

activities at all.[10] Instead, the second prong exacts "deemed" consent as a price to

_____

can be lifted or relaxed only through the execution of formal waivers or suspensions under statutorily required procedures. See Intervenor Br. at 24–25 (citing relevant waiver provisions); see also Klieman, 923 F.3d at 1129–31 (describing the "formal . . . waiver procedure" applicable to 22 U.S.C. § 5202).

[10] The appellants do not dispute that the defendants are statutorily barred from conducting activities in the United States. Rather, the plaintiffs suggest that the Government has historically permitted certain activities as "a matter of grace," thereby allowing the Government to require consent in return. Pls.' Reply Br. at 25. But the Government retains the authority to enforce the relevant prohibitions and could exercise it at any time. See 22 U.S.C. § 5203 (authorizing the Attorney General to take any "necessary steps," including "legal action," to enforce the restrictions as to the PLO); PATA § 7(b), 120 Stat. at 3324 (same as to the PA). Turning a blind eye to prohibited conduct that remains subject to sanction or curtailment is not the same as authorizing such conduct. Cf. Klieman, 923 F.3d at 1131 (rejecting an attempt to "equate [a]

be paid upon "conduct[ing] [such] activit[ies]," 18 U.S.C. § 2334(e)(1)(B), without conferring any rights or benefits on the defendants in return.

The appellants argue that the PSJVTA is constitutionally sound because it gives the defendants "fair warning" of the relevant jurisdiction-triggering conduct and "reasonably advances legitimate government interests in the context of our federal system." Pls.' Br. at 11. They derive this standard from a variety of cases describing basic principles of due process, including the Supreme Court's decisions on specific jurisdiction in <u>Ford Motor Co.</u>, 141 S. Ct. 1017, and <u>Burger King</u>, 471 U.S. 462. However, the concepts of "fair warning" and "legitimate government interests" establish only minimum due process requirements. These generalizations about due process do not resolve the precise issue in this case, which is whether the defendants have consented to suit in the absence of general or specific jurisdiction. None of the cases on which the appellants rely to support their broad due process test purported to answer that question.[11]

---

government 'failure to prosecute'" certain activities under 22 U.S.C. § 5202 with the "waiver or suspension" of the restrictions of those activities, for purposes of an analysis under the ATCA).

[11] The plaintiffs also argue that the district court's analysis was flawed because it referred to the right at issue here, the due process right not to be haled into a forum lacking personal jurisdiction, as a "fundamental constitutional right." <u>See</u> <u>Fuld</u>, 578 F. Supp. 3d at 580, 591. The Supreme Court has recognized that "certain fundamental rights" trigger "heightened" scrutiny, <u>Washington v. Glucksberg</u>, 521 U.S. 702, 720 (1997), and

Tellingly, the appellants have cited no case implying consent to personal jurisdiction under circumstances similar to those in this action. Instead, all of the appellants' authorities concerning such implied consent involved a defendant's litigation-related conduct, or a defendant's acceptance of some in-forum benefit conditioned on amenability to suit in the forum's courts. Those cases premised consent on activities from which it was reasonable to infer a defendant's submission to personal jurisdiction, but that is not the situation here.

For example, in Insurance Corporation of Ireland, a decision that the appellants have relied on extensively, a defendant appeared before the district court to assert a personal jurisdiction defense, but then repeatedly failed to comply with discovery orders "directed at establishing jurisdictional facts" related to its contacts with the forum. 456 U.S. at 695; see id. at 698–99. The district court accordingly imposed a discovery sanction pursuant to Federal Rule of Civil Procedure 37(b)(2)(A), which provides that certain facts may "be taken as established" when a party "fails to obey a[] [discovery] order" concerning those

_____

accordingly, the plaintiffs suggest that the district court must have applied an unduly strict standard in this case. These arguments are without merit. The district court was plainly using the phrase "fundamental" in a colloquial sense, not as a formal classification or a term of art, and we see no indication that the district court applied an inappropriately rigorous standard of scrutiny.

facts. Fed. R. Civ. P. 37(b)(2)(A). Consistent with that Rule, the district court treated the nonresident defendant's forum contacts as having been proven, which in turn established personal jurisdiction. See Ins. Corp. of Ireland, 456 U.S. at 695, 699.

The Supreme Court rejected the defendant's argument that this discovery sanction violated due process. Id. at 696. Relying on its previous decision in Hammond Packing Co. v. Arkansas, 212 U.S. 322 (1909), the Supreme Court explained that the "preservation of due process was secured by the presumption that the refusal to produce evidence material to the administration of due process was but an admission of the want of merit in the asserted defense." Ins. Corp. of Ireland, 456 U.S. at 705 (quoting Hammond Packing, 212 U.S. at 350–51). In other words, the defendant's "failure to supply the requested information as to its contacts with [the forum]," after "[h]aving put the issue in question," could fairly be construed as a tacit acknowledgment that the sought-after facts would establish personal jurisdiction. Id. at 709.

