22-76, 22-496; 15-3135, 15-3531, 22-1060
*Fuld v. PLO*; *Waldman v. PLO*

MENASHI, *Circuit Judge*, joined by LIVINGSTON, *Chief Judge*, and PARK, *Circuit Judge*, and joined as to Part I by SULLIVAN, *Circuit Judge*, dissenting from the denial of rehearing *en banc*:

The panel in these cases invalidated a federal statute that provides that when the Palestine Liberation Organization ("PLO") and the Palestinian Authority ("PA") engage in certain conduct—specifically (1) compensating terrorists who have killed or injured Americans or (2) maintaining premises or engaging in official activities in the United States—those organizations are deemed to have consented to personal jurisdiction in the federal courts.[1] The panel determined that it would be a violation of the Due Process Clause of the Fifth Amendment to subject the PLO and the PA to personal jurisdiction despite having engaged in such conduct, so the panel dismissed the plaintiffs' lawsuit. The plaintiffs had alleged pursuant to the Anti-Terrorism Act of 1992 ("ATA") that the PLO and the PA "encouraged, incentivized, and assisted" terrorists who killed or injured the plaintiffs and their family members. *Fuld*, 82 F.4th at 80 (quoting Fuld Am. Compl. ¶ 4). In one of these cases, a trial convinced a jury that the plaintiffs were right, and the plaintiffs obtained an award of $655.5 million. *Waldman v. PLO* (*Waldman I*), 835 F.3d 317, 324 (2d Cir. 2016).

---

[1] The PLO and the PA "do not dispute that they 'made payments'" to compensate terrorists "sufficient to satisfy the PSJVTA's first statutory prong for 'deemed consent,'" *Fuld v. PLO*, 82 F.4th 74, 86 n.5 (2d Cir. 2023) (quoting *Fuld v. PLO*, 578 F. Supp. 3d 577, 583 (S.D.N.Y. 2022)), and have not argued on appeal that their offices and activities in the United States do not meet the second statutory prong. The panel did not question the plaintiffs' plausible allegations that the statutory predicates have been met.

Invalidating an act of Congress is "the gravest and most delicate duty that [a federal court] is called on to perform." *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J.). In these cases, Congress adopted and the President signed the legislation "in furtherance of their stance on a matter of foreign policy," and "[a]ction in that realm warrants respectful review by courts." *Bank Markazi v. Peterson*, 578 U.S. 212, 215 (2016). Not only that, but the legislation was enacted specifically to overcome the panel's *two* prior dismissals of the plaintiffs' lawsuit for lack of personal jurisdiction. *See Waldman I*, 835 F.3d 317; *Waldman v. PLO* (*Waldman II*), 925 F.3d 570 (2d Cir. 2019). Congress has now deliberately and unequivocally authorized the federal courts to entertain this lawsuit, but the panel dismissed it for a third time.

According to the panel, Congress may "require submission to federal courts' jurisdiction" only "in exchange for, or as a condition of, receiving some in-forum benefit or privilege." *Fuld*, 82 F.4th at 91. The PLO and the PA knew that supporting terrorists who killed or injured Americans and maintaining an office and conducting activities in the United States would subject them to the jurisdiction of the federal courts; the organizations knowingly and voluntarily engaged in that conduct anyway. But the panel nevertheless concluded that subjecting the PLO and the PA to federal court jurisdiction "cannot be reconciled with 'traditional notions of fair play and substantial justice.'" *Id.* at 101 (quoting *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)).

The panel's decision lacks a basis in the Constitution and cannot be reconciled with Supreme Court precedent on personal jurisdiction. The decision rests on three legal errors. First, the panel incorrectly held that Congress may deem a foreign entity to have

2

consented to personal jurisdiction based on its conduct only if the foreign entity receives a reciprocal benefit. *Id.* at 91. No law requires Congress to extend a benefit to those over whom it authorizes personal jurisdiction. Instead, as the Supreme Court has made clear, consent based on conduct need only be knowing and voluntary and have a nexus to the forum. In *Mallory v. Norfolk Southern Railway Co.*, the Supreme Court held that Pennsylvania may deem, via statute, an out-of-state corporation's registration to do business to be consent to personal jurisdiction in Pennsylvania. 600 U.S. 122, 127 (2023). "Having made the choice to register and do business in Pennsylvania, despite the jurisdictional consequences (and having thereby voluntarily relinquished the due process rights our general-jurisdiction precedents afford), Norfolk Southern cannot be heard to complain that its due process rights are violated by having to defend itself in Pennsylvania's courts." *Id.* at 149 (Jackson, J., concurring). The PLO and the PA similarly chose to take actions with a nexus to the United States knowing the jurisdictional consequences.

Second, even if the panel were correct that the Due Process Clause required a reciprocal benefit, the statute here involves such a benefit because the defendants are deemed to have consented based on the privilege of residing and conducting business in the United States—not to mention furthering their political goals at the expense of American lives. The panel claimed that the conduct of business by the PLO and the PA in the United States does not amount to a benefit because "federal law has long prohibited the defendants from engaging in any activities or maintaining any offices in the United States, absent specific executive or statutory waivers." *Fuld*, 82 F.4th at 92. But it is perverse to suggest that a foreign entity may *unlawfully* extract a benefit from the forum and receive constitutional protection

from personal jurisdiction while a foreign entity conducting *lawful* activities in the forum does not receive such protection.

Third, the panel held that the Due Process Clause of the Fifth Amendment imposes the same limits on the jurisdiction of the federal courts that the Due Process Clause of the Fourteenth Amendment imposes on the jurisdiction of the state courts. *Id.* at 102-05. The Supreme Court has expressly left "open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court" as the Fourteenth Amendment imposes on a state court. *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 269 (2017).[2] I would hold that the federal government is not similarly situated to the state governments in the extraterritorial reach of its courts. For that reason, the due process standards limiting the exercise of personal jurisdiction are not the same.

These cases involve a "question of exceptional importance," Fed. R. App. P. 35(a)(2), because Congress has adopted legislation making clear the policy of the federal government that the PLO and

---

[2] The Supreme Court has not reached the issue of the Fifth Amendment Due Process Clause—even though it has considered the reach of personal jurisdiction in the federal courts—because the Federal Rules of Civil Procedure generally limit personal jurisdiction in the federal courts "to the jurisdiction of a court of general jurisdiction in the state where the district is located." Fed. R. Civ. P. 4(k)(1)(A). For that reason, the case law regarding personal jurisdiction in the federal courts applies the Fourteenth Amendment standards applicable to the states. *See, e.g.*, *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) ("Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons."). It is important to note, however, that the federal rules also allow personal jurisdiction to be established "when authorized by a federal statute." Fed. R. Civ. P. 4(k)(1)(C).

4

the PA should be subject to personal jurisdiction in the federal courts. The panel, however, held that the Constitution prohibits Congress from pursuing that policy. Invaliding an act of Congress would entail a question of exceptional importance on its own.[3] But these cases also involve (1) significant questions about constitutional limits on the jurisdiction of the federal courts, (2) judicial deference to the political branches in the realm of foreign affairs, and (3) the invalidation of a jury verdict and award under the ATA. We should have reheard these cases *en banc*.

