# 15-3135(L)

## 15-3151 (XAP); 22-1060 (CON)

# United States Court of Appeals
### FOR THE
# Second Circuit

EVA WALDMAN, REVITAL BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA, MINOR, BY HIS NEXT FRIEND AND GUARDIAN VARDA GUETTA, VARDA GUETTA, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFF OZ JOSEPH GUETTA, NORMAN GRITZ, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DAVID GRITZ, MARK I. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAMIE A. SOKOLOW, RENA M. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAIME A. SOKOLOW, JAMIE A. SOKOLOW, MINOR, BY HER

*(Caption Continued on Inside Cover)*

On Appeal from the United States District Court for the
Southern District of New York, Case No. 2004 Civ. 0397

**DEFENDANTS-APPELLEES' SUPPLEMENTAL BRIEF REGARDING
THE IMPROPER EXPERT TRIAL TESTIMONY**

NEXT FRIENDS AND GUARDIAN MARK I. SOKOLOW AND RENA M. SOKOLOW, LAUREN M. SOKOLOW, ELANA R. SOKOLOW, SHAYNA EILEEN GOULD, RONALD ALLAN GOULD, ELISE JANET GOULD, JESSICA RINE, SHMUEL WALDMAN, HENNA NOVACK WALDMAN, MORRIS WALDMAN, ALAN J. BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, YEHONATHON BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, BINYAMIN BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, DANIEL BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, YEHUDA BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, RABBI LEONARD MANDELKORN, KATHERINE BAKER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN, RICHARD BLUTSTEIN, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, LARRY CARTER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DIANE ("DINA") CARTER, SHAUN COFFEL, DIANNE COULTER MILLER, ROBERT L COULTER, JR., ROBERT L. COULTER, SR., INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JANIS RUTH COULTER, CHANA BRACHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ELIEZER SIMCHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ESTHER ZAHAVA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, KAREN GOLDBERG, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STUART SCOTT GOLDBERG/NATURAL GUARDIAN OF PLAINTIFFS CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG, TZVI YEHOSHUA GOLDBERG, SHOSHANA MALKA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, TZVI YEHOSHUA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YAAKOV MOSHE GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YITZHAK SHALOM

GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, NEVENKA GRITZ, SOLE HEIR OF NORMAN GRITZ, DECEASED,

*PLAINTIFFS - APPELLANTS,*

UNITED STATES OF AMERICA,

*INTERVENOR - APPELLANT,*

v.

PALESTINE LIBERATION ORGANIZATION, PALESTINIAN AUTHORITY, AKA PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY AND OR PALESTINIAN COUNCIL AND OR PALESTINIAN NATIONAL AUTHORITY,

*DEFENDANTS - APPELLEES,*

YASSER ARAFAT, MARWIN BIN KHATIB BARGHOUTI, AHMED TALEB MUSTAPHA BARGHOUTI, AKA AL-FARANSI, NASSER MAHMOUD AHMED AWEIS, MAJID AL-MASRI, AKA ABU MOJAHED, MAHMOUD AL-TITI, MOHAMMED ABDEL RAHMAN SALAM MASALAH, AKA ABU SATKHAH, FARAS SADAK MOHAMMED GHANEM, AKA HITAWI, MOHAMMED SAMI IBRAHIM ABDULLAH, ESATATE OF SAID RAMADAN, DECEASED, ABDEL KARIM RATAB YUNIS AWEIS, NASSER JAMAL MOUSA SHAWISH, TOUFIK TIRAWI, HUSSEIN AL-SHAYKH, SANA'A MUHAMMED SHEHADEH, KAIRA SAID ALI SADI, ESTATE OF MOHAMMED HASHAIKA, DECEASED, MUNZAR MAHMOUD KHALIL NOOR, ESTATE OF WAFA IDRIS, DECEASED, ESTATE OF MAZAN FARITACH, DECEASED, ESTATE OF MUHANAD ABU HALAWA, DECEASED, JOHN DOES, 1-99, HASSAN ABDEL RAHMAN,