The current case bears no resemblance to Insurance Corporation of Ireland. In contrast to the "actions of the defendant" at issue there, id. at 704, the relevant conduct under the PSJVTA takes place entirely outside of the litigation. Moreover, the Supreme Court made clear that the application of the Hammond Packing

presumption in <u>Insurance Corporation of Ireland</u>, along with the exercise of personal jurisdiction that followed from it, was appropriate only because the defendant's litigation conduct related to whether personal jurisdiction existed. To underscore the point, the Supreme Court distinguished <u>Hovey v. Elliott</u>, 167 U.S. 409 (1897), which held that due process was violated where a court rendered judgment against a defendant "as 'punishment' for failure" to pay a certain fee — conduct plainly unrelated to any "asserted defense" in that case. <u>Ins. Corp. of Ireland</u>, 456 U.S. at 705–06. The effect of the PSJVTA is similar: the statute subjects the defendants to the authority of the federal courts for engaging in conduct with no connection to the establishment of personal jurisdiction, and indeed with no connection to litigation in the United States at all.

With respect to non-litigation conduct, the appellants rely heavily on cases finding consent to jurisdiction based on business registration statutes, which the plaintiffs described at oral argument as "no different" from the PSJVTA. However, the Supreme Court's recent decision in <u>Mallory</u> makes plain why those statutes are readily distinguishable. <u>Mallory</u> arose out of a Virginia resident's lawsuit in Pennsylvania state court against his former employer, a Virginia railroad corporation, for damages sustained as a result of work in Virginia and Ohio. <u>See</u>

143 S. Ct. at 2032–33. The plaintiff argued that the defendant had consented to personal jurisdiction in Pennsylvania when it registered as a foreign corporation under Pennsylvania law, which "requires out-of-state companies that register to do business in the [state] to agree to appear in its courts on 'any cause of action' against them." Id. at 2033 (quoting 42 Pa. Cons. Stat. § 5301(a)(2)(i), (b) (2019)); see also id. at 2037 (noting that the Pennsylvania statute "explicit[ly]" provides for general jurisdiction over registered foreign corporations). The defendant did not dispute that it had registered under the Pennsylvania statute, but it "resisted [the plaintiff's] suit on constitutional grounds," raising the question of "whether the Due Process Clause of the Fourteenth Amendment prohibits a State from requiring an out-of-state corporation to consent to personal jurisdiction to do business there." Id. at 2033.

The Supreme Court rejected this due process challenge and held that the defendant was subject to jurisdiction in Pennsylvania based on the state's business registration statute. See id. at 2032, 2037–38. The majority reasoned that the case fell "squarely within [the] rule" of Pennsylvania Fire Insurance Co. v. Gold Issue Mining & Milling Co., 243 U.S. 93 (1917), see Mallory, 143 S. Ct. at 2038, which, in the words of the plurality, established that the type of business registration statute

41

at issue "comport[s] with the Due Process Clause," id. at 2033 (plurality opinion).

Pennsylvania Fire specifically upheld the exercise of personal jurisdiction pursuant to a Missouri state law "requir[ing] any out-of-state insurance company desiring to transact any business in the State to . . . accept service on [a particular state] official as valid in any suit." Id. at 2036 (plurality opinion) (internal quotation marks omitted). In that case, "there was 'no doubt' [the out-of-state insurance company] could be sued in Missouri by an out-of-state plaintiff on an out-of-state contract," because the corporation "had agreed to accept service of process in Missouri on any suit as a condition of doing business there." Id. (plurality opinion) (quoting Pennsylvania Fire, 243 U.S. at 95).

That language — "as a condition of doing business there" — explains why the statutes at issue in both Pennsylvania Fire and Mallory could support a finding of implied consent to personal jurisdiction. Consent may be fairly inferred when a prospective defendant "voluntarily invoke[s] certain [in-forum] benefits . . . conditioned on submitting to the [forum's] jurisdiction," because the acceptance of the benefit implicitly signals the defendant's agreement to appear in the forum's courts. Id. at 2045 (Jackson, J., concurring). Put differently, a defendant may give its consent as part of a bargain: the defendant seeks and obtains a benefit that the

forum has to offer, and the defendant agrees to be sued in that jurisdiction in exchange. Thus, the statute at issue in <u>Mallory</u> supported a finding of consent to jurisdiction because it "gave the [defendant] the right to do business in-state in return for agreeing to answer any suit against it." 143 S. Ct. at 2041 (plurality opinion). Indeed, in discussing why such statutes count among the "legal arrangements [that] may represent . . . implied consent . . . consistent with due process," both the majority and the plurality referred repeatedly to this sort of "exchange."[12] <u>Id.</u> at 2044 n.10 (plurality opinion) (internal quotation marks omitted and alterations adopted); <u>see also id.</u> at 2044 (plurality opinion) ("[A]ccepting an in-state benefit with jurisdictional strings attached . . . can carry with [it] profound consequences for personal jurisdiction."). The plurality also stressed the fundamental fairness of <u>Mallory</u>'s outcome, given the scale of the

---

[12] <u>See, e.g.</u>, <u>Mallory</u>, 143 S. Ct. at 2041 n.8 (plurality opinion) ("[T]hese arrangements <u>can</u> include state laws requiring consent to suit in exchange for access to a State's markets." (internal quotation marks omitted and alterations adopted)); <u>see also id.</u> at 2033 (majority opinion) ("Pennsylvania law . . . requires an out-of-state firm to answer any suits against it in exchange for status as a registered foreign corporation and the benefits that entails."); <u>id.</u> at 2037 (majority opinion) (explaining that the registered defendant obtained "both the benefits and burdens shared by domestic corporations — including amenability to suit in state court on any claim," and that the defendant "has agreed to be found in Pennsylvania and answer any suit there"); <u>id.</u> at 2035 (plurality opinion) (describing a long history of state statutes "requiring out-of-state corporations to consent to in-state suits in exchange for the rights to exploit the local market and to receive the full range of benefits enjoyed by in-state corporations").

defendant's operations in the state. See id. at 2041–43. Because the defendant "had taken full advantage of its opportunity to do business" in the forum, the plurality found no due process concern in enforcing its consent to jurisdiction against it. Id. at 2041.