## BACKGROUND

The panel decision in these cases resulted from an extended back-and-forth between the panel and Congress. The plaintiffs brought suit under the ATA—which provides a remedy against "any person who aids and abets" a terrorist attack "by knowingly providing substantial assistance" to the perpetrator, 18 U.S.C. § 2333(d)(2)—and sought damages from the PLO and the PA for

---

[3] The invalidation of a federal statute is a primary reason for the Supreme Court to grant a petition for certiorari. *See, e.g., Allen v. Cooper*, 589 U.S. 248, 254 (2020) ("Because the Court of Appeals held a federal statute invalid, this Court granted certiorari."); *Iancu v. Brunetti*, 588 U.S. 388, 392 (2019) ("As usual when a lower court has invalidated a federal statute, we granted certiorari."); *United States v. Kebodeaux*, 570 U.S. 387, 391 (2013) ("[I]n light of the fact that a Federal Court of Appeals has held a federal statute unconstitutional, we granted the petition."); *United States v. Morrison*, 529 U.S. 598, 605 (2000) ("Because the Court of Appeals invalidated a federal statute on constitutional grounds, we granted certiorari."); *United States v. Edge Broad. Co.*, 509 U.S. 418, 425 (1993) ("Because the court below declared a federal statute unconstitutional and applied reasoning that was questionable under our cases … we granted certiorari."); *see also* Tejas N. Narechania, *Certiorari in Important Cases*, 122 Colum. L. Rev. 923, 927-28 (2022).

terrorist attacks that killed or wounded themselves or their family members. *Waldman I*, 835 F.3d at 322. The district court held that it had personal jurisdiction over the defendants, and after a trial "a jury found that the defendants, acting through their employees, perpetrated the attacks and that the defendants knowingly provided material support to organizations designated by the United States State Department as foreign terrorist organizations." *Id.* The jury awarded damages of $218.5 million, trebled pursuant to the ATA to $655.5 million. *Id.*[4]

The panel overturned the jury verdict and dismissed the case in 2016, holding that the district court lacked personal jurisdiction over the PLO and the PA. *Waldman I*, 835 F.3d at 337. The panel concluded that the test for personal jurisdiction "is the same under the Fifth Amendment and the Fourteenth Amendment in civil cases" and applied the traditional Fourteenth Amendment personal jurisdiction test to the reach of the federal courts. *Id.* at 331. The panel held that the district court lacked general personal jurisdiction because the PLO and the PA were "fairly regarded as at home" in the

---

[4] The jury made findings regarding the defendants' involvement in several different terrorist attacks. For example, with respect to Hamas's bombing of the Hebrew University in Jerusalem on July 31, 2002, the jury found that the defendants "knowingly provided material support or resources that were used in preparation for or in carrying out this attack"; that "an employee of the PA, acting within the scope of his employment and in furtherance of the activities of the PA, either carried out, or knowingly provided material support," for the attack; that both the PLO and the PA knowingly provided material support to Hamas following its designation as a foreign terrorist organization; and that both defendants "harbored or concealed a person who the [defendants] knew, or had reasonable grounds to believe, committed or was about to commit this attack." Jury Verdict Form at 5-6, *Sokolow v. PLO*, No. 04-CV-00397 (S.D.N.Y. Feb. 25, 2015), ECF No. 825.

6

Palestinian territories and not in New York, *id.* at 332 (quoting *Daimler*, 571 U.S. at 137), and that there was no specific personal jurisdiction because the terrorist attacks "were not sufficiently connected to the United States," *id.* at 337.[5]

In response to *Waldman I*, Congress enacted the Anti-Terrorism Clarification Act of 2018 ("ATCA"), which provided that a defendant will be "deemed to have consented to personal jurisdiction" if, after 120 days, it receives certain forms of American assistance or has its headquarters or office under United States jurisdiction. Pub. L. No. 115-253, § 4(a). The plaintiffs requested that the panel recall the *Waldman I* mandate given the new statute, but the panel rejected that request because the plaintiffs had "not shown that either factual predicate of Section 4 of the ATCA has been satisfied" with respect to the PLO or the PA. *Waldman II*, 925 F.3d at 574.

In response to *Waldman II*, Congress acted again. Congress enacted, and the President signed, the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"). The PSJVTA, codified in relevant part at 18 U.S.C. § 2334(e), left no ambiguity that

---

[5] The district court's decision on personal jurisdiction occurred prior to *Daimler*, 571 U.S. 117, and *Walden v. Fiore*, 571 U.S. 277 (2014), which limited general personal jurisdiction over foreign corporations under the Due Process Clause of the Fourteenth Amendment. Prior to these cases, federal courts exercised personal jurisdiction in terrorism cases such as these. *See, e.g.*, *Est. of Klieman v. Palestinian Auth.*, 82 F. Supp. 3d 237, 239 (D.D.C. 2015) ("In 2006, the Court determined that it could exercise general personal jurisdiction over the PA and PLO based on their 'continuous and systematic' contacts with the United States."); *Mwani v. bin Laden*, 417 F.3d 1, 14 (D.C. Cir. 2005). The *Waldman I* panel relied on *Daimler* to reject this earlier consensus. Neither *Daimler* nor *Walden*, however, involved the Fifth Amendment or a congressional enactment expressly authorizing personal jurisdiction.

Congress intended to subject the PLO and the PA to the jurisdiction of the federal courts based on voluntary contacts with the United States. The statute expressly defines "defendant" to include the PLO, the PA, or any successor or affiliate of these entities. 18 U.S.C. § 2334(e)(5). It also provides new factual predicates that are considered consent to personal jurisdiction in American courts for ATA suits. Any "defendant"—that is, the PLO or the PA—"shall be deemed to have consented to personal jurisdiction … if … the defendant":

> (A) [after 120 days following enactment] makes any payment, directly or indirectly—
>
>> (i) to any payee designated by any individual who, after being fairly tried or pleading guilty, has been imprisoned for committing any act of terrorism that injured or killed a national of the United States, if such payment is made by reason of such imprisonment; or
>>
>> (ii) to any family member of any individual, following such individual's death while committing an act of terrorism that injured or killed a national of the United States, if such payment is made by reason of the death of such individual; or
>
> (B) after 15 days [following enactment]—
>
>> (i) continues to maintain any office, headquarters, premises, or other facilities or establishments in the United States;
>>
>> (ii) establishes or procures any office, headquarters, premises, or other facilities or establishments in the United States; or

8

> > (iii) conducts any activity while physically present
> > in the United States on behalf of the Palestine
> > Liberation Organization or the Palestinian
> > Authority.

*Id.* § 2334(e)(1).[6]  The statute provides that engaging in either of these two conduct predicates—payments for terrorism or premises or activities in the United States—qualifies as consent to personal jurisdiction.

The plaintiffs allege that both prongs of § 2334(e)(1) are met. The PLO and the PA continued past the 120-day notice period to make payments to both the designees and family members of terrorists who committed acts of terrorism that killed or injured American nationals. Fuld Am. Compl. ¶¶ 31-67; *Fuld*, 82 F.4th at 84; *Fuld*, 578 F. Supp. 3d at 583 n.3 ("Defendants all but concede that they did in fact make such payments."). The PLO and the PA also used their offices in the United States for non-UN business and engaged in other activities when physically present. Fuld Am. Compl. ¶¶ 68-95; *Fuld*, 82 F.4th at 84. In these appeals, neither the defendants nor the panel disputed that the PLO and the PA engaged in the relevant conduct to be covered by the PSJVTA. *Fuld*, 82 F.4th at 85-86.[7]

The panel nevertheless affirmed the district court's dismissal of the plaintiffs' suit for lack of personal jurisdiction and held that both

---

[6] The statute exempts activities such as the conduct of business at the United Nations. 18 U.S.C. § 2334(e)(3).

[7] In any event, on a motion to dismiss for lack of personal jurisdiction, we must "construe the pleadings … in the light most favorable to [the plaintiffs], resolving all doubts in [their] favor." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).

prongs of § 2334(e) are unconstitutional because the statute violates the Due Process Clause of the Fifth Amendment. *Fuld*, 82 F.4th at 101.