*DEFENDANTS.*

Gassan A. Baloul
Mitchell R. Berger
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC  20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

*Counsel for Defendants-Appellees*

If this Court reaches the issue, reversal is necessary because of the improper expert testimony at trial. Plaintiffs' liability case relied entirely on expert testimony, so the jury *could not* have found Defendants liable absent the testimony at issue here. Plaintiffs' brief on the experts (ECF 542 at 40-61) makes little attempt to defend the substance of their opinions, and instead argues that Defendants did not preserve their objections and any error was harmless. But Defendants preserved their arguments both before and during trial regarding the expert testimony, including on the most important issue—whether Defendants knowingly provided support for the attacks. Reversal is required because that testimony necessarily determined the jury's decision on liability.

## BACKGROUND

Plaintiffs presented thirty-eight witnesses at trial. Thirty were victims,[1] three testified regarding injuries,[2] and two more discussed economic damages.[3] That left

---

[1] JA-3871-78 (Perlman); JA-6343-66 (M. Sokolow); JA-6366-84 (E. Sokolow); JA-6385-94 (L. Sokolow); JA-6394-407 (J. Sokolow); JA-6420-35 (R. Sokolow); JA-6435-69 (A. Bauer); JA-6471-90 (R. Bauer); JA-6491-95 (Y. Bauer); JA-6512-39 (L. Mandelkorn); JA-6539-48 (N. Mandelkorn); JA-6550-66 (H. Waldman); JA-6568-81 (M. Waldman); JA-6581-603 (S. Waldman); JA-6617-36 (Rine); JA-6636-48 (R. Gould); JA-6651-67 (E. Gould); JA-6668-92 (S. Gould); JA-6693-740 (K. Goldberg); JA-6740-60 (C. Goldberg); JA-6793-808 (S. Goldberg); JA-6808-22 (Y. Goldberg); JA-6824-40 (Kitay); JA-6842-74 (Coulter); JA-6881-902 (Miller); JA-6902-37 (Carter); JA-6970-93 (R. Blutstein); JA-6994-7006 (R. Blutstein); JA-7008-21 (Baker); JA-7022-52 (Gritz).

[2] JA-5723-982 (Strous); JA-5982-6003 (Peri); JA-6003-64; 6099-118 (Friedman).

[3] JA-6118-52 (Soudry); JA-6153-79 (Weinstein).

Plaintiffs' experts, Kaufman, Eviatar, and Shrenzel, as the *only* witnesses to prove that Defendants were legally responsible for the actions of the terrorists. JA-3883-86, 4139-41, 4933-34.[4] Kaufman focused on the Israeli conviction records for the attackers and made little attempt to link the attacks to Defendants (*see* Def. Br., ECF 137 at 60-61). Eviatar and Shrenzel were thus the only witnesses that could prove the essential elements of Plaintiffs' ATA claims (i) that Defendants knowingly supported the attacks; and (ii) that the attackers acted within the scope of their employment with Defendants when they committed the attacks.

Prior to trial, Defendants challenged Eviatar and Shrenzel's methodology, which was to summarize records and Israeli reports (which were all inadmissible hearsay) and then opine that Defendants were responsible for the attacks. JA-1430-46. But at a pretrial conference, the trial court definitively denied the methodology challenge. JA-3644 ("I'm not going to preclude [Eviatar] …. I don't have any problems in general."); JA-3646 ("I'm not going to exclude [Shrenzel] as a witness"). The court did agree that opinions on knowledge, state of mind, and political rhetoric should not be admissible. JA-3192, 3276-78 ("heightened rhetoric does not" show "defendants were involved in any of the particular acts").