Mallory therefore underscores the lack of merit in the appellants' asserted analogy between the PSJVTA and business registration statutes. The PSJVTA does not require that the PLO and the PA consent to jurisdiction as a condition of securing a legal right to do business in the United States, which remains prohibited under current law, or to conduct any other presently unauthorized activity. Indeed, the statute does not offer any in-forum benefit, right, or privilege that the PLO and the PA could "voluntarily invoke" in exchange for their submission to the federal courts. Mallory, 143 S. Ct. at 2045 (Jackson, J., concurring). The defendants in this case cannot be said to have accepted some in-forum benefit in return for an agreement to be amenable to suit in the United States.[13]

_____

[13] The plaintiffs contend that we would "break new ground" if we endorsed the "unprecedented" proposition that an in-forum benefit is required to establish a defendant's consent to jurisdiction based on non-litigation conduct. Pls.' July 26, 2023 Supp. Br. at 5, 6. But this argument misses the point. The receipt of a benefit from the forum is not a necessary prerequisite to a finding that a defendant has consented to personal jurisdiction there. Rather, as in Mallory, this sort of "arrangement[]" — that is, a defendant's voluntary acceptance of an in-forum benefit conditioned on amenability to suit — can suffice under the circumstances to "signal consent to jurisdiction." 143 S. Ct.

The appellants' other examples of consent statutes are distinguishable on the same grounds. For example, the plaintiffs point to the state law at issue in <u>Hess v. Pawloski</u>, 274 U.S. 352 (1927), which provided that a nonresident motorist's use of the public roads "shall be deemed equivalent" to appointing an agent for service of process in actions "growing out of any accident or collision in which said nonresident may be involved." <u>Id.</u> at 354 (internal quotation marks omitted). Such a statute conditions "the use of the highway," an in-state benefit from which states may "exclude" nonresidents, on the nonresident's "consent" to personal jurisdiction. <u>Id.</u> at 356–57. Indeed, the statute itself was phrased in those terms: it stated that "[t]he acceptance by a nonresident of the rights and privileges" associated with "operating a motor vehicle . . . on a public way in the [state]" would be a "signification of his agreement" to service. <u>Id.</u> at 354 (internal quotation marks omitted). The same logic applies to state statutes providing that state courts, in certain classes of cases, can exercise consent-based jurisdiction over nonresident officers and directors of a business incorporated under that state's laws. <u>See</u> Pls.'

---

at 2041 n.8 (plurality opinion) (internal quotation marks omitted). In other words, such an exchange can serve as a proxy for consent, from which it may be reasonable and fair to infer an agreement to submit to the forum. There are other means of demonstrating consent, such as certain litigation-related conduct. <u>See, e.g.</u>, <u>Ins. Corp. of Ireland</u>, 456 U.S. 703–05. But "deemed consent," absent some exchange of benefits, has never been recognized as a means of valid consent to personal jurisdiction.

Br. at 29 (citing <u>Hazout v. Tsang Mun Ting</u>, 134 A.3d 274, 289 (Del. 2016)). In

"accepting and holding" the position of officer or director, <u>Hazout</u>, 134 A.3d at

277, a "privilege" that carries with it "significant [state-law] benefits and

protections," <u>id.</u> at 292 n.66 (quoting <u>Armstrong v. Pomerance</u>, 423 A.2d 174, 176

(Del. 1980)), a nonresident can be said to have signaled an agreement to the

jurisdictional consequences.[14]

---

[14] Relying on other cases outside of the personal jurisdiction context, the plaintiffs compare the PSJVTA to "implied consent laws that require motorists . . . to consent to BAC [(blood alcohol content)] testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense." <u>Missouri v. McNeely</u>, 569 U.S. 141, 161 (2013) (plurality opinion); <u>see, e.g.</u>, <u>South Dakota v. Neville</u>, 459 U.S. 553, 559 (1983) (describing one such statute as "declar[ing] that any person operating a vehicle in [the state] is deemed to have consented to a chemical test of the alcoholic content of his blood if arrested for driving while intoxicated"). But these statutes, which implicate the Fourth Amendment's protections against unreasonable searches, <u>see</u> <u>McNeely</u>, 569 U.S. at 148–51, are distinguishable for a variety of reasons, including those set forth above with regard to <u>Mallory</u> and <u>Hess</u>. Like the service-of-process statute considered in <u>Hess</u>, the "implied consent laws" for suspected drunk drivers require a motorist's consent to a particular obligation (specifically, "cooperation with BAC testing") as "a condition of the privilege of driving on state roads." <u>Birchfield v. North Dakota</u>, 579 U.S. 438, 447–48 (2016); <u>see</u> <u>McNeely</u>, 569 U.S. at 161 (plurality opinion) (noting that "all 50 states" have adopted laws requiring drivers to consent to BAC testing "as a condition of operating a motor vehicle within the State"). That is very different from the statute at issue here, which does not condition the defendants' consent on any in-forum privilege at all.