## DISCUSSION

The panel opinion invokes the purportedly fundamental "liberty interest" of the PLO and the PA that "flow[s] from the Constitution's guarantees of due process" and "ensures that a court will exercise personal jurisdiction over a defendant only if the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* at 86 (internal quotation marks omitted). But in these cases, the defendants are sophisticated international organizations with billion-dollar budgets, Fuld Am. Compl. ¶ 44, that govern a territory recognized as a sovereign state by many other countries. [8] We have held that "foreign states are not 'persons' entitled to rights under the Due Process Clause." *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 400 (2d Cir. 2009). So if tomorrow the Department of State recognized the PA as the sovereign government of "Palestine"—as the defendants believe it is—then there would be no question at all that the PSJVTA is constitutional and that the Due Process Clause is not implicated.[9] Fundamental constitutional rights are not typically so contingent.[10]

---

[8] *See* Permanent Observer Mission of the State of Palestine to the United Nations, *Diplomatic Relations*, https://perma.cc/E5JB-SLZK.

[9] *Cf.* Barak Ravid, *State Department Reviewing Options for Possible Recognition of Palestinian State*, Axios (Jan. 31, 2024), https://perma.cc/RM2M-H9JV.

[10] The concurrence suggests that a sovereign state would "receive the protection of sovereign immunity." *Ante* at 5. But "foreign sovereign immunity is a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution. Accordingly, [the Supreme] Court consistently has deferred to the decisions of the political branches … on whether to take jurisdiction over actions against foreign

The due process right implicated here is ostensibly the interest of "the defendant against the burdens of litigating in a distant or inconvenient forum." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). But the defendants lawfully maintain an office in the United States located at 115 East 65th Street in Manhattan. Fuld Am. Compl. ¶ 92. The Chief Representative of the PLO and the PA was served with process at his home in the United States. *Waldman I*, 835 F.3d at 325; *see* Fed. R. Civ. P. 4(h)(1)(B). The litigation burden entailed travel of approximately four miles from the defendants' office in Manhattan to the courthouse downtown.

In adopting the PSJVTA, Congress declared that defendants that engage in certain conduct affecting the United States after a future date would be considered to have consented to personal jurisdiction. Each defendant here, with "clear notice that [the United States] considered its [actions] as consent to [personal] jurisdiction," engaged in that conduct. *Mallory*, 600 U.S. at 153 (Alito, J., concurring in part and concurring in the judgment). Specifically, the PLO and the PA compensated the designees and family members of terrorists who killed or injured American nationals and used their Manhattan office for extensive, non-UN-related activities in the United States. Fuld Am. Compl. ¶¶ 31-95. The panel opinion insists that it conflicts "with 'traditional notions of fair play and substantial justice'" to require the officials of organizations that engaged in this conduct—and were

---

sovereigns and their instrumentalities." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983). Because "it remains Congress' prerogative to alter a foreign state's immunity," sovereign immunity would not be an obstacle to exercising the jurisdiction Congress authorized in the PSJVTA. *Bank Markazi*, 578 U.S. at 236; *see* 18 U.S.C. § 2334(e)(5)(D) (applying the PSJVTA to any successor or affiliate of the PA that "holds itself out to be … the 'State of Palestine'").

found to have supported terrorists who killed and injured Americans—to endure the burden of travel from East 65th Street to Pearl Street to answer for violations of the ATA. *Fuld*, 82 F.4th at 101 (quoting *Int'l Shoe*, 326 U.S. at 316). I do not see how it does.

To correct the errors of the panel opinion, I would hold that (1) under the Fourteenth Amendment standards for personal jurisdiction, a legislature does not need to provide a reciprocal benefit to a foreign entity to subject that entity to personal jurisdiction based on knowing and voluntary conduct with a nexus to the forum, (2) even if there were a reciprocal benefit requirement, the PLO and the PA benefited from conducting business in the United States, and (3) the Due Process Clause of the Fifth Amendment does not impose the same limits on the jurisdiction of the federal courts that the Due Process Clause of the Fourteenth Amendment imposes on the state courts. Given any one of these conclusions, the district court may exercise personal jurisdiction over the PLO and the PA in these cases.

## I

There is no requirement that a statutory provision that deems certain conduct to signify consent to personal jurisdiction must be based on "reciprocal bargains." *Fuld*, 82 F.4th at 90.[11]  Even assuming

---

[11]  The concurrence denies that the panel opinion created a reciprocal-bargain requirement—even though it simultaneously distinguishes *Mallory* on the ground that it "involved reciprocal bargains" and explains that the PSJVTA is unconstitutional because the PLO and the PA "received no benefit," "have not received *any* benefit in the forum," and participated in "no similar exchange of benefits." *Ante* at 6, 13, 15. The purported denial is simply the observation that consent to personal jurisdiction may be achieved through other means not relevant here, such as "litigation-related activities." *Id.* at 6. No one disputes that point. But the panel opinion clearly invented a new requirement that applies when Congress or a state

that constitutional due process limits the ability of federal courts to exercise personal jurisdiction, the PSJVTA does not conflict with due process because it establishes personal jurisdiction if a defendant knowingly and voluntarily undertakes actions with a nexus to the forum. The panel erred in concluding otherwise.

## A

The Supreme Court recently decided *Mallory v. Norfolk Southern Railway Co.*, in which the Court considered "whether the Due Process Clause of the Fourteenth Amendment prohibits a State from requiring an out-of-state corporation to consent to personal jurisdiction to do business there," as Pennsylvania had done. 600 U.S. at 127. The Supreme Court said that the Pennsylvania statute was constitutional. Five justices noted that the case was controlled by earlier precedent in which the Court had said that "there was 'no doubt'" a company "could be sued in Missouri by an out-of-state plaintiff on an out-of-state contract because it had agreed to accept service of process in Missouri on any suit as a condition of doing business there." *Id.* at 133 (plurality opinion) (quoting *Pa. Fire Ins. Co. v. Gold Issue Mining & Milling Co.*, 243 U.S. 93, 95 (1917)). Those five justices agreed that consent was an independent basis for jurisdiction; because the requirements of *International Shoe* apply only to "an out-of-state corporation that *has not* consented to in-state suits," those requirements were inapplicable. *Id.* at 138 (plurality opinion); *accord id.* at 152 (Alito, J.) ("[T]he *International Shoe* line of cases … involve[s] constitutional limits on jurisdiction over *non-consenting* corporations.").

---

legislature attempts to extend personal jurisdiction through a deemed-consent statute such as the PSJVTA or the statute in *Mallory*.

"Both at the time of the founding and the Fourteenth Amendment's adoption, the Anglo-American legal tradition recognized that a tribunal's competence was generally constrained only by the 'territorial limits' of the sovereign that created it." *Id.* at 128 (plurality opinion) (quoting Joseph Story, Commentaries on the Conflict of Laws § 539, at 450-51 (1834)). Tag jurisdiction was permissible because "an *in personam* suit against an individual 'for injuries that might have happened any where' was generally considered a '*transitory*' action that followed the individual," which "meant that a suit could be maintained by anyone on any claim in any place the defendant could be found." *Id.* (quoting 3 William Blackstone, Commentaries on the Laws of England 294 (1768)). Deemed-consent statutes—such as Pennsylvania's—sought "to adapt the traditional rule about transitory actions for individuals to artificial persons created by law" by ensuring that corporate defendants would always be deemed "found" in the state. *Id.* at 129-30.[12]

The Supreme Court in *Mallory* stressed that "under our precedents a variety of 'actions of the defendant' that may seem like technicalities nonetheless can 'amount to a legal submission to the jurisdiction of a court,'" 600 U.S. at 146 (plurality opinion) (quoting

---

[12] Justice Alito, in a separate concurrence, recognized that *Pennsylvania Fire* remained good law and that there was no due process problem because "the defendant had consented to jurisdiction in the forum State." *Mallory*, 600 U.S. at 156 (Alito, J.). He wrote separately to raise the concern that a "State's assertion of jurisdiction over lawsuits with no real connection to the State" may undermine "the federal system that the Constitution created." *Id.* at 150. Justice Alito observed that "the most appropriate home for these principles is the so-called dormant Commerce Clause" rather than the Due Process Clause. *Id.* These concerns about federalism and the dormant Commerce Clause do not apply to a federal statute extending the reach of the federal courts.

*Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704-05 (1982)), and indeed "a variety of legal arrangements have been taken to represent express or implied consent to personal jurisdiction consistent with due process," *id.* at 136 n.5 (majority opinion) (internal quotation marks and alteration omitted). The defendant need not specifically intend to consent to jurisdiction but need only take a "voluntary act" that the law treats as consent. *Pa. Fire*, 243 U.S. at 96.[13] The "precedents approving other forms of consent to personal jurisdiction have [n]ever imposed some sort of 'magic words' requirement" or required a particular formula. *Mallory*, 600 U.S. at 136 n.5 (majority opinion).

The Supreme Court has thus explained that deemed-consent statutes are consistent with the Constitution and limited only by the sovereign reach of the forum state, as illustrated by the analogy to tag jurisdiction. The panel, however, artificially constrained the power of a legislature to adopt such a statute to two narrow circumstances: (1) "litigation-related conduct" or (2) "where a defendant accepts a benefit from the forum in exchange for its amenability to suit in the forum's courts." *Fuld*, 82 F.4th at 88. Limiting the power of Congress

---

[13] *See Smolik v. Phila. & Reading Coal & Iron Co.*, 222 F. 148, 151 (S.D.N.Y. 1915) (L. Hand, J.) ("When it is said that a foreign corporation will be taken to have consented to the appointment of an agent to accept service, the court does not mean that as a fact it has consented at all, because the corporation does not in fact consent; but the court, for purposes of justice, treats it as if it had. It is true that the consequences so imputed to it lie within its own control, since it need not do business within the state, but that is not equivalent to a consent; actually it might have refused to appoint, and yet its refusal would make no difference. The court, in the interests of justice, imputes results to the voluntary act of doing business within the foreign state, quite independently of any intent.").

or a state legislature to these stylized circumstances conflicts with *Mallory*.

The consent of the foreign entity must only be knowing and voluntary and involve some nexus to the forum such that requiring consent would not be "unfair." *Mallory*, 600 U.S. at 141 (plurality opinion); *id.* at 153-54 (Alito, J.). The Pennsylvania law at issue in *Mallory* did not involve an actual bargain or a "voluntary agreement," *Fuld*, 82 F.4th at 87, between the state and each company. Rather, Norfolk Southern was deemed to have consented to personal jurisdiction from the fact of it having registered under 15 Pa. Stat. § 411(a). That is because a *separate* statute treats "'qualification as a foreign corporation' to be a 'sufficient basis' for Pennsylvania courts 'to exercise general personal jurisdiction' over an out-of-state company." *Mallory*, 600 U.S. at 151 (Alito, J.) (quoting 42 Pa. Stat. § 5301(a)(2)(i) (2019)). Neither statute indicated that personal jurisdiction was being *exchanged* for the benefit of operating in Pennsylvania; the statutes did not even reference each other. [14] Instead, like the PSJVTA, the statute "simply declared that specific activities" such as registering to do business in the state sufficed to

---

[14] It is true that the *Mallory* opinions mention an "exchange." 600 U.S. at 130 (plurality opinion); *id.* at 151 (Alito, J.). But the Court did not hold that such an exchange was required, and the description of deemed-consent statutes as analogous to tag jurisdiction demonstrates that it was not. The Court referenced the notion of exchange only to respond to the argument of Norfolk Southern that enforcing Pennsylvania's statute would be "unfair." *Id.* at 141-43 (plurality opinion); *id.* at 153 (Alito, J.). The plurality said: "[I]f fairness is what Norfolk Southern seeks, pause for a moment to measure this suit against that standard." *Id.* at 141 (plurality opinion). The circumstances of this case similarly evince no unfairness to the PLO and the PA in requiring travel from the offices those entities maintain in the United States to answer for violations of the Anti-Terrorism Act.

establish personal jurisdiction. *Fuld*, 82 F.4th at 97. In this way, contrary to the suggestion of the concurrence, the statute bears a "reasonable resemblance to the deemed consent provisions of the PSJVTA." *Ante* at 8.

"Norfolk Southern is a sophisticated entity, and we may 'presume' that it 'acted with knowledge' of state law when it registered" and, consequently, "by registering, it consented to all valid conditions imposed by state law." *Mallory*, 600 U.S. at 151 (Alito, J.) (alteration omitted) (quoting *Com. Mut. Accident Co. v. Davis*, 213 U.S. 245, 254 (1909)). Norfolk Southern consented to general personal jurisdiction by taking a voluntary action in connection with the forum with knowledge that state law deemed the action to be consent. The PLO and the PA each also acted voluntarily with knowledge that its actions would subject it to the jurisdiction of the federal courts.

In neither case was there an actual "voluntary agreement on the part of a defendant to proceed in a particular forum." *Fuld*, 82 F.4th at 87. But that is not required. The district court was correct that "Defendants do not cite, and the Court has not found, any case holding that … receipt of a benefit is a necessary condition." *Fuld*, 578 F. Supp. 3d at 595 n.10. Rather, the cases emphasize the knowing and voluntary nature of the conduct. *See Pa. Fire*, 243 U.S. at 96 (describing consent via "the defendant's voluntary act"); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (explaining that enforcement of "forum-selection provisions" that are "obtained through freely negotiated agreements and are not unreasonable and unjust" does not offend due process) (internal quotation marks omitted); *Petrowski v. Hawkeye-Security Ins. Co.*, 350 U.S. 495, 496 (1956) (recognizing consent when the parties "voluntarily submit[ted] to the jurisdiction" of the court); *Ins. Corp. of Ir.*, 456 U.S. at 704 ("[T]he Court has upheld state procedures which find constructive consent to the

personal jurisdiction of the state court in the voluntary use of certain state procedures.").[15]

The PSJVTA establishes consent to personal jurisdiction based on knowing and voluntary conduct with a nexus to the United States, and the complaint in *Fuld* alleges such conduct. Knowing that it would be deemed consent to the jurisdiction of the federal courts, the PLO and the PA continued making covered payments after the 120-day period specified in the PSJVTA. There is a nexus to the forum because the payments compensated terrorists for attacks that killed or injured American nationals. Fuld Am. Compl. ¶ 44.[16] It is not "unfair" for Congress to require a foreign entity to consent to the jurisdiction of the federal courts when the entity compensated terrorists who killed Americans with the knowledge that such compensation would be considered consent to jurisdiction. *Mallory*, 600 U.S. at 141 (plurality opinion).

The second prong of the PSJVTA is even more clearly permissible because it parallels the statute upheld in *Mallory.*

---

[15] *See also Adam v. Saenger*, 303 U.S. 59, 67-68 (1938) ("The plaintiff having, by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes for which justice to the defendant requires his presence."); *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 451 (1932) (noting that by bringing suit, the plaintiff "submitted itself to the jurisdiction of the court with respect to … the counterclaim of the defendants").

[16] The PLO and the PA are aware that the United States opposes these payments. Prior to 2018, the United States gave the PLO and the PA hundreds of millions of dollars, but starting in 2018, pursuant to the Taylor Force Act, the United States ended such assistance unless the PLO and the PA terminated the payments. The PLO and the PA continued the payments despite the loss of funding. Fuld Am. Compl. ¶¶ 46-54.

18

Congress may require consent to jurisdiction as a condition of maintaining offices and conducting activities in the United States. The PLO and the PA, as "sophisticated entit[ies]," understood that such conduct would be treated as consent to jurisdiction. *Id.* at 151 (Alito, J.). The Constitution does not excuse such sophisticated entities from the consequences of their informed choices.