The district court mostly enforced those rulings against Kaufman, but reversed

---

[4] Plaintiffs also admitted background deposition testimony (JA-6325, 6328, 6329, 6341) into the record to show the organization of the Palestinian Government. This evidence did not show Defendants knowingly supported the attacks.

course and allowed Shrenzel and Eviatar to opine on knowledge, state of mind, political rhetoric, and the ultimate issue of responsibility for the attacks. Defendants continued to object to both methodology and substance. *See, e.g.*, JA-4306-07 ("[A] state of mind of an entity being proved through this kind of evidence is especially problematic. It is not an appropriate province for an expert witness, as the Court knows from the cases we put before you in connection with *Daubert*."); JA-3647-49 (objecting to Shrenzel summaries and conclusions of liability).

Despite Defendants' objections, the court permitted the experts, based on their review of "case files" provided by Plaintiffs' attorneys, internet searches, and their law-enforcement "experience," to speculate "what actually happened, who was involved, and what was the links of the perpetrators to the PA." JA-4181 (Eviatar); JA-5195-96 (Shrenzel). Shrenzel guessed that PA officials planned the attacks and they must have wanted employees to commit terrorism as part of their job duties. JA-5690-92 (over objection); JA-5716 (over objection). Eviatar testified that another official "served as a central axis in operating terrorist cells that belonged to Fatah", and that terrorists viewed him "as more than an authority; they viewed him as the link between them and Yassar Arafat." JA-4583 (over Defendants' objection to line of questioning). Continuing this line of inquiry, Eviatar claimed "that many hundreds from among the Palestinian security apparatuses were involved in terrorist activities." JA-4597-98 (includes objection). Eviatar also gave an unsupported

3

opinion, over objection, that the PA's old social welfare programs were "a positive incentive that multiplies [the terrorist's] motivation" and "prod and assist" terrorists "to go ahead and carry out ... terror attacks." JA-4374.

Plaintiffs' closing argument on liability thus depended almost exclusively on their testimony that Defendants caused the attacks. For example, Plaintiffs' counsel argued, over objection (JA-8106), that the social welfare programs alone prove that the PA is "providing material support" for terrorism. JA-8104-08; JA-8124, 8134-36; JA-8110 ("Anytime that there's martyr payments, you can check yes" as to material support on the jury verdict form). Based on the expert testimony, Plaintiffs' counsel also urged the jury in closing that the PA was automatically responsible for any violence committed by *any* employee, including a "beat cop walking the street" or "a customer service rep." JA-8102-06, 8110. The court denied Defendants' request for curative instructions on these issues. *See* JA-7915-18, 8128-31; *see also* JA-10701-03, 10690-91.

## ARGUMENT

The district court committed reversible error by allowing Eviatar and Shrenzel to establish the necessary element of Plaintiffs' claim that Defendants knowingly supported the attacks or authorized their employees to commit attacks as part of their employment. That testimony was doubly improper both because it was based on speculation (largely about mental states) and because neither expert used any

4

discernable methodology. *United States v. Castillo*, 924 F.2d 1227, 1232-33 (2d Cir. 1991). The D.C. Circuit affirmed the exclusion of testimony from one of these same experts (Eviatar) based on nearly-identical infirmities. *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 972 (D.C. Cir. 2016).

The verdict was necessarily prejudiced by the experts' improper and unfounded testimony, as there were no fact witnesses on liability. No admissible documents showed Defendants were responsible, and no fact witness testified about material support.[5] A new trial is necessary where "there is a distinct possibility that, absent the errors … the jury would not have reached the verdict that it did." *Nimely v. City of New York*, 414 F.3d 381, 399-400 (2d Cir. 2005). Given that the experts comprised the entirety of Plaintiffs' liability case, there is *far more* than a "distinct possibility" that the improper testimony controlled the outcome of the trial. *Id*.