Further, the Supreme Court has never actually upheld these so-called implied consent laws under a consent theory. Rather, the Court has assessed the constitutionality of these laws on a case-by-case basis, relying on the exigency exception to the probable cause and warrant requirements of the Fourth Amendment. <u>See</u> <u>Mitchell v. Wisconsin</u>, 139 S. Ct. 2525, 2532–33 (2019) ("But our decisions have not rested on the idea that these laws . . . create actual consent to all the searches they authorize."); <u>see also</u> <u>id.</u> at 2551 (Gorsuch, J., dissenting) (underscoring that the Supreme Court did not address whether

In short, when a potential defendant accepts a government benefit conditioned on submitting to suit in the forum, such conduct may fairly be understood as consent to jurisdiction there. The same is often true when a defendant engages in litigation conduct related to the existence of personal jurisdiction. But in the PSJVTA, Congress has simply declared that specific activities of the PLO and the PA — namely, certain payments made outside of the United States, and certain operations within the United States (which remain unlawful) — constitute "consent" to jurisdiction. No aspect of these allegedly jurisdiction-triggering activities can reasonably be interpreted as evincing the defendants' "intention to submit" to the United States courts. J. McIntyre, 564 U.S. at 881 (plurality opinion). Congress cannot, by legislative fiat, simply "deem" activities to be "consent" when the activities themselves cannot plausibly be construed as such. Cf. McDonald v. Mabee, 243 U.S. 90, 91 (1917) (noting that, in "exten[ding] . . . the means of acquiring [personal] jurisdiction," "great caution should be used not to let fiction deny the fair play that can be secured only by a pretty close adhesion to fact").

---

implied consent was sufficient to authorize the search). These cases, therefore, shed little light on when a constitutional right may be waived by implied consent.

Like the district court, we need not decide whether, "under different circumstances, Congress or a state legislature could constitutionally 'deem' certain conduct to be consent to personal jurisdiction." Fuld, 578 F. Supp. 3d at 587. But for such a statute to pass muster, "the predicate conduct would have to be a much closer proxy for actual consent than the predicate conduct at issue" here. Id. Because the PSJVTA's predicate activities cannot reasonably be understood as signifying the defendants' consent, the statute does not effect a valid waiver of the defendants' due process protection against the "coercive power" of a foreign forum's courts. Goodyear, 564 U.S. at 918; see Waldman I, 835 F.3d at 328, 329.

## B.

Our conclusion also follows from College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, 527 U.S. 666 (1999). That decision concerned a federal statute, the Trademark Remedy Clarification Act ("TRCA"), which provided that states would forgo their Eleventh Amendment immunity from federal Lanham Act litigation if they committed "any violation" of the Lanham Act's prohibitions on false and misleading advertising. Id. at 670 (quoting 15 U.S.C. § 1122(b)). As relevant here, the petitioner argued that a state could be said to have "'impliedly' or 'constructively' waived its immunity" upon engaging

in the relevant predicate conduct — namely, "the activities regulated by the Lanham Act" — after "being put on notice by the clear language of the TRCA that it would be subject to [suit] for doing so." Id. at 669, 676, 680.

The Supreme Court rejected that proposition. It concluded that even with "unambiguous[]" advance notice from Congress, a state's "voluntarily elect[ing] to engage in the federally regulated conduct" at issue would not suffice to render the state suable. Id. at 679–81. Such conduct, the Supreme Court explained, supplied no basis "to assume actual consent" to suit in federal court. Id. at 680. To hold otherwise would ignore the "fundamental difference between a State's expressing unequivocally that it waives its immunity" (in which case, one can "be certain that the State in fact consents to suit") and "Congress's expressing unequivocally its intention that if the State takes certain action it shall be deemed to have waived that immunity." Id. at 680–81. The decision explained:

> In the latter situation, the most that can be said with certainty is that the State has been put on notice that Congress intends to subject it to suits brought by individuals. That is very far from concluding that the State made an altogether voluntary decision to waive its immunity.

Id. at 681 (emphasis in original) (internal quotation marks omitted). The Supreme Court also saw no merit in the notion that a state could be "deemed to have constructively waived its sovereign immunity" simply because "the asserted basis

for [the] waiver [was] conduct that the State realistically could choose to abandon."
Id. at 679, 684. This fact, the decision noted, "ha[d] no bearing upon the voluntariness of the waiver." Id. at 684.

This reasoning underscores the unconstitutionality of the PSJVTA's "deemed consent" provision. The statute purports to extract consent to personal jurisdiction using the very same template that College Savings Bank condemned in the sovereign immunity context: it identifies activities that, in Congress's judgment, the PLO and the PA "realistically could choose to abandon," and it "express[es] unequivocally [Congress's] intention that if [either defendant] takes [those] action[s] it shall be deemed to have" consented to a federal court's authority. Id. at 681, 684. The appellants repeatedly contend that this statutory framework gives rise to constructive consent because the predicate conduct is itself "voluntary," and the defendants "knowing[ly]" continued such conduct with "notice" of the statute's terms. Pls.' Br. at 19–20; see Intervenor Br. at 2–3. But College Savings Bank rejected that precise theory of constructive consent, making clear that the ability to "abandon" the relevant predicate conduct "ha[s] no bearing upon the voluntariness of the [asserted] waiver." 527 U.S. at 684. Instead, as College Savings Bank explained with regard to the state respondent, "the most

that can be said" about the defendants here "is that [each] has been put on notice that Congress intends to subject it to [certain] suits" in federal court. Id. at 681. That is a "very far" cry from an "altogether voluntary decision" on the part of either defendant to submit to a court's jurisdiction. See id.