### B

To avoid this conclusion, the panel analogized personal jurisdiction to other constitutional rights, such as the Sixth Amendment right to a jury trial and the states' sovereign immunity from suit. *Fuld*, 82 F.4th at 98-100. The concurrence relies on the same comparisons. *See ante* at 11-12. But the analogies do not work. Imagine the statute the Supreme Court upheld in *Mallory* applied to the Sixth Amendment right to a jury trial. The statute would read: "[A]ny foreign corporation that registers to do business in Pennsylvania automatically consents to waive its Sixth Amendment right to trial by jury." Or apply it to state sovereign immunity: "[A]ny state whose agent operates in Pennsylvania automatically waives its state sovereign immunity." These statutes would not be upheld as easily as the *Mallory* statute.[17]

A "tribunal's competence" to exercise personal jurisdiction has been "generally constrained only by the 'territorial limits' of the sovereign that created it." *Mallory*, 600 U.S. at 128 (plurality opinion) (quoting Story, *supra*, § 539, at 450-51). Personal jurisdiction therefore depends on the powers assigned to the state and federal

---

[17] Nor would a state be able to deprive a defendant of the right to trial by jury if the defendant takes "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

19

governments. Neither an enumerated right nor sovereign immunity works the same way. This becomes obvious when we consider tag jurisdiction. There is no question that if an individual official of the PLO and the PA visited the United States, he could be served personally with process and thereby subjected to the jurisdiction of American courts. A deemed-consent statute such as the PSJVTA is simply the adaptation of tag jurisdiction to artificial persons and works the same way.[18] By contrast, no statute could deem mere presence in the United States to be a waiver of the right to trial by jury.

## II

Even if the panel were correct that the Constitution requires a deemed-consent statute to be based on a benefit to a defendant in exchange for jurisdiction, there still would be jurisdiction over the PLO and the PA in these cases.

## A

The complaint alleges that the PLO and the PA maintained premises and engaged in official activities in the United States

---

[18] The concurrence finds it "difficult to see" the relevance of tag jurisdiction to a deemed-consent statute. *Ante* at 13. That is because the concurrence fails to appreciate the explanation in *Mallory* that deemed-consent statutes "adapt the traditional rule about transitory actions for individuals to artificial persons created by law." *Mallory*, 600 U.S. at 129 (plurality opinion); *see also id.* at 139-40 & n.7 (explaining that "we have already turned aside arguments very much like Norfolk Southern's" in *Burnham v. Superior Ct. of Cal.*, 495 U.S. 604 (1990), in which the Court held that *International Shoe* "did nothing to displace" the "traditional tag rule" or other "traditional practice[s] like consent-based jurisdiction"); *id.* at 171 (Barrett, J., dissenting) ("The plurality claims that registration jurisdiction for a corporation is just as valid as the 'tag jurisdiction' that we approved in *Burnham*.").

knowing that such conduct in the United States would result in the exercise of personal jurisdiction. Fuld Am. Compl. ¶¶ 68-95. In other words, the defendants consented to personal jurisdiction by "maintain[ing]" an "office, headquarters, premises, or other facilities or establishments in the United States" and "conduct[ing] any activity while physically present in the United States." 18 U.S.C. § 2334(e)(1)(B). The PLO and the PA faced a choice between (1) refraining from maintaining an office and engaging in covered activity within the United States and thereby avoiding personal jurisdiction and (2) maintaining an office and engaging in covered activity and thereby consenting to personal jurisdiction. The defendants knowingly and voluntarily opted for the benefits of residing and acting in the United States.

The panel, however, reasoned that "the statute does not provide the PLO or the PA with any such benefit or permission" because "federal law has long prohibited the defendants from engaging in any activities or maintaining any offices in the United States, absent specific executive or statutory waivers." *Fuld*, 82 F.4th at 92. The fact that the PLO and the PA extracted a benefit from the United States in violation of the law—and additionally benefited from the federal government's nonenforcement of the law—does not alter the fact that those organizations received the benefit from the forum that the statute envisions. *See Pa. Fire*, 243 U.S. at 96 (noting that a corporation "would be presumed to have assented" to jurisdiction based on "a mere fiction, justified by holding the corporation estopped to set up its own wrong as a defense").

The panel insisted that "[t]urning a blind eye to prohibited conduct that remains subject to sanction or curtailment is not the same as authorizing such conduct," suggesting that a party can obtain a benefit from a forum only if the forum state affirmatively blesses its

21

conduct. *Fuld*, 82 F.4th at 93 n.10. This argument is strange. It means that the Constitution protects a foreign entity from the jurisdiction of the federal courts if the entity conducts *illegal* activities in the United States but does not extend such protection to foreign entities that act *legally* in the United States. Yet a foreign actor that conducts *unauthorized* business in the United States has obtained an even greater benefit from the forum than the foreign actor that complies with American law. The unauthorized actor has extracted a benefit at the expense of the policy underlying the forum state's laws while the authorized actor has not benefited from such harm to the forum. *Cf. Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 926 (2011) (noting that personal jurisdiction over "a nonresident defendant" may be based on it causing "harm *inside* the forum").

In any event, the conduct of business by the PLO and the PA in the United States was not unauthorized because the federal government followed a nonenforcement policy with respect to its activities, "permit[ing] certain activities as 'a matter of grace.'" *Fuld*, 82 F.4th at 93 n.10 (quoting Plaintiffs' Reply Br. 25). There is no reason for the federal courts to be policing the distinction between a benefit conferred by the executive branch's enforcement discretion and a benefit conferred by the legislative branch's enactment of legislation. The federal government deals with foreign entities through a variety of means, and no law privileges legislatively conferred benefits over those conferred by the executive branch, especially in the field of foreign relations.[19]

---

[19] *Cf. United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (noting that the "exclusive power of the President as the sole organ of the federal government in the field of international relations" is "a power which does not require as a basis for its exercise an act of Congress").

Additionally, the PSJVTA bases personal jurisdiction on "conduct[ing] any activity while physically present in the United States on behalf of … the Palestinian Authority." 18 U.S.C. § 2334(e)(1)(B). At least with respect to the PA, most such activities do not appear to be prohibited. While it is "unlawful to establish or maintain an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by, the Palestinian Authority" absent certain certifications,[20] the plaintiffs allege other activities in the United States on behalf of the PA besides maintaining a facility.[21] The restrictions on activity in the United States on behalf of the PLO are broader.[22]

**B**

The concurrence admits that the panel opinion holds that "the alleged conduct of the PLO and the PA in violation of federal restrictions would be an insufficient basis … to confer jurisdiction." *Ante* at 15. The concurrence insists that this result is required because "establishing deemed-consent jurisdiction based on the alleged

---

[20] Palestinian Anti-Terrorism Act of 2006, Pub. L. No. 109-446, § 7(a), 120 Stat. 3318, 3324 (codified at 22 U.S.C. § 2378b note).

[21] *See, e.g.*, Fuld. Am. Compl. ¶ 75 ("[W]hile physically in the United States, Defendants have conducted press conferences and created and distributed informational materials."); *id*. ¶ 76 (alleging "communications made while physically in the United States"); *id*. ¶ 85 ("Defendants have updated their website and/or their United States-based social-media accounts while physically inside the United States."); *id*. ¶ 88 (alleging social media updates "done by persons and/or on computers that were physically present in the United States").

[22] *See* Anti-Terrorism Act of 1987, Pub. L. No. 100-204, tit. X, §§ 1002-05, 101 Stat. 1331, 1406-07 (codified at 22 U.S.C. §§ 5201-03).

unlawful activities undertaken by the PLO and the PA in the United States would be nothing more than 'punishment' for such conduct." *Ante* at 18. The concurrence believes it would be improper for Congress to punish the unlawful conduct of the PLO and the PA. But Congress often creates civil liability to penalize unlawful conduct. The whole premise of *specific* personal jurisdiction is that wrongful conduct in the forum gives the forum an interest in subjecting the bad actor to the jurisdiction of its courts. *See, e.g.*, *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 355 (2021). And tag jurisdiction, the analogue of deemed-consent statutes, has never been limited only to those *lawfully* present in the forum. *See Burnham*, 495 U.S. at 610-11.