**A. The District Court Allowed Plaintiffs' Experts to Tell the Jurors that Defendants Were Liable Without Using a Specialized Methodology.**

Eviatar and Shrenzel did little more than review "case files" provided by Plaintiffs' attorneys, conduct internet searches, and then speculate "what actually happened, who was involved, and what was the links of the perpetrators to the PA." JA-4181 (Eviatar); JA-5195-96 (Shrenzel); JA-1427-58 (MIL). Before and during

---

[5] Plaintiffs argue (ECF 542 at 55-56) Defendants "opened the door," but that doctrine "does not give an opponent unbridled license to introduce otherwise inadmissible evidence." *U.S. v. Martinez*, 988 F.2d 685, 702 (7th Cir. 1993).

trial, the district court conclusively denied Defendants' objections to this purported methodology. JA-3644, 3646, 3649. But the D.C. Circuit has since affirmed the exclusion of near-identical testimony from Eviatar in a look-alike case for failing to offer supporting methodology or explain "how [his] approach differed from that of a layperson." *Gilmore*, 843 F.3d at 972-73.

Plaintiffs argue that *Gilmore's* exclusion of Eviatar was "based exclusively on documents the court had ruled were hearsay" rather than a failure of methodology. ECF 542 at 46-47. This is flat wrong. *Gilmore* explicitly held that "Eviatar has not identified any particular methodology he used to form his opinion." *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 53 F. Supp. 3d 191, 211-15 (D.D.C. 2014). It explained that Eviatar's analysis "contains no discussion of 'the variety and diversity of the sources and/or types of information and data[.]' Nor does he explain how his 'cumulative experience and knowledge' as an IDF intelligence officer, as opposed to commonsense and general deductive principles that any non-expert finder of fact would rely on, lead him to the conclusion that Abu Halawa was the likely murderer." *Id*. at 212. Eviatar, in sum, had "not 'reliably applied' his own [supposed] methodology to the facts of this case." *Id*.

Nor did *Gilmore* exclude the hearsay evidence. It recognized that experts can rely on hearsay, but held that Eviatar had failed to apply "*any specialized knowledge to the hearsay materials*" as "his analysis consists entirely of deductions and

6

observations that flow directly from the content of the hearsay statements *and would be self-evident to a layperson.*" *Id.* at 213 (emphasis added). Exactly as in this case, Eviatar's reasoning was "precisely the type of generalized inferences that a lay person, and the jury itself, could draw without any expert assistance." *Id.*

Eviatar's improper methodology likewise requires his exclusion here because he could not "provide any facts regarding the basis of this opinion much less relate it to his specific experience and expertise." *Id.* "Because Eviatar's opinion consists entirely of generalized and conclusory assertions that lack any basis in his specialized knowledge, the Court concludes that he 'is simply repeating hearsay evidence without applying any expertise whatsoever.'" *Id.* Experts can only testify about subjects "beyond the ken of the average juror" that the average juror "is not capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d 179, 191, 194 (2d Cir. 2008); *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003) ("expert testimony should be excluded if the witness is not actually applying expert methodology"). This Court should follow *Gilmore* and remand for a new trial, holding that Eviatar and Shrenzel's "methodology" was wholly improper.

**B.      The Experts Constructed Inflammatory, Speculative Narratives to Link Defendants to the Terrorists.**

Plaintiffs were required to prove the PA and PLO "knowingly provided material support" for each attack or show that a terrorist was "acting within the scope of his employment and in furtherance of the activities of the PA" in committing an

7

attack. Jury Verdict Form, 8261-68; *see* Jury Instructions, JA-8214-17, 8221, 8226-27. The district court committed reversible error by permitting Plaintiffs to prove these elements through expert testimony that speculated on mental states, summarized hearsay, and ultimate-issue opinions that "merely told the jury what result to reach." *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) (cleaned up).