The appellants argue that the logic of College Savings Bank is inapplicable here because the decision concerned the "special context" of state sovereign immunity, where the standard for waiver is "particularly strict." Pls.' Br. at 30–31 (internal quotation marks omitted); see Coll. Sav. Bank, 527 U.S. at 675 (describing the "test for determining whether a State has waived its immunity" as a "stringent one" (internal quotation marks omitted)). But the relevant aspects of the Supreme Court's reasoning were not so cabined. To the contrary, the decision emphasized that "constructive consent is not a doctrine commonly associated with the surrender of constitutional rights," and it noted that constructive waivers like the one considered there — a close match for the sort of "deemed consent" at issue here — "are simply unheard of in the context of . . . constitutionally protected privileges." 527 U.S. at 681 (internal quotation marks omitted and alteration adopted). The Supreme Court illustrated this point with an analogy to an entirely different constitutional context:

51

[I]magine if Congress amended the securities laws to provide with unmistakable clarity that anyone committing fraud in connection with the buying or selling of securities in interstate commerce would not be entitled to a jury in any federal criminal prosecution of such fraud. Would persons engaging in securities fraud after the adoption of such an amendment be deemed to have "constructively waived" their constitutionally protected rights to trial by jury in criminal cases? After all, the trading of securities is not so vital an activity that any one person's decision to trade cannot be regarded as a voluntary choice. The answer, of course, is no. The classic description of an effective waiver of a constitutional right is the intentional relinquishment or abandonment of a known right or privilege.

Id. at 681–82 (internal quotation marks and citations omitted, alterations adopted).

This example was pertinent, the Supreme Court explained, because the Eleventh Amendment privilege of "[s]tate sovereign immunity, no less than the [Sixth Amendment] right to trial by jury in criminal cases, is constitutionally protected." Id. at 682. The same is true with regard to the "due process right not to be subjected to judgment in [a foreign forum's] courts," J. McIntyre Mach., 564 U.S. at 881 (plurality opinion), which, like the Sixth Amendment jury trial right, is a "legal right protecting the individual," Ins. Corp. of Ireland, 456 U.S. at 704. The plaintiffs nevertheless suggest that we should ignore the lessons of College Savings Bank because its general statements regarding waivers of constitutional rights are nonbinding "dicta." Pls.' Br. at 13, 30, 32. But "it does not at all follow that we can cavalierly disregard" those statements. United States v. Bell, 524 F.2d

52

202, 206 (2d Cir. 1975). Even if Supreme Court dicta do not constitute established law, we nonetheless accord deference to such dicta where, as here, no change has occurred in the legal landscape. United States v. Harris, 838 F.3d 98, 107 (2d Cir. 2016) (citing Newdow v. Peterson, 753 F.3d 105, 108 n.3 (2d Cir. 2014)); Bell, 524 F.2d at 206 (noting that Supreme Court dicta "must be given considerable weight"). That deference is especially warranted in this case, given the close parallels between the PSJVTA and the statutory framework that College Savings Bank rejected.

Indeed, the voluminous briefing in this case makes clear that the PSJVTA's approach to deemed consent is "simply unheard of," Coll. Sav. Bank, 527 U.S. at 681, because those papers, while extensive, fail to identify a single case approving a similar constructive waiver of the personal jurisdiction requirement. The briefs instead rely entirely on personal jurisdiction cases that are inapposite or distinguishable, for all of the reasons discussed above.

The appellants also cite various cases involving waivers of other constitutional rights, but those cases do not support the constitutionality of the "deemed consent" imposed in the PSJVTA. For example, in arguing that waiving a constitutional right does not require any exchange of benefits, the appellants

point to United States v. O'Brien, 926 F.3d 57 (2d Cir. 2019). In O'Brien, however, the defendant had expressly consented to the warrantless searches of his properties, in writing, rendering that case a plainly inapt comparison on the question of constructive consent.[15] Id. at 77. The appellants' authorities concerning valid waivers of the Fifth Amendment privilege against self-incrimination are similarly far afield. See Moran v. Burbine, 475 U.S. 412 (1986); Oregon v. Elstad, 470 U.S. 298 (1985). The criminal suspects' actions in those cases, taken upon receiving clear and comprehensive warnings pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), left "no doubt" (in Moran) or "no question" (in Elstad) that each had knowingly and voluntarily waived his Fifth Amendment protections. See Moran, 475 U.S. at 417–18, 421–22 (respondent executed "written form[s] acknowledging that he understood his [Miranda] right[s]," and then gave a free and uncoerced confession); Elstad, 470 U.S. at 314–15, 315 n.4 (respondent gave affirmative verbal responses confirming that he understood his Miranda rights, then provided a free and uncoerced description of his offense).

---

[15] The Supreme Court's decision in Schneckloth v. Bustamonte, 412 U.S. 218 (1973), a case that the plaintiffs cited at oral argument, is likewise distinguishable because it focused on an instance of express consent — in particular, to the warrantless search of a vehicle. See id. at 220.