In any event, the PSJVTA simply subjects each defendant to the jurisdiction of the federal courts by virtue of its conduct in the forum. That is not a penalty for unlawful conduct; it merely extends jurisdiction over parties engaged in conduct in the forum. The connection to the forum, rather than the unlawfulness of the conduct, is what establishes jurisdiction.

The concurrence purports to find its novel principle about punishment in the Supreme Court's gloss on the nineteenth-century decision *Hovey v. Elliott*, 167 U.S. 409 (1897). *See ante* at 17; *see also Fuld*, 82 F.4th at 94 (discussing *Hovey*). According to the concurrence, in *Insurance Corp. of Ireland*, the Supreme Court distinguished the case before it from *Hovey*, "in which the Court held that it 'violated due process for a court to take similar action as punishment for failure to obey an order to pay into the registry of the court a certain sum of money.'" *Ante* at 17 (internal quotation marks and alteration omitted) (quoting *Ins. Corp. of Ir.*, 456 U.S. at 706). In *Hovey*, as punishment for contempt for failure to comply with the court-ordered payment, the supreme court of the District of Columbia struck the defendant's entire answer from the record and ordered "that this cause do

24

proceed as if no answer herein had been interposed." 167 U.S. at 411. The U.S. Supreme Court rejected the notion that "courts have inherent power to deny all right to defend an action, and to render decrees without any hearing whatever." *Id.* at 414. It disapproved of the D.C. court's action as inconsistent with due process because "[a]t common law no man was condemned without being afforded opportunity to be heard," *id.* at 415, and because it cannot be "doubted that due process of law signifies a right to be heard in one's defense," *id.* at 417.

In *Insurance Corp. of Ireland*, the Supreme Court cited *Hovey* for the proposition that it would violate due process "to create a presumption of fact" regarding personal jurisdiction as a punishment without affording the defendant the opportunity to be heard, unless that presumption was based on the principle that "refusal to produce evidence material to the administration of due process was but an admission of the want of merit in the asserted defense." 456 U.S. at 705-06 (quoting *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 350-51 (1909)).

The idea expressed in *Hovey* and *Insurance Corp. of Ireland*—that it would violate the Due Process Clause to deny a defendant the opportunity to be heard in its own defense—is well established. But it has nothing to do with the constitutionality of the PSJVTA. The PLO and the PA have not been denied the opportunity to dispute either the facts on which personal jurisdiction is based or the facts on which liability is based. There has been no denial of the defendants' rights to notice and an opportunity to be heard, nor did the district court assert personal jurisdiction over the defendants as a penalty for non-compliance with court orders. Neither *Hovey* nor *Insurance Corp. of Ireland* establishes a general principle that a defendant cannot be made subject to suit—about which the defendant receives notice and

an opportunity to be heard—when that defendant engages in unlawful conduct.

Based on that dubious principle, however, the panel has added two requirements on top of the Supreme Court's straightforward rule for establishing consent-based jurisdiction: First, the consent must be granted in exchange for the extension of a benefit to the foreign actor. Second, the benefit must be affirmatively authorized by a statute. These requirements are not rooted in the Constitution, and the additional complexity creates needless confusion and absurd results.

### III

For the foregoing reasons, even accepting the panel's premise that the Fifth Amendment imposes the same restrictions on the jurisdiction of the federal courts as the Fourteenth Amendment imposes on the state courts, the PSJVTA still would be constitutional. But the premise is incorrect. The Supreme Court has reserved judgment on "whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court" as the Fourteenth Amendment does on a state court. *Bristol-Myers Squibb*, 582 U.S. at 269. Recent scholarship has shown that the Fifth Amendment does not impose such limits. *See* Brief for Constitutional Law Scholars Philip C. Bobbitt, Michael C. Dorf, and H. Jefferson Powell as Amici Curiae in Support of Plaintiffs-Appellants, *Fuld v. PLO*, 82 F.4th 74 (2023) (Nos. 22-76, 22-496), ECF No. 72; *see also* Max Crema & Lawrence B. Solum, *The Original Meaning of "Due Process of Law" in the Fifth Amendment*, 108 Va. L. Rev. 447 (2022); Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 Va. L. Rev. 1703 (2020).

Our court has acknowledged that "[r]ecent scholarship suggests that we err in viewing due process as an independent

26

constraint on a court's exercise of personal jurisdiction." *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 66 n.23 (2d Cir. 2021). And other judges have argued that the Due Process Clause of the Fifth Amendment does not limit the exercise of personal jurisdiction by the federal courts. *See Lewis v. Mutond*, 62 F.4th 587, 598 (D.C. Cir. 2023) (Rao, J., concurring) ("There is little (or no) evidence that courts and commentators in the Founding Era understood the Fifth Amendment's Due Process Clause to impose a minimum contacts requirement. On the contrary, the widespread assumption was that Congress could extend federal personal jurisdiction by statute."); *Douglass v. Nippon Ysen Kabushiki Kaisha*, 46 F.4th 226, 255 (5th Cir. 2022) (*en banc*) (Elrod, J., dissenting) ("The text, history, and structural implications of the Fifth Amendment Due Process Clause suggest that its original public meaning imposed few (if any) barriers to federal court personal jurisdiction."); *id.* at 282 (Higginson, J., dissenting) ("[B]y importing Fourteenth Amendment constraints on personal jurisdiction, born out of federalism concerns, into process due to foreign corporations in global disputes, where those concerns don't exist, our court makes several mistakes."); *id.* at 284 (Oldham, J., dissenting) ("[A]s originally understood, the Fifth Amendment did not impose any limits on the personal jurisdiction of the federal courts. Instead, it was up to Congress to impose such limits by statute."); *see also Devas Multimedia Private Ltd. v. Antrix Corp. Ltd.*, 91 F.4th 1340, 1352 (9th Cir. 2024) (Bumatay, J., dissenting from the denial of rehearing *en banc*) ("Justice Story opined that foreign-based defendants were owed no more than service authorized by Congress before being haled into our federal courts.").

That view is correct, and I would adopt it.

27

**A**

From the founding to the Civil War, no one suggested that the Due Process Clause of the Fifth Amendment limited the exercise of personal jurisdiction by the federal courts. *See* Sachs, *supra*, at 1704. The Clause required only that "deprivations of life, liberty, or property must be preceded by process of law in th[e] narrow and technical legal sense" of legitimate service of process that could ensure notice and an opportunity to be heard. Crema & Solum, *supra*, at 451-52. After the Fifth Amendment was ratified, federal courts continued to follow general law principles according to which tag jurisdiction allowed anyone served with process in the forum to be subject to personal jurisdiction there. *Mallory*, 600 U.S. at 128; *Massie v. Watts*, 10 U.S. (6 Cranch) 148, 162-63 (1810). "[N]ot until the Civil War did a single court, state or federal, hold a personal-jurisdiction statute invalid on due process grounds." Sachs, *supra*, at 1712.