Eviatar and Shrenzel created shortcuts to liability by claiming Defendants used techniques from "the Soviet Union" to "control [Palestinians'] minds and thoughts." JA-5329 (over objection). Shrenzel claimed Defendants intentionally transformed their employees into terrorists: "This is the crucial issue. There was an atmosphere, either those were employees of the PA, either they read it, either they were exposed to announcement by the commanders." JA-5690-92 (includes objection); *see also* JA-1427-58 (MIL); JA-3647-49 (overarching pretrial objection to Shrenzel's ultimate-issue testimony). This led Shrenzel to claim that PA employees believed committing attacks was part of their job description: "for him it was clear, this is what my superiors expect from me .... They want me to go out and ... shoot indiscriminately in the streets of Jerusalem." JA-5690-92 (over objection). He claimed the PA's "atmosphere" caused one bomber to "go out and detonate himself." JA-5690-92; *see also* JA-5326-27 (over objection). This testimony was "the essence of unverifiable subjectivity, amounting to the sort of *ipse dixit* connection between methodology and conclusion." *Nimely*, 414 F.3d at 399.

8

Eviatar similarly testified Defendants were responsible for the attacks because their social welfare programs were intended to (and did) motivate terrorist attacks.[6] Defendants repeatedly objected to this line of questions (JA-1435, 4355, 4283-87, 4373-74), but Eviatar, who is not an economist, testified that the payments "are not social welfare payments," and are "a positive incentive that multiplies [terrorists'] motivation [to] ... carry out ... terror attacks." JA-4281, 4374; JA-4354-55 (objection). Plaintiffs' counsel characterized it as a "professional opinion" (JA-4385), though Eviatar had no qualifications, methodology, or special expertise on the payment program. In closing argument, Plaintiffs argued, over another objection, that this testimony alone proved causation: "Anytime that there's martyr payments, you can check yes [as to material support]. You don't have to find that those payments preceded the attack." JA-8110; *see also* JA-8104-08 (objection to this line of argument), 8124, 8134-36.

Testimony regarding state of mind, such as knowledge, motivations, and intentions of Defendants and others, are questions for the jury, not an invitation for guesswork by "experts." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013); *In re Terrorist Attacks*, 2023 WL 3116763, at *6 (S.D.N.Y. Apr. 27, 2023) ("state of mind testimony is outside an expert's purview"). Recent terrorism

---

[6] Though now repealed, the original payment program was created with input from the United States to rehabilitate offenders. JA-7184-90, 7539-44, 7360.

cases confirm that "[e]xpert testimony cannot weigh in on subjective states of mind." *Id.,* 2025 WL 2476303, at \*1-2, 6-12 (Aug. 28, 2025). Recent cases also highlight the prejudice of the testimony about the supposed indoctrination of the Palestinian people. *U.S. v. Zhong*, 26 F.4th 536, 557-58 (2d Cir. 2022) (vacating conviction where expert improperly discussed China's "reeducation through labor camps").

The district court allowed the experts to offer improper summary and ultimate-issue testimony that Defendants knowingly provided material support, and that terrorism was within the scope of their employment and in furtherance of the PA's activities. Such "shortcuts" to liability create prejudice warranting a new trial. *See Mejia*, 545 F.3d at 190-94. For example, Eviatar assured the jury that PA security forces supported terrorism: "My well-founded assessment is that many hundreds from among the Palestinian security apparatuses were involved in terrorist activities." JA-4597 (over objection); *see also* JA-3647-49 (overruled pretrial objection on this issue). Defendants objected to this testimony before trial, but the court overruled their objections. JA-1430-35, 1439-46; *see also* JA-3644, 3646, 3649 (overruling objections); JA-4176-77 (court again defending its reasoning).

Eviatar testified that Defendants asked employees and citizens to kill Israelis: "all of the different sectors of the Palestinian leadership … want to convey to the public by messages, by statements, by hinting, by explicit calls, all of these fall under the category of incitement, the meaning of which is clear anti-Israeli statements from

an explicit call for armed struggle." JA-4154-55 (over objection). Shrenzel conjectured that Defendants adopted "explicit, but no less than that, the implicit messages" to kill Israelis, and that this was a "contributing factor" to the attacks. JA-5690-92 (over objection). Eviatar read the conclusions of an otherwise-inadmissible Israeli report to the jury "that determines that Arafat and the Palestinian Authority are involved in terrorism." JA-4425-26 (over objection), 4313 (objection). And Shrenzel instructed the jury that a PA official knew about an attack: "This very document cannot provide us with a conclusive final proof of his prior knowledge… But ... I think it's more likely than not that he had prior knowledge and involvement in that attack. That's my professional assessment." JA-5716 (over objections).