The PSJVTA also finds no support in the plaintiffs' cases concerning implied waivers of a litigant's right to proceed before an Article III court. See Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665 (2015); Roell v. Withrow, 538 U.S. 580 (2003). In these decisions, the Supreme Court explained that such waivers could be fairly inferred based on specific litigation conduct, namely, "voluntarily appear[ing] to try [a] case before [a] non-Article III adjudicator" after "[being] made aware of the need for consent and the right to refuse it." Wellness Int'l Network, 575 U.S. at 685 (internal quotation marks omitted) (discussing implied consent to a bankruptcy judge's resolution of certain claims); Roell, 538 U.S. at 586 n.3, 591 (discussing implied consent to a magistrate judge's disposition of an action). Those authorities are unlike this case, where the defendants have not engaged in any conduct (litigation-related or otherwise) evincing an "intention of . . . submitting to the court's jurisdiction." Roell, 538 U.S. at 586 n.3 (internal quotation marks omitted).

In sum, Congress cannot take conduct otherwise insufficient to support an inference of consent, brand it as "consent," and then decree that a defendant, after some time has passed, is "deemed to have consented" to the loss of a due process right for engaging in that conduct. This unprecedented framework for consent-based jurisdiction, predicated on conduct that is not "of such a nature as to justify

the fiction" of consent, cannot be reconciled with "traditional notions of fair play and substantial justice." Int'l Shoe, 326 U.S. at 316, 318 (internal quotation marks omitted). Thus, the PSJVTA's "deemed consent" provision is incompatible with the Fifth Amendment's Due Process Clause.

## C.

The appellants and their amici make various other arguments in support of the constitutionality of the PSJVTA and the exercise of personal jurisdiction in this case, none of which is persuasive.

The Government defends the constitutionality of the PSJVTA on the grounds that the predicate conduct at issue is "closely linked to the only claim for which personal jurisdiction is permitted, a civil ATA action concerning attacks on Americans." Intervenor Br. at 30. But the relevant question here is not whether the predicate conduct identified in the statute bears some relation to the activities proscribed under the ATA, or to Congress's interest in remediating the harms that flow from those activities. Rather, the question is whether such conduct demonstrates the defendants' valid consent to the authority of a United States court. No basis exists to conclude that it does.

Also unpersuasive is the Government's contention that Congress, in furtherance of an important legislative purpose, narrowly tailored the PSJVTA to establish jurisdiction over only the PLO, the PA, and their "successors or affiliates." Intervenor Br. at 24. Such singling out does not cure a constitutional deficiency. Where, as here, a statute impinges on constitutional rights, it cannot be salvaged on the basis that it violates the rights of only a handful of subjects.

Relatedly, the Government contends that this Court must defer to Congress's choices in crafting the PSJVTA because the statute is "centrally concerned with matters of foreign affairs," a realm in which the political branches enjoy "broad authority." Intervenor Br. at 27. Invalidating the statute, the Government argues, would frustrate legislative and executive efforts to give full effect to the ATA's civil liability provisions, which comprise part of the nation's "comprehensive legal response to international terrorism." <u>Id.</u> at 22–23 (internal quotation marks omitted). It is true, of course, that when "sensitive interests in national security and foreign affairs [are] at stake," the policy judgments of both Congress and the Executive are "entitled to significant weight." <u>Holder v. Humanitarian Law Project</u>, 561 U.S. 1, 36 (2010). But it is equally true that the Government's broad "foreign affairs power . . . , 'like every other governmental

power, must be exercised in subordination to the applicable provisions of the Constitution.'" Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 416 n.9 (2003) (quoting United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 320 (1936)). Indeed, "[o]ur deference in matters of policy cannot . . . become abdication in matters of law," and "[o]ur respect for Congress's policy judgments . . . can never extend so far as to disavow restraints on federal power that the Constitution carefully constructed." Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 538 (2012).

Thus, a statute "cannot create personal jurisdiction where the Constitution forbids it." In re Terrorist Attacks on Sept. 11, 2001, 538 F.3d 71, 80 (2d Cir. 2008) (internal quotation marks omitted), abrogated on other grounds by Samantar v. Yousuf, 560 U.S. 305 (2010); accord Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co., 284 F.3d 1114, 1121 (9th Cir. 2002); Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 95 (D.C. Cir. 2002). Because the PSJVTA purports to provide consent-based jurisdiction in a manner at odds with constitutional due process, the statute cannot stand, notwithstanding the policy concerns that motivated its enactment. See Nat'l Fed'n of Indep. Bus., 567 U.S. at 538 ("[T]here can be no question that it is the responsibility of th[e] Court to enforce the limits on federal power by striking down acts of Congress that transgress those limits.").

The appellants also urge us to depart from our prior holding that the due process analyses under the Fifth and Fourteenth Amendments parallel one another in civil cases, see Waldman I, 835 F.3d at 330, and to embrace instead the view that the Fifth Amendment imposes comparatively looser requirements for the exercise of personal jurisdiction. For its part, the Government argues that Congress, as compared to state legislatures subject to the Fourteenth Amendment, should be permitted under the Fifth Amendment to authorize "a greater scope of personal jurisdiction" where it wishes to facilitate federal adjudication of certain "legal claims." Intervenor Br. at 39–40. As the basis for this position, the Government contends that the Supreme Court "has tied the limitations of its Fourteenth Amendment personal jurisdiction jurisprudence" to interstate federalism concerns, which do not similarly constrain the exercise of Congress's legislative power. Id. at 37–38. Under the Government's theory, the Fifth Amendment subjects Congress to a more lenient due process standard, allowing it to enact the sort of "deemed consent" provision featured in the PSJVTA — "[e]ven if," due to their limited sovereignty, "state[s] could not enact similar legislation consistent with the Fourteenth Amendment." Id. at 40.