The history demonstrates that, outside of the limits imposed by service of process, "[a] federal court's writ may run as far as Congress, within its enumerated powers, would have it go." *Id.* at 1704. In the early republic, the limitations on the federal courts' exercise of personal jurisdiction derived from general and international law—not from the Fifth Amendment—and Congress could always override those limitations. Just as states had limited power to reach outside their "territorial limits," Story, *supra*, § 539, at 450, the general law of nations limited the power of the national government to exercise jurisdiction over persons located abroad, Sachs, *supra*, at 1708-17. However, Congress could depart from the default rules of

28

international law by a clearly worded statute, and the Supreme Court said it would honor such laws.[23]

In 1828, while riding circuit, Justice Story considered a case in which an alien sued a non-resident American citizen in federal court. *Picquet v. Swan*, 19 F. Cas. 609 (C.C.D. Mass. 1828). Story acknowledged that under "the principles of common law," "in the contemplation of the framers of the judiciary act of 1789, … *independent of some positive provision to the contrary*, no judgment could be rendered in the circuit court against any person, upon whom process could not be personally served within the district." *Id.* at 613 (emphasis added). Story recognized that because "a general jurisdiction is given [under Article III] in cases, where an alien is party," even if the alien "is not an inhabitant of the United States, and has not any property within it … still he is amenable to the jurisdiction of any circuit court." *Id.* If Congress authorized it, "a subject of England, or France, or Russia, having a controversy with one of our own citizens, may be summoned from the other end of the globe to obey our process, and submit to the judgment of our courts." *Id.* While such an extension of jurisdiction might be "repugnant to the general rights and sovereignty of other nations," "[i]f congress had prescribed

---

[23] *See, e.g.*, *The Nereide*, 13 U.S. (9 Cranch) 388, 423 (1815) ("If it be the will of the government to apply to Spain any rule respecting captures which Spain is supposed to apply to us, the government will manifest that will by passing an act for the purpose. Till such an act be passed, the Court is bound by the law of nations which is a part of the law of the land."); *see also Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations *if any other possible construction remains*.") (emphasis added); *Talbot v. Seeman*, 5 U.S. (1 Cranch) 1, 43 (1801) ("[T]he laws of the United States ought not, *if it be avoidable*, so to be construed as to infract the common principles and usages of nations.") (emphasis added).

such a rule, the court would certainly be bound to follow it, and proceed upon the law." *Id.* at 613-15.

The Supreme Court later embraced that reasoning. *See Toland v. Sprague*, 37 U.S. (12 Pet.) 300, 328 (1838). In *Toland*, an American plaintiff attached the American property of a defendant domiciled abroad. *Id.* at 302. The Supreme Court decided that the exercise of jurisdiction in such a case would be "unjust" and that Congress had not authorized such jurisdiction by statute. *Id.* at 328-29. However, the Court recognized that Story's analysis in *Picquet* had "great force." *Id.* at 328. The Court explained that "Congress might have authorized civil process from any circuit court, to have run into any state of the Union," including as to "persons in a foreign jurisdiction," but the Court would not exercise such jurisdiction "independently of positive legislation." *Id.* at 330. In this way, the early cases show both that the Fifth Amendment did not limit the exercise of personal jurisdiction and that Congress was understood to be able to extend such jurisdiction by statute.

## B

Personal jurisdiction "perform[s] two related, but distinguishable, functions." *World-Wide Volkswagen*, 444 U.S. at 291-92. First, it guards against infringements on federalism—that is, "it acts to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *Id.* at 292. Second, it protects an individual liberty interest of "the defendant against the burdens of litigating in a distant or inconvenient forum." *Id.* These interests are not implicated to the same extent by the federal government as by state governments, so there is no reason to expect the Constitution to impose the same restrictions on the federal and state courts in the

30

exercise of personal jurisdiction. Indeed, "personal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign, analysis." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (plurality opinion).

The clearest difference is that federalism does not impose the same restrictions on the federal government as it does on state governments. "[P]ersonal jurisdiction cases have discussed the federalism implications of one State's assertion of jurisdiction over the corporate residents of another," *Mallory*, 600 U.S. at 144 (plurality opinion), and the Supreme Court has said that "this federalism interest may be decisive" in the due process analysis when considering personal jurisdiction. *Bristol-Myers Squibb*, 582 U.S. at 263. That is because the Due Process Clause of the Fourteenth Amendment is "an instrument of interstate federalism." *Id*. (quoting *World-Wide Volkswagen*, 444 U.S. at 294). Because "[t]he sovereignty of each State … implie[s] a limitation on the sovereignty of all its sister States," the Constitution must ensure that states do not exceed "the limits imposed on them by their status as coequal sovereigns in a federal system." *World-Wide Volkswagen*, 444 U.S. at 292.

The Due Process Clause of the Fifth Amendment, by contrast, is *not* an instrument of interstate federalism. While states may not intrude on each other's or the federal government's prerogatives, Congress *may* decide to intrude on foreign governments' prerogatives. *See, e.g., United States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003) ("If it chooses to do so, [Congress] may legislate with respect to conduct outside the United States, in excess of the limits posed by international law.") (quoting *United States v. Pinto-Mejia*, 720 F.2d 248, 259 (2d Cir. 1983)). "[W]hether a judicial judgment is lawful depends on whether the sovereign has authority to render it," and the federal

and state governments have different authorities. *Nicastro*, 564 U.S. at 884.

The panel nonetheless concluded that the Fifth Amendment must impose the same limits as the Fourteenth Amendment because "the Constitution's personal jurisdiction requirements represent a 'restriction on judicial power' … 'not as a matter of sovereignty, but as a matter of individual liberty.'" *Fuld*, 82 F.4th at 103 (alterations omitted) (quoting *Nicastro*, 564 U.S. at 884). However, the liberty interest in avoiding inconvenient litigation is also dramatically different in the context of the federal courts. Because "due process protects the individual's right to be subject only to lawful power," *Nicastro*, 564 U.S. at 884, the Supreme Court has emphasized the liberty interest in avoiding compulsory process that exceeds "'territorial limitations' on state power," *Mallory*, 600 U.S. at 156 (Alito, J.) (quoting *Hanson*, 357 U.S. at 251). The burden on a defendant's liberty interest encompasses "the practical problems resulting from litigating in the forum, but it also encompasses the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question." *Bristol-Myers Squibb*, 582 U.S. at 263. A defendant in one state generally does not have "fair warning that a particular activity may subject [it] to the jurisdiction of a foreign sovereign," *Burger King*, 471 U.S. at 472 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring in the judgment)), because a state does not normally regulate activity beyond its borders. So "the Due Process Clause 'gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'" *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297).

The same limitations do not apply to the federal courts.[24] In contrast to state legislatures, "Congress has the authority to enforce its laws beyond the territorial boundaries of the United States." *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). In the context of taxing extraterritorial property, the Supreme Court has observed that while the "limits of jurisdiction" of states must "be ascertained in each case with appropriate regard to … the view of the relation of the states to each other in the Federal Union," there is no basis in the Due Process Clause to "construct[] an imaginary constitutional barrier around the exterior confines of the United States for the purpose of shutting that government off from the exertion of powers which inherently belong to it by virtue of its sovereignty." *Burnet v. Brooks*, 288 U.S. 378, 401, 404-05 (1933). The authority of Congress to assert legislative power extraterritorially means that the federal courts must have a corresponding power to adjudicate disputes concerning its laws. "If there are such things as political axioms, the propriety of the judicial power of a government being co-extensive with its legislative, may be

---

[24] *Cf. Dennis v. IDT Corp.*, 343 F. Supp. 3d 1363, 1367 (N.D. Ga. 2018) ("The concerns regarding a state overreaching its status as a coequal sovereign simply do[] not exist in a nationwide class action in federal court."); *Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840, 858 (N.D. Cal. 2018) (noting that "the due process analysis encompasses the question of state sovereignty," so "the due process analysis differs fundamentally when a case is pending in federal court and no such concerns are raised"); *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. MDL-09-2047, 2017 WL 5971622, at *20 (E.D. La. Nov. 30, 2017) (noting that "federalism concerns" about "limiting a state court's jurisdiction when it tried to reach out-of-state defendants" are "inapplicable to nationwide class actions in federal court").

ranked among the number." The Federalist No. 80, at 476 (Alexander Hamilton) (Clinton Rossiter ed., 1961).[25]

Contemporary international law recognizes that a state may adjudicate a foreign person's foreign conduct "having a substantial, direct, and foreseeable effect within the state." Restatement (Third) of Foreign Relations Law § 421(2)(j). A foreign entity is not similarly situated to the United States as a Wyoming resident is to Florida because the foreign entity is on notice that foreign conduct affecting the United States may subject it to American law. It does not violate "fair play and substantial justice" to apply those laws Congress intended to apply to foreign actors. *Int'l Shoe*, 326 U.S. at 316.[26]

---

[25] *See also* 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 532 (James Madison) (Jonathan Elliot ed., 2d ed. 1836) ("With respect to the laws of the Union, it is so necessary and expedient that the judicial power should correspond with the legislative, that it has not been objected to."); 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 469 (James Wilson) (Jonathan Elliot ed., 2d ed. 1836) ("I believe they ought to be coëxtensive; otherwise, laws would be framed that could not be executed. Certainly, therefore, the executive and judicial departments ought to have power commensurate to the extent of the laws; for, as I have already asked, are we to give power to make laws, and no power to carry them into effect?").