The district court thus allowed Eviatar and Shrenzel to become "chronicler[s] of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt." *Mejia*, 545 F.3d at 190; *Lane v. Am. Airlines, Inc.*, 2024 WL 1200074, at *19 (E.D.N.Y. Mar. 20, 2024) (excluding expert's "factual narrative" that "rehash[ed] … evidence about which he has no personal knowledge"). The testimony did not apply "specialized knowledge to the hearsay materials" and its analysis was just "deductions and observations that flow directly from the content of the hearsay statements." *Gilmore*, 53 F. Supp. 3d at 213.

**C.** **Eviatar and Shrenzel's Improper Speculation Was the Only Testimony Linking Defendants to the Attacks.**

A new trial is required because the jury *must* have relied on Eviatar and

11

Shrenzel's improper testimony, which was the *only* testimony tying Defendants to the attacks. *Nimely*, 414 F.3d at 400. By contrast, Plaintiffs' cited cases only find harmless error when the improper testimony was not critical to the case. *See* ECF 542 at 51-52 (citing *U.S. v. Moye*, 793 F. App'x 19, 22 (2d Cir. 2019) (testimony was "hardly" important); *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 151 (2d Cir. 2010) (unchallenged evidence was "convincing" and "substantial"); *Parker v. Reda*, 327 F.3d 211, 215 (2d Cir. 2003) (only a single sentence was improper)).[7]

Recent terrorism decisions confirm that expert testimony must avoid improper state-of-mind and ultimate-issue opinions. *In re Terrorist Attacks*, 2023 WL 3116763, at *20 (excluding "characterizations" of "conduct as providing 'material support' to al Qaeda or claiming that an individual or organization subjectively intended a specific outcome"), 2025 WL 2476303, at *1-2, 6-11 (Aug. 28, 2025) (excluding three terrorism experts), 2025 WL 2383768, *14, 16 (Aug. 18, 2025) (excluding "speculation on the state of mind of actors," which "usurps the jury's function to apply the law to the facts"), 2024 WL 5077293, at *14 (Dec. 11, 2024) (excluding "unreliable analytical methods" and "speculation about … states of mind, all in the service of his version of the events").

---

[7] Plaintiffs also argue that Defendants' own documents were enough establish liability. But those documents were a very small fraction of Plaintiffs' liability case and were insufficient on their own to show liability without the improper expert testimony that purported to interpret their meaning.

Fed. R. Evid. 702 was recently amended to clarify that courts must not "bypass [their] gatekeeping responsibility and pass it off to the jury by declaring 'questions of the sufficiency of an expert's basis, and the application of the expert's methodology, [to be] questions of weight and not admissibility.'" *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *2 (S.D.N.Y. Jan. 30, 2025). But that is exactly what happened here—the court below refused to act as a gatekeeper because, in its view, Defendants could just "argue he's a quack, doesn't know what he's talking about." JA-3648.

Even if an individual example does not move this Court, the cumulative weight of dozens of improper lines of questioning (without application of any expert methodology) requires a new trial. *Zhong*, 26 F.4th at 558; *Nimely*, 414 F.3d at 400.