The short answer to this argument is that the panel's opinion in Waldman I

is the law of the Circuit and cannot be changed unless it is overruled by the

Supreme Court or by this Court in an en banc or "mini-en banc" decision. See

United States v. Peguero, 34 F.4th 143, 158 & n.9 (2d Cir. 2022). In any event,

federalism is not the only constraint on the exercise of personal jurisdiction. See

Douglass v. Nippon Yusen Kabushiki Kaisha, 46 F.4th 226, 235 (5th Cir. 2022) (en

banc), cert. denied sub nom. Douglass v. Kaisha, 143 S. Ct. 1021 (2023) (mem.);

Livnat, 851 F.3d at 55 ("[P]ersonal jurisdiction is not just about federalism.").

Fundamentally, the Constitution's personal jurisdiction requirements represent a

"restrict[ion] [on] judicial power" — and, as a corollary, a restriction on the

legislative ability to expand that power — "not as a matter of sovereignty, but as

a matter of individual liberty." J. McIntyre Mach., 564 U.S. at 884 (plurality

opinion) (quoting Ins. Corp. of Ireland, 456 U.S. at 702). Thus, to the extent that the

need for personal jurisdiction operates as a limit on a state's sovereign authority,

that effect "must be seen as ultimately a function of the individual liberty interest

preserved by the Due Process Clause." Ins. Corp. of Ireland, 456 U.S. at 702 n.10.

Relatedly, the Supreme Court's precedents make clear that one of the "vital

purpose[s] of personal-jurisdiction standards," whether applied in state or federal

60

court, "is to ensure fairness to the defendant." Livnat, 851 F.3d at 55 (internal quotation marks omitted and alteration adopted).

For these very reasons, several courts of appeals, including ours, have rejected the notion that federalism's irrelevance in the Fifth Amendment context justifies a "more lenient" standard for personal jurisdiction. Waldman I, 835 F.3d at 329–30; see, e.g., Livnat, 851 F.3d at 54–55; see also Douglass, 46 F.4th at 236–38 ("Because the Due Process Clauses use the same language and guarantee individual liberty in the same way, it makes sense that the standards developed in the Fourteenth Amendment context must govern under the Fifth Amendment."). No basis exists to conclude that the same argument, rooted in the absence of federalism-related restrictions on national power, would warrant relaxing due process constraints on Congress's ability to "deem[] certain actions . . . to be consent to personal jurisdiction." Intervenor Br. at 40. Whether premised on contacts or consent, subjecting a nonresident defendant to the power of a particular forum implicates compelling concerns for fairness and individual liberty, and those "strong justifications for personal-jurisdiction limits apply equally in Fifth Amendment cases." Livnat, 851 F.3d at 55.[16]

---

[16] Moreover, "[j]urisdictional rules should be 'simple,' 'easily ascertainable,' and 'predictable.'" Livnat, 851 F.3d at 56 (alterations adopted) (quoting Daimler, 571 U.S. at

61

The plaintiffs take a somewhat different approach to this Fifth Amendment issue: they ask us to invoke our "'mini en banc' process," overrule Waldman I entirely, and embrace the broader Fifth Amendment standard used for personal jurisdiction in criminal cases, so that the district court may assert "specific jurisdiction" over the defendants irrespective of whether the PSJVTA gives rise to valid consent. Pls.' Br. at 16, 49. Together with their amici, the plaintiffs raise a host of historical, structural, and practical considerations, including many of the same federalism-related arguments already rejected above, in an attempt to secure a more permissive interpretation of the Fifth Amendment's due process limits.

These arguments, however, provide no persuasive basis for disturbing a binding decision of this Court, especially where that decision accords with existing Circuit case law and the overwhelming weight of authority from the other federal courts of appeals.[17] See Douglass, 46 F.4th at 235, 239 & n.24 (collecting cases from

_____

137). The Government's proposal meets none of those criteria. While the Government assures us that not every conceivable "deemed consent" provision would pass muster under a relaxed Fifth Amendment standard, it fails to identify any workable limitation on the "greater scope" of jurisdiction that would be permitted. Intervenor Br. at 39.

[17] See, e.g., Douglass, 46 F.4th at 235 ("We . . . hold that the Fifth Amendment due process test for personal jurisdiction requires the same 'minimum contacts' with the United States as the Fourteenth Amendment requires with a state. Both Due Process Clauses use the same language and serve the same purpose, protecting individual liberty by guaranteeing limits on personal jurisdiction."); Herederos de Roberto Gomez Cabrera, LLC v. Teck Res. Ltd., 43 F.4th 1303, 1308 (11th Cir. 2022) ("[C]ourts should analyze personal jurisdiction under the Fifth Amendment using the same basic standards and

the Second, Sixth, Seventh, Eleventh, Federal, and D.C. Circuits); see also Livnat,