[26] The concurrence says it does not see a principled reason for the limits on federal courts to diverge from the limits on state courts. *Ante* at 19-20. But, tellingly, the concurrence does not even mention "federalism" in its analysis. The Supreme Court, however, has told us that the due process limitations on personal jurisdiction in the state courts reflect the states' "status as coequal sovereigns in a federal system," *World-Wide Volkswagen*, 444 U.S. at 292, and that "this federalism interest may be decisive" in determining the reach of the state courts, *Bristol-Myers Squibb*, 582 U.S. at 263.

## C

The Constitution entrusts "the field of foreign affairs … to the President and the Congress." *Zschernig v. Miller*, 389 U.S. 429, 432 (1968). When Congress legislates on foreign affairs matters that "implicate[] sensitive and weighty interests of national security," as in these cases, its judgments are "entitled to deference." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33-34 (2010). "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not." *Id.* at 35.

The facts of these cases illustrate the point. The federal government has broad authority to respond to terrorist attacks against Americans that foreign entities support. The states do not have the same authority to respond to such attacks abroad. Generally, state criminal law is territorially limited. *See, e.g.*, Model Penal Code § 1.03. The United States, by contrast, may criminalize extraterritorial conduct pursuant to its power to "define and punish Piracies and Felonies committed on the high seas, and Offences against the Law of Nations," as well as its power to make laws necessary and proper for regulating foreign commerce. U.S. Const. art. I, § 8, cls. 3, 10, 18. The extraterritorial application of American criminal law requires only "a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or unfair." *United States v. Epskamp*, 832 F.3d 154, 168 (2d Cir. 2016). Accordingly, Congress could criminalize the conduct described in the PSJVTA, 18 U.S.C. § 2334(e)(1)(A). Providing compensation and incentive payments to those who kill or injure Americans—especially after the United States repeatedly raised concerns about such payments—involves "a

35

sufficient nexus" to the United States. *Epskamp*, 832 F.3d at 168.[27]  The federal government can also impose sanctions on terrorist groups and their supporters,[28]  given its power—denied to the states—to regulate foreign commerce. U.S. Const. art. I, § 8, cl. 3; *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 453-54 (1979) (invalidating a state tax as applied because the tax "results in multiple taxation of the instrumentalities of foreign commerce, and because it prevents the Federal Government from 'speaking with one voice' in international trade," and was therefore "inconsistent with Congress' power to 'regulate Commerce with foreign Nations'").[29]  The United States

---

[27]  The federal government already criminalizes similar conduct. *See, e.g.*, 18 U.S.C. § 2332(c)(2) (criminalizing physical violence outside the United States "with the result that serious bodily injury is caused to a national of the United States"); 18 U.S.C. § 2339B (criminalizing the provision of material support or resources to a foreign terrorist organization, with extraterritorial application to offenses affecting foreign commerce or when the offender is brought into or found in the United States); 18 U.S.C. § 2339C(a)(1), (b)(2)(C)(iii) (criminalizing the knowing provision of funds to be used in terrorism that results in an attack on American nationals abroad).

[28]  *See, e.g.*, International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06; Hizballah International Financing Prevention Act of 2015, Pub. L. No. 114-102, 129 Stat. 2205 (2015); Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, Exec. Order 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001); Modernizing Sanctions To Combat Terrorism, Exec. Order 13886, 84 Fed. Reg. 48041 (Sept. 9, 2019).

[29]  The ATA falls within Congress's power to "regulate Commerce with foreign Nations." Congress found that international terrorism affects the "foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States." Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 2(a)(2), 130 Stat. 852, 852 (2016). Just as Congress's expansive authority in foreign affairs is rooted in its

may also authorize the use of military force against terrorist organizations that kill Americans and against states supporting such entities.[30]  States cannot do that. *See* U.S. Const. art. I, § 10, cl. 3. It does not make sense to conclude that the PLO and the PA have no constitutional right to be free from prosecution, sanctions, or war in response to supporting terrorism but have an inviolable liberty interest in avoiding a civil suit in federal court on the same basis.

The concurrence quotes a six-year-old amicus brief from the Justice Department in an earlier case for the proposition that the panel's earlier holding on personal jurisdiction might have allowed *some* Americans injured by international terrorism to seek relief in *other* hypothetical cases—even though the panel opinion forecloses such relief in *these* cases. *See ante* at 23-24. The Justice Department intervened here, however, to defend the constitutionality of the PSJVTA, which Congress adopted "[t]o ensure American victims of international terrorism are able to seek redress in U.S. courts." Intervenor-Appellant's Petition for Rehearing *En Banc* at 1, *Fuld v. PLO*, Nos. 22-76 & 22-496 (2d Cir. Nov. 22, 2023), ECF No. 245. The Justice Department seeks rehearing because "[a] panel of this [c]ourt erroneously held the PSJVTA's jurisdictional provision is inconsistent with due process." *Id.* The Justice Department argues that "the Fifth Amendment permits federal courts to assert personal jurisdiction over a foreign defendant in certain circumstances that have no

---

commerce power, the "federalism concerns" that underlie the personal jurisdiction standards developed for state courts under the Due Process Clause of the Fourteenth Amendment may "fall more naturally within the scope of the Commerce Clause." *Mallory*, 600 U.S. at 157 (Alito, J.).

[30] *See, e.g.*, Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001); Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, 116 Stat. 1498 (2002).

analogue for a state court exercising personal jurisdiction under the Fourteenth Amendment" and that "the Fourteenth Amendment's limitations should not be adopted reflexively into the Fifth Amendment." *Id.* at 14-16.[31]

The Justice Department is correct. Although due process might protect persons from being subject to extraterritorial adjudication in states whose power the Constitution generally limits territorially, the same limitations do not apply to courts established by a sovereign authority with sweeping extraterritorial power. Accordingly, the Fifth Amendment does not preclude the exercise of personal jurisdiction in these cases.

\*    \*    \*

I would rehear these cases *en banc* to establish three propositions. First, deemed-consent statutes do not require an exchange of benefits as long as consent is knowing and voluntary and the conduct has a nexus to the forum. Second, even if reciprocity were required, the PSJVTA involves such reciprocity because the PLO and the PA received benefits by operating in the United States, regardless of whether such operations were lawful. Third, the Due Process Clause of the Fifth Amendment does not limit the exercise of personal jurisdiction by the federal courts in the same way as the Fourteenth Amendment restricts the state courts. In these cases, the Fifth Amendment does not leave Congress powerless to afford relief to

---

[31] Members of Congress who adopted the PSJVTA similarly do not share the concurrence's confidence that the panel opinion does not undermine the ability of Congress to allow American victims of international terrorism to seek redress. *See, e.g.*, Brief for Richard Blumenthal, Theodore E. Deutch, Charles E. Grassley, James Lankford, Grace Meng, Jerrold Nadler, Kathleen Rice, Marco Rubio, Bradley E. Schneider, Claudia Tenny, and Lee Zeldin, *Fuld v. PLO*, 82 F.4th 74 (2d Cir. 2023) (Nos. 22-76, 22-496), ECF No. 120.

American victims of international terrorism. I dissent from the denial of rehearing *en banc*.