**D.**     **This Court Should Reject Plaintiffs' New Arguments Regarding Plain Error and Waiver.**

Defendants preserved their objections, as explained above, and Plaintiffs' arguments to the contrary are red herrings. Prior to trial, Defendants challenged the admissibility of the experts' opinions, highlighting their lack of methodology, reliance on speculation, and ultimate-issue opinions. *See* JA-1427-58 (MIL); D.Ct. Dkt 555 at 11-24 (MIL reply); JA-3451-58 (further letter in support of MIL). Defendants continued to challenge their admissibility during two pre-trial conferences. *See, e.g.*, JA-3288 (describing Eviatar as someone who is going to "just summarize hearsay"); JA-3299 (Shrenzel's testimony would be "like a detective

13

looking at the evidence in this case and saying, the guy is guilty"); JA-3647-49 (objecting that Shrenzel will improperly opine: "I've looked at the documents in this case and I conclude that the defendants are liable."). The court denied Defendants' motion seeking the exclusion of these experts in their entirety based on their lack of expertise and methodology. *See* JA-3644 ("I'm not going to preclude [Eviatar] …. I don't have any problems in general …."); JA-3646 ("I'm not going to exclude [Shrenzel] as a witness"); JA-3649.

Defendants then repeatedly renewed their objections, including before each expert offered his opinions, JA-4154 (objecting when Eviatar was "starting to get into [his] opinion"), and as each expert moved into new lines of inquiry, JA-4306-07 (trial objection that Eviatar's "state of mind" testimony "is not an appropriate province for an expert witness, as the Court knows from the cases we put before you in connection with *Daubert*"). But this is beside the point, as every (non-exhaustive) example cited in the above sections has an overruled objection on the issue. The objections were contemporaneous, at the beginning of the line of inquiry, or were conclusively resolved before trial (like the challenges to methodology). Either way, Defendants preserved the issue. *Cf. U.S. v. Demott*, 906 F.3d 231, 249 (2d Cir. 2018) (counsel "not obliged to repeat the objection for every further iteration").

Plaintiffs also argued that Defendants waived their *Daubert* objections by failing to object to Eviatar and Shrenzel's *qualifications* at trial. ECF 542 at 42

14

(citing JA-4185, 5197). But expert qualification is a distinct issue from challenges to methodology, weighing of evidence, and ultimate-issue testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153, 158 (1999) (approving exclusion on methodology grounds despite accepting the experts' "qualifications"). This Court recently explained that an "expert must be qualified, his testimony must be helpful, and his conclusions must derive from reliable principles and methods." *Structured Asset Sales, LLC v. Sheeran*, 120 F.4th 1066, 1077 (2d Cir. 2024).

Plaintiffs' plain-error argument is also a strawman because Defendants objected at every stage. Indeed, Plaintiffs admitted the proper standard was "manifest error" in the original appeal. ECF 96 at 52 (opening brief). As Plaintiffs made the plain error claim for the first time in a reply years later (ECF 542 at 41-52), the issue itself has been waived. *In re Grand Jury Subpoenas Returnable Dec. 16, 2015*, 871 F.3d 141, 147 (2d Cir. 2017) (waived argument first raised on reply).

The trial court committed manifest error by allowing Eviatar and Shrenzel to prove the critical issues for Plaintiffs' claims—namely whether Defendants knowingly provided material support to the attackers, or expected their employees to commit attacks as part of their employment—through improper means. Given that this testimony essentially amounted to Plaintiffs' *entire* liability case, there is more than just a "distinct possibility" that without it, "the jury would not have reached the verdict it did," and reversal is the appropriate course. *Nimely*, 414 F.3d at 400.

15

Dated: October 17, 2025

Respectfully submitted,

SQUIRE PATTON BOGGS (US) LLP

*/s/Gassan A. Baloul*

Gassan A. Baloul
Mitchell R. Berger
2550 M Street, NW
Washington, DC  20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

*Counsel for Defendants-Appellees*

16

**CERTIFICATE OF COMPLIANCE**

The undersigned certifies that the foregoing supplemental brief complies with this Court's Order dated October 6, 2025, because it is no more than fifteen double-spaced pages, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in Times New Roman, 14-point font.

*/s/Gassan A. Baloul*
*Counsel for Defendants-Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2025, the foregoing document was filed with the Clerk of the Court and served via CM/ECF upon all counsel of record.

Dated: October 17, 2025

*/s/Gassan A. Baloul*
*Counsel for Defendants-Appellees*