851 F.3d at 54–55 & 55 n.5 (similar). Moreover, Waldman I was not the first

_____

tests that apply under the Fourteenth Amendment."); Abelesz v. OTP Bank, 692 F.3d 638, 660 (7th Cir. 2012) (finding "no merit" in the contention that the Fifth Amendment "relaxes the minimum-contacts inquiry"); Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430, 449 (6th Cir. 2012) (holding that the Fifth Amendment due process test "parallels" the Fourteenth Amendment analysis); Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found., 297 F.3d 1343, 1350 (Fed. Cir. 2002) (concluding that the Fourteenth Amendment "minimum contacts" standard "articulated in International Shoe . . . and its progeny" applies in "Fifth Amendment due process cases"). In contending that several federal courts of appeals have held otherwise, see Pls.' Br. at 59–60, the plaintiffs rely on outdated authorities, chief among them a vacated decision of the United States Court of Appeals for the Fifth Circuit, see Douglass v. Nippon Yusen Kabushiki Kaisha, 996 F.3d 289 (5th Cir.) (per curiam), opinion vacated and reh'g en banc granted, 2 F.4th 525 (5th Cir. 2021) (mem.), which subsequently concluded that the Due Process Clauses of the Fifth and Fourteenth Amendments require the same personal jurisdiction analysis, see 46 F.4th 226 (5th Cir. 2022) (en banc). The plaintiffs also misstate the holdings of other cases, which nowhere suggested that the personal jurisdiction requirements of the Fifth Amendment are less stringent than those applicable under the Fourteenth Amendment. See, e.g., Pinker v. Roche Holdings Ltd., 292 F.3d 361, 370–71 & 370 n.2 (3d Cir. 2002) (invoking Fourteenth Amendment due process "minimum contacts" standards where the Fifth Amendment applied); see also Peay v. BellSouth Med. Assistance Plan, 205 F.3d 1206, 1211–12 (10th Cir. 2000) (similarly borrowing Fourteenth Amendment standards to conduct a Fifth Amendment inquiry).

  The Supreme Court has never "expressly analyzed whether the Fifth and Fourteenth Amendment standards differ," instead reserving decision on the issue. Livnat, 851 F.3d at 54; see, e.g., Bristol-Meyers, 582 U.S. at 268–69 ("[S]ince our decision concerns the due process limits on the exercise of specific jurisdiction by a State, we leave open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court."). Other courts of appeals have observed that on at least one occasion, the Supreme Court appears to have "instinctively relied on its Fourteenth Amendment personal jurisdiction jurisprudence" in the Fifth Amendment context. Douglass, 46 F.4th at 239 (citing Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 620 (1992), in turn quoting Burger King, 471 U.S. at 475); accord Livnat, 851 F.3d at 54.

decision of this Court to apply Fourteenth Amendment due process principles in a Fifth Amendment context; the analysis there followed from prior Circuit precedents that "clearly establish[ed] the congruence of [the] due process analysis under both the Fourteenth and Fifth Amendments." 835 F.3d at 330 (citing, among other authorities, Chew, 143 F.3d at 28 n.4, and In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 659, 673–74 (2d Cir. 2013)); see also Porina v. Marward Shipping Co., 521 F.3d 122, 127–29 (2d Cir. 2008). Therefore, we decline the invitation to abandon our prior ruling and upend settled law on the due process standards under the Fifth Amendment.

To the extent the plaintiffs ask us to revisit any other aspect of our decision in Waldman I, we decline that invitation as well. After explaining that the Fifth and Fourteenth Amendment due process analyses parallel one another in civil actions, Waldman I faithfully applied the Supreme Court's binding due process precedents, including its then-recent decision in Daimler, to conclude that the PLO and the PA could not be subjected to general or specific jurisdiction under the circumstances presented. In three separate cases involving similar ATA claims, the D.C. Circuit Court of Appeals agreed. See Shatsky, 955 F.3d at 1036–37; Klieman,

64

923 F.3d at 1123–26; <u>Livnat</u>, 851 F.3d at 56–57. No aspect of the present dispute

affects our decision in <u>Waldman I</u> as to what constitutional due process requires.

*    *    *

We reiterate the district court's closing observation that just "[a]s in

<u>Waldman I</u>, the killing of Ari Fuld was 'unquestionably horrific' and [the]

[p]laintiffs' efforts to seek justice on his and their own behalf are morally

compelling." <u>Fuld</u>, 578 F. Supp. 3d at 595 (quoting <u>Waldman I</u>, 835 F.3d at 344).

But "the federal courts cannot exercise jurisdiction in a civil case beyond the

limits" of the Due Process Clause, "no matter how horrendous the underlying

attacks or morally compelling the plaintiffs' claims." <u>Id.</u> at 595–96 (quoting

<u>Waldman I</u>, 835 F.3d at 344). The PSJVTA provides for personal jurisdiction over

the PLO and the PA in a manner that exceeds those constitutional limits. Because

the statute violates due process, the defendants cannot be "deemed to have

consented" to personal jurisdiction in this case. 18 U.S.C. § 2334(e)(1).

## CONCLUSION

We have considered all of the arguments of the parties and their <u>amici</u>. To

the extent not specifically addressed above, those arguments are either moot or

without merit. For the foregoing reasons, we conclude that the PSJVTA's provision

65

regarding "deemed" consent to personal jurisdiction is inconsistent with constitutional due process. Accordingly, the plaintiffs' complaint against the PLO and the PA was properly dismissed for lack of personal jurisdiction, pursuant to Rule 12(b)(2). The judgment of the district court is **AFFIRMED.**